KIRBY NOONAN LANCE &
    HOGE LLP
David J. Noonan (Bar No. 55966)
Ethan T. Boyer (Bar No. 173959)
350 10th Avenue, Suite 1300
San Diego, California 92101
Tel: (619) 231-8666
Fax: (619) 231-9593
dnoonan@knlh.com
eboyer@knlh.com

*Liaison Counsel for the Class*

[additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOU BAKER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SEAWORLD ENTERTAINMENT, INC., JAMES ATCHISON, JAMES M. HEANEY, MARC SWANSON, DAVID F. D'ALESSANDRO, BRUCE MCEVOY, PETER WALLACE, JOSEPH BARATTA, JUDITH A. MCHALE, DEBORAH THOMAS, THE BLACKSTONE GROUP L.P., BARCLAYS CAPITAL INC., BLACKSTONE CAPITAL MARKETS L.P., CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., DREXEL HAMILTON, LLC, GOLDMAN, SACHS & CO., J.P. MORGAN SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., LAZARD CAPITAL MARKETS LLC, MACQUARIE CAPITAL (USA) INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., NOMURA SECURITIES INTERNATIONAL INC., PIPER JAFFRAY & CO., SAMUEL A. RAMIREZ & COMPANY, INC., TELSEY | No. 3:14-cv-02129-MMA-KSC<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ADVISORY GROUP LLC, AND
WELLS FARGO SECURITIES, LLC,

Defendants.

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................2

II.   JURISDICTION AND VENUE .........................................9

III.  THE PARTIES ..................................................................9

    A.   Lead Plaintiffs ........................................................9

    B.   Additional Plaintiffs ............................................10

    C.   The Corporate Defendant ....................................10

    D.   The Individual Defendants ...................................11

        i.    Officer Defendants ....................................11

        ii.   Director Defendants ..................................13

    E.   The Blackstone Group L.P. ..................................15

    F.   The Underwriter Defendants ................................16

    G.   Relevant Non-Parties ...........................................17

IV.   OVERVIEW .....................................................................21

    A.   SeaWorld's April 2013 IPO And Two Secondary Public Offerings During The Class Period ........................................................21

    B.   SeaWorld's Operations ........................................24

        i.    The Amusement And Theme Park Industry ..............................................25

        ii.   Attendance Drives SeaWorld's Revenues ...................................................27

    C.   *Blackfish* Premieres At The Sundance Film Festival And Seizes Public Attention ...................................................30

    D.   Defendants Mislead Investors Concerning The Impact Of *Blackfish* On The Company's Operations And Attendance ...................................33

        i.    Defendants Repeatedly Deny That The Stark Attendance Decline At SeaWorld's Parks Was Caused, To Any Degree, By *Blackfish* ...................................................33

        ii.   The Reasons SeaWorld Provided For The Entire Decline In Attendance In Each Quarter Throughout The Class Period Are Not Plausible ................................................41

    E.   Unlike Its Competitors, SeaWorld Was Plagued By *Blackfish*, Which Generated Extraordinary Negative Public Response and Media Attention Throughout The Class Period ................................................47

        i.    Social Media Platforms Like Twitter Successfully Moved The Public To Watch *Blackfish* And Boycott SeaWorld ...................48

i

ii. External Polls And News Stories Showed That *Blackfish* Had Negatively Impacted The Public's Willingness To Attend SeaWorld Parks ........................................................... 51

iii. The "*Blackfish* Effect" Swallowed SeaWorld's Annual Music Festival ........................................................................ 52

iv. In The Wake Of *Blackfish*, Long-Standing SeaWorld Sponsors And Strategic Partners Jumped Ship ................................. 55

v. Proposed California Legislation Inspired By *Blackfish* Threatened SeaWorld's Ability To Hold Captive Orcas In California ........................................................................ 58

F. The Truth Concerning *Blackfish*'s Impact On SeaWorld Emerges ........ 59

G. The Aftermath Of The Fraud ............................................................ 64

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT – EXCHANGE ACT CLAIMS .............................................................. 67

A. April 18, 2013 – IPO Offering Materials ........................................ 67

B. May 23, 2013 – 1Q13 Form 10-Q ................................................... 70

C. August 13, 2013 – 2Q13 Form 10-Q, Press Release And Earnings Call ................................................................................ 70

D. August 29, 2013 – SeaWorld's Statements To The Media ........... 74

E. November 13, 2013 – 3Q13 Form 10-Q, Press Release And Earnings Call ................................................................................ 76

F. November 14, 2013 – Atchison's Statements To The Media ........ 78

G. December 9, 2014 and December 12, 2014 – December SPO Offering Materials ......................................................................... 80

H. December 20, 2013 – Atchison's Statements To The *Orlando Sentinel* ........................................................................................ 80

I. March 13, 2014 – 4Q13 And FY 2013 Press Release And Earnings Call ................................................................................ 82

J. March and April 2014 – 2013 Form 10-K And April SPO Offering Materials ......................................................................... 86

K. May 14, 2014 – 1Q14 Form-10Q, Press Release And Earnings Call ................................................................................ 87

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT – SECURITIES ACT CLAIMS ............................................................................................. 89

A. Defendants Issued Materially False And Misleading Statements In The IPO Offering Materials ........................................................ 89

B. Defendants Issued Materially False And Misleading Statements

ii

In The December And April SPO Offering Materials.............................91

VII.    ADDITIONAL SCIENTER ALLEGATIONS – EXCHANGE
ACT CLAIMS.......................................................................................93

    A.    Defendants' Actual Knowledge Of And/Or Reckless Disregard For
Material Facts Contrary To Their Public Statements ...........................93

    B.    Motive And Opportunity – Insider Selling By CEO Atchison...............99

VIII.   LOSS CAUSATION – EXCHANGE ACT CLAIMS...................................101

IX.     PLAINTIFFS AND THE CLASS ARE ENTITLED TO A
PRESUMPTION OF RELIANCE – EXCHANGE ACT CLAIMS...............104

X.      THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
DOCTRINE ARE INAPPLICABLE .......................................................106

XI.     CLASS ACTION ALLEGATIONS .......................................................107

XII.    CAUSES OF ACTION .......................................................................109

    A.    Claims Brought Pursuant To The Securities Act.................................109

COUNT I For Violations Of Section 11 Of The Securities Act
(Against SeaWorld, The Individual Defendants And The Underwriter
Defendants) ......................................................................................109

COUNT II For Violations Of Section 12(a)(2) Of The Securities Act
(Against SeaWorld, The Underwriter Defendants And Blackstone).............111

COUNT III  For Violations Of Section 15 Of The Securities Act
(Against The Individual Defendants And Blackstone)..................................113

    B.    Claims Brought Pursuant To The Exchange Act.................................115

COUNT IV  For Violations Of Section 10(b) Of The Exchange Act And
Rule 10b(5) Promulgated Thereunder
(Against SeaWorld, Atchison, Heaney and Swanson)..................................115

COUNT V  For Violations Of Section 20(a) Of The Exchange Act
(Against Atchison, Heaney Swanson and Blackstone)..................................119

XIII.   PRAYER FOR RELIEF.......................................................................121

XIV.    JURY TRIAL DEMANDED ................................................................121

iii

1.     Court-Appointed Lead Plaintiffs, Arkansas Public Employees Retirement System ("APERS") and Pensionskassen For Børne-Og Ungdomspaedagoger ("PBU") (collectively, "Lead Plaintiffs") and additional plaintiffs Oklahoma City Employee Retirement System ("Oklahoma") and Pembroke Pines Firefighters and Police Officers Pension Fund ("Pembroke") (the "Additional Plaintiffs," and together with Lead Plaintiffs, "Plaintiffs") bring this action individually and on behalf of all persons and entities who: (i) purchased or otherwise acquired the publicly traded common stock of SeaWorld Entertainment, Inc. ("SeaWorld" or the "Company") between April 18, 2013 and August 12, 2014, inclusive (the "Class Period"); or (ii) purchased or otherwise acquired SeaWorld common stock pursuant or traceable to the materially false and misleading Registration Statements and Prospectuses issued in connection with the Initial Public Offering of SeaWorld Common Stock that occurred on or about April 18, 2013 ("IPO") or the Secondary Public Offerings that occurred on or about December 12, 2013 and April 4, 2014 (the "December SPO" and "April SPO," respectively), and who were damaged thereby (collectively, the "Class"). Excluded from the Class are: (i) Defendants (defined below); (ii) present or former executive officers of SeaWorld, members of SeaWorld's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of SeaWorld.

2.     Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon a continuing investigation, conducted

by Plaintiffs' counsel under Plaintiffs' supervision, into the facts and circumstances alleged herein including, without limitation, review and analysis of: (i) SeaWorld's filings with the United States Securities and Exchange Commission ("SEC"); (ii) securities and financial analysts' reports concerning SeaWorld; (iii) SeaWorld's press conferences, investor and analyst conference calls, and corresponding transcripts thereof; (iv) SeaWorld's press releases and other public statements; (v) media and industry reports and other publications concerning SeaWorld and/or the other Defendants; (vi) interviews of confidential witnesses, including but not limited to, former SeaWorld employees; and (vii) SeaWorld's corporate website. Plaintiffs believe that additional evidentiary support for the allegations herein will likely emerge after a reasonable opportunity to conduct discovery.

## I.  INTRODUCTION[1]

3.     This action involves a series of false and misleading statements and omissions by Defendants regarding the critically acclaimed 2013 documentary *Blackfish* – a film that would have a profound impact on SeaWorld's attendance throughout the Class Period, as it damaged the public's perception of SeaWorld and degraded the Company's core brand and business.

4.     SeaWorld is an aquatic theme park and entertainment company best known for shows featuring orca whales (starting with the famous Shamu), which SeaWorld captures, breeds and trains to perform. Like most theme parks, SeaWorld derives the majority of its revenues from ticket sales. Thus, SeaWorld's financial health is directly tied to its ability to attract, grow and maintain attendance at its parks.

---

[1] All emphasis herein is added unless otherwise noted.

2

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

1      5.     Shortly before the start of the Class Period and the Company's IPO,
2  *Blackfish* was released.  In *Blackfish*, director Gabriela Cowperthwaite makes the
3  case that SeaWorld – a company that purports to create "distinctive entertainment
4  experiences that blend imagination with a passion for nature" – actually harms both
5  its captive orca whales and their trainers by unnaturally confining the orcas in small
6  spaces and forcing them to perform tricks for audiences.  *Blackfish* portrays
7  SeaWorld's business as turning sensitive and social creatures into aggressively
8  dangerous animals for the purposes of public entertainment and financial gain to
9  SeaWorld.  After its release, the film garnered the attention of the country, including
10  celebrities, animal rights activists and California lawmakers, who proposed
11  legislation banning orca performances in the state.

12      6.     SeaWorld experienced significant, unprecedented attendance declines
13  for four consecutive quarters during the Class Period following the release of
14  *Blackfish*.  SeaWorld would blame the entirety of these declines on everything <u>but</u>
15  *Blackfish* – namely, adverse weather conditions, holiday and school schedules, and
16  SeaWorld's pricing strategies.  This was not plausible.  Yet, when directly questioned
17  whether *Blackfish* was contributing to the steep attendance declines, Defendants
18  repeatedly assured the market the film had not contributed "at all" and went so far as
19  to suggest the film was having a positive impact on the Company.

20      7.     When SeaWorld finally came clean at the end of the Class Period and
21  revealed that attendance at its parks had been negatively affected by the public
22  response to *Blackfish*, the Company's stock price plummeted almost 33%.
23  SeaWorld's admission that declining attendance resulted, at least in part, from
24  *Blackfish* rather than the short-lived effects of weather and/or school and holiday
25  calendars was disastrous for SeaWorld's investors, since a negative shift in the public

perception of SeaWorld's brand that caused consumers to shun the park would starve the Company of the attendance-driven revenues on which it depended.

8.      By the first day of the Class Period, April 18, 2013, *Blackfish* had premiered at the world-renowned Sundance Film Festival and had been acquired by CNN Films and Magnolia Pictures – which immediately announced plans to screen the film broadly beginning in the summer of 2013.  The documentary had already generated a powerful public and media response, was persistently trending on social media such as Twitter, and was the focus of aggressive public relations campaigns led by the People for the Ethical Treatment of Animals ("PETA").  Not only was SeaWorld acutely aware of these facts, it was actively working to counteract the so-called "*Blackfish* effect" through an extensive public relations campaign.  Notwithstanding these highly material facts, SeaWorld failed to mention the film by name in any of its IPO Offering Materials (defined below at ¶29).  Instead, SeaWorld offered only a generalized reference to the fact that accidents or adverse publicity "may" potentially harm SeaWorld's reputation, attendance and business at some point in the future.

9.      SeaWorld repeated these generalized references in the Company's quarterly, annual and offering-related SEC filings throughout the Class Period, and continued to fail to acknowledge that *Blackfish* was having a present impact on attendance.  For example, in its first quarter results announced on May 23, 2013 ("1Q13"), SeaWorld parroted its earlier statement that adverse publicity "may" potentially harm SeaWorld in the future.

10.     By the time SeaWorld announced its second quarter results on August 13, 2013 ("2Q13") – which disclosed that SeaWorld had suffered a *9.5% decline* in attendance – *Blackfish* had been released in theaters across the United States, and also

had been released in various formats internationally.   Moreover, SeaWorld had dramatically intensified its public relations campaign against *Blackfish*, which included distributing a detailed critique of the film, calling it a "dishonest movie." Despite these highly material facts, SeaWorld omitted any mention of *Blackfish* its 2Q13 earnings announcement.   Instead, Defendants attributed the entire 9.5% attendance drop to three distinct factors, with each supposedly accounting for an equal one-third of the decline:   (i) new pricing strategies, (ii) adverse weather conditions, and (iii) the "unfavorable timing of Easter," which "caused an overlap with the spring break holiday period for schools."

11.   SeaWorld's attendance continued to decline.   By the time SeaWorld announced its third quarter ("3Q13") results on November 13, 2013 – which disclosed that attendance had dropped another 3.6% for the third quarter – *Blackfish* had been broadcast on CNN to millions of people during a highly publicized screening.   The public outcry regarding the film had reached a fever pitch, yet SeaWorld incredibly continued to blame its declining attendance on adverse weather conditions in July and pricing strategies implemented the prior quarter.

12.   Doubling down, on November 14 and December 20, 2013, SeaWorld's Chief Executive Officer James Atchison ("Atchison") repeatedly told the public that *Blackfish* was having no impact at all on the Company.   Yet, at the same time Atchison was publicly denouncing any notion that *Blackfish* was contributing to shrinking attendance, SeaWorld published an open letter rebutting the claims made in the film.   Commenting on this move, CNN noted, "you have to wonder…why they would go to such an expense" if *Blackfish* truly was not having any impact whatsoever on attendance.

13.     The furor surrounding *Blackfish* continued across 2013 and into 2014, as celebrity musicians noisily pulled out of concerts at SeaWorld parks, and corporate sponsors started to cut ties.

14.     On March 7, 2014, it was announced that legislation had been introduced that would ban orca performances in the state of California.  The proposed legislation, if passed, would have a devastating effect on SeaWorld's operations, and received intense media coverage. The proposed legislation was so closely associated with *Blackfish* that it became known as the "*Blackfish* Bill."  Just days after this announcement, on March 13, 2014, SeaWorld announced its fourth quarter ("4Q13") and full year ("FY13") financial results, which disclosed a decline in attendance for the *third consecutive quarter*.   Moreover, the Company reported that full year attendance in 2013 had declined by 4.1%, or approximately one million guests. Again, SeaWorld blamed the declines on everything but *Blackfish* – namely, pricing and yield management strategies for the fourth quarter declines, and adverse weather conditions and holiday schedules for the full year decline.

15.     Significantly, in stark contrast to SeaWorld, each of SeaWorld's main competitors in the same geographic regions, The Walt Disney Company ("Disney") and Universal Parks and Resorts ("Universal"), attained either comparable or increased attendance figures (over the prior year) in 2013:

| Park | Location | 2012 Attendance | 2013 Attendance | Change (%) |
|---|---|---|---|---|
| Magic Kingdom [Disney] | Lake Buena Vista, FL | 17,536,000 | 18,588,000 | 6.0% |
| Disneyland [Disney] | Anaheim, CA | 15,963,000 | 16,202,000 | 1.5% |
| Epcot [Disney] | Lake Buena Vista, FL | 11,063,000 | 11,229,000 | 1.5% |
| Animal Kingdom [Disney] | Lake Buena Vista, FL | 9,998,000 | 10,198,000 | 2.0% |
| Hollywood Studios [Disney] | Lake Buena Vista, FL | 9,912,000 | 10,110,000 | 2.0% |

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

| Park | Location | 2012 Attendance | 2013 Attendance | Change (%) |
|---|---|---|---|---|
| Cal. Adventure [Disney] | Anaheim, CA | 7,775,000 | 8,514,000 | 9.5% |
| Islands of Adventure [Universal] | Orlando, FL | 7,981,000 | 8,141,000 | 2.0% |
| Universal Studios Florida [Universal] | Orlando, FL | 6,195,000 | 7,062,000 | 14.0% |
| Universal Studios Hollywood [Universal] | Universal City, CA | 5,912,000 | 6,148,000 | 4.0% |
| *SeaWorld Orlando [SeaWorld]* | *Orlando, FL* | *5,358,000* | *5,090,000* | *-5.0%* |
| *SeaWorld San Diego [SeaWorld]* | *San Diego, CA* | *4,444,000* | *4,311,000* | *-3.0%* |
| *Busch Gardens Tampa [SeaWorld]* | *Tampa, FL* | *4,348,000* | *4,087,000* | *-6.0%* |

16.     As alleged below, SeaWorld's allocation of its entire attendance declines to factors other than *Blackfish* is simply not believable.

17.     During the 4Q13 earnings call, analysts specifically pressed Defendants to discuss *Blackfish*, asking Atchison to "comment on whether there's any impact that you've noticed at all on satisfaction or attendance."  In response, Atchison noted: "I get asked that a lot" and proceeded to deny multiple times that SeaWorld had seen any such impact, stating:  "***As much as we're asked it, we can see no noticeable impact on our business***."  Moreover, Atchison surprisingly claimed that *Blackfish* was positively impacting SeaWorld by increasing awareness of SeaWorld's brand.

18.     The *Blackfish* effect continued to resound in the public, and SeaWorld's attendance slide continued along with it.  On May 14, 2014, for the *fourth consecutive quarter*, SeaWorld disclosed the largest attendance decline yet – a staggering 13%.  Still refusing to acknowledge the truth, SeaWorld blamed the timing

7

of Easter and Spring Break and adverse weather in Florida and Texas – and excluded *Blackfish*-related issues – as the causes of the decline.

19.   Finally, before the start of trading on August 13, 2014, after sixteen months of denials, excuses and omissions, SeaWorld finally admitted that *Blackfish*-related issues were hurting attendance at its parks.  Although SeaWorld still refused to call *Blackfish* by name, the Company acknowledged, "attendance in the quarter was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California" (i.e., the "*Blackfish* Bill").  In direct response to this disclosure, SeaWorld shares lost almost 33% of their value, falling from $28.15 per share at closing on August 12, 2014 to $18.90 per share on August 13, 2014, on extremely heavy volume.  The market's reaction to this news signaled that until this announcement, investors had taken the Company at its word that issues surrounding *Blackfish* were not causing damage to SeaWorld's brand and reputation – a much different and more significant threat to the Company's ability to generate future earnings than the fleeting effects of weather or the school and holiday calendars that Defendants had blamed for SeaWorld's attendance slide.

20.   Based on the facts alleged herein, Plaintiffs assert claims under: (i) Section 10(b) of the Exchange Act (defined below) against SeaWorld, Atchison, James M. Heaney ("Heaney") and Marc G. Swanson ("Swanson"); (ii) Section 20(a) of the Exchange Act against Atchison, Heaney, Swanson and Blackstone Group L.P. ("Blackstone"); (iii) Section 11 of the Securities Act (defined below) against SeaWorld, the Individual Defendants and the Underwriter Defendants (defined below); (iv) Section 12(a)(2) of the Securities Act against SeaWorld, the Underwriter Defendants and Blackstone; and (v) Section 15 of the Securities Act against the Individual Defendants and Blackstone.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

## II.   JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) ("Rule 10b-5"), and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (15 U.S.C. §§77k, 77l(a)(2), and 77(o)) (the "Securities Act").

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. §77v).

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. §77v). Certain of the acts, practices and transactions complained of herein, including the dissemination of materially false and misleading information, occurred in this District.

## III.  THE PARTIES

### A.     Lead Plaintiffs

24.     APERS is a multi-employer defined benefit retirement plan for employees of the State of Arkansas.  APERS was created by statute in 1957.  On behalf of its approximately 77,000 participants, APERS has approximately $7.5 billion in assets under management.  As reflected in its certification filed previously in this action (ECF No. 13-4), APERS purchased shares of SeaWorld's common stock in the December SPO, the April SPO and during the Class Period and has been damaged as a result of the conduct complained of herein.

25.     PBU is a Danish pension fund for teachers.  PBU was established in 1976.  On behalf of its approximately 110,000 members, PBU has approximately $7.5 billion in assets under management.  As reflected on its certification filed previously in this action (ECF No. 13-3), PBU purchased shares of SeaWorld's common stock in the December SPO, the April SPO and during the Class Period and has been damaged as a result of the conduct complained of herein.

**B.     Additional Plaintiffs**

26.     Oklahoma is a fund that provides pension and survivor benefits to all full-time civilian employees of the City of Oklahoma City.  Oklahoma was established in 1958.  On behalf of its more than 3,900 beneficiaries and active and inactive participants, Oklahoma has approximately $635 million in assets under management.  As reflected on its certification filed previously in this action (ECF No. 12-3), Oklahoma purchased shares of SeaWorld's common stock in the IPO, the December SPO and during the Class Period and has been damaged as a result of the conduct complained of herein.

27.     Pembroke is a fund that provides pension and disability benefits to its participating members, including both active and retired firefighters, police officers, and their beneficiaries.  Pembroke was established in 1979.  Pembroke has approximately $436 million in assets under management.  As reflected on its certification filed previously in this action (ECF No. 12-3), Pembroke purchased shares of SeaWorld's common stock in the IPO, the April SPO and during the Class Period and has been damaged as a result of the conduct complained of herein.

**C.     The Corporate Defendant**

28.     SeaWorld, a Delaware corporation headquartered in Orlando, Florida, is a theme park and entertainment company that owns and operates eleven theme parks

1    within the United States ("U.S."), including:  (i) SeaWorld theme parks in Orlando,

2    Florida, San Antonio, Texas, and San Diego, California; (ii) Busch Gardens theme

3    parks in Tampa, Florida, and Williamsburg, Virginia; (iii) water park attractions in

4    Orlando, Florida (Aquatica), Tampa, Florida (Adventure Island) and Williamsburg,

5    Virginia (Water Country USA); (iv) Discovery Cove, a reservations-only attraction in

6    Orlando offering interaction with marine animals; and (v) Sesame Place, a seasonal

7    park in Langhorne, Pennsylvania.  SeaWorld's common stock is publicly traded on

8    the New York Stock Exchange under the symbol "SEAS."

