1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

|  |  |
|---|---|
| LOU BAKER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SEAWORLD ENTERTAINMENT, INC., et al.,<br><br>Defendant. | Case No.:  14cv2129-MMA (KSC)<br><br>**ORDER:**<br><br>**GRANTING REQUEST FOR JUDICIAL NOTICE;**<br><br>[Doc. No. 88-2]<br><br>**GRANTING MOTIONS TO DISMISS**<br><br>[Doc. Nos. 88, 89] |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Defendants SeaWorld Entertainment, Inc. ("SeaWorld Entertainment"), the Individual Defendants,[1] The Blackstone Group L.P. ("Blackstone"), and the Underwriter Defendants move to dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") in this securities fraud action.  Doc. Nos. 88, 89.  The Court found the matters suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1.  Doc. No. 101.  For the reasons set forth below, the Court **GRANTS** the motions to dismiss (Doc. Nos. 88, 89), and **DISMISSES** Plaintiffs' claims against all Defendants without prejudice.

26
27
28

[1] The Court adopts the use of the terms "Individual Defendants," and "Underwriter Defendants," as used in the Consolidated Amended Class Action Complaint.  *See* Doc. No. 42.

**FACTUAL BACKGROUND**[2]

This case involves statements and omissions made by Defendants in the wake of the 2013 documentary *Blackfish*. *Blackfish* tells the story of Tilikum, a 12,000-pound bull orca implicated in the deaths of three people, and chronicles the cruelty of killer whale capture methods, the dangers trainers face performing alongside killer whales during SeaWorld Entertainment's popular shows, and the physical and psychological strains killer whales experience in captivity. Through interviews with former trainers, spectators, employees of regulatory agencies, and scientists, *Blackfish* makes the case that keeping killer whales in captivity for human entertainment is cruel, dangerous, and immoral. *Blackfish* premiered at the Sundance Film Festival on January 19, 2013.

SeaWorld Entertainment is a theme park and entertainment company best known for its parks with shows featuring orca whales and its famous "Shamu" mascot. SeaWorld Entertainment is headquartered in Orlando, Florida, and owns and operates eleven theme parks within the United States, including: three SeaWorld-branded theme parks in Florida, Texas, and California; two Busch Gardens theme parks in Florida and Virginia; three water parks in Florida and Virginia; Discovery Cove, an attraction in Florida offering interactions with marine animals; and Sesame Place, a seasonal theme park in Pennsylvania. SeaWorld Entertainment's financial health is directly tied to its ability to attract and grow attendance at its parks.

SeaWorld Entertainment was a privately held company until it went public in April 2013 with an initial public offering of its common stock at a price of $27 per share (the "IPO"). In connection with the IPO, SeaWorld Entertainment filed certain Offering Materials with the Securities and Exchange Commission ("SEC"). In the "Risk Factor"

---

[2] Because this matter is before the Court on Defendants' motions to dismiss, the Court must generally accept as true the material facts alleged in the CAC. *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 740 (1976). Although the Court has read and considered the voluminous factual allegations contained in the CAC, the Court includes only a general summary of those facts here.

disclosure sections of the IPO Offering Materials, SeaWorld Entertainment gave the following warning:

> An accident or an injury at any of our theme parks or at theme parks operated by competitors, particularly an accident or an injury involving the safety of guests and employees, that receives media attention, is the topic of a book, film, documentary or is otherwise the subject of public discussions, <u>may</u> harm our brands or reputation, cause a loss of consumer confidence in the Company, reduce attendance at our theme parks and negatively impact our results of operations. Such incidents have occurred in the past and <u>may</u> occur in the future.
>
> . . .
>
> [I]n February 2010, a trainer was killed while engaged in an interaction with a killer whale….**This incident has also been the subject of significant media attention, including television and newspaper coverage, a documentary and a book, as well as discussions in social media. This incident and similar events that <u>may</u> occur in the future may harm our reputation, reduce attendance and negatively impact our business, financial condition and results of operations.**

CAC ¶¶ 187, 236 (emphasis original).

In July 2013, *Blackfish* was released in select theaters in the United States and Canada, and made available for viewing by Netflix customers in the United Kingdom. In September and October 2013, *Blackfish* premiered in a variety of different countries, and was broadcast on CNN in a highly promoted screening on October 24, 2013. *Blackfish* was released on DVD and Blu-ray in the United States in November 2013, and made available for streaming on iTunes and Netflix in December 2013. The BBC also aired the film in the United Kingdom in November 2013.

In December 2013, SeaWorld Entertainment finished a secondary public offering of common stock at a price of $30 per share (the "December SPO"). SeaWorld Entertainment completed another secondary public offering in April 2014 at a price of $30 per share of common stock (the "April SPO"). The December and April SPOs included Risk Factor statements similar to those made in the IPO.

During the Class Period, which extends from April 18, 2013 to August 12, 2014, overall attendance declined at the eleven SeaWorld Entertainment parks. Specifically,

Defendants reported the following declines in attendance as compared to 2012: a 9.5% decline in attendance in the second quarter of 2013; a 3.6% decline in attendance in the third quarter of 2013; and a 1.4% decline in attendance in the fourth quarter of 2013. This resulted in a 4.1% decline in overall attendance for 2013. Defendants reported a 13% decline in attendance for the first quarter of 2014.

SeaWorld Entertainment attributed the declines in attendance to adverse weather conditions, school and holiday schedules, and a new pricing strategy. However, other major theme park groups located in the United States, including Disney and Universal, realized increases in attendance during 2013, even though they both maintain parks in some of the same locations SeaWorld Entertainment does, and were therefore subject to some of the same adverse weather conditions. Disney and Universal parks were also subject to the same school and holiday schedules, and also increased prices at some of their parks in 2013.

Unlike Disney and Universal, SeaWorld Entertainment parks were subjected to significant negative publicity as a result of the *Blackfish* documentary. The negative publicity included statements by celebrities on Twitter urging millions of their followers to watch *Blackfish* and avoid "SeaWorld." An online poll on CNN on October 23, 2015 reported that 86% of the 3,000 respondents would not take their kids to "SeaWorld" in light of the allegations in *Blackfish*. Some schools also canceled their annual field trips to SeaWorld Entertainment parks. Later in 2013, a number of artists slated to perform at a series of summer concerts at the SeaWorld-branded park in Florida and Busch Gardens in Florida cancelled their performances after receiving online petitions urging them to do so. Most of the artists cited the controversy surrounding *Blackfish* as the reason for their withdrawal, and a variety of international news sources reported on the cancellations. In December 2013, SeaWorld Entertainment published an open letter featured in major newspapers and on social media in order to refute "misconceptions" regarding the artist cancellations.

*//*

In late 2013 and early 2014, activists initiated a series of online petitions urging sponsors to end their relationships with SeaWorld Entertainment.  A variety of media outlets reported on the petitions, amplifying their impact.  In July 2014, Southwest Airlines announced it would not renew its 26-year partnership with SeaWorld Entertainment.  Other corporate sponsors also ended their relationships with SeaWorld Entertainment in late 2014 and early 2015.

In March 2014, national media outlets reported that a California Assembly member had introduced legislation that would ban orca performances, breeding, and artificial insemination in California.  The bill was colloquially referred to as "the *Blackfish* bill."  The bill was tabled for further study in April 2014.