9           **D.      The Individual Defendants**

10                 **i.      Officer Defendants**

11          29.     Defendant Atchison served as SeaWorld's Chief Executive Officer

12   ("CEO"), President and Director from before the start of the Class Period until his

13   resignation effective January 15, 2015.  Prior to serving as CEO, Atchison served as

14   President and Chief Operating Officer of Busch Entertainment Corporation from

15   2007 to 2009 and as Executive Vice President and General Manager of SeaWorld

16   Orlando from 2003 to 2007.  As alleged below, during the Class Period, Atchison

17   signed the Company's SEC filings and made public statements in the following

18   contexts and/or documents that were materially false and misleading and/or omitted

19   material facts:  (i) April 18, 2013 amended Registration Statement on Form S-1/A

20   and April 19, 2013 prospectus on Form 424B4 ("IPO Offering Materials"); (ii) May

21   23, 2013 quarterly report on Form 10-Q ("1Q13 Form 10-Q") for the three-month

22   period ended March 31, 2013; (iii) August 13, 2013 quarterly report on Form 10-Q

23   for 2Q13 ("2Q13 Form 10-Q") for the three-month period ended June 30, 2013; (iv)

24   August 13, 2013 press release ("2Q13 Press Release") announcing the Company's

25   financial results for 2Q13; (v) August 13, 2013 earnings conference call concerning

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

the 2Q13 financial results ("2Q13 Earnings Call"); (vi) November 13, 2013 quarterly report on Form 10-Q ("3Q13 Form 10-Q") for the three-month period ended September 30, 2013; (vii) November 14, 2014 statement to the *Wall Street Journal*; (viii) December 9, 2013 amended Registration Statement on Form S-1/A and December 12, 2013 prospectus on Form 424B4 ("December SPO Offering Materials"); (ix) December 20, 2013 statement to the *Orlando Sentinel*; (x) March 13, 2014 conference call ("4Q13 Earnings Call") concerning the Company's financial results for the three-month period ended December 31, 2013; (xi) March 21, 2014 Form 10-K for the year ended December 31, 2013 ("2013 Form 10-K"); (xii) April 2, 2014 amended Registration Statement on Form S-1/A and April 4, 2014 prospectus on Form 424B4 ("April SPO Offering Materials"); and (xiii) May 14, 2014 quarterly report on Form 10-Q ("1Q14 Form 10-Q") for the three-month period ended March 31, 2014 ("1Q14"). In addition, Atchison engaged in insider selling when he personally sold 154,000 shares of SeaWorld common stock in eight sales that he effectuated during a three-month window of the Class Period, amounting to approximately 20% of his beneficially owned shares and yielding proceeds of over $4.6 million.

30. Defendant Heaney has served as SeaWorld's Chief Financial Officer from before the start of the Class Period to present. Prior to joining SeaWorld, Heaney served as Chief Financial Officer and Senior Vice President of Finance and Travel Operations for Disney Cruise Line. As alleged below, during the Class Period, Heaney signed the Company's SEC filings and made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts: (i) IPO Offering Materials; (ii) 1Q13 Form 10-Q; (iii) 2Q13 Form 10-Q; (iv) 2Q13 Earnings Call; (v) 3Q13 Form 10-Q; (vi) November 13, 2013

earnings conference call concerning the 3Q13 financial results ("3Q13 Earnings Call"); (vii) 4Q13 Earnings Call; (viii) December SPO Offering Materials; (ix) 2013 Form 10-K; (x) April SPO Offering Materials; (xi) 1Q14 Form 10-Q; and (xii) May 14, 2014 earnings conference call concerning the 1Q14 financial results ("1Q14 Earnings Call").

31.     Defendant Swanson has served as SeaWorld's Chief Accounting Officer from before the start of the Class Period to present.  Prior to joining SeaWorld, Swanson served as the Corporate Controller of Busch Entertainment Corporation and Vice President of Finance of Sesame Place.  As alleged below, during the Class Period, Swanson signed the Company's SEC filings and made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts:  (i) IPO Offering Materials; (ii) 1Q13 Form 10-Q; (iii) 2Q13 Form 10-Q; (iv) 3Q13 Form 10-Q; (v) December SPO Offering Materials; (vii) 2013 Form 10-K; (viii) April SPO Offering Materials; and (ix) 1Q14 Form 10-Q.

### ii.     Director Defendants

32.     Defendant David F. D'Alessandro ("D'Alessandro") has served as SeaWorld's Chairman of the Board of Directors from before the start of the Class Period to present.  On January 15, 2015, he was named interim Chief Executive Officer of the Company to replace Atchison.  Prior to joining SeaWorld, D'Alessandro served as Chairman, President and Chief Executive Officer of John Hancock Financial Services.  As alleged below, during the Class Period, D'Alessandro signed the Company's SEC filings and made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts:  (i) IPO Offering Materials; (ii) December SPO Offering Materials; (iii) 2013 Form 10-K; and (iv) April SPO Offering Materials.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

33.     Defendant Bruce McEvoy ("McEvoy") served on SeaWorld's Board of Directors during the Class Period.  As alleged below, during the Class Period, McEvoy signed the Company's SEC filings and made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts:  (i) IPO Offering Materials; (ii) December SPO Offering Materials; and (iii) April SPO Offering Materials.

34.     Defendant Peter Wallace ("Wallace") served on SeaWorld's Board of Directors during the Class Period.  As alleged below, during the Class Period, Wallace signed the Company's SEC filings and made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts:  (i) IPO Offering Materials; (ii) December SPO Offering Materials; and (iii) April SPO Offering Materials.

35.     Defendant Joseph Baratta ("Baratta") served on SeaWorld's Board of Directors during the Class Period.  As alleged below, during the Class Period, Baratta signed the Company's SEC filings and made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts:  (i) IPO Offering Materials; (ii) December SPO Offering Materials; and (iii) April SPO Offering Materials.

36.     Defendant Judith A. McHale ("McHale") served on SeaWorld's Board of Directors during the Class Period.  As alleged below, during the Class Period, McHale signed the Company's SEC filings and made public statements in the following contexts and/or documents that were materially false and misleading and/or omitted material facts:  (i) IPO Offering Materials; (ii) December SPO Offering Materials; and (iii) April SPO Offering Materials.

1    37.    Defendant Deborah M. Thomas ("Thomas") served on SeaWorld's

2    Board of Directors during the Class Period.  As alleged below, during the Class

3    Period, Thomas signed the Company's SEC filings and made public statements in the

4    April SPO Offering Materials that were materially false and misleading and/or

5    omitted material facts.

6    38.    The Defendants referenced above in ¶¶29-37 are referred to herein as the

7    "Individual Defendants."

8    **E.    The Blackstone Group L.P.**

9    39.    Defendant Blackstone is a multinational private equity, investment

10   banking, alternative asset management and financial services corporation based in

11   New York, New York.  On December 1, 2009, investment funds associated with

12   Blackstone and certain co-investors acquired 100% of the equity interests of

13   SeaWorld LLC and SeaWorld Parks & Entertainment LLC from certain subsidiaries

14   of Anheuser-Busch Companies, Inc.  Throughout the Class Period, Blackstone

15   exercised substantial control over SeaWorld's operations, including SeaWorld's

16   issuance and sales common stock.  In the IPO, Blackstone sold 19.9 million shares of

17   SeaWorld common stock, after which it continued to own approximately 63.3% of

18   the outstanding common stock of SeaWorld and thus maintained the majority of the

19   voting power of all outstanding shares of the Company's common stock.  In the

20   December SPO, Blackstone sold an additional eighteen (18) million shares of

21   SeaWorld common stock, after which it continued to own approximately 42.8% of

22   the outstanding common stock of SeaWorld.  In the April SPO, Blackstone sold

23   another fifteen (15) million shares of SeaWorld common stock, after which it

24   continued to own approximately 25% of the outstanding common stock of SeaWorld.

25   Today, Blackstone owns 22.5% of SeaWorld's outstanding common stock.  While

26

27

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

1    after the December and April SPOs, Blackstone no longer owned the majority stake,

2    SeaWorld stated in its public filings during the Class Period that Blackstone "will

3    continue to be able to significantly influence [SeaWorld's] decisions."

4         **F.**    **The Underwriter Defendants**

5         40.     Defendant Barclays Capital Inc. ("Barclays") was an underwriter of the

6    IPO, the December SPO and the April SPO.

7         41.     Defendant Blackstone Capital Markets ("Blackstone Capital") was an

8    underwriter of the IPO, the December SPO and the April SPO.

9         42.     Defendant Citigroup Global Markets Inc. ("Citigroup") was an

10   underwriter of the IPO, the December SPO and the April SPO.

11        43.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an

12   underwriter of the December SPO and the April SPO.  Deutsche Bank was a Lead

13   Underwriter of the December SPO.

14        44.     Defendant Drexel Hamilton, LLC ("Drexel Hamilton") was an

15   underwriter of the IPO, the December SPO and the April SPO.

16        45.     Defendant Goldman, Sachs & Co. ("Goldman") was an underwriter of

17   the IPO, the December SPO and the April SPO.  Goldman was a Lead Underwriter of

18   the December SPO and the April SPO.

19        46.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an

20   underwriter of the IPO, the December SPO and the April SPO.  J.P. Morgan was a

21   Lead Underwriter of the December SPO and the April SPO.

22        47.     Defendant KeyBanc Capital Markets Inc. ("KeyBanc") was an

23   underwriter of the IPO, the December SPO and the April SPO.

24        48.     Defendant Lazard Capital Markets LLC ("Lazard") was an underwriter

25   of the IPO, the December SPO and the April SPO.

26

27

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

49.     Defendant Macquarie Capital (USA) Inc. ("Macquarie") was an underwriter of the IPO, the December SPO and the April SPO.

50.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter of the IPO, the December SPO and the April SPO.

51.     Defendant Nomura Securities International, Inc. ("Nomura") was an underwriter of the IPO and the December SPO.

52.     Defendant Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of the December SPO and the April SPO.

53.     Defendant Samuel A. Ramirez & Company, Inc. ("Samuel A. Ramirez") was an underwriter of the IPO, the December SPO and the April SPO.

54.     Defendant Telsey Advisory Group LLC ("Telsey") was an underwriter of the April SPO.

55.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the IPO, the December SPO and the April SPO.

56.     Defendants Barclays, Blackstone Advisory, Citigroup, Deutsche Bank, Drexel Hamilton, Goldman, J.P. Morgan, KeyBanc, Lazard, Macquarie, Merrill Lynch, Nomura, Piper Jaffray, Samuel A. Ramirez, Telsey, and Wells Fargo are collectively referred to hereinafter as the "Underwriter Defendants."   The Underwriter Defendants assisted in the preparation and dissemination of the IPO, December SPO and/or April SPO Offering Materials (as defined above at ¶¶29).

**G.     Relevant Non-Parties**

57.     Certain allegations herein are based on information provided by confidential witnesses ("CWs") who are former employees of SeaWorld interviewed by Plaintiffs' representatives.

1    58.    CW-1 worked for SeaWorld for over three years prior to the start of the
2    Class Period through mid-2014, most recently as a Social Media Manager at the
3    Company's corporate headquarters in Orlando, Florida.  Starting in the first half of
4    2013, CW-1 reported to the Director of Social Media, who reported to Chief
5    Marketing Officer Peter Frey.  In her[2] position, CW-1 was involved in managing
6    social media for the Company as a whole, which included monitoring and tracking
7    commentary on the internet, on Twitter and within various electronic forums
8    concerning SeaWorld.  Each of SeaWorld's eleven parks had its own Facebook and
9    Twitter accounts, as well as social media personnel managing those accounts.  As a
10   Social Media Manager, CW-1 was responsible for, among other things, strategizing
11   with the parks about how to convey information to the public through social media.
12   During the Class Period, CW-1 was among those responsible for monitoring
13   *Blackfish*-related commentary and backlash on the internet and Twitter.  In one
14   aspect of this work, CW-1 participated in a so-called "war room" in which she and
15   other marketing and media employees worked on various digital media for the
16   Company's website in response to *Blackfish*.  CW-1 also worked with representatives
17   from 42West, the public relations company SeaWorld hired in early 2013 to handle
18   the Company's media campaign in response to *Blackfish*.

19   59.    CW-2 worked as a Director in marketing and advertisement at
20   SeaWorld's San Antonio park for over three years prior to the start of the Class
21   Period through early 2014.  CW-2 reported to the Vice President of Marketing for
22   San Antonio, who, in turn, reported to the General Manager of the San Antonio park
23   ("GM"), and also to the SeaWorld Corporate Marketing leadership in Orlando,
24   Florida.   CW-2's responsibilities entailed working on retail and sponsorship

25

26   [2] To preserve anonymity, all CWs are referred to herein using feminine pronouns.

27
                                    18
                              Consolidated Amended Class Action Complaint
                              Case No. 14-cv-2129

relationships and promotions, including with companies such as McDonald's, Coca-Cola and Southwest Airlines.  As a part of her job function, CW-2 received weekly attendance reports showing actual attendance and target attendance numbers compiled at SeaWorld's corporate headquarters, and participated in conference calls and/or meetings in which these attendance reports were reviewed and discussed. Other attendees at these regular meetings included the San Antonio park's GM, Vice President of Marketing and Vice President of Finance.

60.  CW-3 worked for SeaWorld at its San Diego park for over three years prior to the start of the Class Period through late 2014, most recently as a Supervisor. In this role, CW-3 managed various park personnel, including with respect to salary matters, hiring, retention and scheduling.  CW-3 explained that SeaWorld closely managed its staffing based on actual daily attendance figures.  In her role as Supervisor, CW-3 also received a daily e-mail concerning attendance figures.  By noon each day, if actual attendance was too far below the attendance budgeted for that party day, CW-3 would receive instructions to send a certain number of her supervisees home for the day.  In at least 2013 and 2014, CW-3 also had access to SeaWorld's annual Daily Attendance Budget, via a shared drive on SeaWorld's computer network.  The Daily Attendance Budget was a budgeting and forecasting tool developed compiled by SeaWorld's corporate finance department that, among other things, estimated attendance for each day at the park, covering 365 days of the year.  According to CW-3, the finance department used weather patterns, school and holiday schedules, information about other SeaWorld parks and historical data to make the daily estimates.  The forecasted attendance was then used by management to determine, among other things, needs related to staffing, the purchasing of goods and supplies, food and beverage and ride operations.  In or around September each

year, a member of the finance department would advise supervisors and managers that the report was available.   CW-3 also attended Employee Communication Meetings ("ECM"), which she believed were held at all SeaWorld parks to discuss, among other things, *Blackfish*.

61.   CW-4 worked for SeaWorld at its San Diego park for over three years prior to the start of the Class Period through late 2014, most recently as a Director in food and beverage services.   In this role, CW-4 was responsible for food and beverage service at SeaWorld San Diego, which included managing approximately 1,000 or more employees.   CW-3 explained that SeaWorld closely managed its staffing and food and beverage needs based on actual daily attendance figures.   In her role, CW-4 was privy to daily, weekly and yearly attendance reports, including the Daily Attendance Budget which CW-4 added was developed by the Company's Business Analysis Department and typically released in the fourth quarter of the previous year.   According to CW-4, the Daily Attendance Budget was the "heart of the operation" at SeaWorld because attendance forecasting was the primary driver of all business planning and management at SeaWorld parks.   CW-4 further stated that the Daily Attendance Budget included attendance forecasts for all 365 days of the year and could be adjusted on a weekly basis if needed.   CW-4 received daily alerts via her smart phone and email regarding attendance so that she could adjust her department's budget and staffing based on the day's actual attendance levels.   CW-4 recalled it was a regularly occurring, "common practice" to "budget down" by releasing staff early during 2013 and 2014 based on low attendance.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

## IV.  OVERVIEW

### A.  SeaWorld's April 2013 IPO And Two Secondary Public Offerings During The Class Period

62.    SeaWorld is a theme park and entertainment company that owns and operates eleven theme parks that are grouped in key markets across the U.S., including water show parks in Orlando, Florida, San Diego, California, and San Antonio, Texas, and Busch Gardens theme parks in Tampa, Florida, and Williamsburg, Virginia.  SeaWorld owns or licenses a large portfolio of globally recognized brands such as SeaWorld, Shamu (the name of the Company's first performing orca), and Busch Gardens.

63.    Until April 2013, SeaWorld was 100% privately held.  In particular, SeaWorld was privately owned by Busch Entertainment Corp. until December 2009, when it was sold in full to Blackstone and renamed SeaWorld Entertainment.  In April 2013, Blackstone took SeaWorld public.  On or about April 24, 2013, the Company completed the IPO of its common stock at a price of $27.00 per share.  In the IPO, the Company issued and sold 10,000,000 shares of common stock, and certain selling stockholders offered and sold 19,900,000 shares of common stock (owned by Blackstone), including 3,900,000 shares of common stock pursuant to the exercise in full of the underwriters' option to purchase additional shares.  In connection with the IPO, the Company filed with the SEC the IPO Offering Materials, which were signed by the following Individual Defendants and underwritten by the following Underwriter Defendants:

| Signatories to the IPO Offering Materials | Underwriters |
| --- | --- |
| Atchison | Barclays |
| Baratta | Blackstone Capital |

21

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

| Signatories to the IPO Offering Materials | Underwriters |
|---|---|
| D'Alessandro | Citigroup |
| Heaney | Drexel Hamilton |
| McEvoy | Goldman |
| McHale | J.P. Morgan |
| Swanson | KeyBanc |
| Wallace | Lazard |
| | Macquarie |
| | Merrill Lynch |
| | Nomura |
| | Samuel A. Ramirez |
| | Wells Fargo |

64.    On December 17, 2013, the Company completed the December SPO, a secondary offering of 18,000,000 shares of common stock (all of which were owned by Blackstone) at a price of $30.00 per share.  In connection with the December SPO, the Company filed with the SEC the December SPO Offering Materials, which were signed by the following Individual Defendants and underwritten by the following Underwriter Defendants:

| Signatories to the December SPO Offering Materials | Underwriters |
|---|---|
| Atchison | Blackstone Capital |
| Baratta | Citigroup |
| D'Alessandro | Deutsche Bank |
| Heaney | Drexel Hamilton |
| McEvoy | Goldman |

| Signatories to the December SPO Offering Materials | Underwriters |
| --- | --- |
| McHale | J.P. Morgan |
| Swanson | KeyBanc |
| Wallace | Lazard |
| | Macquarie |
| | Merrill Lynch |
| | Piper Jaffray |
| | Samuel A. Ramirez |
| | Telsey |
| | Wells Fargo |

65.   On April 9, 2014, the Company completed the April APO, a secondary offering of 17,250,000 shares of common stock (15,000,000 of which were owned by Blackstone and the other 2,250,000 of which were sold pursuant to the exercise in full of the underwriters' option to purchase additional shares) at a price of $30.00 per share.  In connection with the April SPO, the Company filed with the SEC the April SPO Offering Materials, which were signed by the following Individual Defendants and underwritten by the following Underwriter Defendants:

| Signatories to the April SPO Offering Materials | Underwriters |
| --- | --- |
| Atchison | Barclays |
| Baratta | Blackstone Capital |
| D'Alessandro | Citigroup |
| Heaney | Drexel Hamilton |
| McEvoy | Goldman |
| McHale | J.P. Morgan |

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

| Signatories to the April SPO Offering Materials | Underwriters |
|---|---|
| Swanson | KeyBanc |
| Thomas | Lazard |
| Wallace | Macquarie |
| | Merrill Lynch |
| | Nomura |
| | Samuel A. Ramirez |
| | Wells Fargo |

**B.      SeaWorld's Operations**

66.      SeaWorld's brand and marketing efforts focus on the Company's unique animal-based attractions.   According to public filings, across its eleven parks, SeaWorld maintains one of the world's largest zoological collections, including ninety-three (93) animal habitats with approximately 86,000 animals, including 8,000 marine and terrestrial animals and 78,000 fish.   These parks feature, among other things, orca, sea lion and dolphin shows, as well as zoological displays featuring various other marine animals.   The Company's parks also feature roller coasters and other mechanical thrill rides.

67.      SeaWorld-branded parks' main attraction is shows featuring orcas (i.e., killer whales), which the Company captures, breeds and trains to perform.   "Shamu" – the name of the Company's first orca and SeaWorld's "globally recognized" and trademarked name for its killer whale shows – is a brand "synonymous with SeaWorld for much of the park's 50-year history," according to *The Voice of San Diego*.   SeaWorld's logo features a killer whale's dorsal fin.   At the time of the IPO, SeaWorld housed twenty-nine (29) killer whales.   Currently, SeaWorld houses twenty-four (24) orcas in three parks – eleven (11) at SeaWorld San Diego, seven (7)

1  at SeaWorld Orlando, and six (6) at SeaWorld San Antonio.  Five other orcas are on

2  breeding loan to various establishments.

3      68.    To be sure, SeaWorld's killer whale shows represent a "key point of

4  differentiation" from other theme parks, and are a main driver of the Company's

5  ability to attract customers to its flagship parks in Orlando and San Diego, as reported

6  by *The Voice of San Diego*.  As noted in the Company's IPO Offering Materials,

7  "each SeaWorld theme park showcases killer whales in specially designed

8  amphitheaters."  Since 1964, hundreds of millions of people have attended

9  SeaWorld's signature "Shamu Shows," which emphasize the killer whales'

10  impressive intelligence, massive bodies, and complex social interactions with

11  humans.  Before the Occupational Safety and Health Administration ("OSHA")

12  banned human trainers from working in the water with captive killer whales in 2010,

13  the signature climax of these shows was the iconic "rocket hop" maneuver in which

14  the killer whale propelled a trainer out of the water.

15      69.    Orcas and orca shows thus constitute the core of the SeaWorld brand.

16  Dave Goodman, former vice president and executive producer of entertainment at

17  SeaWorld's Orlando park explained to *The Voice of San Diego* that "[t]ying the

18  human experience to the animal one is the vital thrust behind the Shamu shows and

19  the park itself" and analogized that, "[r]eplacing Shamu to Seaworld is like getting

20  rid of Mickey to Disney."  As Atchison told *Bloomberg* in November 2014:  "Our

21  killer whales, our killer whale program, and all of our animals are emblematic of the

22  whole brand."

23              **i.      The Amusement And Theme Park Industry**

24      70.    The amusement and theme park industry is highly concentrated and

25  dominated by five major players:  (i) SeaWorld; (ii) Disney; (iii) Universal; (iv)

26

27

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

1   Cedar Fair LP; and (v) Six Flags, Inc.  According to IBISWorld – a group comprised
2   of industry-focused analysts, strategists, and researchers that provide comprehensive
3   information on, among other things, the amusement park industry in the U.S. – these
4   five companies collectively account for approximately 86.6% of the total U.S. theme
5   park industry revenue.  Notably, each year, IBISWorld issues the "IBISWorld
6   Industry Report – Amusement Parks in the US" ("IBISWorld Report"), and
7   SeaWorld has referenced the IBISWorld Report in its public statements and filings.

8          71.     Each year, the Themed Entertainment Association ("TEA") publishes a
9   *Theme and Museum Index – Global Attractions Attendance Report* ("2013 TEA
10  Report"), in which it identifies the top theme parks and water parks, including
11  SeaWorld, and reports their performance for the calendar year.  TEA is a prominent
12  group dedicated to providing consumers with information about, among other things,
13  theme parks like SeaWorld.  SeaWorld also references TEA data in its public
14  statements and filings.

15         72.     In the Company's 2013 Form 10-K, SeaWorld identified Disney and
16  Universal as its principal direct competitors.  Like SeaWorld, both Disney and
17  Universal operate theme parks in Orlando, Florida and popular tourist destinations in
18  southern California.   In Orlando, Disney operates Magic Kingdom, Epcot,
19  Hollywood Studios, Animal Kingdom, Blizzard Beach and Typhoon Lagoon, while
20  Universal operates Universal Studios Florida and Island of Adventure.  In southern
21  California, Disney operates Disneyland and California Adventures, while Universal
22  operates Universal Studios Hollywood. Within the theme park industry, Disney,
23  Universal and SeaWorld are often referred to as the "Big Three."  Setting it apart
24  from these competitors, SeaWorld touts its "highly differentiated products," i.e., its

25

26

27

orcas and water shows, as providing a "complementary experience to those offered by fantasy-themed Disney and Universal parks."

73.     According to IBISWorld, families with children aged ten (10) to nineteen (19) make up the primary consumer market for the theme park industry.  As of August 2014, teenagers and children younger than eighteen (18) accounted for approximately 25.6% of all U.S. theme park attendees.  As noted by IBISWorld, due to the limited disposable income of this group, consumers between ages thirty-five (35) and fifty-four (54) years old typically accompany children to parks, and accounts for approximately 21.6% of the market.  In short, younger consumers typically drive a significant portion of demand and attendance for the industry as a whole.