In addition to the disclosures made as part of the IPO and SPOs, in August 2013 SeaWorld Entertainment Vice President of Communications Fred Jacobs stated "*Blackfish* has had no attendance impact," and that SeaWorld Entertainment "can attribute no attendance impact at all to the movie."  CAC ¶ 203.  In November 2013, SeaWorld Entertainment Chief Executive Officer James Atchison ("Defendant Atchison") stated "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it," and that "[i]ronically, our attendance has improved since the movie came out."  CAC ¶ 212.  In December 2013 Defendant Atchison also stated that "[a]s much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business."  CAC ¶ 215.  In a fourth quarter earnings call in 2013, Defendant Atchison reiterated that he had "seen no impact on the business," and that surveys conducted by SeaWorld Entertainment did not "reflect any shift in sentiment about intent to visit our parks."  CAC ¶ 225.

On August 13, 2014, SeaWorld Entertainment made the following statement regarding the decline in attendance in the second quarter of 2014: "the Company believes attendance in the quarter was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California."  CAC ¶ 169.  When

asked why proposed legislation tabled in April 2014 would now have an effect on attendance at SeaWorld Entertainment parks in August 2014, Defendant Atchison responded that at the time, SeaWorld Entertainment was "still grappling with what impact there would be related to the news attention around the legislation," adding that he was not sure SeaWorld Entertainment "had a clear view on what that would look like," because such an unprecedented event is "difficult to model in that respect."  CAC ¶ 171. The same day, SeaWorld Entertainment's common stock price tumbled 33% to $9.25 a share.

SeaWorld Entertainment continued to receive negative publicity after the end of the Class Period.  In November 2014, Defendant Atchison stated that negative attendance trends were the result of "a combination of factors, including negative media attention in California."  CAC ¶ 181.  Defendant Atchison also participated in a Bloomberg Business article entitled, "Saving SeaWorld," in which he acknowledged that SeaWorld Entertainment had struggled to find an effective approach in responding to widespread criticism and activism generated by *Blackfish*.  Defendant Atchison resigned from his position as CEO of SeaWorld Entertainment in December 2014.  News outlets subsequently reported that *Blackfish* is "widely considered to be at least partly responsible for SeaWorld's attendance drop."  CAC ¶ 185.

## PROCEDURAL BACKGROUND

Plaintiff Lou Baker filed this putative class action against Defendants SeaWorld Entertainment, Blackstone, and individual defendants Jim Atchison, James Heaney, Dan Brown, Marc Swanson, David F. D'Alessandro, on September 9, 2014.  Doc. No. 1.  The Court granted Plaintiffs Pensionskassen for Børne-Og Ungdomspædagoger and Arkansas Public Employees Retirement System's Motion for Appointment as Lead Plaintiff and Selection of Counsel on December 11, 2014.  Doc. No. 25.

Plaintiffs filed the operative CAC on February 27, 2015.  Doc. No. 42.  The CAC names the following Defendants: SeaWorld Entertainment; individual Officer Defendants Atchison, Heaney, and Swanson; individual Director Defendants David F. D'Alessandro,

Bruce McEvoy, Peter Wallace, Joseph Baratta, Judith A. McHale, and Deborah M. Thomas; and Blackstone.  The CAC also names the following entities as the "Underwriter Defendants:" Barclays Capital Inc.; Blackstone Capital Markets; Citigroup Global Markets Inc.; Deutsche Bank Securities Inc.; Drexel Hamilton, LLC; Goldman, Sachs & Co.; J.P. Morgan Securities LLC; KeyBanc Capital Markets Inc.; Lazard Capital Markets LLC; Macquarie Capital (USA) Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Nomura Securities International, Inc.; Piper Jaffray & Co.; Samuel A. Ramirez & Company, Inc.; Telsey Advisory Group LLC; and Wells Fargo Securities, LLC.  Plaintiffs allege three claims under Sections 11, 12, and 15 of the Securities Act of 1933, and two claims under Section 10(b) and 20 of the Securities Exchange Act of 1934.

On May 29, 2015, Defendants SeaWorld Entertainment, the Individual Defendants, and Blackstone filed a motion to dismiss Plaintiffs' CAC in its entirety.  Doc. No. 88.  The Underwriter Defendants filed a separate motion to dismiss the same day.  Doc. No. 89.  Plaintiffs filed their oppositions to the motions to dismiss (Doc. Nos. 94, 95), and Defendants replied (Doc. Nos. 98, 99).  Defendants SeaWorld Entertainment, the Individual Defendants, and Blackstone filed an ex parte request for oral argument.  Doc. No. 100.  After preliminarily reviewing the motions to dismiss, the Court denied the request for oral argument without prejudice and took the matters under submission on the papers pursuant to Civil Local Rule 7.1.d.1.  Doc. No. 101.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims made in the complaint.  Accordingly, dismissal under Rule 12(b)(6) is proper where the complaint fails to set forth a "cognizable legal theory," or where there is "an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Although a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" under Rule 8(a)(2), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations, brackets, and citations omitted).

Under Rule 9(b), when the complaint includes allegations of fraud, a party must "state with particularity the circumstances constituting fraud or mistake," even though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  "In other words, the complaint must set forth what is false or misleading about a statement, and why it is false."  *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted).

Additionally, fraud claims made pursuant to the Securities Exchange Act must "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).  To properly allege falsity, "a securities fraud complaint must . . . specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." *Id.* at 990–91 (internal quotation marks omitted) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).  To properly plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 990 (quoting 15 U.S.C. § 78u-4(b)(2)).

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all "allegations of material fact," and construe them "in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).

## DISCUSSION

### I.    Defendants' Request for Judicial Notice

Defendants SeaWorld Entertainment, the Individual Defendants, and Blackstone have filed a Request for Judicial Notice, asking the Court to take judicial notice of certain

documents that are either incorporated into the CAC by reference, or otherwise appropriate for judicial notice.  Doc. No. 88-2 ("RJN").  Plaintiffs do not oppose the request.

Generally, a district court's review on a 12(b)(6) motion to dismiss is "limited to the complaint."  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) *overruled on other grounds by Galbraith v. Cnty. Of Santa Clara*, 307 F.3d 1119, 1125–26 (9th Cir. 2002) (quoting *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993)).  However, "a court may take judicial notice of matters of public record," *id.* at 689 (internal quotations omitted), and of "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith*, 307 F.3d at 1125–26.

Having reviewed the exhibits attached to the Request for Judicial notice, the Court agrees that the proffered documents have either been incorporated into the CAC by reference, or are otherwise a matter of public record.  *See, e.g.*, *In re New Century*, 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008) ("It is well-established that courts may take judicial notice of SEC filings.").  Accordingly, the Court **GRANTS** Defendants' Request for Judicial Notice (Doc. No. 88-2).