74.     Consistent with this observation, SeaWorld noted in its 2013 Form 10-K that "families comprised 54% of our attendance with an average party size of 3.8 people."  Accordingly, SeaWorld's ability to ensure that its products are and remain appealing to this younger demographic are essential to its success.

### ii.     Attendance Drives SeaWorld's Revenues

75.     Amusement and theme parks derive the majority of their revenues from ticket sales.  Attendance, in turn, allows for in-park spending.  SeaWorld is no exception.  Throughout the Class Period, Defendants identified attendance as a key proxy for analyzing the success and stability of the Company's business operations.  Indeed, in its 2013 Form 10-K the Company stated, "[w]e generate most of our revenue from selling admission to our theme parks," and disclosed that admissions accounted for nearly two-thirds (approximately 63%) of its total 2013 revenue.

76.     Likewise, SeaWorld's quarterly filings with the SEC on Form 10-Q each include "attendance" as a key business metric evaluated by management, and

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

represent that "[i]ncreased attendance drives increased admissions revenue to our theme parks as well as total in-park spending."

77.     SeaWorld's growth strategy, as discussed in the IPO Offering Materials, revolves around the Company's ability to "increas[e] [the Company's] existing theme park revenues through strategies designed to drive higher attendance and increase in-park per capita spending."   Further, the main purpose of SeaWorld's marketing efforts is to increase attendance.  As SeaWorld stated in its 2013 Form 10-K, "[o]ur marketing and sales efforts *are focused on generating profitable attendance*…."  The Company further acknowledged in its 2013 Form 10-K that reductions in attendance "can materially adversely affect [SeaWorld's] business, financial condition and results of operations."

78.     The Company's Forms 10-Q likewise represent within a section entitled "Principal Factors Affecting Our Results of Operations" that the Company's "*revenues are driven primarily by attendance in our theme parks* and the level of per capita spending for admission to the theme parks and per capita spending inside the theme parks for culinary, merchandise and other in-park experiences."   Thus, maintaining and driving attendance levels is a fundamental concern of SeaWorld's and critical to its revenues and results of operations.

79.     In order to generate attendance, companies operating amusement parks (or "operators") typically offer various ticketing options, ranging from traditional single-day or multi-day admission tickets granting entrance to a single park to package deals (or "bundles") that entail admission to several different parks, including parks run by different companies.  Companies operating multiple parks in a particular geographic location generally offer consumers the ability to purchase entrance to more than one of their parks for a discounted price.

80.     Moreover, in locations that are home to multiple parks operated by various operators in the industry, the ability to offer joint and single ticketing arrangements with discounts in cooperation with other theme parks, such as a multi-park pass, can further boost ticket sales and attendance.  For example, Orlando, Florida is home to seven of the largest amusement parks in the U.S.  As IBIS explained in the Company's 2014 industry report, "[i]industry players have found that there are synergies and promotions and other advantages in having a number of major operators located in the same area."

81.     TEA explained that increased tourism within a particular destination like Orlando tends to drive increased attendance at all theme parks operating within that market.  Tourists who choose to vacation near theme park venues prefer to have a range of options, and will vacation in places that offer multiple attractions in close and convenient proximity.

82.     These principles apply to SeaWorld, which represented in its public filings during the Class Period that it benefits from the "significant capital investments made in developing the tourism industry in the Orlando area," and that the "high concentration of theme parks operated by several companies" is beneficial to SeaWorld's operations, both in Orlando and in San Diego.  Consistent with these observations, SeaWorld reported in its 2013 Form 10-K that approximately 55% and 21% (or 76% combined) of its revenues in 2013 were generated in the States of Florida and California, respectively.

83.     The Company further emphasized this point in its 2013 Form 10-K, stating, "[w]e also participate in joint programs that are designed to provide visitors to Florida and Southern California with options, flexibility and value in creating their vacation itineraries.  For example, we have partnered with several theme parks in

Orlando to create the Orlando FlexTicket….We also created the 2-Park FlexTicket [in San Diego] in conjunction with Universal Studios, which allows guests to purchase a ticket providing access to SeaWorld San Diego and Universal Studios Hollywood."

84.   Because attending a park is usually an all-day (and sometimes multi-day) event for visitors, industry operators also generate significant revenues from the sales of food and beverage.  In 2013, food, merchandise and other revenue accounted for approximately 37% of SeaWorld's total revenue, according to the Company's 2013 Form 10-K.  In addition, parks generate revenue from merchandise sales, which IBISWorld estimated would account for approximately 16% of overall industry revenue.   The remainder of theme park revenues is typically derived from sponsorships, licensing and other fees.  Of course, a theme park operator's ability to generate revenues through the sale of food, beverages or merchandise depends entirely, as a threshold matter, upon attendance.

85.   Given how critical attendance is to a theme park's bottom line, theme park companies are focused on, and regularly, monitor, track, and account for, factors that may depress attendance.  Such factors, as discussed below, may include adverse weather conditions, annual holiday and school schedules (since school-age children are a critical target demographic), pricing strategies and, as mentioned above, location-related issues.  Companies typically list these factors as potential risks to performance within public financial filings.

## C.   *Blackfish* Premieres At The Sundance Film Festival And Seizes Public Attention

86.   On January 19, 2013, just months before Blackstone took SeaWorld public in the IPO, Gabriela Cowperthwaite's documentary *Blackfish* premiered at the

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

1    world-renowned Sundance Film Festival in Park City, Utah.  The documentary tells

2    the disturbing story of Tilikum, a 12,000-pound bull orca implicated in the deaths of

3    three people.  Cowperthwaite began work on *Blackfish* following Tilikum's well-

4    publicized 2010 mutilation and killing of senior trainer Dawn Brancheau, which took

5    place at SeaWorld Orlando.

6        87.    More generally, *Blackfish* is an indictment of SeaWorld's core brand and

7    killer whale-as-entertainment business.  The film chronicles the apparent cruelty of

8    baby orca capture methods, the dangers associated with the close human-killer whale

9    contact featured at SeaWorld's most popular shows, and the strains, both physical

10   and psychological, of captivity on the killer whales held by SeaWorld.  Featuring

11   graphic images of trainers being mauled and whales being bitten or "raked" by fellow

12   whales in captivity, as well as interviews of former SeaWorld trainers, SeaWorld

13   spectators, and other experts such as OSHA employees and scientists, *Blackfish*

14   makes the case that SeaWorld's business of keeping killer whales in captivity for the

15   purpose of human entertainment and profit is cruel, dangerous, and immoral.  In

16   addition to its anti-captivity message, *Blackfish* suggests that in order to protect its

17   brand and most popular, profitable and iconic attraction – its killer whale shows –

18   SeaWorld cravenly covered up previous dangerous and fatal incidents involving

19   Tilikum, blaming whale trainer error for the tragic incidents.  An early review noted

20   that the film makes "SeaWorld's entire operation look criminal."

21       88.    While the film amounted to a direct attack on SeaWorld's brand and

22   business operations, the Company's response throughout the Class Period reflected a

23   denial of, and inability to deal with, the impact of *Blackfish*.

24       89.    Following the critically acclaimed screening of the film at Sundance, on

25   January 22, 2013, as was widely reported, CNN Films and Magnolia Pictures

26

27

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

1    acquired the rights to *Blackfish* and immediately announced plans to screen the film

2    on a broad public platform beginning in the summer of 2013.

3        90.    The film reached increasingly broad swathes of the public throughout

4    2013.  On July 19, 2013, *Blackfish* was released in theaters in New York, New York,

5    Los Angeles, California, and Toronto, Canada, among other places.  At its widest

6    release, the documentary was shown in approximately ninety-nine (99) theaters for a

7    total of fourteen (14) weeks. Also in July 2013, the film was made available to

8    British customers of Netflix, the leading online video streaming and mail-order

9    service.  The next month, on August 26, 2013, *Blackfish* was released on DVD and

10   Blu-ray Disc in the United Kingdom.  In September and October of 2013, the film

11   premiered in Germany, Greece, Iceland, Spain and other international locations.

12       91.    The documentary was then broadcast to tens of millions more people on

13   CNN during a highly promoted screening on October 24, 2013.  After the broadcast,

14   CNN   aired   an   Anderson   Cooper   special   with,   among   others,   Gabriela

15   Cowperthwaite.  This was followed by a special edition of *Crossfire* with *Blackfish*

16   associate producer Tim Zimmermann debating Grey Stafford, a conservationist,

17   zoologist, and member of the International Marine Animal Trainers Association.

18   CNN re-aired the film numerous times in the days and weeks that followed.

19       92.    *Blackfish* was also released on DVD, Blu-ray Disc and iTunes in the

20   U.S. on November 12, 2013.  The BBC aired the film in the United Kingdom on

21   November 21, 2013.

22       93.    By December 2013, *Blackfish* was made available on Netflix in the U.S.

23   At the time, Netflix maintained approximately thirty-one million U.S. domestic

24   subscribers.

25

26

27

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

94.     On January 22, 2014, Cowperthwaite openly challenged SeaWorld to debate the issues raised by the film in a public forum.  Cowperthwaite stated:

> We challenge SeaWorld to debate these issues with our teams in a public forum, which we will be happy to arrange. Throughout the production and theatrical release of Blackfish, SeaWorld has refused to directly engage with the film or its points in any public way, despite repeated invitations. Instead of releasing more PR spin, written statements and online critiques (which often allow no comments), we encourage SeaWorld's leaders to step forward and address these issues openly and honestly in public debate. Let the public hear both sides of the argument (as we have always desired) and draw their own conclusions.

95.     SeaWorld declined to debate Cowperthwaite directly and continually attempted to downplay *Blackfish* throughout the Class Period, and brazenly denied that it was having ***any*** impact on the Company's operations and attendance.

### D.  Defendants Mislead Investors Concerning The Impact Of *Blackfish* On The Company's Operations And Attendance

#### i.  Defendants Repeatedly Deny That The Stark Attendance Decline At SeaWorld's Parks Was Caused, To Any Degree, By *Blackfish*

96.     As set forth above, SeaWorld's financial health is directly tied to its ability to attract and grow attendance at its parks.  Attendance at SeaWorld's parks declined each quarter during the Class Period following the premiere of *Blackfish*, yet Defendants repeatedly assured investors that *Blackfish* had not contributed, at all, to these drastic declines, and was not impacting SeaWorld's operations in any way. Rather, Defendants attributed the entire decline in attendance to a combination of three factors:  (i) adverse weather conditions; (ii) holiday and school schedules; and/or (iii) SeaWorld's pricing strategies.

97.    As a result of *Blackfish*, by the first day of the Class Period, April 18, 2013 – when the Company filed the IPO Offering Materials – SeaWorld had become a public relations target for PETA, other advocacy groups and prominent celebrities across the nation.  Given that CNN and Magnolia Pictures planned for wide release of the film, the *Blackfish* effect, already significant, was primed to intensify.  Recognizing this, prior to the IPO, SeaWorld already had begun a nationwide campaign to mitigate the harmful impact of *Blackfish* on the public's perception of the Company.

98.    Despite the fact that it was battling the *Blackfish* effect in a nationwide public relations campaign, rather than inform the public within the IPO Offering Materials that *Blackfish* was presently harming SeaWorld's "reputation, reduc[ing] attendance and negatively impact[ing] [SeaWorld's] business, financial condition and results of operations," the Company disclosed only that *Blackfish* "may" have a negative effect on attendance and other key metrics at some point in the future.  Notably, SeaWorld's draft IPO Offering Materials, which the Company submitted to the SEC on December 27, 2012, prior to the release of *Blackfish*, made no mention of any of the events underlying the film, including the Brancheau death, the federal government's response or the media coverage of the incident.  After the Company's proposed material risk disclosures were rejected by the SEC as "brief and general in nature" – and subsequent to *Blackfish*'s screening at Sundance – SeaWorld revised this language on or around February 27, 2013 to include the aforementioned purportedly sufficient disclosure.  According to CW-4, following the showing of *Blackfish* in January 2013, attendance at SeaWorld San Diego noticeably "dipped".

99.    After SeaWorld reported its 1Q13 results on May 23, 2013, Defendants repeated these same purported warnings, again failing to acknowledge the then-

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

existing drag caused by *Blackfish* on the Company's attendance and revenues. This same warning was repeated in certain of SeaWorld's quarterly, annual and offering-related SEC filings throughout the Class Period.

100. Meanwhile, SeaWorld continued to lose customers. On August 13, 2013, Defendants reported SeaWorld's 2Q13 financial results. Among other things, Defendants reported a 9.5% decline in attendance for the second quarter, representing a decrease of approximately 600,000 guests. Defendants attributed the entire drop in attendance to three distinct factors: (i) new pricing strategies (i.e., the Company's annual summer ticket price increases); (ii) adverse weather conditions; and (iii) the "unfavorable timing of Easter," which "caused an overlap with the spring break holiday period for schools." On the earnings call that same day, while Atchison admitted that "over the long term these weather effects tend to even out," he claimed SeaWorld was "impacted much more than normal during the second quarter by these adverse weather conditions."

101. Later in the 2Q13 Earnings Call, in response to an investment analyst question seeking further information concerning attendance, Heaney again attributed the entire decline to these same three factors, stating that each accounted for one-third of the total decline. Heaney further assured investors that "[t]he Easter effect, obviously, won't repeat in the second half and that's one piece of attendance we'll pick up in the third and fourth quarters."

102. Following the 2Q13 Earnings Call, financial analysts accepted Defendants' proffered explanations for the decreased 2Q13 attendance. For example, a September 17, 2013 KeyBanc Capital Markets report dismissed concerns over whether the Company's lagging attendance was associated with *Blackfish*, stating, "[w]hile building investor consternation has been evident in recent weeks following

1    2Q13 results and suspect publicity surrounding discounts and the potential impact of

2    the Blackfish documentary, we believe the operational update provided by SEAS last

3    week should ease some concerns [….] In our view, the vast majority of these

4    transitory issues have had little to no impact on the business and that is now

5    becoming apparent in the results."

6         103.   On August 29, 2013, following the 2Q13 earnings release, the *Los

7    Angeles Times* questioned whether the decline in attendance was also attributable to

8    the ever-growing *Blackfish* effect.   In response, Vice President of Communications

9    Fred Jacobs ("Jacobs"), speaking on behalf of the Company, flatly denied that

10   *Blackfish* or the public backlash spurred by the film was hurting attendance, stating

11   that "'Blackfish' has had no attendance impact."   That same day, Jacobs told

12   *Bloomberg* that the Company "can attribute no attendance impact at all to the movie."

13        104.   Notably, one month prior, SeaWorld had dramatically intensified the

14   Company's public relations campaign opposing *Blackfish*, as Jacobs reached out to

15   fifty (50) major film reviewers to "discredit" *Blackfish*.  The president of Magnolia

16   Pictures – the film's distributor – Eamonn Bowles stated "[f]rankly, I've never seen

17   anything like it."   The *New York Times* called this high profile action "an unusual

18   pre-emptive strike" by a corporation.   NPR called SeaWorld's counter-campaign

19   "one of the clumsiest, most-ill advised acts of corporate crisis-management" in

20   memory.  The Wire likewise reported "[the] magnitude of th[e] response [wa]s odd"

21   and that it was "rare" for a corporation to target a documentary, hire a film publicist

22   [42West] and "make sure critics and journalists are informed of the Company's

23   response to a film."

Consolidated Amended Class Action Complaint

Case No. 14-cv-2129

105. Also in or around July 2013, as the negative public perception of SeaWorld continued to intensify, SeaWorld released a public statement, speaking out against the film and claiming it was "inaccurate":

> *Blackfish*...is inaccurate and misleading and, regrettably, exploits a tragedy.... [T]he film paints a distorted picture that withholds...key facts about SeaWorld—among them...that SeaWorld rescues, rehabilitates and returns to the wild hundreds of wild animals every year, and that SeaWorld commits millions of dollars annually to conservation and scientific research.

106. SeaWorld attendance kept falling. On November 13, 2013, Defendants reported SeaWorld's 3Q13 financial results, including a 3.6% decline in attendance for the third quarter – a decrease of 600,000 guests, and a 4.7% decline overall for the first nine months of 2013 as compared to the same periods in the prior year. The decline, Defendants represented, was attributable to adverse weather conditions in July, as well as the "expected result" of pricing strategies the Company implemented in the prior quarter.

107. The following day, on November 14, 2013, Atchison stated to the *Wall Street Journal*: "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it," adding "[i]ronically, our attendance has improved since the movie came out." Defendants' spin efforts continued to work, as analysts from Wells Fargo, JPMorgan and Barclays, among others, accepted the Company's explanation for declining attendance and made no mention of the *Blackfish* controversy in published reports – even as the film exploded on social media in the weeks following the CNN premiere.

108. On December 20, 2013, Atchison similarly rejected the notion that *Blackfish* was in any way, shape or form, playing a part in the decline in attendance. As reported by the *Orlando Sentinel*, he stated: "As much data as we have and as

37

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business."

109. That same day Atchison was denying any harm to the Company's attendance, from *Blackfish*, SeaWorld responded to the film with an open letter purporting to rebut it, which the company placed in full-page ads in major American newspapers. SeaWorld's "Open Letter from SeaWorld's Animal Advocates," was also posted to the Company's Facebook and Twitter accounts. SeaWorld also devoted an entire section of its website to the documentary, entitled "Truth About Blackfish."

110. CNN called the move "very interesting":

> "[O]ne of the things we have talked with SeaWorld about is how they say, look, *Blackfish* has not had any impact whatsoever on the revenues and on the number of people attending. But then you have to wonder, well, why would they go to such an expense and why would they take this out. Part of it could be because they're starting to see an impact on a very key part of their audience…"

111. Similarly, speaking with the *Orlando Business Journal* on December 27, 2013, Timothy Coombs, crisis communications specialist and public relations professor with the University of Central Florida, commented on the Company's unusual response, stating "the attention generated by Blackfish and the accompanying musical guest cancellations [discussed in ¶¶147-52, *infra*] did require a public statement to defend SeaWorld's mission and methods of operation."

112. On March 13, 2014, Defendants reported SeaWorld's 4Q13 and FY13 financial results, during which the Company reported that for ***the third consecutive quarter attendance had declined*** – this time by 1.4%. Moreover, Defendants reported that full year attendance in 2013 had declined by 4.1%, or approximately one million guests.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

113.   Once again, Defendants claimed the 1.4% fourth quarter decline was the "expected result of planned pricing and yield management strategies implemented at the beginning of 2013," and blamed the full year decline on the same factors noted during the prior quarter – adverse weather conditions and where the holidays and school schedules had fallen on the calendar.

114.   Barton Crockett, an FBR Capital Markets analyst, specifically pressed Defendants to discuss *Blackfish*, asking Atchison to "***comment on whether there's any impact that you've noticed at all on satisfaction or attendance*** or the desirability of SeaWorld for international licensees?  ***Has this had any impact on any of that***?" In response, Atchison noted:  "I get asked that a lot" and proceeded to deny multiple times that SeaWorld had seen any such impact.  In fact, Atchison claimed that *Blackfish* was positively impacting SeaWorld by increasing awareness of the Company's brand and pointed to the Company's "record attendance" in the fourth quarter at certain parks despite the overall 1.4% decline:

> With respect to the impact on our business, I get asked that a lot, too. ***As much as we're asked it, we can see no noticeable impact on our business***.  If you follow this -- even this recent announcement, our SeaWorld parks had record attendance in the fourth quarter of the year, and are out-performing our other parks by considerable margin.
>
> ***
>
> With respect to national surveys and data that we collect around our reputation efforts and image, there's awareness of the movie that kind of peaks and drops as CNN -- who is one of the owners of the movie, by the way -- CNN shows it repeatedly from time to time, so that does spike on occasion.  ***But our surveys don't reflect any shift in sentiment about intent to visit our parks***.
>
> ***
>
> A matter of fact, the movie in some ways has actually made perhaps more interest in marine mammal parks, and actually even about us.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

We have seen that reflected through certain visitor profiles, and certain guest comments and things we get.  The movie did not get an Oscar nomination in January, and we continue to take proactive efforts around communicating with our guests and business partners and others.

\*\*\*

But ultimately the assertions by the animal rights, animal activist community -- they don't necessarily burden themselves with fact, and we have to deal with that from time to time. ***But we have seen no impact on the business***.

115.   SeaWorld's attendance slide continued.  On May 14, 2014, Defendants reported SeaWorld's 1Q14 financial results.  This time, Defendants announced a ***staggering 13% decline in attendance for the quarter***, which they again attributed, in full, to factors other than *Blackfish* – the shift in the timing of Easter and Spring Break and "above average precipitation in the Florida market as well as below average temperatures in the Texas market for the first quarter of 2014."

116.   Despite the successive drops in attendance, analysts continued to accept Defendants' stated reasons for the decline.  For example, Macquarie (USA)'s May 14, 2014 report noted "[a]ttendance drops are not new to SeaWorld as a public company unfortunately, but again the reasons make sense and we are encouraged."  Likewise, JP Morgan's May 15, 2014 report noted, "[a]ttendance dropped 13% to 3.0m guests, with the roughly 0.5m loss in visitors attributed to weather (200K) and Easter (250k) shifting out of the quarter.  Cold weather in Texas and rain in Florida resulted in fewer operating days at some parks."

117.   As set forth below, contrary to Defendants' representations concerning the putative lack of impact on attendance caused by *Blackfish*, Defendants knew or recklessly disregarded that *Blackfish* was, in fact, causing a decline in SeaWorld's

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

attendance and negatively harming its reputation and operations during the Class Period.

### ii. The Reasons SeaWorld Provided For The Entire Decline In Attendance In Each Quarter Throughout The Class Period Are Not Plausible

118.   To the extent adverse weather conditions, school and holiday schedule and pricing increases, did, in fact, impact SeaWorld's attendance figures from April 2013 through May 2014, these factors were not and could not have been the exclusive causes of the entire decline in attendance, as set forth below.

119.   According to the 2013 TEA Report, nearly all of the major theme park groups with locations in the U.S., including Disney and Universal, realized *increases* in domestic attendance for 2013, as compared to 2012.  For example, at its domestic parks, Disney reported a 7% increase for the first half of 2013 (including 2Q13), and comparable attendance figures to the prior year for the rest of 2013.  Moreover, Disney reported a record-setting 3% increase for 1Q14.  For its parks located in Orlando, Disney reported either an increase in or record attendance for every quarter within the Class Period.

120.   SeaWorld represents to investors that the Company benefits from the "high concentration of theme parks operated by several companies" in Orlando and Southern California, and that through its core attractions (i.e., orcas and other wild animals) it offers a "complementary experience to those offered by fantasy-themed Disney and Universal parks."  Thus, when each of the top ten theme parks located in Florida and California experienced increases in annual attendance for 2013 versus the prior year, SeaWorld should have seen comparable attendance figures.  It did not, as demonstrated below:

41

| Park | Location | 2012 Attendance | 2013 Attendance | Change (%) |
|---|---|---|---|---|
| Magic Kingdom [Disney] | Lake Buena Vista, FL | 17,536,000 | 18,588,000 | 6.0% |
| Disneyland [Disney] | Anaheim, CA | 15,963,000 | 16,202,000 | 1.5% |
| Epcot [Disney] | Lake Buena Vista, FL | 11,063,000 | 11,229,000 | 1.5% |
| Animal Kingdom [Disney] | Lake Buena Vista, FL | 9,998,000 | 10,198,000 | 2.0% |
| Hollywood Studios [Disney] | Lake Buena Vista, FL | 9,912,000 | 10,110,000 | 2.0% |
| Cal. Adventure [Disney] | Anaheim, CA | 7,775,000 | 8,514,000 | 9.5% |
| Islands of Adventure [Universal] | Orlando, FL | 7,981,000 | 8,141,000 | 2.0% |
| Universal Studios Florida [Universal] | Orlando, FL | 6,195,000 | 7,062,000 | 14.0% |
| Universal Studios Hollywood [Universal] | Universal City, CA | 5,912,000 | 6,148,000 | 4.0% |
| **SeaWorld Orlando [SeaWorld]** | **Orlando, FL** | **5,358,000** | **5,090,000** | **-5.0%** |
| **SeaWorld San Diego [SeaWorld]** | **San Diego, CA** | **4,444,000** | **4,311,000** | **-3.0%** |
| **Busch Gardens Tampa [SeaWorld]** | **Tampa, FL** | **4,348,000** | **4,087,000** | **-6.0%** |

121.   As shown, each of SeaWorld's main competitors in the same geographic regions, Disney and Universal, attained either comparable or increased attendance figures (over the prior year) in 2013, often achieving record attendance in spite of the same generally-applicable factors to which SeaWorld attributed its attendance decline.  As alleged below, SeaWorld's attribution of its entire attendance declines to these factors – weather, school year and holiday calendars, and pricing strategies – simply does not hold water.