## II.    Plaintiffs' Claims Are Subject to Heightened Pleading Standards

As a threshold matter, no party disputes that each of Plaintiffs' claims directly or indirectly requires that Plaintiffs plead a material misrepresentation or omission.  *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) ("The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material . . . .");  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 885 (9th Cir. 2008) (noting that a § 12(a)(2) claim requires a plaintiff to demonstrate that a prospectus or oral communication "includes an untrue statement of material fact or omits to state a material fact that is necessary to make the statements not misleading");  15 U.S.C. § 77o (providing liability

for controlling persons liable under § 11 or § 12); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (noting required elements of a private securities fraud action pursuant to Exchange Act §§ 10(b) and 20(a) include "a material misrepresentation or omission of fact"). However, Defendants argue that Plaintiffs' Securities Act claims must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), while Plaintiffs argue that Rule 9(b) is inapplicable because they have "specifically disclaimed all allegations of fraud, scienter and recklessness." Doc. No. 94 at 25.

Courts apply the heightened pleading standard found in Rule 9(b) to Securities Act claims sounding in fraud. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404–05 (9th Cir. 1996) ("We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under Section 11 when, as here, they are grounded in fraud."); *In re Daou Systems, Inc.*, 411 F.3d at 1027–28 ("Although section 11 does not contain an element of fraud, a plaintiff may nonetheless be subject to Rule 9(b)'s particularity mandate if his complaint sounds in fraud.") (internal quotation marks omitted); *Rubke*, 551 F.3d at 1161 ("Although the heightened pleading requirements of the PSLRA do not apply to section 11 claims, plaintiffs are required to allege their claims with increased particularity under Federal Rule of Civil Procedure 9(b) if their complaint 'sounds in fraud.'") (internal citations and quotation marks omitted).

When a complaint makes a "wholesale adoption" of the securities fraud allegations for purposes of the Securities Act claims, a court need not "sift through allegations of fraud in search of some lesser included claim of strict liability." *In re Daou Systems, Inc.*, 411 F.3d 1006, 1028 (9th Cir. 2005) (internal quotation marks omitted). Instead, "all of plaintiffs' claims, whether including an element of fraud or not, must satisfy the heightened pleading standard set out in Rule 9(b)." *Id.* at 1028; *see also Rubke*, 551 F.3d at 1161 (noting that where "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud.").

Here, although Plaintiffs attempt to "expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct, Plaintiffs' CAC makes a wholesale adoption of the securities fraud allegations for purposes of Plaintiffs' Securities Act claims by repeating and re-alleging paragraphs 1–241 "as if fully set forth herein" before each claim.  *See* CAC ¶¶ 287, 299, 308.  Accordingly, Plaintiffs' Securities Act claims must meet the heightened pleading standard of Rule 9(b).  *See also In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1405 (noting efforts to specifically disclaim fraud allegations with respect to § 11 claims "are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied . . . .").  Plaintiffs do not dispute that their Exchange Act claims are subject to the heighted pleading standard set forth under the PSLRA.  *See Zucco*, 552 F.3d at 990 (noting fraud claims made pursuant to the Securities Exchange Act must be "plead with particularity both falsity and scienter").  Therefore, under either Rule 9(b) or the PSLRA, the CAC must, at minimum, set forth what statements are false or misleading, and why they are false or misleading.

## III.    Plaintiffs Fail to Sufficiently Allege a Material Misrepresentation or Omission

The misrepresentations and omissions alleged in the CAC can generally be broken down into three categories:

- Affirmative misstatements denying *Blackfish* and/or *Blackfish*-related events had any negative effect on SeaWorld's brand, reputation, attendance and/or revenue. *See, e.g.*, ¶203 ("Blackfish has had no attendance impact."); ¶215 ("As much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business."); *see also* ¶¶212, 225.

- Statements misleadingly attributing the ***full*** decline in SeaWorld's CP [Class Period] attendance to adverse weather, holiday timing and/or changes in pricing strategies, which omitted the effect *Blackfish* and/or *Blackfish*-related events were having on SeaWorld's operations. ¶¶194-97, 200-01, 207-10, 219-20, 222, 231-32.

- Statements characterizing *Blackfish*'s negative effect on SeaWorld's business operations as contingent or speculative when, in fact, those effects already were occurring or were reasonably likely to occur. ¶¶187, 191, 193, 206, 214, 227, 228, 230, 236, 239, 241.

Doc. No. 94 at 9.

The alleged misrepresentations and omissions concern statements by Defendants disclaiming any negative effect *Blackfish* was having on attendance.[3]   Therefore, in order for Plaintiffs to state a claim they must, at a minimum, allege (1) that *Blackfish* actually caused attendance to decline during the Class Period, and (2) Defendants knew *Blackfish* caused the decline.

Defendants move to dismiss the CAC on grounds that Plaintiffs fail to sufficiently allege why the statements identified in the CAC constitute material misrepresentations or omissions under the requisite pleading standards.  The gravamen of Defendants' motion is that even though Plaintiffs allege there was significant negative publicity stemming from the *Blackfish* documentary at the same time overall attendance at SeaWorld Entertainment parks declined, the CAC does not include sufficient factual allegations to establish that the statements made by Defendants regarding the attendance declines were false at the time they were made.  For instance, Plaintiffs do not allege the existence of surveys, market research, models, data, reports or other analysis used by SeaWorld Entertainment during the relevant period showing *Blackfish* was the cause of attendance declines.  Additionally, even considering Plaintiffs' allegations regarding attendance figures, negative publicity, SeaWorld Entertainment's competitors, proposed legislation, and statements made by confidential witnesses as a whole, Defendants argue that it still cannot reasonably be inferred under the requisite pleading standards that Defendants knew *Blackfish* was causing decreased attendance at SeaWorld Entertainment parks when the challenged statements were made.

---

[3] In their opposition, Plaintiffs include a useful chart listing each misrepresentation or omission alleged in the complaint, along with the date and speaker.  *See* Doc. No. 94-1.

For the reasons set forth below, the Court agrees that the CAC fails to successfully allege a material misrepresentation or omission under Rule 9(b) or the PSLRA.  The Court proceeds by first analyzing flaws regarding the allegations underlying the purported misrepresentations and omissions generally, and then by noting specific deficiencies in the allegations supporting each misrepresentation or omission individually.

**A.   General Issues**

      **1.   <u>Allegations Regarding Quarter-by-Quarter Attendance Figures at SeaWorld Entertainment Parks</u>**

In the CAC, Plaintiffs allege "SeaWorld experienced significant, unprecedented attendance declines for four consecutive quarters during the Class Period following the release of *Blackfish*," but refused to acknowledge that *Blackfish* was even a part of the reason for the declines.  CAC ¶ 6.  As used in the CAC, the identifier "SeaWorld" refers to not just the three SeaWorld-branded theme parks in Florida, Texas, and California that house killer whales, but also to eight parks that do not bear the "SeaWorld" moniker and are not alleged to house or otherwise feature killer whales.[4]  Accordingly, when the CAC describes attendance declines at "SeaWorld," it is referring to all SeaWorld Entertainment parks, even though, as pleaded in the CAC, "*Blackfish* is an indictment of SeaWorld's core brand and killer whale-as-entertainment business," and centers primarily on the "business of keeping killer whales in captivity for the purpose of human entertainment and profit . . . ."  CAC ¶ 87.