122.   **Adverse Weather**.  It is well known within the industry and to investors that seasonal factors bear upon theme park operations.  For instance, adverse weather

42

conditions, particularly rain, can lead to "wash outs" at outdoor parks, most commonly during the summer months.  Therefore, park operators typically anticipate and account for the impact on their operations of normal weather swings and occasional adverse weather.  Of course, park operators in the same geographical location (like Disney, Universal, and SeaWorld in Orlando and southern California) are subject to the same weather conditions.

123. As reported by IBIS, however, "SeaWorld's amusement parks are geographically dispersed, which helps the company protect itself from localized events and seasonal weather conditions."  Indeed, due to the location of its parks, seven of the Company's eleven parks – including those in Orlando and California – are able to stay open year-round.  Given this ability, Defendants regularly assured investors that weather-related impacts tend to flatten out over the course of a year.  For instance, during the 2Q13 Earnings Call, Atchison admitted that "over the long term these weather effects tend to even out."  Defendants nonetheless repeatedly blamed the weather as one reason for the decline in attendance during various quarters in the Class Period and in 2013 as a whole.

124. For example, SeaWorld blamed one-third of the 9.5% decline in attendance during 2Q13 on adverse weather, including within Orlando.  But, as the *Orlando Sentinel* reported following the Company's earnings announcement: "Neither the Walt Disney Co. nor Comcast Corp. [which owns Universal], both of whom recently reported earnings for the same quarter, cited weather at Walt Disney World or Universal Orlando."  TIME too was skeptical of SeaWorld's weather-related explanation for decreased attendance, noting that, "Disney and Universal parks – which should also be affected by the factors mentioned – have been enjoying record-high visitor numbers."  Alluding to *Blackfish*, the TIME writer noted that "the

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

downturn in visitor numbers has taken place during a summer when SeaWorld found itself as the unfortunate subject of a documentary film," suggesting that negative publicity from *Blackfish* – not rain – was driving decreased attendance.

125. Similarly, in 1Q14, SeaWorld attributed its staggering 13% decline in attendance in part to "***adverse weather and fewer operating days in 2014***." Yet, despite being subject to nearly identical weather patterns, particularly as applied to Orlando and California, Disney and Universal reported attendance figures for 1Q14 that were comparable to or higher than their attendance marks for the same quarter in the prior year.

126. **School And Holiday Schedules**.  Both the holiday and school calendar impact theme park operations, attendance and revenue on a quarterly basis.  For instance, whether Easter and/or Spring Break fall within the first or second fiscal quarter (i.e., in March or April) or overlap within a quarter has a discernible impact on attendance (and therefore revenue derived from attendance and in-park spending), boosting attendance in the quarter that contains Easter and Spring Break, and lowering the attendance in the quarter that does not.  As Heaney assured investors during the Class Period, however, such impact largely flattens out over the course of the full year:  "The Easter effect, obviously, won't repeat in the second half and that's one piece of attendance we'll pick up in the third and fourth quarters."

127. Nonetheless, Defendants allocated blame for half of the 13% attendance decline in 1Q14 to the timing of Easter and Spring Break.  This was simply not plausible.  In response, *Motley Fool*, among others, asked "[h]as *Blackfish* hurt sales," and questioned SeaWorld's explanation in part due to the fact that rival parks in the same geographic area were unaffected by exactly the same factors:  "Disney is often compared to SeaWorld, and Mickey's theme parks saw increased

attendance in the first quarter, while SeaWorld's dropped 13%, which it attributed to a late Easter (that wasn't in the first quarter) and weird spring-break timing.  But why didn't late Easter eggs and confused spring breakers have the same effect on Disney World?"

128.  **Pricing**.  It has become an "[a]nnual springtime tradition" in the theme park industry for operators – particularly those located in central Florida – to increase ticket prices around Memorial Day in anticipation of the annual boom in tourism that accompanies summer school vacations, according to TIME.  Each year, Disney, Universal and SeaWorld seek to capitalize on the increased flow of consumers during the summer months.  Notably, as reported by TIME, whenever one raises prices, at least one of the others (if not both) follows suit.

129.  While for the entire 2013 fiscal year, SeaWorld blamed a purported company-specific pricing strategy for some portion of the decline in attendance, increased pricing and similar strategies actually boosted attendance figures at SeaWorld's competitors.  For example, in the summer of 2013, each of the Big Three implemented pricing increases.  In May 2013, TIME reported that Universal Orlando raised the price of single-day admission to $92, becoming the first theme park to cross the $90 admission mark.  Likewise, the *Los Angeles Times* noted that Disney raised entry prices to both of its parks in June 2013, including raising a single-day adult ticket 6%.  In June 2013, SeaWorld too raised admission prices to $92 and $89 for a single-day adult ticket at SeaWorld Orlando and Busch Gardens Tampa, respectively.

130.  Notwithstanding the fact that they also implemented pricing increases applicable to their companies' flagship parks in Orlando, Disney and Universal, unlike SeaWorld, met or beat prior attendance numbers in 2013, and throughout the

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

Class Period.  When Atchison claimed a portion of the 9.5% drop in 2Q13 was part of SeaWorld's willing and "deliberate" effort to decrease the number of visitors as a trade-off for high-priced admissions and revenues per guest, TIME again questioned the veracity of the excuse, citing the experience of SeaWorld's competitors down the road.

131.  Additionally, while SeaWorld raised certain baseline ticket prices, in a historically rare and unexpected move, it slashed certain other ticket prices in multiple markets following the announcement of SeaWorld's 2Q13 9.5% attendance decline. *Bloomberg* reported on August 29, 2013 that SeaWorld Orlando had cut $42 off the price of a midweek ticket purchased online (a 46% discount) while SeaWorld San Antonio had started offering a free children's ticket with an adult ticket purchase midweek, a $71 value.  CW-2 believed that SeaWorld executives resorted to lowering prices in an attempt to attract guests.  As reported on August 29, 2013, Dennis Speigel, president of International Theme Park Services Inc., told *Bloomberg* "[w]hen you're seeing those kinds of discounts in the first part of August, that's telling you attendance is off."  Mary Waring, owner of a website that provides information about theme parks and theme-park centric vacation packages – told *Bloomberg* that in the "10-plus years" she had been listing SeaWorld coupons and deals online, she had "never seen a SeaWorld promotion" as "aggressive."

132.  In or around late-February 2014, both Disney and Universal raised prices for single-day admission tickets.  Commenting on Disney's early increase, Doug Mitchelson, a Deutsche Bank analyst, told the *Orlando Business Journal* that the early increase ***evidenced positive park attendance trends across the board***:  "The increase came more than three months earlier than last year, which suggests that park attendance trends must be healthy enough that [management] believes a price

46

1   increase will not unduly negatively impact marketing."   Like clockwork, in May

2   2014 SeaWorld raised its general admission price $3 for both SeaWorld Orlando and

3   Busch Gardens.   However, while Disney and Universal saw attendance rise,

4   SeaWorld once again failed to catch on to the "healthy" "park attendance trend,"

5   *dropping 13% in attendance for that quarter*.

    **E.**    **Unlike Its Competitors, SeaWorld Was Plagued By *Blackfish*,**
6              **Which Generated Extraordinary Negative Public Response and**
7              **Media Attention Throughout The Class Period**

8       133.   Unlike Disney and Universal, throughout the Class Period SeaWorld

9   was under continual fire arising from the damning indictment of the Company's

10   business practices in *Blackfish*.   From the time the film premiered in January 2013,

11   the media regularly reported on *Blackfish* and its potential negative impact on

12   SeaWorld's reputation and business.   As its distribution and notoriety increased after

13   January 2013, the film sparked a groundswell of anti-SeaWorld commentary and

14   action from an ever-expanding bloc of public citizens, both prominent and grassroots.

15   This phenomenon was even given a name – the *Blackfish* effect – by observers.   It

16   entailed traditional forms of protest, such as demonstrations and lobbying by interest

17   groups, and also leveraged the influence of modern forms of social media, such as

18   online petitions, issue-dedicated websites and celebrity statements on broadcast

19   platforms such as Twitter.   These and other responses generated by *Blackfish* urged

20   the public to boycott SeaWorld's parks in response to the Company's treatment of its

21   killer whales, and put pressure on organizations and individuals doing business with

22   SeaWorld to end existing or planned relationships with the Company.

23       134.   Such facts led the media, as well as analysts following and reporting on

24   SeaWorld, to query whether at least a portion of the Company's remarkable

25   attendance decline was attributable to consumer sentiment and brand harm from

47

1   *Blackfish*.  However, despite the ever-growing public backlash stemming from the
2   film, Defendants repeatedly assured investors that *Blackfish* was not having any
3   impact whatsoever on SeaWorld's declining attendance.

### i.   Social Media Platforms Like Twitter Successfully Moved The Public To Watch *Blackfish* And Boycott SeaWorld

6   135.   In the Company's IPO Offering Materials, SeaWorld identified online
7   and social media platforms as being key to its ability to "[d]rive [i]ncreased
8   [a]ttendance."  Ironically, however, these same platforms put SeaWorld on the
9   defensive throughout the Class Period, as the negative perception of the Company
10   generated by *Blackfish* spread like wildfire across the internet and Twitter following
11   the film's premiere.

12   136.   Prior to the film's screening at Sundance, in December 2012 the Twitter
13   username @blackfishmovie was created.  Among other things, @blackfishmovie was
14   used:  (i) to promote the film and re-convey its message; (ii) strengthen opposition to
15   SeaWorld; (iii) inform the public when and where the film was being screened; (iv)
16   provide daily updates concerning the availability of the film on various platforms,
17   such as Netflix, DVD and iTunes; and (v) provide real-time access to media coverage
18   of the film and its impact on SeaWorld.

19   137.   According to CW-1, at or around the time of the IPO in April 2013,
20   SeaWorld had a variety of hashtags that were intended to be used by SeaWorld fans
21   such as #SeaWorldCares and #$SEAS, many of which were intended to celebrate the
22   Company's fifty (50) year anniversary.  In response to *Blackfish*, however, CW-1
23   stated that individuals were posting hundreds of anti-SeaWorld posts each day and
24   would "hijack" (or include) those hashtags in order to spread their anti-SeaWorld
25   messages by reaching SeaWorld followers.  CW-1 recalled that a significant portion

26
27

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

1  of the tweets specifically mentioned *Blackfish* and continued through the summer of

2  2013 as *Blackfish* was released in theaters domestically.  Moreover, CW-2 believed

3  that the backlash from *Blackfish* essentially ruined the Company's attempt to

4  celebrate its 50th Anniversary in 2014.

5      138.  Prominent celebrities utilized Twitter to urge their millions of followers

6  – many of whom fell squarely within SeaWorld's target market of people between

7  ages ten (10) and nineteen (19) – to watch *Blackfish* and avoid SeaWorld.

8  Specifically, around the time of *Blackfish*'s theatrical release in July 2013, celebrities,

9  including Olivia Wilde, Ellen Page, Evan Rachel Wood and Kesha, each made

10 statements on their Twitter pages encouraging followers to watch the film, and

11 condemning the apparently inhumane treatment of animals by SeaWorld.  For

12 example, on July 17, 2013, Olivia Wilde, who maintains 1.5 million followers, wrote:

13 "Only movie I want to go see this week:  Blackfish. Watch out, Sea World. We are

14 on to you."  On August 12, 2013 Singer Kesha, who maintains 3.6 million followers,

15 urged her followers to watch the film writing, "ANIMALS! Learn the truth about

16 marine  mammal  theme  parks:  http://t.co/jn7eSGQSzs  @humanesociety

17 @MagnoliaPics #Blackfish."  Likewise, on September 8, 2013, Russell Brand, who

18 maintains more than 9 million followers tweeted, "Do watch "Black Fish". Don't go

19 to  SeaWorld,  a  stain  upon  humanity  posing  as  entertainment.

20 #liftedfromanearlyreviewofmine."

21     139.  The social media conversation generated by *Blackfish* reached a fever

22 pitch following the CNN premiere of the film on October 24, 2013.  This was no

23 accident.  Lila King, CNN's senior director for social news, explained that CNN

24 aimed to create a parallel experience on Twitter and TV stating, "Our approach was

25 to create a back channel to the broadcast, featuring live Tweets from experts […] and

26

27

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

many others."  King explained that CNN purposely integrated Twitter into the broadcast by inviting "our audiences to join the conversation by showing the #blackfish hashtag on the screen, and also curating the conversation in live blog on CNN.com."

140.   CNN's strategy of deliberately leveraging social media on Twitter to boost TV ratings by creating a synergistic effect between its cable network and its internet and social media platforms worked.  On the CNN premiere night alone, there were 67,673 Tweets seen by 7.3 million people about *Blackfish*, which made it the most talked about show on CNN in October 2013.  According to CW-1, *Blackfish* became a trending topic shortly after it aired.  In the weeks following the premiere, as confirmed by CW-1, numerous high-profile celebrities, with some of the most followed accounts on Twitter, continued to Tweet about the film and their disdain for SeaWorld and its brand, thereby magnifying the scale of the controversy surrounding SeaWorld's apparent mistreatment of its orcas.

141.   For example, on November 3, 2013, then nineteen (19) year old singer and former Nickelodeon star Ariana Grande, who maintains 26.2 million followers on Twitter, wrote, "I highly recommend all of my fans watch #Blackfish and never go to @Seaworld again.  Used to love that place. Beyond heartbroken #Free Tilly." Grande's statement excoriating SeaWorld was the most re-tweeted of that night. Among other high-profile celebrities with massive Twitter followings to Tweet disparaging statements about SeaWorld in light of *Blackfish* were:  (i) Miley Cyrus, with 19.2 million followers; (ii) Stephen Fry, with 8.6 million followers; and (iii) Zach Braff, with 1.4 million followers.

142.   As reported by CNN on December 20, 2013, social media sites became and remained "filled with comments from people vowing they'll never go to the

[SeaWorld-owned] parks again after viewing the film." According to CW-1, by January or February 2014, SeaWorld began an effort to respond to social media postings as they occurred. Typically, the Company would post a link to their "open letter," discussed above. CW-1 worked within a so-called "war room" in which she and other employees in Interactive Marketing worked on various digital media for the Company's website in response to *Blackfish*. However, CW-1 stated that when SeaWorld would respond, the anti-SeaWorld sentiment would only magnify.

143. According to CW-2, *Blackfish* was at least partially the reason for declines in attendance in 2013 and early 2014, when she left the Company. In fact, CW-2 attended weekly meetings that were also attended by the General Manager, the Vice President of Marketing and the Vice President of Finance for SeaWorld's San Antonio park, where attendance at the park was discussed and, in at least one such meeting held between the time of *Blackfish*'s release and February 2014, she recalled that it was acknowledged that the negative press from *Blackfish* seemed to be having an impact on attendance.

ii.    **External Polls And News Stories Showed That *Blackfish* Had Negatively Impacted The Public's Willingness To Attend SeaWorld Parks**

144. In order to gauge public sentiment on *Blackfish*, various media groups and publications conducted surveys to poll the public. CNN, for example, ran a poll during an October 25, 2013 episode of *Crossfire* asking viewers "[w]ould you take your kids to SeaWorld" in light of the information revealed by *Blackfish*. Of approximately 3,000 responses, 86% stated "No."

145. Tellingly, SeaWorld was caught red-handed attempting to manipulate the results of a similar poll conducted by the *Orlando Sentinel* in January 2014. Shortly after the poll began, it was revealed by the news group that more than 50% of

the responses were from an IP address owned by SeaWorld.  Ultimately, once this tactic was uncovered and the poll was cleansed, two-thirds of voters responding to that poll – which asked whether "CNN's 'Blackfish' [sic] documentary changes your perception of SeaWorld" – answered in the affirmative.

146.  Similarly, *Blackfish* prompted schools to either cancel long-standing annual field trips to SeaWorld's parks or publicly swear off attending the parks until SeaWorld changed its policies.  For example, just weeks after *Blackfish* aired on CNN, in November 2013, San Diego's Point Loma High School produced a striking video response to the film, vowing never to return to the parks until the whales and animals were retired from show business.  The video entitled "Dear SeaWorld," received nationwide attention, was aired on CNN and reported on by numerous publications and received a "Compassionate Classroom Award" from PETA, which also made the video available on its website.  As reported by CNN in December 2013, Point Dume Marine Science Elementary School in Malibu, California – prompted by the concerns of a 10-year old – abruptly canceled its long-standing trip to the Company's park over concerns about the treatment of whales as shown in *Blackfish*.  These cancellations and others indicated that children and teens – the individuals who drive parents and families to travel to the parks – were no longer supporting SeaWorld.

### iii.   The "*Blackfish* Effect" Swallowed SeaWorld's Annual Music Festival

147.  Each year SeaWorld hosts "Bands, Brew & BBQ," a live concert series at SeaWorld Orlando and Busch Gardens in Tampa during February and March, featuring top classic rock and country bands and artists, BBQ from Central Florida's top local smokehouses, and other festivities.  The concerts are included with regular admission to the parks.  According to SeaWorld's public filings, the Company's

52

market is "further diversified among a more stable base of local visitors, non-local domestic visitors and international tourists."  "Bands, Brew and BBQ" is part of the Company's stated business strategy to "increase non-peak demand through seasonal and special events and concerts" – i.e., to drive off-season attendance in prime markets.  SeaWorld Orlando and Busch Gardens in Tampa depend on the annual "Bands, Brew and BBQ" concert series to increase park attendance and overall revenue during the typically slow mid-winter months.

148.   In late 2013, as the *Blackfish* controversy continued ablaze, nearly every act slated to perform at "Bands Brew and BBQ" received a petition through Change.Org (along with significant pressures from other social media platforms) imploring the band or artist to cancel its performance.  Change.org is the world's largest online petition platform and seeks to empower individuals to create change by offering them the ability to start a campaign and mobilize supporters.  These particular petitions were successful, prompting nearly every artist scheduled to perform at the series in February and March 2014 to withdraw. Beginning in November 2013 and through mid-January 2014, the following artists canceled their performances:  (i) The Barenaked Ladies; (ii) Willie Nelson; (iii) Cheap Trick; (iv) Heart; (v) Martina McBride; (vi) 38 Special; (vii) Trisha Yearwood; (viii) REO Speedwagon; (ix) Pat Benatar; and (x) Beach Boys.

149.   For example, The Barenaked Ladies – the first to withdraw – received a petition signed by 11,782 supporters, prompting the group to alert the public on their Facebook page:  "This is a complicated issue, and we don't claim to understand all of it, but we don't feel comfortable proceeding with the gig at this time."  Activists successfully directed similar online petitions at other performers including Willie Nelson, Trisha Yearwood, and Cheap Trick.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

150.   In nearly every instance, the artist specifically cited the controversy surrounding *Blackfish* as the basis for the cancellation. In explaining his decision to cancel, Willie Nelson condemned SeaWorld's practices, stating, "I don't agree with the way they treat their animals, […] it wasn't that hard a deal for me." Likewise, sisters Nancy and Ann Wilson of Heart acknowledged their decision to cancel at SeaWorld was "due to the controversial documentary film."

151.   These cancellations attracted international attention, as news sources reported on each successive cancellation over the seven week period beginning November 27, 2013 with The Barenaked Ladies' announcement and continuing through January 15, 2014 with the Beach Boys' announcement that they would not perform.  A December 11, 2013 *Orlando Sentinel* article entitled, "Will SeaWorld face long-term 'Blackfish' backlash?" noted that, at a minimum, withdrawals from the concert series "threatened to sabotage SeaWorld's 'Bands, Brew and BBQ' program," which the park depended on "to drive traffic during the typically slow midwinter months."  Potentially much more damaging, the article noted that the cancellations might help "sustain *Blackfish* in the public consciousness, raising the risk that the film and its criticisms could do lasting damage to SeaWorld's brand."

152.   Atchison admitted in his December 20, 2013 interview with the *Orlando Sentinel* that the cancellations "ended up getting more coverage and became a story of its own."  Atchison further explained that the Company decided to publish the December 2013 full-page open letter on social media and within major newspapers in order to refute what he described as "misconceptions that were floating around related to that coverage."  SeaWorld's ad, entitled "Open Letter from SeaWorld's Animal Advocates" was widely viewed as evidence that the Company was "concerned about potential long-term brand damage from *Blackfish*," as reported by

54

the *Sentinel*, and was, according to CNN and the *Orlando Business Journal*, concerned by both *Blackfish*'s "impact on a very key part of their audience" and "the attention generated by Blackfish and the accompanying musical guest cancellations."

### iv. In The Wake Of *Blackfish*, Long-Standing SeaWorld Sponsors And Strategic Partners Jumped Ship

153. Amidst the growing negative publicity directed at SeaWorld throughout the Class Period, pressure from activists to cut ties with SeaWorld and extensive media coverage of this pressure, many SeaWorld corporate partners terminated their relationships with SeaWorld.

154. For example, in October 2013, activists initiated a Change.org petition urging Southwest Airlines to end its relationship with SeaWorld. By January 2014, the petition had garnered 27,000 signatures. In a widely reported story, dozens of protesters delivered the petition to Southwest's headquarters in Dallas on January 9, 2014, prompting the airline to publicly respond. According to CW-1, Southwest contacted SeaWorld and inquired about *Blackfish* in response to a slew of negative Facebook and Twitter messages Southwest was receiving due to its association with SeaWorld. Southwest did not cut ties with SeaWorld immediately, but acknowledged the *Blackfish* controversy stating: "We are engaged with SeaWorld related to the recent concerns being raised. We are in a listening and education mode."

155. In November 2013, petitions by PETA and the public implored Macy's to ban SeaWorld from participating in the annual Macy's Thanksgiving Parade later that month. According to the *Huffington Post*, Macy's also received more than 80,000 emails to this end, while an online petition started by PETA seeking a similar ban likewise received more than 80,000 signatures.

156.   The impact of these petitions, collectively signed by hundreds of thousands of individuals, was amplified by extensive media coverage of them.  For example, a January 15, 2014 article on CNBC entitled, "Southwest Air, others, pressured to break ties with SeaWorld" discussed the Change.org petition directed at Southwest and noted that "on Change.org alone, there are more than two dozen 'Blackfish'-inspired petitions."  Similarly, a January 13, 2014 National Geographic article reporting on the *Blackfish* effect noted that there were more than twenty-one (21) *Blackfish*-inspired Change.org petitions, including many aimed at destroying SeaWorld's relationships with corporate sponsors and partners, among them Southwest Airlines, Toys R Us, and Groupon.

157.   A Change.org petition was also effective in persuading Taco Bell, which had been offering discounts on tickets to SeaWorld, to cut ties with SeaWorld in May 2014.  Likewise, on May 16, 2014, after consulting PETA, STA Travel, a company which provides flights, accommodation, tours and expeditions for 2.5 million students and young people, announced that it would stop booking trips to SeaWorld in Orlando and San Diego.

158.   By this point, association with SeaWorld was perceived as being so toxic that on June 22, 2014 Outdoor Play, a company specializing in outdoor apparel and equipment, declined to fill an order placed by SeaWorld.  The CEO of Outdoor Play wrote in a letter to SeaWorld, "Although I would love to take your money, our company does not support the ethics of your business model."  Likewise, on July 24, 2014, Savings.com, a company that specializes in digital coupons, stopped offering deals on SeaWorld tickets after Savings.com's chief executive officer was contacted by PETA and watched *Blackfish*.