Because SeaWorld Entertainment operates a variety of parks that do not include killer whales and otherwise appear unrelated to the subject matter addressed in *Blackfish*, Plaintiffs' allegations that attendance across *all* SeaWorld Entertainment parks was down

---

[4] These other parks include two Busch Gardens theme parks in Florida and Virginia, three water parks in Florida and Virginia, a Discovery Cove attraction in Florida, and a Sesame Place theme park in Pennsylvania.  SeaWorld Entertainment also operates a water park located in California, but Plaintiffs do not allege its existence or refer to it in the CAC.

in the wake of *Blackfish* tends to negate an inference that *Blackfish* caused the decline, and that Defendants secretly knew *Blackfish* was the cause.  *See Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998) (noting that although a court must assume the truth of all well-pleaded factual allegations, "unwarranted inferences are not sufficient to defeat a motion to dismiss").  This is especially true because it appears from the CAC that the three SeaWorld-branded parks most closely associated with the allegations made in *Blackfish* actually experienced "record attendance," during the fourth quarter of 2013, which may suggest that *Blackfish* was not impacting attendance, despite receiving significant media attention.  *See* CAC ¶ 225.

Additional allegations concerning details of any direct link between *Blackfish* and the non-SeaWorld-branded parks during the Class Period may strengthen an inference that *Blackfish* caused overall attendance declines at all SeaWorld Entertainment parks in 2013.  However, whether viewed in isolation or instead as a part of the broader allegations made in the CAC, as currently pleaded Plaintiffs' attendance allegations are insufficient to demonstrate that a material misrepresentation or omission regarding *Blackfish* caused attendance to decline at all SeaWorld Entertainment parks.

### 2.     Allegations of Overall Attendance Increases by SeaWorld Entertainment's Competitors

Among other things, Plaintiffs allege that *Blackfish* must have been part of the reason behind attendance declines at SeaWorld Entertainment parks because theme park competitors Disney and Universal parks were subject to similar adverse weather conditions, holiday schedules, and increased ticket prices, but saw overall attendance increases during 2013.[5]  However, Defendants argue that SeaWorld Entertainment's

---

[5] The CAC only makes comparisons between annual attendance at select SeaWorld Entertainment and competitor theme parks in 2012 and 2013, even though the Class Period extends through August 12, 2014.

parks are not identical to their competitors' parks, and include both water parks and parks that are only open for a limited season.

### a.   *Adverse Weather*

As discussed above, SeaWorld Entertainment operates parks not only in California and Florida, as Disney and Universal do, but also in Virginia and Pennsylvania. Additionally, unlike their Disney and Universal counterparts, some SeaWorld Entertainment parks are only open for a limited season.  Accordingly, it is difficult to compare the effect of weather conditions on overall attendance at SeaWorld Entertainment parks with select Disney and Universal parks because weather in different locations can vary, and may disproportionately impact parks which are only open for a limited season.

Adverse weather may have also a disparate impact on SeaWorld Entertainment parks because the parks appear to be unique from many of their competitors.  For instance, SeaWorld Entertainment boasts "one of the world's largest zoological collections, including ninety-three (93) animal habitats with approximately 86,000 animals, including 8,000 marine and terrestrial animals and 78,000 fish," and features "orca, sea lion and dolphin shows, as well as zoological displays featuring various other marine animals."  CAC ¶ 66.  As pleaded in the CAC, "SeaWorld touts its 'highly differentiated products,' i.e., its orcas and water shows."  CAC ¶ 72.  Therefore, weather conditions that did not substantially impact attendance at Disney and Universal may nevertheless have significantly lessened attendance at SeaWorld Entertainment parks, because of their unique entertainment offerings.  In any event, because SeaWorld Entertainment operates different types of theme parks in different locations from Disney and Universal, and at a different scale,[6] without more it is difficult to draw an inference

---

[6] In 2013 Walt Disney Attractions parks saw some 132,549,000 visitors worldwide.  During the same period Universal Parks and Resorts saw 36,360,000 visitors, while SeaWorld Entertainment parks hosted 23,400,000 visitors.  *See* RJN Exhibit D.

that Defendants knew that it was *Blackfish* adversely impacting attendance, and not other factors.

### b.   *New Ticket Price Strategies*

The CAC contains allegations regarding SeaWorld Entertainment's 2013 "company-specific pricing strategy," but does not specifically discuss what the pricing strategy was, or why it shows that Defendants knew *Blackfish* was adversely impacting attendance.[7]

Plaintiffs also allege that SeaWorld Entertainment, Disney, and Universal all raised ticket prices at some of their Florida parks in summer 2013, but that "in a historically rare and unexpected move, [SeaWorld Entertainment] slashed certain other ticket prices in multiple markets following the announcement of SeaWorld's 2Q13 9.5% attendance decline." CAC ¶ 131. However, Plaintiffs do not allege how much SeaWorld Entertainment increased ticket prices, which ticket prices SeaWorld Entertainment reduced, and whether this was part of the intentional pricing strategy. Plaintiffs also fail to sufficiently explain why raising certain ticket prices while reducing others at two of its eleven theme parks tends to show that Defendants knew *Blackfish* was having a negative impact on attendance at all SeaWorld Entertainment parks.

### c.   *Other Insufficient Allegations Regarding Overall Attendance*

It is important to note that the CAC only compares overall attendance figures at certain Disney and Universal parks between 2012 and 2013 with attendance figures at three SeaWorld Entertainment parks between 2012 and 2013. Absent are attendance figures for the SeaWorld-branded park in San Antonio, Texas, or figures comparing individual SeaWorld Entertainment parks with the competitor parks during the first two quarters of 2014. Additionally, the CAC fails to include any historical data to show that

---

[7] Although the CAC does not detail the new pricing strategy, it appears that SeaWorld Entertainment sought to "reduce low yielding and free attendance," in favor of "increasing revenues and operating margins through higher quality attendance," and that SeaWorld Entertainment purportedly achieved this goal in the third quarter of 2013. *See* CAC ¶ 208.

attendance figures at SeaWorld Entertainment parks and its competitors, especially in Florida and California, ordinarily rise or fall together, or are otherwise correlated in any way.[8]  *See* CAC ¶ 120 ("Thus, when each of the top ten theme parks located in Florida and California experienced increases in annual attendance for 2013 versus the prior year, SeaWorld should have seen comparable attendance figures.").

Furthermore, it is difficult to draw an inference that SeaWorld Entertainment should have attracted greater attendance merely because its direct competitors did when it may have been the direct competition that caused the declines to begin with.  For instance, it appears that Disney and Universal parks located in the same region as certain SeaWorld Entertainment parks enjoyed recently completed expansions or opened new attractions in 2013, while SeaWorld Entertainment parks did not.  *See* RJN Exhibit D.  In any event, although the CAC makes an effort to draw a comparison between SeaWorld Entertainment parks in California and Florida and some Disney and Universal parks in the same regions, Plaintiffs do not provide sufficient factual allegations to warrant an inference that Defendants misrepresented the impact of certain factors on their parks merely because some of their competitors did not cite the same factors and reported attendance increases during a portion of the Class Period.  *See Pareto*, 139 F.3d at 699 (noting that although a court must assume the truth of all well-pleaded factual allegations, "unwarranted inferences are not sufficient to defeat a motion to dismiss").