159.  This trend of companies terminating their relationships with SeaWorld was amplified when Southwest Airlines, after enduring the intense and well-publicized efforts of activists for almost ten (10) months, announced on July 31, 2014 that it would not be renewing its 26-year partnership with SeaWorld.  While a press release stated that the break was mutual and based on "shifting priorities," every major news source reporting on the announcement noted that Southwest had been subject to massive activist pressure in the form of protests and a Change.org petition signed by more than 32,000 people, urging it to terminate the partnership.

160.  Following the Southwest Airlines announcement, other important corporate partners followed suit, and ended their relationships with SeaWorld.  In October 2014, the *Orlando Sentinel* reported that Virgin America, JetBlue, and Alaska Airlines also had terminated their promotional partnerships with SeaWorld. In November 2014, the *Orlando Sentinel* reported that Panama Jack, an Orlando-based sunscreen company, would end its relationship with SeaWorld effective February 2015.  Finally, on November 14, 2014, Hyundai Motors America Communications Executive Director Chris Hosford confirmed that Hyundai had "ended its relationship with SeaWorld."  Remaining sponsors American Express and British Airways are currently subject to similar pressures through Change.org petitions, signed by 75,000 and 265,000 individuals, respectively.

161.  The fallout for SeaWorld from *Blackfish*-generated controversy is ongoing.  On January 15, 2015, the *Orlando Sentinel* reported that the Miami Dolphins, which had previously offered ticketholders free admission to SeaWorld, had ended its marketing partnership with SeaWorld.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

v.   **Proposed California Legislation Inspired By *Blackfish* Threatened SeaWorld's Ability To Hold Captive Orcas In California**

162.   On March 7, 2014 national media outlets reported that California Assembly member Richard Bloom had introduced legislation in the state Assembly that would ban orca performances, breeding or artificial insemination in the state of California.   The proposed legislation was closely associated with *Blackfish* in widespread public reporting.

163.   For example, in a March 7, 2014 article entitled "California Lawmaker Introduces '*Blackfish*' Inspired Orca Captivity Bill," U.S. News & World Report reported:

> The Oscar-shortlisted documentary "Blackfish" has already created a public relations nightmare for SeaWorld, and now it looks like the theme park's worst fears could be coming true. ***The film, which alleges that killer whales are gravely mistreated by the aquatic entertainment theme parks, has inspired a California lawmaker to introduce legislation that would ban the captivity of orcas.***
>
> ….
>
> The bill would ban orca performances, breeding and artificial insemination in the state. Orcas would only be allowed kept in captivity for the purposes of rehabilitation and release. It would also ban the import and export of killer whales across state lines, meaning the 10 killer whales currently in captivity California would have to stay there, but in sea pens not open to public, unless they can be returned to the wild.

164.   The media repeatedly noted the direct link between *Blackfish* and the proposed bill.   Indeed, some press outlets coined the proposed legislation "The *Blackfish* Bill."   For example, *The Voice of San Diego* published an article on March 7, 2014 entitled "So-Called *Blackfish* Bill Could Devastate SeaWorld," which noted

58

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

1   that the proposed bill contained measures "largely motivated by *Blackfish*" and that
2   the "movie's director, as well as three opponents of SeaWorld's treatment of killer
3   whales interviewed in the film, appeared" with the sponsor of the bill at the press
4   conference announcing the bill.  Other articles published on March 7, 2014 in outlets
5   as diverse as *USA Today* and *The Hollywood Reporter* repeatedly referenced the
6   *Blackfish* effect when reporting on the proposed bill and its potentially disastrous
7   effects for SeaWorld's business.

8   165.  However, as TIME reported in its online news platform on April 8,
9   2014, "the so-called *Blackfish* bill" was tabled "for further study at a committee
10  hearing in Sacramento."   According to TIME, the study was expected to take
11  approximately twelve (12) months.  The California Assemblyman who introduced the
12  bill was later quoted by *Bloomberg* as stating, with respect to the bill's tabling in
13  April 2014:  "SeaWorld went to the mat on this issue," and brought in "big guns" to
14  lobby for the bill to be tabled.

15        **F.    The Truth Concerning *Blackfish*'s Impact On SeaWorld Emerges**

16        166.  On August 13, 2014, after categorically denying for a year and half that
17  *Blackfish* had impacted the Company ***at all***, SeaWorld finally admitted that
18  "***attendance in the [second] quarter was impacted by demand pressures related to***
19  ***recent media attention surrounding proposed legislation in the state of California***
20  [i.e., the '*Blackfish* Bill']."  The *Wall Street Journal* described this stark admission as
21  an "about face."  In direct response to this news, SeaWorld's common stock price
22  tanked $9.25 per share, or nearly 33%.

23        167.  More specifically, on August 13, 2014, SeaWorld:  (i) filed with the
24  SEC the Company's quarterly report on Form 10-Q for the three-month period ended
25  June 30, 2014 (the "2Q14 Form 10-Q"), which was signed by Heaney and Swanson;

26
27

59

(ii) issued a press release announcing its second quarter 2014 results ("2Q14 Press Release"); and (iii) held the Company's second quarter earnings conference call ("2Q14 Earnings Call"), in which Atchison and Heaney participated on behalf of SeaWorld. SeaWorld disclosed dismal revenues, driven by weak attendance levels, for the second quarter and the first half of 2014, severely cut its revenue guidance for the year, and attributed its disappointing performance in part to *Blackfish*-related causes.

168. SeaWorld disclosed that in 2Q14 its revenues had fallen 1%, or $6.1 million, compared to 2Q13, and that its revenues for the first half of 2014 were down $32.5 million, or 5%, compared to the first half of 2013. The Company further disclosed that in 2Q14 it had earned $0.43 per diluted share, and revised its revenue guidance for 2014 sharply downwards, stating "the Company now expects full year 2014 revenue … to be down in the range of 6-7% … compared to the prior year."

169. SeaWorld gave reasons for these results, explaining that the "decrease in revenue was driven by a 4.3% decline in attendance" in the first half of 2014, and that "[a]ttendance for the first half of 2014 was largely impacted by a decrease at the Company's destination parks primarily in the second quarter as discussed in the preceding section." In "the preceding section," SeaWorld stated that "lower attendance at the Company's destination parks [was] due to a combination of factors," including the school calendar, new attractions at the company's competitor parks, and a delay in opening a SeaWorld attraction. "[I]n addition," SeaWorld stated, "*the Company believes attendance in the quarter was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California*." The Company had finally admitted that *Blackfish* was hurting attendance at SeaWorld parks.

170.   The Company's reference to "legislation" was a reference to the so-called "*Blackfish* Bill."   Indeed, on the Company's 2Q14 Earnings Call, Felicia Hendrix, an investment analyst from Barclays Capital, questioned why that bill, which was introduced in March 2014 and tabled in early April 2014, would have a new attendance effect in August 2014, noting that the Company had not stated that the proposed bill was having any effect on attendance on its prior earnings call in May 2014.   Hendrix asked, "I don't understand the commentary regarding the proposed legislation having an effect on attendance because that was resolved in early April.  And when you addressed this in May, that didn't come up as an issue at all.  So I'm just wondering why you thought that was an issue in the quarter."

171.   Atchison's response left no doubt that when the Company did not include the *Blackfish* Bill as a factor impacting attendance declines in May 2014, it lacked a reasonable basis for doing so.   Atchison stated:   "With respect to the California legislation, as we spoke in May …. [A]t that point in time, we were really still grappling with what impact there would be related to the news attention around that legislation.  ***So I'm not sure that we had a clear view on what that would look like.***   That's a rather unprecedented event for us and ***difficult to model in that respect***."

172.   After the Company disclosed that *Blackfish*-related attendance declines had caused weak revenues and a downward revision of guidance, SeaWorld's common stock price plunged, as reported by industry, business and financial press. For example, the *Wall Street Journal*'s online site, *WSJ Blog*, reported during trading on August 13, 2014 that SeaWorld's common stock price was "tank[ing]" on news that "protests and negative publicity took a significant toll on the company's second-quarter results."   The report noted that SeaWorld had "reported disappointing second-

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

quarter results and slashed its revenue guidance for the year," and had "blamed the recent media debate about its treatment of captive orcas, saying the negative attention has hurt attendance." The report further stated that "the controversy was sparked last year in the wake of *Blackfish*," and that the Company's attribution of attendance declines to "demand pressures related to recent media attention surrounding proposed legislation" was a reference to the California bill proposed in March 2014 "aiming to restrict SeaWorld's ability to showcase some animals in that state." Finally, the report concluded that the Company's admission that *Blackfish* had hurt attendance and revenues represented "***an about face for SeaWorld***, which late last year was singing a different tune," citing Atchison's December 2013 statements that *Blackfish* had "had no impact on our business."

173. Dow Jones also published a wire during trading on August 13, 2014, reporting that SeaWorld had "slashed its revenue guidance for the year as the theme-park operator reported underwhelming results and attendance for the second quarter. Shares of the company—***which acknowledged that media attention about legislation in California to end the orca shows weighed on attendance***—fell nearly 30% in morning trading as its results for the period missed analysts' expectations by a wide margin."

174. Similarly, in an August 13, 2014 article entitled "SeaWorld Shares Hit As Negative Publicity From Film Hurts Revenue," the *Financial Times* reported that "this quarter marks the first time management has mentioned *Blackfish*-related issues in its earnings results." Travel industry news and analysis website SKIFT posted an article on August 13, 2014 entitled "SeaWorld Concedes *Blackfish* Hurt Attendance In Second Quarter." The *Christian Science Monitor* likewise reported on August 13, 2014, on SeaWorld's dismal second quarter 2014 earnings in an article entitled

"SeaWorld Earnings, Stocks Plunge As Animal Welfare Debate Rages." The article set forth the Company's disappointing quarterly results before stating, "So what's behind the numbers? *For the first time*, SeaWorld is saying that media attention surrounding the treatment of its animals is hurting attendance at its parks." The report quoted an industry expert as follows:

> "'[SeaWorld's] attendance has been flat since Blackfish came out,' Andy Brennan, lead analyst at IBISWorld, an industry research group, said in an interview. 'Essentially the company in previous statements said the decline in attendance was caused by other factors, but now they are having to justify bad earnings and why stock prices are going down.' Mr. Brennan said SeaWorld 'is underperforming compared to [other companies] in industry' and that *the negative attention is to blame*."

175. As all of these industry and financial market observers noted, the Company had admitted for the first time that *Blackfish* had negatively impacted both attendance and revenue throughout the Class Period.

176. This admission was of major significance because *Blackfish* and the fallout surrounding it were tied to how the public viewed SeaWorld. As *Bloomberg* put it in an article published on November 20, 2014, SeaWorld attendance declining "because of changing perceptions of killer whale shows" would represent "a potentially catastrophic threat to a $1.4 billion-a-year business." Damage to SeaWorld's brand and reputation would constitute a different and direr threat to its ability to generate future earnings than issues stemming from transitory effects of weather or the holiday calendar because harm to brand or reputation risks a structural shift in consumer taste away from a company's existing product. Accordingly, investment analysts focused on the health of the Company's brand during the 2Q14 Earnings Call. For example, Robert Fishman of MoffettNathanson LLC pointedly

63

asked if SeaWorld had sought to measure how its "brand is perceived today versus maybe a year ago?"   The admission that *Blackfish*-related issues were, in fact, impacting park attendance, was very bad news for the Company in the eyes of investors.

177.   In response to the August 13, 2014 disclosure, SeaWorld's common stock price declined a staggering $9.25 per share, or nearly 33%, from a closing price of $28.15 per share on August 12, 2014, to a closing price of $18.90 per share on August 13, 2014.   This decline eliminated more than $830 million from the Company's market capitalization in just one day.

### G.   The Aftermath Of The Fraud

178.   On August 14, 2014, S&P lowered SeaWorld's corporate credit rating to BB- from BB, pushing the rating further below investment grade, also known as junk status.  The negative outlook reflected S&P's expectation that SeaWorld still faced significant challenges regarding "reputational risk and potential improvements in operating performance beyond 2014."   Additionally, S&P cited "negative media reports that have specifically targeted the company's use of orca whales for entertainment purposes" as contributing to "lower attendance and spending at the parks" as a reason for the downgrade.

179.   As discussed above, SeaWorld suffered new blows in the following months as additional corporate sponsors and marketing partners cut ties with the Company.  *See* ¶¶153-161.

180.   Reports of grassroots protests and school groups organizing to prevent school sponsored associations with SeaWorld continued to arise, threatening to further erode gate attendance.  On November 6, 2014, it was reported that California State University Long Beach students planned to stage a protest to demand that the

1  university stop selling discounted SeaWorld tickets due to the theme park's alleged
2  mistreatment of killer whales. The rally came after California State University Long
3  Beach Associated Students Inc. passed a resolution to end the sale of SeaWorld
4  tickets in the University Student Union, which the trustee board for the student union
5  ultimately moved to support.

6      181.   Following the announcement of extremely poor attendance figures and
7  earnings in the third quarter earnings call on November 12, 2014, Atchison reiterated
8  his commentary from the 2Q14 Earnings Call regarding negative attendance trends,
9  explaining that "the decline resulted from a combination of factors, including
10  negative media attention in California."  The declining attendance trend was ongoing
11  and Atchison noted that "[c]onsistent with the update we provided in August, the
12  attendance trends the Company experienced in the latter part of the second quarter
13  continued into the third quarter."  Referring to decreased attendance at SeaWorld's
14  Orlando and San Diego parks, he admitted the Company was not "happy with it or
15  accepting of it, but we're seeing similar trends through those two parks, as has been
16  reported previously in our Q2 numbers."  Alluding to efforts to repair the damage
17  *Blackfish* had caused to SeaWorld's brand, he stated, "[o]n the reputation side, we
18  have introduced a number of aggressive and proactive initiatives and campaigns to
19  make sure the truth is being told, address public perceptions, and raise and protect
20  brand awareness."

21      182.   Following that call, Atchison granted wide-ranging access to a
22  *Bloomberg Business* reporter for a November 20, 2014 piece entitled, "Saving
23  SeaWorld," in which he discussed the negative impact of *Blackfish* on SeaWorld's
24  reputation and ticket sales. *Bloomberg* reported that, "SeaWorld acknowledges that
25  ticket sales have declined because of changing perceptions of killer whale shows"

26

27

and noted that "[f]or SeaWorld, whose logo features an orca's dorsal fin, *Blackfish* has gone from being a public relations problem to a potentially catastrophic threat to a $1.4 billion-a-year business." Commenting on the crucial importance of SeaWorld's killer whale shows to SeaWorld's business model, Atchison admitted, "Our killer whales, our killer whale program, and all of our animals are emblematic of the whole brand." He acknowledged that *Blackfish* had long been on the Company's radar and that he was aware of the "notable momentum" the film gained when "CNN started airing it…[r]epeatedly," but that the Company had struggled to find an effective approach in responding to widespread criticism and activism generated by the film.

183.   Weeks later, on December 11, 2014, the *Daily Mail* reported that Atchison had "resigned following low visitor numbers in the wake of a 2013 film, Blackfish, which criticized [the Company's treatment] of killer whales." As reported by the *Tampa Bay Times* that same day, however, a SeaWorld spokesman "would not say whether Atchison's decision was voluntary." According to an analyst with Pacific Asset Management, "[SeaWorld's] board was likely looking for someone who can better handle SeaWorld's public-relations problems." Also on December 11, 2014, the *Wall Street Journal* confirmed that Atchison would "depart as chief executive" and that SeaWorld would unveil "a restructuring plan that comes as it has faced controversy over its treatment of killer whales."

184.   Days later, SeaWorld announced plans to cut "about 300 jobs" as part of the $50 million cost-saving restructuring plan it had announced in its 3Q14 report. In reporting on this development, the *Wall Street Journal* explained that the cuts occurred as SeaWorld "continues to deal with the backlash from animal-rights activists and consumers about its treatment of animals, especially killer whales," and

noted that, "[t]he documentary 'Blackfish,' which has been screened in cinemas and broadcast multiple times by CNN, raised these criticisms to a higher level of public awareness, harming the company's financial results."

185.  CBS reported on December 12, 2014 that "'Blackfish' is widely considered to be at least partly responsible for SeaWorld's attendance drop."  On January 6, 2015, *Fortune* likewise concluded that "SeaWorld has had a bad few years, with park attendance down and the company's reputation taking a beating due to the controversial anti-SeaWorld documentary *Blackfish*."

## V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT – EXCHANGE ACT CLAIMS

### A.    April 18, 2013 – IPO Offering Materials

186.  On April 18, 2013 SeaWorld filed with the SEC its Offering Materials in connection with the Company's IPO.

187.  In the "Risk Factor" section of the IPO Offering Materials, SeaWorld purported to warn investors that *Blackfish* and the negative publicity arising from the film aimed at SeaWorld "may" potentially harm the Company's reputation, attendance, and business at some point in the future:

> An accident or an injury at any of our theme parks or at theme parks operated by competitors, particularly an accident or an injury involving the safety of guests and employees, that receives media attention, is the topic of a book, film, documentary or is otherwise the subject of public discussions, <u>may</u> harm our brands or reputation, cause a loss of consumer confidence in the Company, reduce attendance at our theme parks and negatively impact our results of operations.  Such incidents have occurred in the past and <u>may</u> occur in the future.

****

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

[I]n February 2010, a trainer was killed while engaged in an interaction with a killer whale….This incident has also been the subject of significant media attention, including television and newspaper coverage, a documentary and a book, as well as discussions in social media. ***This incident and similar events that may occur in the future <u>may</u> harm our reputation, reduce attendance and negatively impact our business, financial condition and results of operations***.

188.   Defendants' statement that *Blackfish* "may" have a negative effect on future attendance and other key Company metrics was materially false and misleading because it characterized as contingent or speculative something SeaWorld knew was already occurring or that was reasonably projected to occur.   As thoroughly detailed above, SeaWorld's specific actions in response to *Blackfish* and the information available to Defendants concerning the public's perception of the Company and the film demonstrate as much.   As early as February 27, 2013, SeaWorld knew the threat created by *Blackfish* was real, and, as a result of SEC comments, submitted revised IPO Offering Materials, which included the purported "warning" set forth above.

189.   In addition, the statement set forth in ¶187 was materially false and misleading because at or around the time of the IPO, the intense negative nationwide public attention and reaction to the film was apparent and already impacting the public's intent to visit SeaWorld's parks, as demonstrated by the following facts:

    a)  At or around the time of the IPO, CW-1 stated that there were at least a couple hundred anti-SeaWorld posts a day on Twitter, many of which mentioned *Blackfish* and also hijacked SeaWorld's hashtags in order to reach existing SeaWorld fans.   SeaWorld had internal discussions concerning these posts and potential responses.

    b)  CW-3 recalled that during the time frame from *Blackfish*'s premiere in January 2013 to April 2013, attendance at SeaWorld San Diego was

68

"tanking," down approximately 30% from the budgeted attendance. CW-4 likewise stated that there was a noticeable dip in attendance following the premiere, which continued throughout the Class Period.

c) According to CW-2, CW-3 and CW-4, SeaWorld held ECMs approximately monthly at parks for all employees. At such meetings, attendance was discussed. According to CW-2, CW-3 and CW-4, there were several instances in 2013 when *Blackfish* was discussed. According to CW-2, in one such instance, the San Antonio park's general manager tried to "boost morale" by expressing "this too shall pass," indicating that *Blackfish* was, in fact, plaguing the Company. CW-2 stated that Atchison attended one such meeting and specifically discussed *Blackfish*. CW-4 recalled that these meetings would typically be put together when Atchison was in town.

d) Immediately following the premiere of *Blackfish* at Sundance in January 2013, PETA implemented a devastating public relations campaign related to *Blackfish*, which urged consumers and businesses to boycott the Company's parks. Among other things, PETA launched www.seaworldofhurt.com – a website which discussed *Blackfish*, attacked SeaWorld's treatment of its captured animals, and sought to instigate changes in the Company's core business model and attractions.

e) By January 22, 2013 – three months prior to the IPO – *Blackfish* was certain to reach a larger, national audience in short order, as publications such as the *Chicago Tribune* reported that CNN and Magnolia Pictures had partnered to acquire the domestic rights to *Blackfish*, and that Magnolia planned a summer 2013 theatrical release followed by a domestic broadcast premiere on CNN.

f) At odds with SeaWorld's representation in April 2013 that *Blackfish* "may" negatively impact the Company, on January 23, 2013. Almost immediately following the film's showing at Sundance, SeaWorld began an extensive nationwide public relations campaign in an attempt to counteract the film's predictable effect on public opinion – outrage at the practices reflected in the film, and unwillingness to attend the Company's parks.

190.   Thus, it is neither plausible nor, in fact, possible, that despite this intense negative nationwide public attention and reaction to the film, *Blackfish* was not yet having any impact on attendance or revenues at SeaWorld at the time of the IPO.

**B.     May 23, 2013 –1Q13 Form 10-Q**

191.   On May 23, 2013, SeaWorld filed its 1Q13 Form 10-Q, which was signed by Heaney and Swanson.   The same statements set forth above in ¶187 purporting to warn investors of risks that "may" or "could" negatively impact the Company's results of operations, including attendance, were specifically incorporated by reference within the 1Q13 Form 10-Q, and were materially false and misleading for the reasons set forth above in ¶¶188-89.

**C.     August 13, 2013 – 2Q13 Form 10-Q, Press Release And Earnings Call**

192.   On August 13, 2013, SeaWorld:  (i) filed with the SEC the Company's 2Q13 Form 10-Q, which was signed by Heaney and Swanson; (ii) issued the 2Q13 Press Release; and (iii) held the Company's 2Q13 Earnings Call, in which Atchison and Heaney participated on behalf of SeaWorld.

193.   The same statements set forth above in ¶187 purporting to warn investors of certain risks that "may" or "could" negatively impact the Company's results of operations, including attendance, were specifically incorporated by reference within the 2Q13 Form 10-Q, and were materially false and misleading for the reasons set forth above in ¶¶188-89 and below in ¶199.

194.   In the 2Q13 Press Release, among other things, SeaWorld announced that "attendance for first half of 2013 declined by 6% compared to the same period in 2012 from approximately 10.7 to 10.1 million guests."   The Company attributed the drop in attendance – in its entirety – to three discrete factors.   These factors did not include *Blackfish*:

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

The most significant portion of the decline was an expected result of new pricing and yield management strategies, which reduced attendance but increased total revenue per capita.  The next largest portion of the decline was a result of unexpected adverse weather conditions at the Company's Florida and Virginia parks during the second quarter and at all but one of the Company's park locations in the month of June.  The remainder of the decline was a result of the unfavorable timing of Easter on March 31 which caused an overlap with the spring break holiday period for schools in many of the Company's key markets.

195.   The Company further represented that "attendance in the second quarter of 2013 was impacted by the same issues as outlined in the year-to-date results with an additional impact of attendance shifting out of the second quarter into the first quarter due to the timing of Easter."  Accordingly, SeaWorld reported a 9.5% decline in second quarter attendance, dropping "from approximately 7.2 million in 2012 to 6.6 million guests in 2013."

196.   Likewise, SeaWorld's 2Q13 Form 10-Q represented that:

Attendance in the quarter decreased primarily due to the timing and compression of Easter in 2013 along with the impact of adverse weather conditions particularly at our Florida and Virginia parks during the second quarter of 2013.  These weather conditions also impacted all but one of our park locations in the month of June.  Attendance also declined due to the expected impact of new pricing and yield management strategies.

197.   In the 2Q13 Press Release, Atchison also attributed the 9.5% attendance decline to adverse weather and the timing of the holidays – apportioning none of the decline to *Blackfish* – stating:  "We are pleased with our first half results particularly in light of a challenging second quarter due to the unfavorable timing of Easter and adverse weather conditions at many of our parks."  Atchison further stated:  "While

71

over the long term these weather effects tend to even out, we were impacted much more than normal during the second quarter by these adverse weather conditions."