### 3.   <u>Allegations Regarding Negative Publicity</u>

The CAC contains numerous allegations regarding negative publicity directed towards SeaWorld Entertainment as a result of *Blackfish*:

This phenomenon was even given a name – the *Blackfish* effect – by observers.  It entailed traditional forms of protest, such as demonstrations and lobbying by interest groups, and also leveraged the influence of modern forms of social media, such as online petitions, issue-dedicated websites and celebrity statements on broadcast platforms such as Twitter.  These and other

---

[8] Such historical data would also be useful in giving more meaningful context to Plaintiffs' allegations regarding the effect *Blackfish* had on declining attendance figures during the Class Period.

responses generated by *Blackfish* urged the public to boycott SeaWorld's parks in response to the Company's treatment of its killer whales, and put pressure on organizations and individuals doing business with SeaWorld to end existing or planned relationships with the Company.

CAC ¶ 133.  Plaintiffs also allege that *Blackfish* adversely impacted a music festival at two SeaWorld Entertainment parks in Florida, and that certain corporate sponsorships and school trips to SeaWorld Entertainment parks were cancelled.[9]  However, Defendants argue that these allegations are defective because Plaintiffs fail to allege how the cancellations actually impacted attendance at SeaWorld Entertainment parks.

Plaintiffs make no direct allegations regarding surveys, market research, models, data, or other reports that show that any of the negative publicity or cancellations prevented people who would have otherwise visited a SeaWorld Entertainment park during the Class Period from doing so.  Instead, the allegations in the CAC require an inference that because the negative publicity and cancellations were so significant, people who would have visited SeaWorld Entertainment parks under ordinary circumstances must have decided not to, and therefore caused attendance to decline.  However, as explained above, because the CAC does not contain sufficient allegations regarding attendance data for individual SeaWorld Entertainment parks, especially the SeaWorld-branded parts, such an inference is unwarranted at this time.  *See Pareto*, 139 F.3d at 699.  This is especially true to the extent that it appears SeaWorld-branded parks had record setting attendance levels at the same time negative publicity on social media had reached "a fever pitch."  CAC ¶¶ 11, 139.

### 4.  Allegations Regarding Proposed Legislation in California

Plaintiffs allege that a proposed bill banning orca performances, breeding, and artificial insemination in California widely known as the "*Blackfish* Bill," was introduced

[9] The Court notes that although Plaintiffs allege that Southwest Airlines decided not to renew their relationship with SeaWorld Entertainment during the Class Period, the allegations in the CAC appear to indicate that other corporate sponsors did not terminate their relationships with SeaWorld Entertainment until after the end of the Class Period.  *See* CAC ¶¶ 159–161.

1   in March 2014.  In August 2014, SeaWorld Entertainment disclosed that it believed

2   attendance in the second quarter of 2014 was "impacted by demand pressures related to

3   recent media attention surrounding proposed legislation in the state of California."  CAC

4   ¶ 169.  After the disclosure, SeaWorld Entertainment's stock price fell nearly 33%.

5   Plaintiffs allege that "[t]he Company had finally admitted that *Blackfish* was hurting

6   attendance at SeaWorld [Entertainment] parks."  CAC ¶ 169.

7        The disclosure made by SeaWorld Entertainment reads in full: "the Company

8   believes attendance in the quarter was impacted by demand pressures related to recent

9   media attention surrounding proposed legislation in the state of California."  CAC ¶ 169.

10  This is not the expansive admission Plaintiffs apparently believe it to be.  To start, the

11  statement does not "admit[] that *Blackfish* was hurting attendance at SeaWorld parks."

12  *Id.*  Accurately read, the statement refers only to the media attention related to the

13  proposed *Blackfish* Bill in California.  Even if one infers that the statement was really a

14  tacit reference to the so-called *Blackfish* effect as a whole, rather than just the California

15  legislation, the statement only refers to attendance during the second quarter of 2014, not

16  the entire Class Period.[10]   No reasonable person could construe the statement, without

17  more, as an "admission" that *Blackfish* was the cause of attendance declines at all

18  SeaWorld Entertainment parks since April 2013, and that Defendants knew *Blackfish* was

19  the cause of the decline all along.  For these reasons, the disclosure itself, as currently

20  pleaded in the CAC, does not support an inference that the Defendants made a material

21  misrepresentation or omission in any of the earlier challenged statements.  *See In re*

22  *GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) ("The fact that an allegedly

23  fraudulent statement and a later statement are *different* does not necessarily amount to an

24  explanation as to why the earlier statement was false.").

25

26  _____

27  [10] The Court notes that Defendant Atchison's later comment that SeaWorld Entertainment had been "grappling with what impact there would be related to the news attention" because it is "difficult to model in that respect," is too equivocal to successfully plead that SeaWorld Entertainment knew that the

28  legislation was actually impacting attendance before the second quarter of 2014.  *See* CAC ¶ 171.

1

## 5.   Allegations Made By Confidential Witnesses

2     The CAC includes a variety of statements made by confidential witnesses,

3  including a Social Media Manager at SeaWorld Entertainment's corporate headquarters

4  ("CW-1"), a director in marketing at the SeaWorld-branded park in Texas ("CW-2"), a

5  supervisor at the SeaWorld-branded park in California ("CW-3"), and a director of food

6  and beverage services at the SeaWorld-branded park in California ("CW-4").[11]  As

7  Defendants note in their motion, none of the statements made by these confidential

8  witnesses show *Blackfish* negatively impacted attendance at SeaWorld Entertainment

9  parks during the Class Period, or that SeaWorld Entertainment knew that *Blackfish* was

10  negatively impacting the parks.  Instead, the confidential witnesses generally speculate

11  that because SeaWorld Entertainment experienced negative publicity in the wake of

12  *Blackfish*, attendance declines at SeaWorld Entertainment parks must have been caused

13  by *Blackfish*.  For instance, CW-2 asserts that "*Blackfish* was at least partially the reason

14  for declines in 2013 and early 2014," because someone at a meeting, which included

15  executives from the SeaWorld-branded park in Texas, that was held sometime between

16  *Blackfish's* release in January 2013 and February 2014, "acknowledged that the negative

17  press from *Blackfish* seemed to be having an impact on attendance."  CAC ¶ 143.

18  Whether considered individually, or as part of the broader CAC, these types of assertions

19  do not significantly advance an inference that *Blackfish* was having an impact on

20  attendance at SeaWorld Entertainment parks under the heightened pleading standards

21  Plaintiffs are obligated to meet.

22  //

23  //

24  //

25

26

27

28

[11]  Plaintiffs do not allege that any of the confidential witnesses had any contact with the Individual Defendants, or otherwise had access to internal surveys, market research, models, data, reports or other analysis used by SeaWorld Entertainment showing that *Blackfish* was the true cause of attendance declines.

**B.    Specific Considerations**

        **1.    <u>Allegations Concerning April 18, 2013 IPO Offering Materials</u>**

Plaintiffs allege that the following statement in the Risk Factor Disclosure materials included as part of the IPO Offering Materials is materially false and misleading:

> An accident or an injury at any of our theme parks or at theme parks operated by competitors, particularly an accident or an injury involving the safety of guests and employees, that receives media attention, is the topic of a book, film, documentary or is otherwise the subject of public discussions, <u>may</u> harm our brands or reputation, cause a loss of consumer confidence in the Company, reduce attendance at our theme parks and negatively impact our results of operations. Such incidents have occurred in the past and <u>may</u> occur in the future.
> . . .
> [I]n February 2010, a trainer was killed while engaged in an interaction with a killer whale….**This incident has also been the subject of significant media attention, including television and newspaper coverage, a documentary and a book, as well as discussions in social media. This incident and similar events that <u>may</u> occur in the future may harm our reputation, reduce attendance and negatively impact our business, financial condition and results of operations.**

CAC ¶¶ 187, 236 (emphasis original).