198.   Defendants, in other words, stated that ***the entire steep decline in attendance*** was attributable to the vagaries of weather, how the holiday calendar had coincided with the Company's fiscal quarter and the "expected impact of new [i.e., increased] pricing."   Defendants thus omitted to acknowledge that any of the attendance decline was caused by negative public response to *Blackfish*, a factor that would represent a more persistent, structural risk to the Company's attendance and revenue dynamic, to the extent people and corporate partners were demonstrating an unwillingness to spend money at SeaWorld, or rejecting the Company's brand.

199.   In addition to the reasons set forth above in ¶¶188-89 and 199, the following facts underscore that each of Defendants' statements set forth above in ¶¶194-98 omitting that *Blackfish* was impacting the Company and responsible, at least in some part, for the decline in SeaWorld's 2Q13 and first half 2013 attendance, was materially false and misleading:

   a) As reported by TIME and other publications, all of the major theme parks in SeaWorld's geographic locations, including Disney and Universal, attained comparable, increased or record attendance figures after they too hiked ticket prices in May or June 2013, consistent with the "annual tradition." *See* ¶¶128-32.

   b) As reported by *Bloomberg* on May 7, 2013, attendance at Disney's domestic parks rose 8% percent in the same quarter, as compared to SeaWorld's 9.5% decline, notwithstanding the fact that Disney's primary U.S.-based parks are located in the same geographic markets as SeaWorld's Orlando, Tampa and San Diego parks – and therefore operated under the same weather conditions (and, of course, holiday and school schedules).

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

200.   During the 2Q13 Earnings Call, Defendants again discussed the factors that caused the decline in attendance and, yet again, omitted *Blackfish* as even a contributing cause.  For example, Heaney repeated the declining attendance figures announced in the 2Q13 Press Release and re-affirmed that new pricing initiatives, adverse weather and the timing of the holiday and school schedule – and nothing else – had caused that decline:

> As mentioned in our earnings release, the most significant driver of the lower attendance was the expected impact of new pricing and yield management strategies that reduced attendance but increased revenue per capita and overall revenue.  The next largest driver was an unexpected impact from adverse weather in our Florida and Virginia parks in the second quarter and at all but one of our park locations in June.  Lastly, the early timing of Easter in March caused an overlap of spring break in many of our markets, which had a negative effect on attendance for the year-to-date period.  From a quarterly perspective, the early Easter also shifted attendance out of the second quarter into the first quarter, as discussed in our prior earnings call.

201.   Tim Conder, a Wells Fargo Securities analyst, questioned Defendants' proffered bases for the decline in attendance, and pressed Defendants for additional detail.  Conder asked "can you quantify any of the impact in any way to the Virginia and the Florida parks in particular?"  In response, Heaney apportioned the loss in attendance equally amongst pricing, weather and the holidays, providing that each was to blame for one-third of the 6% year-to-date decline (which included a 9.5% 2Q13 decline). He thus excluded any other factor, including *Blackfish*, as having affected the Company's attendance:

> One way to slice apart the attendance numbers are, if you look at our year-to-date number we were 605,000 down in attendance versus the

73

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

prior year.  To break that down a little bit for you, a little over a third of that was due to the pricing and yield management efforts that took place in the quarter, so that was somewhat of an expected impact. About a third we can attribute to the adverse weather we had in Florida and Virginia and as you mentioned, all of the parks except one in June.  And then the last piece was the compression of Easter and spring break.  That was a little bit less than a third of the variance versus the prior year, but those are basically the three drivers.  The purposeful piece of it you'll see going forward.  The Easter and weather effects are somewhat a function of, obviously, the weather. The Easter effect, obviously, won't repeat in the second half and that's one piece of attendance we'll pick up in the third and fourth quarters.

202.   Each of Defendants' statements set forth above in ¶¶200-01 regarding the causes of the decline in SeaWorld's attendance figures was materially false and misleading for the reasons set forth above in ¶¶188-89 and 199.

**D.    August 29, 2013 – SeaWorld's Statements To The Media**

203.   On August 29, 2013, following the 2Q13 Press Release and Earnings Call, the *Los Angeles Times* called into question the Company's representation to investors that the 6% decline over the first half of 2013 was attributable to bad weather, suggesting that bad publicity stemming from *Blackfish* may have played a role.  In response, Jacobs, speaking on behalf of the Company, flatly denied the suggestion that *Blackfish* or the public backlash spurred on by the film was hurting attendance, stating that "'***Blackfish' has had no attendance impact***."  That same day – again denying that negative publicity from *Blackfish* was impacting the gates at SeaWorld's parks – Jacobs told *Bloomberg* that "*[w]e [SeaWorld] can attribute no attendance impact at all to the movie*."

204.   In addition to the reasons set forth above in ¶¶188-89 and 199, each of Jacobs' August 29, 2013 statements made on behalf of the Company set forth above in ¶203 was materially false and misleading because by the time of each statement:

74

a) *Blackfish* had reached an even larger domestic and international audience, thus increasing the probability that the film was having or would have an impact on the Company's operations and attendance. For example, on July 19, 2013, *Blackfish* was released in U.S. theaters. Also in July 2013, the film was made available to British customers of Netflix.

b) SeaWorld had dramatically intensified the Company's public relations campaign opposing *Blackfish*. Prior to its release in major markets in the U.S., Jacobs emailed fifty (50) major film reviewers to "discredit" *Blackfish* with a point-by-point refutation of eight claims made in the film. Eammon Bowles, president of Magnolia Pictures, stated "[f]rankly, I've never seen anything like it."

c) SeaWorld employees believed Defendants' statements that *Blackfish* did not have an effect on SeaWorld's attendance "were pretty false" according to CW-3. In fact, CW-3 described SeaWorld San Diego's attendance during the period after the IPO as "off," and, both she and CW-4 believed that the negative publicity due to *Blackfish* had an impact.

d) Prior to 2013, the July 4th holiday was one of SeaWorld's biggest events, but, according to CW-3, in 2013 the San Diego park was "abnormally slow" during that holiday. Similarly, CW-4 recalled that in mid-July through at least August 2013, SeaWorld cancelled almost all of their extra dining services the San Diego park would normally set up for the increased summer crowds due to low attendance.

e) Likewise, as reported by the *Orlando Sentinel*, the Company purchased the rights to Web domains associated with the film title, such as BlackfishFacts.com and TheTruthAboutBlackfish.com, evidencing the Company's internal concern over the growing impact of *Blackfish* on SeaWorld's operation and attendance.

f) Prominent celebrities were urging their millions of follows and the public in general to see *Blackfish* and to then boycott SeaWorld's parks in light of the revelations of *Blackfish* concerning the Company's practices. *See* ¶¶135-43.

75

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

g) As reported by the *Huffington Post* on August 10, 2013, the *Blackfish* effect was so strong that upon viewing the film, executives from Disney's Pixar announced that the company would alter the movie storyline for the sequel to "Finding Nemo," entitled "Finding Dory," so as to remove references to captive sea animal parks.

E.    **November 13, 2013 – 3Q13 Form 10-Q, Press Release And Earnings Call**

205.   On November 13, 2013, SeaWorld:   (i) filed with the SEC the Company's 3Q13 Form 10-Q, which was signed by Heaney and Swanson; (ii) issued a press release announcing its third quarter 2013 results ("3Q13 Press Release"); and (iii) held the Company's 3Q13 Earnings Call, in which Atchison and Heaney participated on behalf of SeaWorld.

206.   The same statements set forth above in ¶187 purporting to warn investors of risks that "may" or "could" negatively impact the Company's results of operations, including attendance, were specifically incorporated by reference and also appeared in substantial form within the 3Q13 Form 10-Q, and were materially false and misleading for the reasons set forth above in ¶¶188-89, 199 and 204 and below in ¶211.

207.   In the 3Q13 Press Release, among other things, SeaWorld again reported a decline in attendance:   "[a]ttendance for the first nine months of 2013 declined by 4.7% compared to the same period in 2012 from 19.9 million to 18.9 million guests." According to the Company, "[a]ttendance was impacted by new pricing and yield management strategies implemented at the beginning of 2013 that increased revenue but reduced low yielding and free attendance, adverse weather conditions in the Company's second quarter and in July, and the negative impact of an early Easter in 2013."

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

208.   SeaWorld then discussed the specific causes of the decline in attendance for the third quarter – none of which, according to the Company, included *Blackfish* or negative publicity arising from the film:

> Attendance trends improved in the third quarter compared to the second quarter reversing a negative trend earlier in the year, with a 3.6% decline versus a 9.5% decline in the second quarter. Attendance trends also improved steadily within the quarter with July attendance down 5.7% due to adverse weather and August/September attendance down 1.8% as weather conditions improved.  Preliminary attendance in October showed continued improvement with attendance comparable to prior year levels.  In addition to adverse weather, the attendance decline in the third quarter was an expected result of planned strategies that increased revenue but reduced low yielding and free attendance.  These strategies were implemented at the beginning of 2013 to increase revenues and operating margins through higher quality attendance which the Company achieved in the third quarter.

209.   Each statement set forth in ¶¶207-08 was repeated in substantial form within SeaWorld's 3Q13 Form 10-Q.

210.   During the 3Q13 Earnings Call, Defendants continued to omit material facts concerning the impact of *Blackfish* on attendance.   For example, Heaney repeated the declining attendance figures announced in the 3Q13 Press Release and re-affirmed that one half of the 3.6% decline was attributable to new pricing initiatives, while the "remainder of the attendance decline" was due to adverse weather not *Blackfish*:

> Attendance trends improved in the third quarter compared to the second quarter, reversing a negative trend earlier in the year with a 3.6% decline in the third quarter versus a 9.5% decline in the second quarter. This improvement continued into October and November, with attendance running flat with prior year levels.  Roughly half of

77

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

the 3.6% decline in the third quarter was expected due to new pricing and yield management strategies implemented at the beginning of 2013 to increase revenue, per capita revenue and operating margin. The remainder of the attendance decline in the third quarter was due to adverse weather in July when we had above average precipitation in all of our markets, including record precipitation in Florida. Weather conditions improved in August and September, and our attendance trends improved accordingly.

211.    Each of Defendants' statements set forth in ¶¶207-10 blaming adverse weather conditions and/or pricing and yield management strategies for the decline in SeaWorld's attendance figures was materially false and misleading for the reasons set forth above in ¶¶188-89, 199 and 204 because – in addition to being subject to the same "adverse weather" conditions as SeaWorld in Orlando and Anaheim – Disney and Universal also implemented pricing increases applicable to the quarter and nonetheless reported comparable or higher attendance figures for the quarter than in the preceding year, as discussed above in ¶¶128-32.

**F.       November 14, 2013 – Atchison's Statements To The Media**

212.    On or around November 14, 2013, Atchison again rejected the assertion that *Blackfish* had or was having any impact on the Company's attendance. Specifically, Atchison stated to the *Wall Street Journal:* "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it," adding "[i]ronically, our attendance has improved since the movie came out."

213.    In addition to the reasons set forth above in ¶¶188-89, 199, 204 and 211, Atchison's statement denying that *Blackfish* had or was having any impact on the Company's business as of November 14, 2013 was materially false and misleading because by the time of his statement:

a) *Blackfish*, which had already inspired public outrage against SeaWorld, now had reached an even larger global audience. Notably, on October 24, 2013, CNN aired *Blackfish* to an estimated twenty-one (21) million viewers, and continued to air and discuss the film multiple times a day thereafter. According to CW-1, media exposure for *Blackfish* just kept getting worse from October forward.

b) For SeaWorld San Diego, after CNN aired *Blackfish*, CW-3 noticed a drop in attendance of approximately 20% compared with previous years, reflected in the budgeted attendance report that she and others received, which she stated must have been attributable, at least in part, to *Blackfish*.

c) External polls evidenced that consumers were no longer interested in attending SeaWorld's parks after viewing *Blackfish*, including an October 25, 2013 poll conducted by *CNN* asking "[w]ould you take your kids to SeaWorld" in light of the information revealed by *Blackfish*. Of approximately 3,000 responses, 86% stated "No." *See* ¶¶144-45.

d) Teenagers and high school classes like San Diego's Point Loma High School, discussed above in ¶146, started refusing to attend SeaWorld's parks until the Company changed its business practices, drawing additional nationwide attention to *Blackfish*.

e) *Blackfish* had sparked enormous opposition to SeaWorld's float at the annual Macy's Thanksgiving Day Parade, as Macy's received more than 80,000 emails urging it to ban SeaWorld from participating in light of *Blackfish*.

f) Further to ¶¶135-43, above, after viewing *Blackfish*, more and more prominent celebrities took to Twitter to campaign against SeaWorld's parks. For example, on September 8, 2013, Russell Brand tweeted to his 9.06 million followers: "Do watch "Black Fish". Don't go to SeaWorld, a stain upon humanity posing as entertainment…." On October 28, 2013, Stephen Fry similarly tweeted to his 8.6 million followers: "Finally watched @Blackfishmovie blackfishmovie.com I hope Seaworld goes out of business. Horrifying."

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

**G.      December 9, 2014 and December 12, 2014 – December SPO Offering Materials**

214.    On December 9, 2013 and December 12, 2013, in connection with the Company's December SPO, SeaWorld filed with the SEC its December SPO Offering Materials.  The same statements set forth above in ¶187 purporting to warn investors of risks that "may" or "could" negatively impact the Company's results of operations, including attendance, were specifically incorporated by reference or appeared in substantial form within the December SPO Offering Materials, and were materially false and misleading for the reasons set forth above in ¶¶188-89, 199, 204, 211 and 213.

**H.      December 20, 2013 – Atchison's Statements To The *Orlando Sentinel***

215.    As reported by the *Orlando Sentinel*, on December 20, 2013, Atchison continued to conceal the impact of *Blackfish* on the Company's business and deny the negative publicity for SeaWorld that the film had spawned.  For example, Atchison stated ***"[a]s much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business***."

216.    In addition to the reasons set forth above in ¶¶188-89, 199, 204, 211 and 213, Atchison's statement denying the impact of *Blackfish* on the Company's business and attendance as of December 20, 2013 was materially false and misleading because:

> a) Beginning as early as November 2013, as a direct consequence of *Blackfish*, nearly every act SeaWorld had booked to headline the Company's annual "Bands, Brews & BBQ" concert series in February and March 2014 at the Orlando and Tampa parks cancelled their appearances following the public backlash directed towards SeaWorld due to *Blackfish*.  *See* ¶¶147-52.   These cancellations received

80

significant media attention, including from *The New York Times*, *CNN*, *Orlando Sentinel* and *National Geographic*.

b) Beginning as early as December 2013 – as Atchison admitted during the December 20 interview – events such as the artist cancellations forced SeaWorld to launch what *ABC News* and the *Orlando Sentinel* called a "big PR blitz" to attempt to counteract the snowballing *Blackfish* effect. SeaWorld's efforts included placing full-page ads in the country's largest newspapers and on social media defending SeaWorld's brand.

c) By December 2013, *Blackfish* was poised to reach even more viewers, as the film was made available on Netflix. Moreover, by December 2013, the *Blackfish* effect had continued to spread on social media, particularly through the use of Twitter and online petitions on Change.org or related websites. As reported by *CNN*, social media sites were "filled with comments from people vowing they'll never go to the [SeaWorld-owned] parks again after viewing the film."

d) In December 2013, SeaWorld again resorted to offering unprecedented discounts as the Company continued to battle negative publicity related to *Blackfish*. For example, SeaWorld turned to Groupon to promote tickets, allowing users to buy as many as ten (10) tickets to SeaWorld Orlando for $59 each – 40% below the basic gate price. During a telecast of Legal View with Ashleigh Banfield on December 19, 2013, Peter Shankman, a CNN Social Medial Consultant, reported that this type of ticket promotion by SeaWorld had "never happened before" and demonstrated the "incredible hit they've taken."

e) As discussed above in ¶¶135-43, after viewing *Blackfish*, prominent celebrities took to Twitter to campaign against SeaWorld's parks. For example, Arianna Grande, who maintains 24.6 million followers, implored fans to watch the film and boycott SeaWorld: "I highly recommend all of my fans to watch Blackfish and never go to SeaWorld again."

f) Beginning in December 2013, SeaWorld could no longer utilize its longstanding soundtrack accompanying orca shows at its parks because of public backlash over *Blackfish*. Specifically, Joan Jett issued a cease and desist letter to SeaWorld demanding that the Company no longer use

her music – the song "I Love Rock and Roll" – during orca whale shows.  After viewing *Blackfish*, Jett wrote that she was "among the millions who saw 'Blackfish' and [was] sickened that [her] music was blasted without [her] permission at sound-sensitive marine mammals."

g) *Blackfish* prompted numerous schools to either cancel long-standing field trips to SeaWorld's parks or publicly swear off attending the parks until SeaWorld changed its policies.  For example, as reported by *CNN*, Point Dume Marine Science Elementary School in Malibu, California canceled its long-standing annual trip to the Company's park over concerns about the treatment of whales as shown in *Blackfish*.

h) *Blackfish* sparked enormous opposition to SeaWorld's float at the annual Macy's Thanksgiving Day Parade.  As reported by CNN on November 25, 2013, an online petition released by PETA asking that the SeaWorld float be removed from the parade received more than 80,000 signatures.  Similarly, prominent celebrities like Alec Baldwin publicly urged Macy's to ban the SeaWorld float.  In an open email to Macy's, Baldwin wrote:  "Please don't be a party of SeaWorld's crisis-management plan," as reported by *The New York Times* on November 18, 2013.

I.   **March 13, 2014 – 4Q13 And FY 2013 Press Release And Earnings Call**

217.   On March 13, 2014, SeaWorld issued a press release ("4Q13 Press Release") announcing its fourth quarter 2013 results and its results for the year ended December 31, 2013 ("FY 2013") and held the Company's 4Q13 Earnings Call, in which Atchison and Heaney participated on behalf of SeaWorld.

218.   In the 4Q13 Press Release, among other things, the Company reported a decline in both the 4Q13 and full-year attendance.

219.   SeaWorld reported that its 2013 attendance had declined by 4.1%, from 24.4 million guests in 2012 to 23.4 million guests in 2013.  It stated three reasons for this decline – none of which was *Blackfish*:  "The decline was primarily attributable to the expected result of planned pricing and yield management strategies that

82

increased revenue but reduced low yielding and free attendance.  Also contributing to the decline in full year attendance was unexpected adverse weather conditions in the Company's second quarter and July as well as the impact of an early Easter in 2013."

220.   With respect to the fourth quarter, SeaWorld reported that "consolidated fourth quarter attendance declined by 1.4% to 4.5 million guests in 2013" and attributed the entire decline to "planned pricing and yield management strategies" the Company had implemented in January 2013:

> The attendance decline was the expected result of planned pricing and yield management strategies implemented at the beginning of 2013. Attendance trends improved sequentially through the year with a 1.4% decline in the fourth quarter compared to a 3.6% decline in the third quarter and a 5.7% decline in the first half of the year.

221.   In addition to the reasons set forth above in ¶¶188-89, 199, 204, 211, 213 and 216, each of Defendants' statements set forth above in ¶¶219-20 regarding the causes of the decline in SeaWorld's attendance figures was materially false and misleading because:

> a) According to the 2013 TEA Report and discussed above in ¶¶119-21, nearly all of the major theme park groups with locations in the U.S. – including Disney and Universal – experienced *increases* in full year attendance for 2013 despite many being located in the same geographic market as the Company's SeaWorld Orlando and Busch Gardens Tampa parks and subject to the same calendar as SeaWorld, laying bare the Company's attempt to attribute attendance declines in 2013 to adverse weather and holiday timing.  Specifically, Disney, Universal and Six Flags experienced increases of 4.8%, 5.3% and 1.4%, respectively.
>
> b) As reported in the 2013 TEA Report and discussed above in ¶¶119-21, nearly all of the largest *individual* theme parks in the U.S. likewise experienced significant year-over-year attendance increases in 2013, including those located in the same geographic market as SeaWorld.

83

For example, while SeaWorld's parks in Orlando and San Diego experienced a 5% and 3% year-over-year loss in attendance, respectively, Disney's Magic Kingdom, Epcot, Animal Kingdom and California Adventures realized gains in year-over-year attendance of 6.0%, 1.5%, 2.0% and 9.5%, respectively. Universal Studio's parks in Florida and Hollywood, California similarly experienced year-over-year increases in attendance of 14% and 4%, respectively.

c) By the first quarter of 2014, there were more than two dozen *Blackfish*-related petitions on Change.org, including one petition asking country singer and American Idol winner Scotty McCreery to cancel a March 1, 2014 show that collected nearly 30,000 signatures.

d) During 4Q13, prominent sponsors – some of which the Company specifically identified within Class Period filings with the SEC – were under public pressure to terminate long-standing partnerships with SeaWorld, as discussed above in ¶¶153-61 and by CW-1.

222. During the 4Q13 Earnings Call, Defendants continued to omit material facts concerning the impact of *Blackfish* on park attendance. For example, in explaining why 4Q13 attendance had fallen by 1.4%, Heaney stated that the decline was caused by "planned pricing and yield management strategies." Addressing the full 2013 attendance decline, Heaney explained that such decline was caused both by pricing strategies and bad weather.

223. Each of Heaney's statements set forth above in ¶222 regarding the causes of the decline in SeaWorld's attendance figures was materially false and misleading for the reasons set forth above in ¶¶188-89, 199, 204, 211, 213, 216 and 221.

224. During the 4Q13 Earnings Call, an FBR Capital Markets analyst Barton Crocket specifically pressed Defendants on whether *Blackfish* had had any impact whatsoever on SeaWorld, including attendance:

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

1
2
3
4
5
6
7

Then if I could switch gears to get you to touch on the big thing that has been in the media.  Obviously, the animal activism discussion from the documentary, from legislation, from bands making statements – it's been in the news.  And if you have a fair response to that, in terms of it being unfair, given everything you guys do to help conservation and make that part of your brand.  ***But leaving aside the fairness of it, I was just wondering if you could comment on whether there's any impact that you've noticed at all on satisfaction or attendance or the desirability of SeaWorld for international licensees?  Has this had any impact on any of that***?

8
9
10
11
12
13

225.   In response, Atchison stated in no uncertain terms that the Company had "***seen no impact on the business***" stemming from *Blackfish* and that surveys conducted by the Company did not "***reflect any shift in sentiment about intent to visit [SeaWorld's] parks***" as a result of *Blackfish*.  In fact, Atchison boldly claimed just the opposite – that *Blackfish* was ***positively impacting SeaWorld*** by increasing interest in the park and its wildlife.  Specifically, Atchison assured investors that:

14
15
16
17
18

With respect to the impact on our business, I get asked that a lot, too.  ***As much as we're asked it, we can see no noticeable impact on our business***.  If you follow this -- even this recent announcement, our SeaWorld parks had record attendance in the fourth quarter of the year, and are out-performing our other parks by considerable margin.

\*\*\*

19
20
21
22
23

With respect to national surveys and data that we collect around our reputation efforts and image, there's awareness of the movie that kind of peaks and drops as CNN -- who is one of the owners of the movie, by the way -- CNN shows it repeatedly from time to time, so that does spike on occasion.  ***But our surveys don't reflect any shift in sentiment about intent to visit our parks***.

\*\*\*

24
25
26

A matter of fact, the movie in some ways has actually made perhaps more interest in marine mammal parks, and actually even about us.  We have seen that reflected through certain visitor profiles, and certain guest comments and things we get.  The movie did not get an

27

85

Oscar nomination in January, and we continue to take proactive efforts around communicating with our guests and business partners and others.

\*\*\*

But ultimately the assertions by the animal rights, animal activist community -- they don't necessarily burden themselves with fact, and we have to deal with that from time to time. ***But we have seen no impact on the business***.