The CAC alleges that this statement was false and misleading during the relevant time period because, among other things:

    a.    CW-1 stated there were at least a couple of hundred anti-SeaWorld posts a day on Twitter, many of which mentioned *Blackfish*;

    b.    CW-3 recalled that attendance at the SeaWorld-branded park in California was down between January and April 2013.  CW-4 also noticed a "dip;"

    c.    CW-2, CW-3, and CW-4 recalled SeaWorld Entertainment held monthly meetings for employees at their park, and there were several instances in which *Blackfish* was discussed;

    d.    PETA began a public relations campaign related to *Blackfish*;

e.   It was reported that CNN and Magnolia pictures had partnered to acquire the domestic rights to *Blackfish*; and

f.   SeaWorld Entertainment began a nationwide public relations campaign to counteract *Blackfish*.

These allegations do not plausibly establish that the above cited statement was materially false or misleading at the time of the IPO disclosures.  Instead, Plaintiffs' allegations amount to speculation regarding *Blackfish's* impact on attendance at SeaWorld Entertainment parks before or during the IPO.  For instance, even if attendance at the SeaWorld-branded park in California was down before the IPO, Plaintiffs make no allegations about the ten other parks during the relevant period.  Additionally, Plaintiffs fail to allege the existence of surveys, market research, models, data, reports or other analysis that shows that the negative reactions on Twitter and PETA's public relations campaign had an actual effect on SeaWorld Entertainment parks during this time.  Plaintiffs also fail to plausibly allege Defendants knew that these actions were having any impact on attendance at SeaWorld Entertainment parks, especially as the first quarter 2013 attendance results had not been released yet.  Accordingly, Plaintiffs fail to successfully allege that there was a material misrepresentation or omission in the IPO Offering materials under the heightened pleading standard of Rule 9(b).

### 2.   Allegations Concerning May 23, 2013, Form 10-Q

Plaintiffs allege that the first quarter Form 10-Q filed on May 23, 2013, included the same misstatements as the IPO.  Plaintiffs allege no additional facts as to why the statements were false or misleading when filed.  Therefore, Plaintiffs fail to successfully allege that there was a material misrepresentation or omission in the May 23, 2013 Form 10-Q under the heightened pleading standard of Rule 9(b) for the reasons set forth above.

### 3.   Allegations Concerning August 13, 2013, Form 10-Q, Press Release, and Earnings Call

Plaintiffs allege that the second quarter Form 10-Q filed on August 13, 2013, included the same misstatements as the IPO.  In the Press Release issued the same day,

SeaWorld Entertainment announced that "attendance for first half of 2013 declined by 6% compared to the same period in 2012 from approximately 10.7 to 10.1 million guests," and attributed the drop in attendance to factors that did not include *Blackfish*. CAC ¶ 194.  In discussing the factors impacting attendance during the second quarter 2013 Earnings Call, Defendants also did not attribute any of the attendance decline to *Blackfish*.

In addition to the purported misstatements in the IPO Offering materials, Plaintiffs allege that the August 13, 2013 statements were materially false and misleading because, among other things:

a.   Some Disney and Universal theme parks in Florida and California achieved record attendance figures even though they raised prices; and

b.   Attendance at Disney's domestic parks rose 8% in the same quarter that attendance at SeaWorld Entertainment Parks declined 9.5%.

For the reasons set forth above in section III(A)(2), Plaintiffs' allegations comparing attendance figures at some of SeaWorld Entertainment's parks with some of its competitor parks during the relevant time period are unavailing.  Accordingly, Plaintiffs fail to successfully allege that any of these statements constitute a material misrepresentation or omission under the heightened pleading standard of Rule 9(b) or the PSLRA.

**4.**      **Allegations Concerning August 29, 2013 Statements to the Media**

Plaintiffs allege that in responding to questions from the *Los Angeles Times* concerning the impact of *Blackfish* on attendance, SeaWorld Entertainment Vice President of Communications Fred Jacobs denied that *Blackfish* was having any impact on attendance, and stated that SeaWorld Entertainment "can attribute no attendance impact at all to the movie."  CAC ¶ 203.  Plaintiffs allege that these statements were materially false and misleading because, among other things:

a.   *Blackfish* had reached a larger domestic and international audience;

b.   SeaWorld Entertainment had intensified its public relations campaign

opposing *Blackfish*;

c.    CW-3 and CW-4 believed that attendance was down at SeaWorld-branded park in California, and that *Blackfish* caused the impact;

d.    CW-3 stated that the SeaWorld-branded park in California was "abnormally slow" on July 4, 2013, and CW-4 recalled that the park cancelled some of their extra dining services during the summer due to low attendance;

e.    SeaWorld Entertainment purchased the rights to BlackfishFacts.com and TheTruthAboutBlackfish.com;

f.    Celebrities urged their twitter followers to go see *Blackfish* and to boycott "SeaWorld;" and

g.    Disney's Pixar animation studio announced that the company would alter the storyline to the upcoming movie "Finding Dory" to remove references to captive sea animal parks.

As discussed elsewhere, Plaintiffs allege no surveys, market research, models, data, reports or other analysis tying increased *Blackfish* viewership or other negative publicity to declining attendance at SeaWorld Entertainment parks.  Furthermore, CW-3 and CW-4's unsupported belief that *Blackfish* was impacting attendance at the lone SeaWorld-branded park in California does not support an inference that *Blackfish* was the cause of attendance declines at all SeaWorld Entertainment parks.  Plaintiffs' allegations concerning the import of SeaWorld Entertainment's acquisition of certain web addresses and changes to the script of an upcoming movie are so speculative as to be immaterial under the requisite pleading standards.  Accordingly, Plaintiffs fail to successfully allege that the August 29, 2013 statement constituted a material misrepresentation or omission.

### 5.   Allegations Concerning November 13, 2013 Form 10-Q, Press Release, and Earnings Call

Plaintiffs allege that the third quarter Form 10-Q filed on November 13, 2013, included the same misstatements as the IPO.  In the Press Release issued the same day, SeaWorld Entertainment announced that "[a]ttendance for the first nine months of 2013

declined by 4.7% compared to the same period in 2012 from 19.9 million to 18.9 million guests." CAC ¶ 207. SeaWorld Entertainment attributed the drop in attendance to factors other than *Blackfish*, including pricing strategies "implemented at the beginning of 2013 to increase revenues and operating margins through higher quality attendance which the company achieved in the third quarter." CAC ¶ 208. In discussing the factors impacting attendance during the third quarter 2013 Earnings Call, Defendants did not attribute any of the attendance decline to *Blackfish*. Plaintiffs allege that these statements were materially false and misleading for the same reasons that the preceding statements were misleading.