226.   In addition to the reasons set forth above in ¶¶188-89, 199, 204, 211, 213, 216 and 221, each of Atchison's statements set forth above in ¶225, which outright denied the impact *Blackfish* was having on SeaWorld's attendance figures and business as of March 13, 2014, was materially false and misleading because:

   a) PETA was actively campaigning against the Company on the national stage in light of the mistreatment of animals depicted by *Blackfish*, including by staging demonstrations at prominent events such as the January 1, 2014 Rose Parade.

   b) Recognizing the impact of *Blackfish* on the public's willingness to attend the SeaWorld's parks, the Company attempted to manipulate the results of a January 2014 public poll conducted by the *Orlando Sentinel*, which asked whether "CNN's 'Blackfish' [sic] documentary changes your perception of SeaWorld." *See* ¶¶144-45.

### J.   March and April 2014 – 2013 Form 10-K And April SPO Offering Materials

227.   On March 21, 2014, SeaWorld filed with the SEC its 2013 Form 10-K, which was signed by Atchison, Heaney, Swanson, and D'Alessandro.   On April 2, 2014 and April 4, 2014, in connection with the Company's April SPO, SeaWorld filed with the SEC its April SPO Offering Materials.

228.   The same statements set forth above in ¶187 purporting to warn investors of risks that "may" or "could" negatively impact the Company's results of

86

operations, including attendance, were specifically incorporated by reference or appeared in substantial form within the 2013 Form 10-K and April SPO Offering Materials, and were materially false and misleading for the reasons set forth above in ¶¶188-89, 199, 204, 211, 213, 216, 221 and 226.

**K.     May 14, 2014 – 1Q14 Form-10Q, Press Release And Earnings Call**

229.   On May 14, 2014, SeaWorld:  (i) filed with the SEC the Company's 1Q14 Form 10-Q, which was signed by Heaney and Swanson; (ii) issued a press release announcing its first quarter 2014 financial results ("1Q14 Press Release"); and (iii) held the Company's 1Q14 Earnings Call, in which Atchison and Heaney participated on behalf of SeaWorld.

230.   The same statements set forth above in ¶187 purporting to warn investors of risks that "may" or "could" negatively impact the Company's results of operations, including attendance, were specifically incorporated by reference within the 1Q14 Form 10-Q, and were materially false and misleading for the reasons set forth above in ¶¶188-89, 199, 204, 211, 213, 216, 221 and 226 and below in ¶233.

231.   In the 1Q14 Press Release and 1Q14 Form 10-Q, among other things, SeaWorld reported a staggering ***13% decrease in attendance for the first quarter 2014***, which the Company attributed to factors other than *Blackfish*:

> Attendance in the first quarter was impacted by a shift in the timing of Easter into the second quarter of 2014, which caused a shift in the Spring Break holiday period for schools in many of the Company's key source markets.   Attendance was also impacted by adverse weather, particularly above average precipitation in the Florida market as well as below average temperatures in the Texas market for the first quarter of 2014.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

232.  During the 1Q14 Earnings Call, Heaney echoed the representations in the Company's 1Q14 Press Release, claiming "[t]he shortfall in attendance is attributable to the shift of Easter and spring break into the second quarter, as well as adverse weather and fewer operating days in 2014.  Prior years where Easter was in late April, the Company experienced a similar shift in first-quarter attendance."

233.  In addition to the reasons set forth above in ¶¶188-89, 199, 204, 211, 213, 216, 221 and 226, each of Defendants' statements set forth above in ¶¶231-32 regarding the causes of the **13%** decline in SeaWorld's attendance figures was materially false and misleading because:

a) *Blackfish* had inspired a proposed bill, which could devastate SeaWorld's business model.  On March 7, 2014, California Assemblyman Richard Bloom introduced the Orca Welfare and Safety Act, which would ban SeaWorld's San Diego park from featuring orcas in entertainment performances and from breeding, importing and exporting orcas.  *See* ¶¶162-65.

b) Regardless of whether Defendants could precisely quantify the impact of *Blackfish* on attendance as of 1Q14, it was clear that it was having some negative impact.  As Defendant Atchison admitted during the Company's August 12, 2014 second quarter earnings conference call ("2Q14 Earnings Call"), in May the Company was "still grappling with what impact there would be related to the news attention around the legislation.  So I'm not sure that we had a clear view...."  Despite the fact that *Blackfish* had been plaguing the Company for over a year and a half, Atchison claimed that in May 2014 Defendants thought "it was too early to call and tell what kind of impact" *Blackfish* may have.  Given this uncertainly, Defendants could not reasonable reject *Blackfish* as a cause of SeaWorld's attendance decline.

c) While Defendants blamed adverse weather conditions and the shift of Easter and spring break into the second quarter for the decline in SeaWorld's attendance figures, Disney and Universal – both of which were subject to the same "adverse weather" conditions and shifts in

88

holiday and school calendars – reported comparable (Universal) or record (Disney) attendance figures for 1Q14.  For instance, Disney reported a 3% increase in attendance at its domestic parks for the quarter.  *See* ¶¶122-27.

## VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT – SECURITIES ACT CLAIMS

234.  The claims in Counts I-III are brought pursuant to Sections 11, 12 and 15 of the Securities Act.  The Securities Act claims are brought on behalf of persons or entities who purchased or otherwise acquired SeaWorld common stock pursuant or traceable to the materially false and misleading IPO Offering Materials, the December SPO Offering Materials or the April SPO Offering Materials.  The Securities Act claims are based solely on strict liability and negligence, and are not based on any knowing or reckless conduct by or on behalf of Defendants – i.e., they do not allege, and do not sound in, fraud – and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.

### A.   Defendants Issued Materially False And Misleading Statements In The IPO Offering Materials

235.  On or about April 24, 2013, the Company completed an IPO of its common stock at a price of $27.00 per share.  In the IPO, the Company issued and sold 10,000,000 shares of common stock and certain selling stockholders offered and sold 19,900,000 shares of common stock, which included 3,900,000 shares of common stock pursuant to the exercise in full of the underwriters' option to purchase additional shares.  In connection with the IPO, the Company filed with the SEC on April 18, 2013 and April 19, 2013 the IPO Offering Materials.  The IPO was underwritten by the following Underwriter Defendants:

| Underwriters | Number of Shares |
|---|---|
| Goldman, Sachs & Co. | 5,720,000 |
| J. P. Morgan Securities LLC | 5,720,000 |
| Citigroup Global Markets Inc. | 3,250,000 |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 2,600,000 |
| Barclays Capital Inc. | 2,340,000 |
| Wells Fargo Securities, LLC | 2,080,000 |
| Blackstone Advisory Partners L.P. | 1,300,000 |
| Lazard Capital Markets LLC | 1,300,000 |
| Macquarie Capital (USA) Inc. | 650,000 |
| KeyBanc Capital Markets Inc. | 390,000 |
| Nomura Securities International, Inc. | 390,000 |
| Drexel Hamilton, LLC | 130,000 |
| Samuel A. Ramirez & Company, Inc. | 130,000 |
| Total | 26,000,000 |

236.   Rather than disclosing material facts required to make the IPO Offering Materials not misleading, and without ever mentioning *Blackfish* by name, Defendants offered only a generalized reference to the fact that accidents or adverse publicity *may* harm the Company in the future:

> An accident or an injury at any of our theme parks or at theme parks operated by competitors, particularly an accident or an injury involving the safety of guests and employees, that receives media attention, is the topic of a book, film, documentary or is otherwise the subject of public discussions, <u>may</u> harm our brands or reputation, cause a loss of consumer confidence in the Company, reduce attendance at our theme parks and negatively impact our results of operations.  Such incidents have occurred in the past and <u>may</u> occur in the future.

*** 

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

> [I]n February 2010, a trainer was killed while engaged in an interaction with a killer whale….This incident has also been the subject of significant media attention, including television and newspaper coverage, a documentary and a book, as well as discussions in social media. This incident and similar events that may occur in the future <u>may</u> harm our reputation, reduce attendance and negatively impact our business, financial condition and results of operations.

237.   In reality, however, *Blackfish* was ***already*** having a negative impact on SeaWorld's attendance, reputation and financial health.  Indeed, each of Defendants' statements set forth above in ¶236 was materially false and misleading for the reasons set forth above in ¶¶188-89.

**B.    Defendants Issued Materially False And Misleading Statements In The December And April SPO Offering Materials**

238.   On December 17, 2013, the Company completed the December SPO – a secondary offering of 18,000,000 shares of common stock at a price of $30.00 per share.  In connection with the December SPO Offering, the Company filed with the SEC the December SPO Offering Materials.  The December SPO was underwritten by the following Underwriter Defendants:

| Underwriters | Number of Shares |
|---|---|
| Goldman, Sachs & Co. | 3,600,000 |
| J. P. Morgan Securities LLC | 3,600,000 |
| Deutsche Bank Securities Inc. | 2,700,000 |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 1,350,000 |
| Barclays Capital Inc. | 1,350,000 |
| Citigroup Global Markets, Inc. | 1,350,000 |
| Wells Fargo Securities, LLC | 1,350,000 |
| Blackstone Advisory Partners L.P. | 900,000 |
| Lazard Capital Markets LLC | 450,000 |
| Macquarie Capital (USA) Inc. | 450,000 |

91

| Underwriters | Number of Shares |
|---|---|
| KeyBanc Capital Markets, Inc. | 270,000 |
| Nomura Securities International, Inc. | 270,000 |
| Piper Jaffray & Co. | 180,000 |
| Drexel Hamilton, LLC | 90,000 |
| Samuel A. Ramirez & Company, Inc. | 90,000 |
| Total | 18,000,000 |

239.  As was the case with the IPO Offering Materials, rather than disclosing material facts required to make the December SPO Offering Materials not misleading, Defendants again offered only a generalized reference to the fact that accidents or adverse publicity *may* harm the Company, and repeated the statement set forth above in ¶236.  Defendants' statement was materially false and misleading for the reasons set forth above in ¶¶188-89, 199, 204, 211, 213.

240.  On April 9, 2014, the Company completed the April SPO – a secondary offering of 17,250,000 shares of common stock at a price of $30.00 per share, which included 2,250,000 shares that were offered by certain selling shareholders pursuant to the full exercise of the underwriters' option to purchase additional shares.  In connection with the April SPO, the Company filed with the SEC the April SPO Offering Materials.  The April SPO was underwritten by the following Underwriter Defendants:

| Underwriters | Number of Shares |
|---|---|
| Goldman, Sachs & Co. | 3,000,000 |
| J. P. Morgan Securities LLC | 3,000,000 |
| Deutsche Bank Securities Inc. | 1,800,000 |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 1,125,000 |
| Citigroup Global Markets Inc. | 1,125,000 |
| Wells Fargo Securities, LLC | 1,125,000 |
| Blackstone Advisory Partners L.P. | 750,000 |
| Macquarie Capital (USA) Inc. | 750,000 |

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

| Underwriters | Number of Shares |
|---|---|
| Lazard Capital Markets LLC | 375,000 |
| KeyBanc Capital Markets Inc. | 300,000 |
| Piper Jaffray & Co. | 300,000 |
| Drexel Hamilton, LLC | 75,000 |
| Samuel A. Ramirez & Company, Inc. | 75,000 |
| Telsey Advisory Group LLC | 75,000 |
| Total | 15,000,000 |

241.   As was the case with the IPO Offering Materials and December SPO Offering Materials, rather than disclosing material facts required to make the April SPO Offering Materials not misleading, Defendants again offered only a generalized reference to the fact that accidents or adverse publicity *may* harm the Company, and repeated the statement set forth above in ¶236.  Defendants' statement was materially false and misleading for the reasons set forth above in ¶¶188-89, 199, 204 211, 213, 216, 221, 226, 233.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS – EXCHANGE ACT CLAIMS

### A.   Defendants' Actual Knowledge Of And/Or Reckless Disregard For Material Facts Contrary To Their Public Statements

242.  As alleged herein, Defendants SeaWorld, Atchison, Heaney and Swanson acted with scienter in that each Defendant:   (i) knew or recklessly disregarded that the public statements or documents issued or disseminated in the name of the Company (or in their own name) were materially false and misleading when made; (ii) knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. SeaWorld, Atchison, Heaney and Swanson, by virtue of their receipt of information

93

reflecting the true facts regarding SeaWorld, and their control over, receipt and/or modification of SeaWorld's materially misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

243.   As alleged herein, numerous facts support a strong inference that, during the Class Period, SeaWorld, Atchison, Heaney and Swanson knew or recklessly disregarded the false and misleading nature of information that they caused to be disseminated to the investing public, which artificially inflated the trading prices of the Company's common stock during the Class Period.  The misrepresentations and omissions of material fact alleged herein concerning:  (i) the then-existing impact (or purported lack thereof) of *Blackfish* on SeaWorld's attendance, brand and reputation; and (ii) the cause of the decline in the Company's attendance figures on a quarterly and year-end basis, could not have been made during the Class Period without the knowledge and complicity or reckless disregard of the personnel at the highest levels of the Company, including Atchison, Heaney and Swanson.  The nature of these facts is of such prominence to investors that it would be absurd to suggest that management was without knowledge of the underlying matters.

244.   Defendants Atchison, Heaney and Swanson, because of their positions with SeaWorld, controlled the contents of the Company's public statements during the Class Period.  In this regard, each was provided with, or had access to, copies of the documents alleged herein to be false and/or misleading prior to or shortly after, their issuance, had access to the data underlying the representations therein and had the ability and opportunity to prevent the materially false and misleading statements from being made and/or to cause them to be corrected.  Because of their positions and access to material non-public information, Atchison, Heaney and Swanson knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to,

1 and/or were being concealed from, the public, and that the positive representations
2 that were being made were materially false, misleading, and incomplete.  As a result,
3 Atchison, Heaney and Swanson are responsible for the accuracy of SeaWorld's
4 corporate statements, and each is therefore responsible and liable for the
5 representations contained therein and/or omitted therefrom.

6     245.  SeaWorld knowingly and/or recklessly made the materially false and/or
7 misleading statements and omissions of material fact alleged herein based on the fact
8 that Defendants Atchison, Heaney and Swanson, the Company's CEO, CFO, and
9 CAO throughout the Class Period, knew and/or recklessly disregarded that the
10 Company's statements were materially false and/or misleading, and/or omitted
11 material facts at the times that such statements were made.  Each of these Defendants
12 was among the most senior executives of the Company throughout the Class Period
13 and a member of the Company's management, and their knowledge may be imputed
14 to the Company.

15     246.  Further contributing to a strong inference of scienter, the fraud alleged
16 herein concerns the very core of SeaWorld's operations – park attendance – the
17 Company's key proxy for the success and stability of its business operations.  Indeed,
18 SeaWorld represented to investors in public filings that:  (i) its revenues are "driven
19 primarily by attendance," as approximately 63% of SeaWorld's 2013 revenue came
20 from selling admission tickets; (ii) the Company's entire growth strategy revolves
21 around "increas[ing] [the Company's] existing theme park revenues through
22 strategies designed to drive higher attendance and increase in-park per capita
23 spending"; and (iii) reductions in attendance "can materially adversely affect
24 [SeaWorld's] business, financial condition and results of operations."

25
26
27

247. Thus, as SeaWorld's top officers, Atchison, Heaney and Swanson controlled the Company's day-to-day operations and were informed of and responsible for monitoring important developments concerning attendance. Indeed, throughout the Class Period, Atchison and Heaney were among those responsible for making specific communications to analysts and the press in response to specific questions concerning the Company's attendance, the purported causes of its decline and the impact of *Blackfish* on the Company's operations. In each instance, Defendants affirmatively and conclusively denied that *Blackfish* had or was having any impact whatsoever on the Company. In doing so, Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public, which artificially inflated the trading prices of the Company's common stock during the Class Period.

248. Statements made by SeaWorld, Atchison, Heaney and Swanson strongly suggest each had access to the disputed information, and the total mix of allegations makes such a conclusion irrefutable. Indeed, on the basis of these facts, it would be absurd to suggest that these Defendants did not have knowledge of the information contradicting their public statements.

249. With this in mind, the vast majority of Defendants' material misrepresentations and omissions, explicitly or implicitly, denied that *Blackfish* had had or was having any impact whatsoever on attendance. These statements could not have been made with any reasonable basis in fact, as Atchison in large part confirmed himself during the 2Q14 Earnings Call.

250. The scienter of SeaWorld, Atchison, Heaney and Swanson also can be inferred from the fact that the fraud here concerns materially false and misleading statements and omissions intended to conceal the impact of *Blackfish* on the

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

Company's brand and reputation. *Blackfish* attacked the single most important component of SeaWorld's brand – its treatment of orcas. In this regard, the Company's efforts to maintain the public's perception of the Company had developed into another "core operation" by the beginning of the Class Period, requiring constant oversight on a day-to-day basis. In light of the significant, public nature of the potential threat to the Company arising from *Blackfish*, it is unlikely that top management was unaware of facts undermining any purported belief or representation concerning the film's impact.

251. In addition to the duties of full disclosure imposed on SeaWorld, Atchison, Heaney and Swanson as a result of making affirmative statements and reports to the investing public, these Defendants also had a duty to disclose information required to update and/or correct their prior misstatements and/or omissions, and to update any statements or omissions that had been become false or misleading as a resulting of intervening events. Further, these Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01, *et seq*.) and Regulation S-K (17 C.F.R. Section 29.10, *et seq*.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information. Atchison and Heaney also had duties under the Sarbanes-Oxley Act of 2002 to ensure that SeaWorld's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts. Both Atchison and Heaney certified that SeaWorld's Forms 10-Q and 10-K issues during the Class Period "d[id] not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" with respect to the periods covered by those filings.

252. The following facts also support a strong inference of Defendants' scienter:

    a) SeaWorld's decision to removed Atchison as CEO after the Class Period, as discussed above in ¶¶183-85.

    b) SeaWorld was both aware of and took affirmative steps to counteract the strong anti-SeaWorld sentiment on numerous social media platforms following *Blackfish*, including by establishing project or "war" rooms and groups responsible for real-time responses to such sentiment, as stated by CW-1.

    c) According to CW-1, SeaWorld's brand-specific hashtags, created for its followers, were being hijacked by activists and coupled with *Blackfish*-inspired attacks on SeaWorld, ensuring that the *Blackfish* effect would continue to intensify.

    d) According to CW-3, SeaWorld's Finance Department made accessible to mid- and high-level management SeaWorld's Daily Attendance Budget via a shared network.  CW-3 believed that Atchison, as the CEO of the Company, would have access to similar data on a daily basis. During the time period after CNN aired *Blackfish* and before the new fiscal year, SeaWorld revised the Daily Attendance Budget, and did so again during 2014.  CW-3 believed the Daily Attendance Budget was revised as a result of declining attendance due, at least in part, to *Blackfish*.  According to CW-4, the Daily Attendance Budget was also a key attendance-based forecasting tool, as discussed above in ¶61.

    e) According to CW-3, SeaWorld armed employees with literature and instructions on how to handle any incidents or inquiries tied to *Blackfish*. According to CW-2, SeaWorld executives circulated an email to employees directing them not to engage in discussion about *Blackfish* with customers.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

f) According to CW-2, CW-3 and CW-4, SeaWorld held an ECM every month at parks for all employees. At such meetings, attendance and *Blackfish* were discussed. CW-2 stated that Atchison attended one such meeting at the San Antonio and specifically discussed *Blackfish*, declaring that the negativity towards SeaWorld arising from the film would go away. CW-4 stated that the San Diego park would typically try and schedule such meetings when Atchison was in town and could attend.

**B.     Motive And Opportunity – Insider Selling By CEO Atchison**

253.   During the Class Period, Defendants were also motivated to artificially inflate SeaWorld's stock price during the Class Period in order to benefit their own personal financial situation with the proceeds from insider stock sales.

254.   Atchison in particular disposed of a substantial portion of his personal holdings in SeaWorld common stock in eight sales between December 2, 2013 and March 6, 2014, while in possession of material inside information concerning the enduring impact *Blackfish* was having on the Company's attendance. He sold all of this stock prior to the disclosure of the Company's year-end 2013 and 4Q13 results, which showed the Company's continuing attendance declines. The Company's stock price would not again (during the Class Period) reach the levels at which Atchison sold his personal holdings in March 2014. And only five months later, Atchison would admit that the Company's attendance was harmed by *Blackfish* and that in March and April 2014 the Company had struggled to understand how the "*Blackfish* Bill" would impact its attendance and revenues.

255.   In this regard, according to Forms 4 filed with the SEC, Atchison made eight Class Period sales of his personal holdings of SeaWorld common stock, selling a total of ***154,000 shares***, for proceeds of ***$4,662,235.37***, between December 2, 2013 and March 6, 2014, as reflected in the table below:

| Date | Number of Shares | Weighted Avg. Price | Proceeds |
|---|---|---|---|
| 12/2/2013 | 28,300 | $29.9148 | $846,588.84 |
| 12/3/2013 | 16,821 | $29.6883 | $499,386.89 |
| 12/4/2013 | 4,879 | $29.727 | $145,038 |
| 1/2/2014 | 50,000 | $29.0736 | $1,453,680 |
| 2/3/2014 | 45,100 | $31.5052 | $1,420,884.52 |
| 2/3/2014 | 4,900 | $31.9523 | $156,566.27 |
| 3/5/2014 | 2,196 | $35.0321 | $76,892.94 |
| 3/6/2014 | 1,804 | $35.0321 | $63,197.91 |
| **Totals** | **154,000** | | **$4,662,235.37** |

256.  These sales were suspicious as to amount and/or size because of the gross amount of proceeds they generated, which dwarfed Atchison's total 2013 compensation (as disclosed by the Company) of $2,552,000, and also because they disposed of *20%* of Atchison's total holdings of SeaWorld common stock, even when including for calculation purposes not only vested common stock, but also unvested and restricted common stock.

257.  The foregoing tightly-clustered sales were suspiciously timed in that they were Atchison's only sales during the entire Class Period, they occurred within a brief, discrete time window, and prior to the Company's disclosure of its full 2013 and 4Q13 performance, including attendance declines that were not in keeping with what any other large domestic theme park reported, and because SeaWorld's common stock price traded at its highest level during all of 2014 on March 6, 2014, when Atchison made his final sale.

258.  Further, Atchison's Forms 4 indicate that each of the foregoing trades was made pursuant to a Rule 10b5-1 trading plan.  The Company has not disclosed any facts about Atchison's Rule 10b5-1 trading plan (or plans) in effect during the Class Period.  Rather, the Company stated in its 2013 10-K that it does "not

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

undertake any obligation to disclose, or to update or revise any disclosure regarding, any such plans and specifically do not undertake to disclose the adoption, amendment, termination or expiration of any such plans." Thus pertinent facts, such as when Atchison entered into the plan or plans under which he made the foregoing trades, are not available because they have not been publicly disclosed. However, to the extent Atchison entered into the applicable trading plan or plans during the Class Period, this, too, would support a finding of scienter.

## VIII.  LOSS CAUSATION – EXCHANGE ACT CLAIMS

259.  For purposes only of the Exchange Act claims alleged herein, Defendants' alleged unlawful conduct directly caused the losses incurred by Plaintiffs and the Class.  Throughout the Class Period, the prices of SeaWorld common stock were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions regarding the purported non-effect of *Blackfish* on the Company's attendance, and thus, revenues.   The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public.  The true facts became known for the first time by investors and the market through a corrective disclosure on August 13, 2014.

260.  When the true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of SeaWorld common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiffs and the members of the Class.

261.  On August 13, 2014, on its 2Q14 Earnings Call and in the 2Q14 Press Release, SeaWorld announced surprisingly poor results for the second quarter and

101

first half of the year, with earnings of 43 cents a share – well below the consensus analyst estimate of 59 cents a share – and slashed its prior 2014 revenue guidance from between $1.49 billion and $1.52 billion to between $1.36 billion and $1.37 billion.  The Company made clear in its press release that the primary driver for its disappointing second quarter and first half 2014 earnings was a "decline in attendance" of 4.3% in the first half of 2014 (versus the first half of 2013).  Critically, it acknowledged, for the first time, that attendance at its parks had been negatively affected by the public response to *Blackfish* – specifically, what the Company termed "demand pressures related to recent media attention surrounding proposed legislation in the state of California."

262.   After the August 13, 2014 disclosure by the Company, shares of SeaWorld common stock fell by a staggering $9.25, or 32.9%, from $28.15 per share at the close on August 12, 2014 to $18.90 per share at the close on August 13, on extremely heavy volume.