Plaintiffs do not allege additional reasons why these statements were materially false or misleading, other than those already discussed immediately above, and more generally in section III(A)(2)(b). Plaintiffs allege no surveys, market research, models, data, reports or other analysis that SeaWorld Entertainment relied upon that show that *Blackfish* had any impact on declining attendance at SeaWorld Entertainment parks. The CAC also contains allegations indicating that SeaWorld Entertainment implemented a ticket pricing strategy that reduced attendance but increased revenues in the third quarter of 2013, which may account for some of the decreased attendance, and weakens the inference that *Blackfish* was the reason for the declines. *See* CAC ¶ 208. Accordingly, Plaintiffs fail to successfully allege that any of these statements constitutes a material misrepresentation or omission under the heightened pleading standard of Rule 9(b) or the PSLRA.

### 6. Allegations Concerning November 14, 2013 Statements to the Media

Plaintiffs allege that in responding to questions from the *Wall Street Journal* concerning the impact of *Blackfish* on attendance, CEO James Atchison stated "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it," adding that "[i]ronically, our attendance has improved since the movie came out." CAC

¶ 212.  Plaintiffs allege that these statements were materially false and misleading because, among other things:

a. *Blackfish* had an even larger global audience at this time, and was aired on CNN multiple times per day;

b. After CNN aired *Blackfish* CW-3 noticed a 20% drop in attendance at the SeaWorld-branded park in California;

c. An October 25, 2013 poll conducted by *CNN* asked "[w]ould you take your kids to SeaWorld" in light of *Blackfish*, and 86% of the 3,000 respondents stated "No;"

d. Some schools cancelled trips to SeaWorld Entertainment parks until the company changed its business practices;

e. Macy's received more than 80,000 emails urging it to ban SeaWorld Entertainment from participating in the Macy's Thanksgiving Day Parade in light of the allegations made in *Blackfish*;[12] and

f. Additional celebrities took to Twitter to urge their followers to watch *Blackfish* and to not go to "SeaWorld."

Plaintiffs make no allegations that tie the cancellation of several school trips and other negative media attention to a demonstrable material impact on overall attendance at the eleven SeaWorld Entertainment parks.  Instead, to state this claim the CAC requires an inference that *Blackfish* must have been the cause of attendance declines because of the amount of negative attention SeaWorld Entertainment was receiving.  However, for the same reasons identified elsewhere, especially in section III(A), these allegations are insufficient to plausibly state a material misrepresentation or omission.

//

---

[12] This allegation is contradicted by Plaintiffs' later allegation that it was an online petition released by PETA that received more than 80,000 signatures, but the distinction is immaterial to the Court's analysis.  *See* CAC ¶ 216.

### 7. Allegations Concerning December 2013 SPO Offering Materials

Plaintiffs allege that the December 2013 SPO included the same misstatements as the April 2013 IPO.  Plaintiffs do not allege additional reasons why the December 2013 SPO Offering Materials were materially false or misleading, and the Court finds that these allegations are insufficient to plausibly allege a material misrepresentation or omission for the same reasons stated elsewhere in this Order.

### 8. Allegations Concerning December 20, 2013 Statements to the *Orlando Sentinel*

Plaintiffs allege that in responding to questions from the *Orlando Sentinel* that CEO James Atchison continued to conceal the impact of *Blackfish* on attendance at SeaWorld Entertainment parks by asserting that "[a]s much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business."  CAC ¶ 215.  Plaintiffs allege that this statement was materially false and misleading because, among other things:

a.  Nearly every act slated to perform at an annual concert series at two of SeaWorld Entertainment's parks cancelled their appearances because of *Blackfish*;

b.  Defendant Atchison admitted that the cancellations caused SeaWorld Entertainment to launch a "big PR blitz;"

c.  *Blackfish* was made available on Netflix in December 2013, and talk of *Blackfish* continued to spread on social media.

d.  SeaWorld Entertainment continued 'unprecedented discounts' at some of their parks;

e.  Celebrities on Twitter continued to urge followers to watch *Blackfish* and to "never go to SeaWorld again;"

f.  A musical artist issued a cease and desist letter to SeaWorld Entertainment in December 2013 asking the company to refrain from using her song during killer whale shows;

   g.  Numerous schools cancelled their regular field trips to SeaWorld Entertainment parks; and

   h.  An online petition opposing inclusion of a SeaWorld Entertainment float at the Macy's Thanksgiving Day Parade received more than 80,000 signatures.

Because Plaintiffs fail to provide more specific allegations regarding attendance figures at individual SeaWorld Entertainment parks, including historical attendance figures, and in the absence of other surveys or analysis, it is difficult to determine what correlation there was, if any, between the cancellation of the annual concert series and attendance at the affected parks. Additionally, it is unclear what the nature and the scope of any discounts were at SeaWorld Entertainment parks, and there are insufficient allegations regarding the number of schools and students that cancelled trips to SeaWorld Entertainment because of *Blackfish* to infer that the cancellations had a material effect on attendance declines. It is also unclear what impact the cease and desist letter is alleged to have had on attendance at the relevant SeaWorld Entertainment parks. Accordingly, for these, and the other reasons stated in this Order, Plaintiffs fail to sufficiently allege that the December 20, 2013 statements where materially false or misleading.

   **9.**  **Allegations Concerning March 13, 2014 Fourth Quarter 2013 and Full Year 2013 Press Release and Earnings Call**

On March 13, 2014, SeaWorld Entertainment reported a decline in its fourth quarter and overall 2013 attendance, and failed to attribute the decline to *Blackfish*. Plaintiffs allege that these statements were materially false and misleading because, among other things:

   a.  Certain SeaWorld Entertainment competitors experienced attendance increases in 2013;

   b.  Almost all of the largest individual theme parks in the United States experienced attendance increases in 2013;

   c.  By the first quarter of 2013 there were more than two dozen *Blackfish*-related petitions on Change.org; and

d.   Prominent sponsors were under public pressure to terminate partnerships with SeaWorld Entertainment.

Plaintiffs also allege that in the Earnings Call Defendant Atchison stated that SeaWorld Entertainment had seen no impact from *Blackfish* on its business.  Although Defendant Atchison stated that the SeaWorld-branded parks had record attendance in the fourth quarter of the year, Plaintiffs allege that these statements were materially false and misleading because, among other things:

a.   PETA was actively campaigning against SeaWorld Entertainment; and

b.   SeaWorld Entertainment attempted to manipulate the results of a January 2014 poll conducted by the *Orlando Sentinel*, which asked whether *Blackfish* "changes your perception of SeaWorld."

The Court has addressed the allegations concerning SeaWorld Entertainment's competitors elsewhere, and claims that attendance at SeaWorld Entertainment parks was materially impacted by *Blackfish* during this time period appear to be contradicted by allegations that SeaWorld-branded parks experienced "record attendance in the fourth quarter of the year," and were "out-performing our other parks by considerable margin." *See* CAC ¶ 225.  It is also unclear whether the "*Blackfish*-related" petitions on Change.org concerned SeaWorld Entertainment parks, or what PETA's campaign consisted of, and how it impacted attendance SeaWorld Entertainment parks.  For these reasons, and those identified in section III(A), Plaintiffs fail to sufficiently allege that these statements were materially false or misleading.

**10.   Allegations Concerning March and April 2014 10-K and April 2014 SPO Offering Materials**

Plaintiffs allege that these materials contain the same misstatements made in the April 2013 IPO, but do not allege additional specific reasons why they were materially false or misleading.  Accordingly, the Court finds that these allegations are insufficient to plausibly allege a material misrepresentation or omission for the same reasons stated elsewhere in this Order.