263.   As confirmed by industry, financial and business press articles and the 2Q13 Earnings Call:  (i) the Company's reference to "demand pressures" from "proposed legislation" referred to the so-called "*Blackfish* bill" put forward by a California Assemblyman in March 2014; and (ii) the August 13, 2014 statements marked the first time that the Company had admitted that *Blackfish*-related issues were hurting attendance and the Company's revenues, both current and going forward.  These admissions were reported widely as notable new disclosures that underlay the sharp August 13, 2014 stock price decline.

264.   For example, on August 13, 2014, the *Wall Street Journal*'s online site, *WSJ Blog*, reported that SeaWorld's stock price was declining after the Company had "blamed" its "disappointing second-quarter results" and lowered revenue guidance on

"the recent media debate about its treatment of captive orcas, saying the negative attention has hurt attendance."  The report noted "the controversy was sparked last year in the wake of *Blackfish*," and explained that the Company's reference to "demand pressures related to recent media attention surrounding proposed legislation" that hurt attendance was a reference to the California bill proposed in March 2014 (*see* ¶¶162-65, *supra*), which "aim[ed] to restrict SeaWorld's ability to showcase some animals in that state."

265.   The report described SeaWorld's admission that *Blackfish*-related issues were hurting attendance and thus, revenues, as "***an about face for SeaWorld***," citing Atchison's prior statements that *Blackfish* had "had no impact on our business."

266.   Other financial press outlets also reported that, in SeaWorld's August 13, 2014 public disclosures that preceded the stock price decline that day, SeaWorld had blamed its attendance decline on the *Blackfish* effect.  For example, the *Financial Times* reported on August 13, 2014 that "this quarter marks ***the first time*** management has mentioned *Blackfish*-related issues in its earnings results."

267.   The *Los Angeles Times* reported on August 14, 2014 that the Company's attendance-driven revenue miss preceded this price decline:  "[s]hares of SeaWorld Entertainment Inc. plunged 33% on Wednesday after the company's earnings missed Wall Street expectations.  The Orlando, Fla.-based company also conceded for the first time that attendance at its theme parks has been hurt by negative publicity concerning accusations by animal-rights activists that SeaWorld mistreats killer whales," publicity which, according to the article, followed *Blackfish*.

268.   Similarly, the *Washington Post* reported on August 14, 2014, in an article headlined, "*Blackfish' Takes Its Toll: SeaWorld Shares Take A Nose-Dive*" that SeaWorld "acknowledged ***for the first time*** Wednesday the fallout that followed

the film's release, admitting attendance issues in San Diego."  And the *Orlando Sentinel* reported on August 14, 2014 that "Wednesday was **the first time** SeaWorld had acknowledged that controversy about its whales had taken a toll on attendance."

269.  Discussion that occurred during the Company's 2Q14 Earnings Call further confirms that the reference to "demand pressures" from "proposed legislation" was in fact a reference to the so-called "*Blackfish* bill" introduced in March 2014, as discussed above in ¶¶162-65.

270.  For the purposes of the Exchange Act claims, it was entirely foreseeable to SeaWorld, Atchison, Heaney and Swanson that concealing from investors the actual and reasonably forecast impact that negative publicity from *Blackfish* was having on attendance at the Company's parks and SeaWorld's brand and reputation, would artificially inflate the price of SeaWorld common stock during the Class Period.  It was similarly foreseeable that the ultimate disclosure of the concealed information would cause the price of SeaWorld common stock to drop significantly as the inflation caused by earlier misstatements was removed from the stock by the corrective disclosure set forth herein.

271.  Accordingly, the conduct of these Defendants as alleged herein proximately caused foreseeable losses under the Exchange Act to Plaintiffs and members of the Class.

## IX.  PLAINTIFFS AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE – EXCHANGE ACT CLAIMS

272.  At all relevant times, the market for SeaWorld's common stock was open and efficient for the following reasons, among others:

    a) SeaWorld's common stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient electronic stock market;

104

b) As a registered and regulated issuer of securities, SeaWorld filed periodic public reports with the SEC;

c) SeaWorld regularly communicated with public investors via established market communication mechanisms, including regularly disseminating press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as conference calls with analysts and investors and other communications with the financial press and other similar reporting services; and

d) SeaWorld was followed by securities analysts employed by major brokerage firms, including Wells Fargo Securities, LLC, FBR Capital Markets, and Macquarie Research, which authored reports that were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

273.   As a result of the foregoing, the market for SeaWorld's common stock promptly digested current information regarding the Company from all publicly available sources, and the prices of SeaWorld common stock reflected such information.   Based upon the materially false and misleading statements and omissions of material fact alleged herein, SeaWorld common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and all other members of the Class purchased SeaWorld common stock relying upon the integrity of the market price of SeaWorld common stock and other market information relating to SeaWorld.

274.   Under these circumstances, all Class members suffered similar injuries through their purchases and/or acquisitions of SeaWorld common stock at artificially inflated prices, and the presumption of reliance under the fraud-on-the-market doctrine applies.

275.   Further, at all relevant times, Plaintiffs and the other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Plaintiffs and the other members of the

105

1   Class would not have purchased or otherwise acquired SeaWorld common stock at

2   artificially inflated prices if Defendants had disclosed all material information as

3   required.   Thus, to the extent that Defendants concealed or improperly failed to

4   disclose material facts concerning the Company and its operations, Plaintiffs and the

5   other members of the Class are entitled to a presumption of reliance in accordance

6   with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972) ("*Affiliated*

7   *Ute*").

8   ## X.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
9   DOCTRINE ARE INAPPLICABLE

10   276.   The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine

11   applicable to forward-looking statements under certain circumstances do not apply to

12   any of the materially false and/or misleading statements alleged herein.

13   277.   None of the statements complained of herein was a forward-looking

14   statement.   Rather, each was a historical statement or a statement of purportedly

15   current facts and conditions at the time each statement was made.

16   278.   To the extent that any materially false and/or misleading statement

17   alleged herein, or any portion thereof, can be construed as forward-looking, such

18   statement was not accompanied by meaningful cautionary language identifying

19   important facts that could cause actual results to differ materially from those in the

20   statement.   As set forth above in detail, given the then-existing facts contradicting

21   Defendants' statements, the generalized risk disclosures made by Defendants were

22   not sufficient to insulate Defendants from liability for their materially false and

23   misleading statements.

24   279.   To the extent that the statutory safe harbor may apply to any materially

25   false and/or misleading statement alleged herein, or a portion thereof, Defendants are

26   liable for any such false and/or misleading forward-looking statement because at the

27

106

1    time such statement was made, the speaker actually knew the statement was false, or

2    the statement was authorized and/or approved by an executive officer of SeaWorld

3    who actually knew that the statement was false.

4         280.   Moreover, to the extent that Defendants issued any disclosures

5    purportedly designed to "warn" or "caution" investors of certain "risks," those

6    disclosures were also materially false and/or misleading because they did not disclose

7    that the risks that were the subject of such warnings had already materialized and/or

8    because Defendants SeaWorld, Atchison, Heaney and Swanson had actual

9    knowledge of existing, but undisclosed, material adverse facts that rendered such

10   "cautionary" disclosures materially false and/or misleading.

11   **XI.   CLASS ACTION ALLEGATIONS**

12        281.   Plaintiffs bring this action as a class action pursuant to Federal Rules of

13   Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class, consisting of

14   all persons and entities who:  (i) purchased or otherwise acquired the publicly traded

15   common stock of SeaWorld between April 18, 2013 and August 13, 2014; or (ii)

16   purchased or otherwise acquired SeaWorld common stock pursuant or traceable to

17   the materially false and misleading IPO Offering Materials, the December SPO

18   Offering Materials or the April SPO Offering Materials.  Excluded from the Class

19   are:  (i) Defendants; (ii) present or former executive officers of SeaWorld, members

20   of SeaWorld's Board of Directors, and members of their immediate families (as

21   defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the

22   foregoing persons' legal representatives, heirs, successors or assigns; and (iv) any

23   entity in which Defendants have or had a controlling interest or any affiliate of

24   SeaWorld.

25

26

27

282.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery from Defendants, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class.  Members of the Class may be identified from records maintained by SeaWorld or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

283.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

284.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

285.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations, and management of the Company; and

c) to what extent the members of the Class have sustained damages, and the proper measure of damages.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

286.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.  CAUSES OF ACTION

### A.    Claims Brought Pursuant To The Securities Act

<u>COUNT I</u>
<u>For Violations Of Section 11 Of The Securities Act (Against SeaWorld, The Individual Defendants And The Underwriter Defendants)</u>

287.   Plaintiffs repeat and reallege the allegations set forth above at ¶¶1-241 and 276-86 as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.   This claim is based solely on negligence and/or strict liability.

288.   This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who purchased or otherwise acquired SeaWorld common stock pursuant or traceable to the materially false and misleading IPO Offering Materials, the December SPO Offering Materials or the April SPO Offering Materials against SeaWorld, the Individual Defendants and the Underwriter Defendants.

289.   The Registration Statements issued in connection with the IPO, the December SPO and the April SPO contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading, as set forth more fully above.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

290.   SeaWorld is the issuer of the common stock pursuant to the Registration Statements.  As the issuer of the common stock, SeaWorld is strictly liable to the members of the Class who purchased or otherwise acquired SeaWorld common stock pursuant or traceable to the materially false and misleading IPO Offering Materials, the December SPO Offering Materials or the April SPO Offering Materials for the materially untrue statements and omissions alleged herein that appeared in or were omitted from the Registration Statements.

291.   The Individual Defendants were signatories to the Registration Statements at the times they were filed.

292.   The Underwriter Defendants were underwriters of the IPO, the December SPO or the April SPO.  The Underwriter Defendants' liability under this Count is limited only to the Offerings they underwrote as set forth above.  *See supra*, ¶¶40-55.

293.   The Defendants named in this Count acted negligently and are therefore liable to the members of the Class who purchased or otherwise acquired SeaWorld common stock pursuant or traceable to the materially false and misleading IPO Offering Materials, the December SPO Offering Materials or the April SPO Offering Materials.

294.   Plaintiffs and other members of the Class purchased or otherwise acquired SeaWorld common stock pursuant or traceable to the materially false and misleading IPO Offering Materials, the December SPO Offering Materials or the April SPO Offering Materials.

295.   Plaintiffs and other members of the Class purchased SeaWorld common stock in the IPO, the December SPO or the April SPO pursuant to the materially false and misleading Registration Statements and did not know, or in the exercise of

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

1   reasonable diligence could not have known, of the untruths and omissions contained

2   therein.

3       296.  Plaintiffs and the other members of the Class who purchased or

4   otherwise acquired SeaWorld common stock pursuant or traceable to the materially

5   false and misleading IPO Offering Materials, the December SPO Offering Materials

6   or the April SPO Offering Materials suffered substantial damages as a result of the

7   untrue statements and omissions of material facts in the Registration Statements.

8       297.  This claim is brought within the applicable statute of limitations.

9       298.  By virtue of the foregoing, the Defendants named in this count have

10  violated Section 11 of the Securities Act.

## COUNT II
### For Violations Of Section 12(a)(2) Of The Securities Act (Against SeaWorld, The Underwriter Defendants And Blackstone)

14      299.  Plaintiffs repeat and reallege the allegations set forth above at ¶¶1-241

15  and 276-86 as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly

16  exclude and disclaim any allegation that could be construed as alleging or sounding

17  in fraud or intentional or reckless misconduct.   This claim is based solely on

18  negligence.

19      300.  This claim is brought pursuant to Section 12(a)(2) of the Securities Act,

20  15 U.S.C. § 77*l*(a)(2), on behalf of all members of the Class who purchased or

21  otherwise acquired SeaWorld common stock pursuant or traceable to the materially

22  false and misleading IPO Offering Materials, the December SPO Offering Materials

23  or the April SPO Offering Materials against the Company, the Underwriter

24  Defendants and Blackstone

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

301.   SeaWorld was a seller, offeror, and/or solicitor of sales of the common stock offered pursuant or traceable to the IPO Offering Materials, the December SPO Offering Materials and the April SPO Offering Materials, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

302.   Blackstone was a seller, offeror, and/or solicitor of sales of the common stock offered pursuant or traceable to the IPO Offering Materials, the December SPO Offering Materials and the April SPO Offering Materials, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

303.   The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the common stock offered pursuant or traceable to the IPO Offering Materials, the December SPO Offering Materials and the April SPO Offering Materials, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

304.   Plaintiffs and other members of the Class purchased or otherwise acquired SeaWorld common stock pursuant or traceable to the materially false and misleading IPO Offering Materials, the December SPO Offering Materials or the April SPO Offering Materials and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

305.   Members of the Class who purchased or otherwise acquired SeaWorld common stock pursuant or traceable to the materially false and misleading IPO

112

Offering Materials, the December SPO Offering Materials or the April SPO Offering Materials and still hold that stock have sustained substantial damages as a result of the untrue statements of material facts and omissions in the Registration Statements, for which they hereby elect to rescind and tender their common stock to the Defendants sued in this count in return for the consideration paid with interest. Those members of the Class who have already sold their stock acquired in the IPO, the December SPO or April SPO pursuant to the materially false and misleading Registration Statements are entitled to rescissory damages from Defendants.

306.   This claim is brought within the applicable statute of limitations.

307.   By virtue of the foregoing, the Defendants named in this count have violated Section 12(a)(2) of the Securities Act.

**COUNT III**
**For Violations Of Section 15 Of The Securities Act**
**(Against The Individual Defendants And Blackstone)**

308.   Plaintiffs repeat and reallege the allegations set forth above at ¶¶1-241 and 276-86 as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.   This claim is based solely on negligence.

309.   This Count is asserted against the Individual Defendants and Blackstone for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired SeaWorld common stock pursuant or traceable to the materially false and misleading IPO Offering Materials, the December SPO Offering Materials or the April SPO Offering Materials.

310.   At all relevant times, these Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Atchison, at the time of the filing of the Registration Statements, served as Chief Executive Officer, President and Director of SeaWorld.  Heaney served as Chief Financial Officer of SeaWorld at the time of the filing of the Registration Statements.  Swanson served as Chief Accounting Officer of SeaWorld at the time of the filing of the Registration Statements.  D'Alessandro, McEvoy, Wallace, Baratta, McHale and Thomas served as Directors of SeaWorld at the time of the filing of certain Registration Statements.  Blackstone owned a majority of the voting power of all outstanding shares of the Company's common stock at the time of the filing of the IPO Offering Materials, such that SeaWorld was a "controlled company" within the meaning of the corporate governance standards of the New York Stock Exchange.  After the completion of the December SPO, Blackstone no longer owned a majority of SeaWorld's outstanding common stock, and thus, SeaWorld was no longer a "controlled company" within the meaning of the NYSE corporate governance standards; however, SeaWorld stated that Blackstone "will continue to be able to significantly influence [SeaWorld's] decisions."   SeaWorld made an identical statement in the April SPO Offering Materials.

311.   The Individual Defendants, prior to and at the time of the Offerings, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of SeaWorld's business affairs.  As senior officers, directors and/or majority shareholders of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SeaWorld's business, financial condition and results of operations.   The   Individual   Defendants   participated   in   the   preparation   and

114

dissemination of the Offering Materials, and otherwise participated in the process necessary to conduct the IPO, the December SPO and the April SPO.  Because of their positions of control and authority as senior officers, directors and/or majority shareholders of a publicly owned company, the Individual Defendants were able to, and did, control the contents of the Offering Materials, which contained materially untrue information.

312.   By reason of the aforementioned conduct, the Individual Defendants are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as SeaWorld is liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiffs and members of the Class who purchased or otherwise acquired SeaWorld common stock pursuant or traceable to the materially false and misleading IPO Offering Materials, the December SPO Offering Materials or the April SPO Offering Materials.

**B.    Claims Brought Pursuant To The Exchange Act**

**COUNT IV**
**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b(5)**
**Promulgated Thereunder**
**(Against SeaWorld, Atchison, Heaney and Swanson)**

313.   Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.   This claim is brought against SeaWorld, Atchison, Heaney and Swanson pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by Plaintiffs on behalf of themselves and all other members of the Class.

314.   During the Class Period, SeaWorld, Atchison, Heaney and Swanson used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to knowingly and/or recklessly make

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

and/or approve the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs and the other Class members; (ii) artificially inflate and/or maintain the market price of SeaWorld's common stock; and (iii) cause Plaintiffs and the other members of the Class to purchase or otherwise acquire SeaWorld common stock at artificially inflated prices.  In furtherance of their unlawful scheme, plan, and course of conduct, SeaWorld, Atchison, Heaney and Swanson took the actions alleged herein.

315.   While in possession of material adverse non-public information, SeaWorld, Atchison, Heaney and Swanson, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for SeaWorld common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As alleged herein, the material misrepresentations contained in, or the material facts omitted from, these Defendants' public statements included, but were not limited to, materially false and/or misleading representations and omissions during the Class Period regarding the impact (or purported lack thereof) of *Blackfish* and the negative publicity created by the film on the Company's business and attendance.   SeaWorld, Atchison, Heaney and Swanson are sued as primary participants in the wrongful conduct alleged herein.

316. By virtue of their high-level positions at the Company during the Class Period, Atchison, Heaney, and Swanson were authorized to make public statements, and made public statements during the Class Period on SeaWorld's behalf. These Defendants also were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they either knew, or recklessly disregarded, was materially false and misleading.

317. In addition to the duties of full disclosure imposed on SeaWorld, Atchison, Heaney and Swanson as a result of making affirmative statements and reports to the investing public, these Defendants also had a duty to disclose information required to update and/or correct their prior misstatements and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events. Further, SeaWorld, Atchison, Heaney and Swanson had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01, *et seq.*) and Regulation S-K (17 C.F.R. Section 229.10, *et seq.*), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information. Atchison and Heaney also had duties under the Sarbanes-Oxley Act of 2002 to ensure that SeaWorld's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

318. SeaWorld, Atchison, Heaney and Swanson had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  These Defendants' material misrepresentations and omissions were done knowingly or recklessly, and for the purpose and effect of concealing the truth with respect to SeaWorld's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

319.  The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of SeaWorld's common stock during the Class Period.  In ignorance of the fact that the market prices of SeaWorld's common stock were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by SeaWorld, Atchison, Heaney and Swanson, and on the efficiency and integrity of the market in which the Company's common stock trades, or on the absence of material adverse information that was known to or recklessly disregarded by SeaWorld, Atchison, Heaney and Swanson but not disclosed in public statements by these Defendants during the Class Period, Plaintiffs and the other members of the Class purchased SeaWorld's common stock during the Class Period at artificially inflated prices.  As the previously misrepresented and/or concealed material facts eventually emerged, the price of SeaWorld's common stock substantially declined.

320.  At the time of the material misrepresentations and omissions alleged herein, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class known the truth with respect to the business, operations, performance, and prospects of SeaWorld, which was misrepresented and/or concealed by SeaWorld, Atchison, Heaney and Swanson, Plaintiffs and the other members of the Class would not have

purchased SeaWorld's common stock, or if they had purchased such stock, would not have done so at the artificially inflated prices that they paid.

321.   By virtue of the foregoing, SeaWorld, Atchison, Heaney and Swanson have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**COUNT V**
**For Violations Of Section 20(a) Of The Exchange Act**
**(Against Atchison, Heaney Swanson and Blackstone)**

322.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.   This Claim is brought against Defendants Atchison, Heaney, Swanson and Blackstone pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a) by Plaintiffs on behalf of themselves and all other members of the Class.

323.   During the Class Period, Atchison, Heaney, and Swanson were senior executive officers of SeaWorld and were privy to, and monitored, confidential and proprietary information concerning SeaWorld, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

324.   Because of their high-level positions at SeaWorld, Atchison, Heaney, and Swanson had regular access to non-public information about its business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to him or her in connection therewith.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

325. Atchison, Heaney and Swanson acted in concert and each was a controlling person of SeaWorld within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in the Company's day-to-day operations, and knowledge of the statements filed by the Company with the SEC and other statements disseminated to the investing public, Atchison, Heaney and Swanson had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the various statements Plaintiffs allege were materially false and misleading and/or omitted material facts. Atchison, Heaney, and Swanson were each provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after those statements were issued, and each had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

326.   In particular, Atchison, Heaney, and Swanson had direct and supervisory involvement in the day-to-day operations of the Company, and therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

327. Blackstone owned a majority of the voting power of all outstanding shares of the Company's common stock at the time of the filing of the IPO Offering Materials, such that SeaWorld was a "controlled company" within the meaning of the corporate governance standards of the New York Stock Exchange.

328.   As set forth above, Atchison, Heaney, Swanson and SeaWorld violated Section 10(b) and Rule 10b-5 by making or causing to be made the materially false and misleading statements and omissions of material fact alleged herein. By virtue of

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

their participation in the underlying violations of Section 10(b) and Rule 10b-5, Blackstone, Atchison, Heaney, and Swanson are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of the Company's common stock during the Class Period.

## XIII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

a) Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d) Awarding all equitable and other relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all triable claims and issues.

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

1    Dated:  February 27, 2015                     Respectfully Submitted,

2                                                  **KIRBY NOONAN LANCE & HOGE LLP**

3
                                                   __/s/ Ethan T. Boyer_____
4                                                  David J. Noonan (Bar No. 55966)
5                                                  Ethan T. Boyer (Bar No. 173959)
                                                   350 10th Avenue, Suite 1300
6                                                  San Diego, California 92101
                                                   Tel: (619) 231-8666
7                                                  Fax: (619) 231-9593
8                                                  dnoonan@knlh.com
                                                   eboyer@knlh.com
9

10                                                 **KESSLER TOPAZ MELTZER & CHECK,**
11                                                 **LLP**
                                                   Michael K. Yarnoff
12                                                 Eric L. Zagar (Bar No. 250519)
13                                                 Joshua E. D'Ancona
                                                   Joshua A. Materese
14                                                 280 King of Prussia Road
15                                                 Radnor, PA 19087
                                                   Tel: (610) 667-7706
16                                                 Fax: (610) 667-7056
17                                                 myarnoff@ktmc.com
                                                   ezagar@ktmc.com
18                                                 jdancona@ktmc.com
19                                                 jmaterese@ktmc.com

20                                                 **NIX, PATTERSON & ROACH, LLP**
21                                                 Jeffrey J. Angelovich
22                                                 Bradley E. Beckworth
                                                   3600 N. Capital of Texas Hwy.,
23                                                 Suite 350
24                                                 Austin, TX 78746
                                                   Tel: (512) 328-5333
25                                                 Fax: (512) 328-5332
26                                                 jangelovich@npraustin.com

27                                                         122

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

bbeckworth@nixlawfirm.com

-and-

Susan Whatley
205 Linda Drive
Daingerfield, TX 75638
Tel: (903) 645-7333
Fax: (903) 645-4415
susanwhatley@nixlawfirm.com

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Jeffrey A. Almeida
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8505
Fax: (646) 722-8501
jeisenhofer@gelaw.com
jalmeida@gelaw.com

*Counsel for Additional Plaintiffs*

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system.  Based upon the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Timothy Gordon Blood | tblood@bholaw.com |
| Chet A Kronenberg | ckronenberg@stblaw.com |
| Jeffrey Almeida | jalmeida@gelaw.com |
| Bradley E. Beckworth | bbeckworth@nixlawfirm.com |
| Jeffrey J. Angelovich | jangelovich@npraustin.com |
| Susan Whatley | susanwhatley@nixlawfirm.com |
| Laurence M. Rosen | lrosen@rosenlegal.com |
| Jonathan Youngwood | jyoungwood@stblaw.com |
| Michael K. Yarnoff | myarnoff@ktmc.com |
| Joshua E. D'Ancona | jdancona@ktmc.com |
| Joshua A. Materese | jmaterese@ktmc.com |

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

DATED:  February 27, 2015          */s/ Ethan T. Boyer*  _____

124

Consolidated Amended Class Action Complaint
Case No. 14-cv-2129