**11. Allegations Concerning May 14, 2014 Form-10Q, Press Release, and Earnings Call**

Plaintiffs allege that the Form-10Q contains the same misstatements made in the April 2013 IPO. Additionally, Plaintiffs allege that Defendants fail to attribute any of the 13% decrease in attendance at SeaWorld Entertainment parks in the first quarter of 2013 to *Blackfish*. Plaintiffs allege that these statements were materially false and misleading because, among other things:

    a. *Blackfish* had inspired proposed legislation in California which would ban the SeaWorld-branded park in California from featuring killer whales in its shows, or from breeding, importing, and exporting them;

    b. Defendants could not reasonably reject *Blackfish* as a cause of attendance declines at SeaWorld Entertainment; and

    c. Disney and Universal were subject to the same adverse factors as SeaWorld Entertainment parks.

For the reasons set forth elsewhere in this Order, these claims are insufficient to successfully allege a material misrepresentation or omission under the requisite pleading standards at this time.

**III. Plaintiffs' Section 12 Claim**

Defendants SeaWorld Entertainment and Blackstone move to dismiss Plaintiffs' § 12(a)(2) claim because they did not offer or sell the securities purchased by Plaintiffs, and Plaintiffs do not sufficiently allege solicitation. The Underwriter Defendants move to dismiss on grounds that the CAC does not allege that Plaintiffs purchased any of the common stock from the Underwriter Defendants, or that the Underwriter Defendants solicited Plaintiffs' purchases. Plaintiffs oppose on a variety of grounds, including because whether or not Defendants solicited sales is a factual question that should be left to a jury, because an issuer is automatically considered a seller of securities, and because Plaintiffs need not specify which Underwriter Defendants sold the securities at issue to Plaintiffs.

Section 12(a)(2) provides that a person who "offers or sells a security" by means of a materially false and misleading prospectus shall be liable to the person purchasing the security.  15 U.S.C. § 77*l*(a)(2).  However, the clause "offers or sells" is limited to immediate sellers, and "those who solicit purchases to serve their 'own financial interests or those of the securities owner.'"  *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1183 (C.D. Cal. 2008) (quoting *Pinter v. Dahl*, 486 U.S. 622, 644 n.21 (1988)).

### A.  SeaWorld Entertainment and Blackstone

Plaintiffs do not appear to dispute that SeaWorld Entertainment and Blackstone were not immediate sellers of the securities because the securities at issue were sold through a firm commitment underwriting.  *See* Doc. No. 94 at 27.  Instead, Plaintiffs argue that SeaWorld Entertainment and Blackstone solicited purchases of the securities because they issued the securities in question, and therefore are considered by the SEC to have automatically engaged in solicitation.  *See Sec. Offering Reform*, Securities Act Release No. 75 (July 19, 2005) (determining that by "offering or selling its securities in a registered offering pursuant to a registration statement containing a prospectus that it has prepared and filed," an issuer "can be viewed as soliciting the purchases of the issuer's registered securities.").  However, decisions by the SEC are not binding on this Court, and courts routinely hold that plaintiffs must "plead active participation in the solicitation of the immediate sale, a direct relationship between the purchaser and the defendant," pursuant to *Pinter v. Dahl*, "regardless of what the SEC's position may be . . . ."  *See Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-0302 MRP, 2011 WL 4389689, at *9–10 (C.D. Cal. May 5, 2011) (discussing SEC Rule 159A and the requirements set forth in *Pinter*); *see also*, *In Re Violin Memory Sec. Litig.*, No. 13-CV-5486 YGR, 2014 WL 5525946, at *18 (N.D. Cal. Oct. 31, 2014) ("Generally, issuers and underwriters are not sellers within the meaning of Section 12 unless they actively participate in the negotiations with the plaintiff/purchaser.").

Accordingly, barebones allegations that SeaWorld Entertainment and Blackstone are "seller[s], offeror[s], and/or solicitor[s] of sales of the common stock," are

insufficient to properly allege solicitation.  CAC ¶¶ 301–03; *see Maine State Ret. Sys.*, 2011 WL 4389689, at \*109 (noting that allegations that defendants "promoted" the sale are insufficient, and plaintiffs "must include very specific allegations of solicitation, including direct communication with Plaintiffs" in order to state a claim).

## B.    The Underwriter Defendants

Although the CAC includes allegations that the Underwriter Defendants were underwriters of the IPO and SPOs, and that the named Plaintiffs purchased shares of SeaWorld Entertainment's common stock in the offerings, there are no allegations that Plaintiffs purchased their stock directly from the Underwriter Defendants.

Pursuant to 15 U.S.C. § 77*l*(a), a seller is only liable to "the person purchasing securities from him."  As noted above, "[g]enerally, issuers and underwriters are not sellers within the meaning of Section 12 unless they actively participate in the negotiations with the plaintiff/purchaser."  *See In Re Violin Memory Sec. Litig.*, 2014 WL 5525946, at \*18 (listing cases).  This is because "it seems quite clear that § 12 contemplates only an action by a buyer against *his or her immediate seller*.  That is to say, in the case of the typical firm commitment underwriting, the ultimate investor can recover only from the dealer who sold to him or her."  *In Re Violin Memory Sec. Litig.*, 2014 WL 5525946, at \*18 (emphasis original) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 n.1 (5th Cir. 2003)); *see also Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999) (noting that § 12 "permits suit against a seller of a security by prospectus only by 'the person purchasing such security *from him*,' thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus") (emphasis original).

Plaintiffs plead that they purchased their shares "in" the IPO and SPOs, but fail to plead that they purchased them from any of the Underwriter Defendants.  This is problematic because "even in a firm commitment underwriting, it is possible that the underwriters sold to a broker who may have actually passed the title to Plaintiffs."  *In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1367 (N.D. Ga. 2005).  Accordingly,

Plaintiffs fail to sufficiently allege that the Underwriter Defendants were immediate sellers.  The Court also finds that Plaintiffs have failed to sufficiently allege solicitation for the same reasons set forth in preceding section, namely that Plaintiffs' allegations of solicitation are conclusory, and do not include any allegations of direct communication. S*ee Maine State Ret. Sys.*, 2011 WL 4389689, at *109 (noting plaintiffs "must include very specific allegations of solicitation, including direct communication with Plaintiffs" in order to state a § 12 claim).

## IV.    Premature Arguments

The Court has reviewed Defendants' additional arguments regarding other reasons Defendants cannot be held liable for statements in the Risk Factor disclosures, Plaintiffs' failure to adequately plead scienter and loss causation in connection with their Exchange Act claims, and the failure to adequately plead control person liability, as well as arguments regarding the statute of limitations and traceability.  However, the Court declines to address those arguments at this time as it appears that these issues will be best considered after Plaintiffs have first pleaded a material misrepresentation or omission under the requisite pleading standards.

### CONCLUSIONS

For the reasons set forth above, Defendants' Request for Judicial Notice (Doc. No. 88-2) is **GRANTED**, the Court **GRANTS** Defendants' motions to dismiss (Doc. Nos. 88, 89), and **DISMISSES** all claims without prejudice.  Plaintiffs may file an amended complaint that addresses the deficiencies noted herein within 60 days of the date of this Order.

**IT IS SO ORDERED.**

Dated:  March 31, 2016

Hon. Michael M. Anello
United States District Judge