1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

KIRBY NOONAN LANCE &
    HOGE LLP
David J. Noonan (Bar No. 55966)
Ethan T. Boyer (Bar No. 173959)
350 10th Avenue, Suite 1300
San Diego, California 92101
Tel: (619) 231-8666
Fax: (619) 231-9593
dnoonan@knlh.com
eboyer@knlh.com

*Liaison Counsel for the Class*

[additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOU BAKER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SEAWORLD ENTERTAINMENT, INC., JAMES ATCHISON, JAMES M. HEANEY, MARC SWANSON, AND THE BLACKSTONE GROUP L.P.,<br><br>Defendants. | No. 3:14-cv-02129-MMA-KSC<br><br>**CLASS ACTION**<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION .................................................................................. 2

II.   JURISDICTION AND VENUE ........................................................ 15

III.   THE PARTIES ................................................................................ 15

    A.   Lead Plaintiffs ........................................................................ 15

    B.   The Corporate Defendant ...................................................... 16

    C.   The Individual Defendants ..................................................... 16

    D.   The Blackstone Group L.P. .................................................... 18

    E.   Relevant Non-Parties ............................................................. 19

IV.   OVERVIEW ................................................................................... 24

    A.   SeaWorld's April 2013 IPO And Two Secondary Public Offerings ...... 24

    B.   SeaWorld's Operations ......................................................... 25

        i.   The Amusement And Theme Park Industry ............... 27

        ii.   Attendance Drives SeaWorld's Revenues .................. 29

    C.   *Blackfish* Premieres At The Sundance Film Festival And Seizes Public Attention ................................................................ 34

    D.   Defendants Mislead Investors Concerning The Impact Of *Blackfish* On The Company's Operations And Attendance ......................................... 40

        i.   Defendants Repeatedly Deny That The Stark Attendance Decline At SeaWorld's Parks Was Caused, To Any Degree, By *Blackfish* ................................. 40

        ii.   The Reasons SeaWorld Provided For The Entire Decline In Attendance In Each Quarter Throughout The Class Period Are Not Plausible ........................ 50

    E.   Unlike Its Competitors, SeaWorld Was Plagued By *Blackfish*, Which Generated Extraordinary Negative Public Response and Media Attention Throughout The Class Period ........................ 57

        i.   Social Media Platforms Like Twitter Successfully Moved The Public To Watch *Blackfish* And Boycott SeaWorld .................... 58

        ii.   External Polls And News Stories Showed That *Blackfish* Had Negatively Impacted The Public's Willingness To Attend SeaWorld Parks ........................ 61

        iii.   The "*Blackfish* Effect" Swallowed SeaWorld's Annual Music Festival ........................................ 62

        iv.   In The Wake Of *Blackfish*, Long-Standing SeaWorld Sponsors

i

And Strategic Partners Jumped Ship ...........................................65
    v.    Proposed California Legislation Inspired By *Blackfish* Threatened SeaWorld's Ability To Hold Captive Orcas In California...........68
F.    The Truth Concerning *Blackfish*'s Impact On SeaWorld Emerges........69
G.    The Aftermath Of The Fraud and the Continued Impact of *Blackfish* ...83
H.    SeaWorld's About Face ........................................................................89

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ........................94
A.    August 29, 2013 – SeaWorld's Statements To The Media ...................94
B.    November 13, 2013 – 3Q13 Form 10-Q, Press Release And Earnings Call ..................................................................................................98
C.    November 14, 2013 – Atchison's Statements To The Media...............100
D.    December 20, 2013 – Atchison's Statements To The *Orlando Sentinel* ......................................................................................................102
E.    March 13, 2014 – 4Q13 And FY 2013 Press Release And Earnings Call ......................................................................................................104
F.    May 14, 2014 – 1Q14 Form-10Q, Press Release And Earnings Call ..109

VI.    ADDITIONAL SCIENTER ALLEGATIONS .............................................111
A.    Defendants' Actual Knowledge Of And/Or Reckless Disregard For Material Facts Contrary To Their Public Statements ..........................111
B.    Motive And Opportunity – Insider Selling By CEO Atchison.............117

VII.    LOSS CAUSATION .............................................................................119

VIII.    PLAINTIFFS AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE .....................................................................................123

IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE .....................................................124

X.    CLASS ACTION ALLEGATIONS ........................................................125

XI.    CAUSES OF ACTION .........................................................................127

COUNT I  For Violations Of Section 10(b) Of The Exchange Act And Rule 10b(5) Promulgated Thereunder  (Against SeaWorld and the Individual Defendants) ...........................................................................127

COUNT II  For Violations Of Section 20(a) Of The Exchange Act   (Against the Individual Defendants and Blackstone) ...................................131

ii

XII.    PRAYER FOR RELIEF.......................................................................133

XIII.   JURY TRIAL DEMANDED .............................................................133

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

1.	Court-Appointed Lead Plaintiffs, Arkansas Public Employees Retirement System ("APERS") and Pensionskassen For Børne-Og Ungdomspaedagoger ("PBU") (collectively, "Lead Plaintiffs" or "Plaintiffs") bring this action individually and on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock of SeaWorld Entertainment, Inc. ("SeaWorld" or the "Company")[1] between August 29, 2013 and August 12, 2014, inclusive (the "Class Period") and who were damaged thereby (collectively, the "Class"). Excluded from the Class are: (i) Defendants (defined below); (ii) present or former executive officers of SeaWorld, members of SeaWorld's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of SeaWorld.

2.	Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon a continuing investigation, conducted by Plaintiffs' counsel under Plaintiffs' supervision, into the facts and circumstances

---

[1] As used herein, "SeaWorld" shall refer to the corporate entity defined above. When Defendants refer to attendance results in their filings with the United States Securities and Exchange Commission ("SEC") and on conference calls, they typically refer to results at all eleven SeaWorld-owned parks collectively. Accordingly, Defendants' statements regarding attendance declines at "SeaWorld," referenced herein, refer to all eleven SeaWorld-owned parks as a whole. In contrast, Plaintiffs' allegations regarding attendance declines caused by *Blackfish* refer specifically to the three SeaWorld-branded theme parks in Florida, Texas and California that house killer whales (hereinafter the "SeaWorld-branded parks"), and shall not include the eight parks that do not bear the "SeaWorld" moniker and are not alleged to house or otherwise feature killer whales.

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

alleged herein including, without limitation, review and analysis of: (i) SeaWorld's filings with the SEC; (ii) securities and financial analysts' reports concerning SeaWorld; (iii) SeaWorld's press conferences, investor and analyst conference calls, and corresponding transcripts thereof; (iv) SeaWorld's press releases and other public statements; (v) media and industry reports and other publications concerning Defendants; (vi) interviews of confidential witnesses, including but not limited to, former SeaWorld employees; and (vii) SeaWorld's corporate website. Plaintiffs believe that additional evidentiary support for the allegations herein will likely emerge after a reasonable opportunity to conduct discovery.

# I.   INTRODUCTION[2]

3.     This action involves a series of false and misleading statements and omissions by Defendants regarding the critically acclaimed 2013 documentary *Blackfish* – a film that had a profound impact on attendance at SeaWorld-branded parks[3] throughout the Class Period, as it damaged the public's perception of SeaWorld and degraded the Company's core brand and business. When SeaWorld finally came clean at the end of the Class Period and revealed that attendance at the SeaWorld-branded parks had been negatively affected by the public response to *Blackfish*, the Company's stock price plummeted by almost 33%. SeaWorld's admission that declining attendance at its branded parks resulted, at least in part, from

---

[2] All emphasis herein is added unless otherwise noted.

[3] SeaWorld admittedly does not "break [] out" attendance at specific parks in its SEC filings, and on conference calls, its "executives decline[] to offer more specific figures[.]" Therefore, investors' only source of park-by-park attendance figures is the TEA Reports, discussed herein, and which showed dramatic attendance declines at two of SeaWorld's three branded parks (Orlando and San Diego) during the Class Period.

*Blackfish* was disastrous for SeaWorld's investors, since a negative shift in the public perception of SeaWorld's brand that caused consumers to shun the branded parks would starve the Company of the attendance-driven revenues on which it depended. The film ultimately would result in SeaWorld ending its orca breeding program and orca shows, a fundamental change to the Company's core business.

4.      SeaWorld is an aquatic theme park and entertainment company best known for shows featuring orca whales (starting with the famous Shamu), which, until March 17, 2016, SeaWorld captured, bred and trained to perform at its three branded parks in Florida, Texas and California.  Indeed, orca whales have been the core of SeaWorld's brand and operations.  As Dave Goodman, former vice president and executive producer at SeaWorld Orlando put it, "*[r]eplacing Shamu to SeaWorld is like getting rid of Mickey to Disney*."  SeaWorld's Chief Executive Officer Defendant James Atchison ("Atchison") agreed, telling *Bloomberg* in November 2014: "*Our killer whales, our killer whale program, and all of our animals are emblematic of the whole brand*."

5.      Like most theme parks, SeaWorld derives the majority of its revenues from ticket sales.  Thus, SeaWorld's financial health is directly tied to its ability to attract, grow and maintain attendance at its parks.

6.      Shortly before the Company's initial public offering ("IPO"), *Blackfish* was released.  In *Blackfish*, director Gabriela Cowperthwaite makes the case that SeaWorld – a company that purports to create "distinctive entertainment experiences that blend imagination with a passion for nature" – actually harms both its captive orca whales and their trainers by unnaturally confining the orcas in small spaces and forcing them to perform tricks for audiences.  *Blackfish* portrays SeaWorld's business as turning sensitive and social creatures into aggressively dangerous animals for the

3

1   purposes of public entertainment and financial gain to SeaWorld.  After its release,

2   the film garnered the attention of the country, including the media, celebrities, animal

3   rights activists and California lawmakers, who proposed legislation banning orca

4   performances in the state.

5       7.      Following the release of *Blackfish*, SeaWorld-branded parks experienced

6   a pronounced trend of significant, unprecedented attendance declines.  SeaWorld

7   would blame the entirety of these declines on everything <u>but</u> *Blackfish* – namely,

8   adverse weather conditions, holiday and school schedules, and SeaWorld's pricing

9   strategies.  This was not plausible.  Yet, when directly questioned whether *Blackfish*

10  was contributing to the steep attendance declines, Defendants repeatedly assured the

11  market the film had not contributed "at all," even suggesting the film was positively

12  impacting the Company.

13      8.      By the time SeaWorld went public, on April 18, 2013, *Blackfish* had

14  premiered at the world-renowned Sundance Film Festival and had been acquired by

15  CNN Films and Magnolia Pictures – which immediately announced plans to screen

16  the film broadly beginning in the summer of 2013.  The documentary had already

17  generated a powerful public and media response, was persistently trending on social

18  media such as Twitter, and was the focus of aggressive public relations campaigns

19  led by the People for the Ethical Treatment of Animals ("PETA").  SeaWorld was

20  acutely aware of these facts and was actively working to counteract the so-called

21  "*Blackfish* effect."  Internally, a former SeaWorld employee reported that SeaWorld

22  adopted an "extremely hush-hush" policy, "feeding [SeaWorld employees] lines,"

23  instructing SeaWorld employees to dissuade family and friends from seeing the film,

24  and, most egregiously, holding "a collective meeting before [*Blackfish*] came out

25  telling [SeaWorld employees] to say it was fake[.]"  Externally, SeaWorld waged war

26

27

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

on the "*Blackfish* effect" by investing millions of dollars into an extensive public relations campaign.  Notwithstanding these highly material facts, SeaWorld failed to mention the film by name in its April 18, 2013 amended Registration Statement on Form S-1/A and April 19, 2013 prospectus on Form 424B4 ("IPO Offering Materials").  Instead, SeaWorld offered only a generalized reference to the fact that accidents or adverse publicity "may" potentially harm SeaWorld's reputation, attendance and business at some point in the future.

9.     As SeaWorld's attendance continued to decline, SeaWorld repeated these generalized references in the Company's SEC filings prior to the Class Period, and continued to fail to acknowledge that *Blackfish* was already having a present impact on attendance.

10.     On the first day of the Class Period, August 29, 2013, the *Los Angeles Times* questioned whether the decline in attendance was also attributable to the ever-growing *Blackfish* effect.  In direct response, Vice President of Communications Fred Jacobs ("Jacobs"), speaking on behalf of the Company, flatly denied that *Blackfish* or the public backlash spurred by the film was hurting attendance, stating that "'Blackfish' has had no attendance impact."  That same day, Jacobs told *Bloomberg* that the Company "can attribute no attendance impact at all to the movie."  From August 29, 2013 through the end of the Class Period on August 13, 2014, SeaWorld would continue to assure investors that there were no uncertainties at all in regard to whether *Blackfish* was having a negative impact on SeaWorld's attendance, core brand and business.

11.     Although SeaWorld publicly denied the effects of *Blackfish*, it was concerned enough about the negative publicity from the film to hire publicist 42West to lead a public relations blitz against *Blackfish*.  The Wire reported "[the] magnitude

1    of th[e] response [wa]s odd" and that it was "rare" for a corporation to target a

2    documentary, hire a film publicist and "make sure critics and journalists are informed

3    of the Company's response to a film."   Further, just a month before denying

4    *Blackfish*'s impact on August 29, 2013, Jacobs contacted fifty (50) major film

5    reviewers to "discredit" *Blackfish*, a move that industry insiders noted was extremely

6    unusual.   And, SeaWorld devoted a portion of its website to "The Truth About

7    *Blackfish*."

8         12.   Even more egregiously, according to SeaWorld's own subsequent

9    admission, SeaWorld sent employees to infiltrate PETA and pose as animal rights

10   activists, a campaign that *Bloomberg* began at least as early as Thanksgiving of 2013.

11   SeaWorld finally came clean to this espionage campaign on a February 26, 2016

12   earnings call through a statement that *NonProfit Quarterly* interpreted as "admit[ting]

13   that the practice of spying was at least authorized and possibly intentionally utilized

14   by some in management[.]"

15        13.   By the time SeaWorld announced its third quarter ("3Q13") results on

16   November 13, 2013 – which disclosed that attendance at all SeaWorld parks had

17   dropped another 3.6% for the third quarter – *Blackfish* had been broadcast on CNN to

18   millions of people during a highly publicized screening.  The public outcry regarding

19   the film had reached a fever pitch, yet SeaWorld incredibly continued to blame its

20   declining attendance on adverse weather conditions in July and pricing strategies

21   implemented the prior quarter.

22        14.   Doubling down, on November 14 and December 20, 2013, Atchison

23   repeatedly told the public that *Blackfish* was having no impact at all on the Company.

24   Yet, at the same time Atchison was publicly denouncing any notion that *Blackfish*

25   was contributing to shrinking attendance, SeaWorld published an open letter

26

27

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

rebutting the claims made in the film.  Commenting on this move, CNN noted, "you have to wonder…why they would go to such an expense" if *Blackfish* truly was not having any impact whatsoever on attendance.

15.    The furor surrounding *Blackfish* continued throughout 2013 and into 2014, as celebrity musicians pulled out of concerts at SeaWorld-branded parks, and long-time corporate sponsors started to cut ties.

16.    On March 7, 2014, it was announced that legislation had been introduced that would ban orca performances in the state of California.  The proposed legislation, if passed, would have a devastating effect on SeaWorld's operations, and received intense media coverage.  The proposed legislation was so closely associated with *Blackfish* that it became known in the popular press as the "*Blackfish* Bill."  Just days after this announcement, on March 13, 2014, SeaWorld announced its fourth quarter ("4Q13") and full year ("FY13") financial results, which disclosed an overall decline in attendance for the third consecutive quarter.  Moreover, the Company reported that full year attendance in 2013 had declined by 4.1%, or approximately one million guests.  Again, SeaWorld blamed the declines on everything but *Blackfish* – namely, pricing and yield management strategies for the fourth quarter decline, and adverse weather conditions and holiday schedules for the full year decline.

17.    Significantly, in stark contrast to SeaWorld, SeaWorld's two primary competitors in the Orlando, Florida and Southern California areas—The Walt Disney Company ("Disney") and Universal Parks and Resorts ("Universal")—saw either comparable or increased attendance in 2013 over the prior year.  Similarly, Disney and Universal parks in Florida and California saw comparable or increased attendance in 2014, while SeaWorld Orlando suffered an 8.0% decline in attendance

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

and SeaWorld San Diego suffered a 12.0% decline in attendance.  Remarkably, SeaWorld Orlando and SeaWorld San Diego were the only parks who saw attendance declines in 2013 and 2014, as the following chart depicts:

| Park | Location | 2012 Attendance | 2013 Attendance | Change (%) | 2013 Attendance | 2014 Attendance | Change (%) |
|---|---|---|---|---|---|---|---|
| Magic Kingdom [Disney] | Lake Buena Vista, FL | 17,536,000 | 18,588,000 | 6.0% | 18,588,000 | 19,332,000 | 4.0% |
| Epcot [Disney] | Lake Buena Vista, FL | 11,063,000 | 11,229,000 | 1.5% | 11,229,000 | 11,454,000 | 2.0% |
| Animal Kingdom [Disney] | Lake Buena Vista, FL | 9,998,000 | 10,198,000 | 2.0% | 10,198,000 | 10,402,00 | 2.0% |
| Hollywood Studios [Disney] | Lake Buena Vista, FL | 9,912,000 | 10,110,000 | 2.0% | 10,110,000 | 10,312,000 | 2.0% |
| Islands of Adventure [Universal] | Orlando, FL | 7,981,000 | 8,141,000 | 2.0% | 8,141,000 | 8,141,000 | 0.0% |
| Universal Studios Florida [Universal] | Orlando, FL | 6,195,000 | 7,062,000 | 14.0% | 7,062,000 | 8,263,000 | 17.0% |
| *SeaWorld Orlando [SeaWorld]* | *Orlando, FL* | *5,358,000* | *5,090,000* | *-5.0%* | *5,090,000* | *4,683,000* | *-8.0%* |
| Disneyland [Disney] | Anaheim, CA | 15,963,000 | 16,202,000 | 1.5% | 16,202,000 | 16,769,000 | 3.5% |
| Cal. Adventure [Disney] | Anaheim, CA | 7,775,000 | 8,514,000 | 9.5% | 8,514,000 | 8,769,000 | 3.0% |
| Universal Studios Hollywood [Universal] | Universal City, CA | 5,912,000 | 6,148,000 | 4.0% | 6,148,000 | 6,824,000 | 11.0% |
| *SeaWorld San Diego [SeaWorld]* | *San Diego, CA* | *4,444,000* | *4,311,000* | *-3.0%* | *4,311,000* | *3,794,000* | *-12.0%* |

18.    Further, historical attendance figures demonstrate that attendance at SeaWorld-branded parks, Disney parks and Universal parks in the Florida and California areas ordinarily rise and fall together.  For example, attendance across all SeaWorld-branded parks, Disney parks and Universal parks in Florida and California increased in 2011.  Similarly, attendance across all SeaWorld-branded parks, Disney and Universal parks in Florida and California increased in 2012, with the lone exception of Disneyland in Anaheim, California, which saw a slight 1.0% decrease. These directionally-correlated historical attendance figures demonstrate that the

dramatic attendance declines SeaWorld-branded parks saw in 2013 and 2014 had to be the result of *Blackfish* and not the other generic excuses SeaWorld offered.  The following graph depicts the 2010-2012 attendance figures at SeaWorld as compared to Disney and Universal parks in the Orlando and Southern California markets:

| Park | Location | 2010 Attendance | 2011 Attendance | Change (%) | 2011 Attendance | 2012 Attendance | Change (%) |
|---|---|---|---|---|---|---|---|
| Magic Kingdom [Disney] | Lake Buena Vista, FL | 16,972,000 | 17,142,000 | 1.0% | 17,142,000 | 17,536,000 | 2.3% |
| Epcot [Disney] | Lake Buena Vista, FL | 10,825,000 | 10,825,000 | 0.0% | 10,825,000 | 11,063,000 | 2.2% |
| Animal Kingdom [Disney] | Lake Buena Vista, FL | 9,686,000 | 9,783,000 | 1.0% | 9,783,000 | 9,998,000 | 2.2% |
| Hollywood Studios [Disney] | Lake Buena Vista, FL | 9,603,000 | 9,699,000 | 1.0% | 9,699,000 | 9,912,000 | 2.2% |
| Islands of Adventure [Universal] | Orlando, FL | 5,949,000 | 7,674,000 | 29.0% | 7,674,000 | 7,981,000 | 4.0% |
| Universal Studios Florida [Universal] | Orlando, FL | 5,925,000 | 6,044,000 | 2.0% | 6,044,000 | 6,195,000 | 2.5% |
| *SeaWorld Orlando [SeaWorld]* | *Orlando, FL* | 5,100,000 | 5,202,000 | 2.0% | 5,202,000 | 5,358,000 | 3.0% |
| Disneyland [Disney] | Anaheim, CA | 15,980,000 | 16,140,000 | 1.0% | 16,140,000 | 15,963,000 | -1.1% |
| Cal. Adventure [Disney] | Anaheim, CA | 6,278,000 | 6,341,000 | 1.0% | 6,341,000 | 7,775,000 | 22.6% |
| Universal Studios Hollywood [Universal] | Universal City, CA | 5,040,000 | 5,141,000 | 2.0% | 5,141,000 | 5,912,000 | 15.0% |
| *SeaWorld San Diego [SeaWorld]* | *San Diego, CA* | 3,800,000 | 4,294,000 | 13.0% | 4,294,000 | 4,444,000 | 3.5% |

19.     The historical attendance figures also confirm that the addition of new attractions at Disney or Universal was not the reason for the attendance declines in 2013 and 2014 at the SeaWorld-branded parks in Orlando and San Diego.  According to a July 18, 2014 report by the Motley Fool entitled "Why These 2 Theme Park Operators Don't Fear Competition," "[t]heme park operators like Six Flags [] and SeaWorld Entertainment . . . are far more immune to competition than most

9

companies in other businesses." Indeed, historically, attendance at all of the parks rose, even as a particular park might see sharp increases because of a new attraction. For example, according to the annual report of Themed Entertainment Association ("TEA") in 2011, *Theme and Museum Index – Global Attractions Attendance Report* (the "2011 TEA Report"), that year Universal Orlando's Islands of Adventure park saw a "magical" increase in attendance of 29% because of its new Harry Potter attraction. That same year, SeaWorld Orlando's attendance also increased, albeit by 2%. Similarly, according to TEA's 2012 attendance report, in 2012, California Adventure and Universal Studios saw industry-leading increases of 22.6% and 15% as a result of their respective additions of CarsLand and Transformers: the Ride 3-D, while SeaWorld San Diego still saw an attendance increase of 3.5%. These historical figures indicate that it was *Blackfish* and not the success of new attractions at other parks that led to attendance declines at SeaWorld-branded parks.

20.     Indeed, a May 25, 2016 *Los Angeles Times* article acknowledged the impact of *Blackfish* on attendance at the SeaWorld-branded parks compared to its competitors since 2013. The article quoted Brian Sands, Vice President of Aecom, which produces the annual TEA reports, stating: "Over the last couple years, the aggregate increase of the 20 top performing theme parks in North America was between 2% and 3.5%--good, steady, moderate growth. But it positively leapt beyond that in 2015 to an impressive 5.9%." The article went on to note:

> The [2015 TEA Report] didn't speculate why SeaWorld lost ground last year, . . . but the marine park has acknowledged that it has foundered in its efforts to improve its image in the face of criticism from animal rights groups. Attendance numbers at the marine-themed park have been flagging since the release of the 2013 documentary "Blackfish" . . .

10

21.   As alleged below, SeaWorld's allocation of its entire attendance declines to factors other than *Blackfish* is simply not plausible.

22.   During the 4Q13 earnings call, analysts specifically pressed Defendants to discuss *Blackfish*, asking Atchison to "comment on whether there's any impact that you've noticed at all on satisfaction or attendance."  In response, Atchison noted: "I get asked that a lot" and proceeded to deny multiple times that SeaWorld had seen any such impact, stating:  "***As much as we're asked it, we can see no noticeable impact on our business***."  Moreover, Atchison surprisingly claimed that *Blackfish* was positively impacting SeaWorld by increasing awareness of SeaWorld's brand.

23.   The *Blackfish* effect continued to resound in the public, and SeaWorld's attendance slide continued along with it.  On May 14, 2014, SeaWorld disclosed the largest attendance decline yet – a staggering 13%.  Still refusing to acknowledge the truth, SeaWorld blamed the timing of Easter and Spring Break and adverse weather in Florida and Texas – and excluded *Blackfish*-related issues – as the causes of the decline.

24.   At the same time SeaWorld was publicly denying the obvious effects of *Blackfish*, the Company was pouring money into an aggressive counterattack against the film and its supporters. In 2014, SeaWorld's public relations counterattack continued, including increased retaliation using websites and social media.  For example, SeaWorld provided funding for Awesome Ocean—a website run by a digital marketing and brand management expert—that is fiercely critical of *Blackfish* and its supporters.  Speaking to the *Orlando Sentinel*, Jacobs affirmed the importance of social media sites like Awesome Ocean to SeaWorld, stating "I would certainly characterize them as an important part of our marketing and communications strategy."  It is clear from SeaWorld's ample and costly response to *Blackfish*

1   throughout 2013 and 2014, the Company was aware of, and attempting to mitigate,

2   the film's impact on its bottom line.   Yet, SeaWorld continually refused to

3   acknowledge that known impact to its own investors.

4        25.     Finally, before the start of trading on August 13, 2014, after a year of

5   express denials, excuses and omissions, SeaWorld finally admitted that *Blackfish*-

6   related issues were hurting attendance at its parks.   Although SeaWorld still refused

7   to call *Blackfish* by name, the Company acknowledged, "attendance in the quarter

8   was impacted by demand pressures related to recent media attention surrounding

9   proposed legislation in the state of California" (i.e., the "*Blackfish* Bill").   The entire

10  market saw this for what it was: SeaWorld's first and long overdue public admission

11  that *Blackfish* had been impacting SeaWorld's attendance all along.   Indeed, as

12  demonstrated in ¶¶168-75 *infra*, the national media and analysts alike uniformly

13  recognized that despite SeaWorld's refusal to name *Blackfish*, SeaWorld was

14  nevertheless acknowledging the impact of the film on its attendance.   Moreover,

15  although SeaWorld's announcement only referred to the 2Q14 attendance decline, it

16  was widely recognized as a long overdue acknowledgment of *Blackfish*'s impact on

17  the Company since the film debuted.   In direct response to this disclosure, SeaWorld

18  shares lost almost 33% of their value, falling from $28.15 per share at closing on

19  August 12, 2014 to $18.90 per share on August 13, 2014, on extremely heavy

20  volume.   The market's reaction to this news signaled that until this announcement,

21  investors had taken the Company at its word that issues surrounding *Blackfish* were

22  not causing damage to SeaWorld's brand and reputation – a much different and more

23  significant threat to the Company's ability to generate future earnings than the

24  fleeting effects of weather or the school and holiday calendars that Defendants had

25  blamed for SeaWorld's attendance slide.

26

27

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

26.    The impact of *Blackfish* on SeaWorld's business is unmistakable. Indeed, after SeaWorld's disclosure, attendance and revenues continued to decline owing to shifting public opinion as a result of *Blackfish*.  On March 17, 2016, SeaWorld announced an end to its orca breeding program and orca trick shows, a historic shift in its business model.  The announcement was a tacit acknowledgement that SeaWorld could no longer afford to deny the profound impact *Blackfish* has had on its business or continue to blatantly ignore the data showing a clear shift in public sentiment regarding its killer whale program.  Reporting on the announcement, *ABC News* noted, "***Manby . . . acknowledged that 'Blackfish' did have an impact***[.]" Another article entitled "*How One Documentary Brought SeaWorld To Its Knees*", emphasized the profound impact *Blackfish* had on SeaWorld's core business and operations:



Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

27.     Manby cast SeaWorld's dramatic operational shift as a necessary response to public opinion and the Company's own data regarding public sentiment. According to the *Orlando Sentinel*, Manby told fans in an online forum "***I understand you may feel betrayed . . . [b]ut . . . the data showed, and trends showed, it was a SeaWorld without whales or it would probably be a world without SeaWorld***."   In other words, Manby and SeaWorld could not continue to deny the profound impact of *Blackfish* or ignore the Company's own public opinion data, as his predecessor had done, and remain viable.   Indeed, the *Wall Street Journal* reported that as a result of the announcement, SeaWorld "expects to save $15 million in reputational-management costs, and it sees attendance rising by 380,000 to 940,000 in the next three to five years. . . .   SeaWorld also expects revenue to increase by $20 million to $80 million during the same time frame."

28.     Following SeaWorld's historic announcement, investors and experts questioned why the Company took so long to come to this decision.   For example, activist investor Greg Taxin, whose Luma Asset Management has a 4% stake in SeaWorld, commented ***"[w]e believe the company took far too long to respond effectively to the challenge of 'Blackfish.'"***   Likewise, theme park consultant Dennis Speigel recognized that the move away from killer whale shows was a prudent business decision by Manby, stating: "[t]he SeaWorld in 10 years will not be the SeaWorld we know today, and make no mistake, this is all emanating from Joel Manby's management position."

29.     Based on the facts alleged herein, Plaintiffs assert claims under: (i) Section 10(b) of the Exchange Act (defined below) against SeaWorld, Atchison, James M. Heaney ("Heaney") and Marc G. Swanson ("Swanson"); and (ii) Section

14

20(a) of the Exchange Act against Atchison, Heaney, Swanson and Blackstone Group L.P. ("Blackstone").

## II.     JURISDICTION AND VENUE

30.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§78j(b) and 78t(a)) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) ("Rule 10b-5").

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

32.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   Certain of the acts, practices and transactions complained of herein, including the dissemination of materially false and misleading information, occurred in this District.

## III.    THE PARTIES

### A.     Lead Plaintiffs

33.     APERS is a multi-employer defined benefit retirement plan for employees of the State of Arkansas.  APERS was created by statute in 1957.  On behalf of its approximately 77,000 participants, APERS has approximately $7.5 billion in assets under management.  As reflected in its certification filed previously in this action (ECF No. 13-4), APERS purchased shares of SeaWorld's common stock during the Class Period and has been damaged as a result of the conduct complained of herein.

34.     PBU is a Danish pension fund for teachers.  PBU was established in 1976.  On behalf of its approximately 110,000 members, PBU has approximately

15

$7.5 billion in assets under management.  As reflected on its certification filed previously in this action (ECF No. 13-3), PBU purchased shares of SeaWorld's common stock during the Class Period and has been damaged as a result of the conduct complained of herein.

**B.    The Corporate Defendant**

35.    SeaWorld, a Delaware corporation headquartered in Orlando, Florida, is a theme park and entertainment company that owns and operates eleven theme parks within the United States ("U.S."), including:  (i) three SeaWorld-branded theme parks in Orlando, Florida; San Antonio, Texas; and San Diego, California; (ii) Busch Gardens theme parks in Tampa, Florida; and Williamsburg, Virginia; (iii) water park attractions in Orlando, Florida (Aquatica); Tampa, Florida (Adventure Island) and Williamsburg, Virginia (Water Country USA); (iv) Discovery Cove, a reservations-only attraction in Orlando offering interaction with marine animals; and (v) Sesame Place, a seasonal park in Langhorne, Pennsylvania.  SeaWorld's common stock is publicly traded on the New York Stock Exchange under the symbol "SEAS."

**C.    The Individual Defendants**

36.    Defendant Atchison served as SeaWorld's Chief Executive Officer ("CEO"), President and Director from before the start of the Class Period until his resignation effective January 15, 2015.  Prior to serving as CEO, Atchison served as President and Chief Operating Officer of Busch Entertainment Corporation from 2007 to 2009 and as Executive Vice President and General Manager of SeaWorld Orlando from 2003 to 2007.  As alleged below, during the Class Period, Atchison signed the Company's SEC filings and made public statements in the following contexts and/or documents during the Class Period:  (i) November 13, 2013 quarterly report on Form 10-Q ("3Q13 Form 10-Q") for the three-month period ended

16

September 30, 2013; (ii) November 14, 2013 statement to the *Wall Street Journal*; (iii) December 20, 2013 statement to the *Orlando Sentinel*; (iv) March 13, 2014 conference call ("4Q13 Earnings Call") concerning the Company's financial results for the three-month period ended December 31, 2013; and (v) May 14, 2014 quarterly report on Form 10-Q ("1Q14 Form 10-Q") for the three-month period ended March 31, 2014 ("1Q14").  In addition, Atchison engaged in insider selling when he personally sold 154,000 shares of SeaWorld common stock in eight sales that he effectuated during a three-month window of the Class Period, amounting to approximately 20% of his beneficially owned shares and yielding proceeds of over $4.6 million.

37.     Defendant Heaney has served as SeaWorld's Chief Financial Officer from before the start of the Class Period to present.  Prior to joining SeaWorld, Heaney served as Chief Financial Officer and Senior Vice President of Finance and Travel Operations for Disney Cruise Line.  As alleged below, during the Class Period, Heaney signed the Company's SEC filings and made public statements in the following contexts and/or documents during the Class Period:  (i) 3Q13 Form 10-Q; (ii) November 13, 2013 earnings conference call concerning the 3Q13 financial results ("3Q13 Earnings Call"); (iii) 4Q13 Earnings Call; (iv) 1Q14 Form 10-Q; and (v) May 14, 2014 earnings conference call concerning the 1Q14 financial results ("1Q14 Earnings Call").

38.     Defendant Swanson has served as SeaWorld's Chief Accounting Officer from before the start of the Class Period to present.  Prior to joining SeaWorld, Swanson served as the Corporate Controller of Busch Entertainment Corporation and Vice President of Finance of Sesame Place.  As alleged below, during the Class Period, Swanson signed the Company's SEC filings and made public statements in

the following contexts and/or documents that were materially false and misleading and/or omitted material facts: (i) 3Q13 Form 10-Q; and (ii) 1Q14 Form 10-Q.

39.     Defendants Atchison, Heaney and Swanson are collectively referred to herein as the "Individual Defendants."

**D.     The Blackstone Group L.P.**

40.     Defendant Blackstone is a multinational private equity, investment banking, alternative asset management and financial services corporation based in New York, New York.  On December 1, 2009, investment funds associated with Blackstone and certain co-investors acquired 100% of the equity interests of SeaWorld LLC and SeaWorld Parks & Entertainment LLC from certain subsidiaries of Anheuser-Busch Companies, Inc.   Throughout the Class Period, Blackstone exercised substantial control over SeaWorld's operations by, *inter alia*, ensuring that Blackstone executives were seated on SeaWorld's board of directors and organizing and executing SeaWorld's issuance and sales of common stock.   Following the *Blackfish* premiere in January of 2013, Blackstone aggressively and steadily sold its ownership interest in SeaWorld to generate about $2.2 billion in a pattern that the *New York Post* described in August of 2014 as follows: "In this murky financial situation, one thing is clear: The Blackstone Group, which bought SeaWorld less than five years ago, is feeling a lot less pain than some other shareholders."

41.     Specifically, in the IPO, Blackstone sold 19.9 million shares of SeaWorld common stock, after which it continued to own approximately 63.3% of the outstanding common stock of SeaWorld and thus maintained the majority of the voting power of all outstanding shares of the Company's common stock.   In the secondary offering of SeaWorld common stock that occurred on or about December 12, 2013 ("December SPO"), Blackstone sold an additional eighteen (18) million

18

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

shares of SeaWorld common stock, after which it continued to own approximately 42.8% of the outstanding common stock of SeaWorld.  In the secondary offering of SeaWorld common stock that occurred on or about April 4, 2014 ("April SPO"), Blackstone sold another fifteen (15) million shares of SeaWorld common stock, after which it continued to own approximately 25% of the outstanding common stock of SeaWorld.  Concurrently with the closing of the April SPO, Blackstone also sold 1,750,000 shares of its own common stock directly to SeaWorld as a part of a private share repurchase program.  As of December 31, 2015, Blackstone owned approximately 22.2% of SeaWorld's outstanding common stock.  While after the December and April SPOs, Blackstone no longer owned the majority stake, SeaWorld stated in its public filings during the Class Period that Blackstone "will continue to be able to significantly influence [SeaWorld's] decisions."  Indeed, Blackstone's steady decline in its SeaWorld position following the premiere of *Blackfish* and throughout the Class Period—while Blackstone was privy to material non-public information regarding SeaWorld's operations—was staggering.

| Date | Blackstone's Ownership of SeaWorld Throughout Class Period |
|---|---|
| December 1, 2009 | 100% |
| April 18, 2013 | 63.3% |
| December 17, 2013 | 42.8% |
| April 9, 2014 | 25% |
| December 31, 2015 | 22.2% |

### E.    Relevant Non-Parties

42.    Certain allegations herein are based on information provided by confidential witnesses ("CWs") who are former employees of SeaWorld interviewed by Plaintiffs' representatives.

43.     CW-1 worked for SeaWorld for over three years prior to the start of the Class Period through mid-2014, most recently as a Social Media Manager at the Company's corporate headquarters in Orlando, Florida.  Starting in the first half of 2013, CW-1 reported to the Director of Social Media, who reported to Chief Marketing Officer Peter Frey.  In her[4] position, CW-1 was involved in managing social media for the Company as a whole, which included monitoring and tracking commentary on the internet, on Twitter and within various electronic forums concerning SeaWorld.  Each of SeaWorld's eleven parks had its own Facebook and Twitter accounts, as well as social media personnel managing those accounts.  As a Social Media Manager, CW-1 was responsible for, among other things, strategizing with the parks about how to convey information to the public through social media. During the Class Period, CW-1 was among those responsible for monitoring *Blackfish*-related commentary and backlash on the internet and Twitter.   In one aspect of this work, CW-1 participated in a so-called "war room" in which she and other marketing and media employees worked on various digital media for the Company's website in response to *Blackfish*.  CW-1 also worked with representatives from 42West, the public relations company SeaWorld hired in early 2013 to handle the Company's media campaign in response to *Blackfish*.

44.     CW-2 worked as a Director in marketing and advertisement at SeaWorld's-branded San Antonio park for over three years prior to the start of the Class Period through early 2014.  CW-2 reported to the Vice President of Marketing for San Antonio, who, in turn, reported to the General Manager of the San Antonio park ("GM"), and also to the SeaWorld Corporate Marketing leadership in Orlando, Florida.   CW-2's responsibilities entailed working on retail and sponsorship

---

[4] To preserve anonymity, all CWs are referred to herein using feminine pronouns.

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

relationships and promotions, including with companies such as McDonald's, Coca-Cola and Southwest Airlines.  As a part of her job function, CW-2 received weekly attendance reports showing actual attendance and target attendance numbers compiled at SeaWorld's corporate headquarters, and participated in conference calls and/or meetings in which these attendance reports were reviewed and discussed. Other attendees at these regular meetings included the San Antonio park's GM, Vice President of Marketing and Vice President of Finance.

45.    CW-3 worked for SeaWorld's-branded San Diego park for over three years prior to the start of the Class Period through late 2014, most recently as a Supervisor.  In this role, CW-3 managed various park personnel, including with respect to salary matters, hiring, retention and scheduling.  CW-3 explained that SeaWorld closely managed its staffing based on actual daily attendance figures.  In her role as Supervisor, CW-3 also received a daily e-mail concerning attendance figures.  By noon each day, if actual attendance was too far below the attendance budgeted for that particular day, CW-3 would receive instructions to send a certain number of her supervisees home for the day.  In at least 2013 and 2014, CW-3 also had access to SeaWorld's annual Daily Attendance Budget, via a shared drive on SeaWorld's computer network.  The Daily Attendance Budget was a budgeting and forecasting tool developed by SeaWorld's corporate finance department that, among other things, estimated attendance for each day at the park, covering 365 days of the year.  According to CW-3, the finance department used weather patterns, school and holiday schedules, information about other SeaWorld parks and historical data to make the daily estimates.  The forecasted attendance was then used by management to determine, among other things, needs related to staffing, the purchasing of goods and supplies, food and beverage and ride operations.  In or around September each

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

year, a member of the finance department would advise supervisors and managers that the report was available. CW-3 also attended Employee Communication Meetings ("ECMs"), which she believed were held at all SeaWorld parks to discuss, among other things, *Blackfish*.

46.   CW-4 worked for SeaWorld's-branded San Diego park for over three years prior to the start of the Class Period through late 2014, most recently as a Director in food and beverage services. In this role, CW-4 was responsible for food and beverage service at SeaWorld San Diego, which included managing approximately 1,000 or more employees. CW-4 explained that SeaWorld closely managed its staffing and food and beverage needs based on actual daily attendance figures. In her role, CW-4 was privy to daily, weekly and yearly attendance reports, including the Daily Attendance Budget which CW-4 added was developed by the Company's Business Analysis Department and typically released in the fourth quarter of the previous year. According to CW-4, the Daily Attendance Budget was the "heart of the operation" at SeaWorld because attendance forecasting was the primary driver of all business planning and management at SeaWorld parks. CW-4 further stated that the Daily Attendance Budget included attendance forecasts for all 365 days of the year and could be adjusted on a weekly basis if needed. CW-4 received daily alerts via her smart phone and email regarding attendance so that she could adjust her department's budget and staffing based on the day's actual attendance levels. CW-4 recalled it was a regularly occurring, "common practice" to "budget down" by releasing staff early during 2013 and 2014 based on low attendance.

47.   CW-5 worked for SeaWorld for over five years, first as a Financial Analyst supporting the Marketing division for SeaWorld's Orlando parks (which included SeaWorld, Discovery Cove and Aquatica), then as a Corporate Analyst in

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

the finance division at the Company's Orlando headquarters.  CW-5 worked in the former position for over three years prior to the start of the Class Period until December 2014.  In her role as a Financial Analyst at SeaWorld Orlando, CW-5 was responsible for budgeting, forecasts, data analysis and analytics for the marketing department.  CW-5 compiled park-level data for the Orlando parks that was reported to corporate headquarters in weekly, monthly and quarterly reports.  The reports compared actual attendance to budgeted attendance, forecasted attendance, which was updated monthly, and the prior year's attendance.  CW-5 explained that SeaWorld used a "homegrown" proprietary database called ParkWare to track attendance and data in real time on each visitor that entered the park.  As a Financial Analyst for the Orlando parks, CW-5 primarily had exposure to attendance projections for those parks.  As part of her reporting duties, CW-5 also analyzed which ticket types were not selling and the residence of visitors.  CW-5 also had responsibility for data analysis for the contact center when she was at the Orlando parks.  She explained that the call center was "rich with data" and that every second of every call was recorded in the database.  Although CW-5 was only responsible for compiling data on the length and volume of calls and wait times for incoming calls, CW-5 did discuss *Blackfish* as a likely reason for the decreased attendance at the three SeaWorld-branded parks with her colleagues.  CW-5 stated that she knew that SeaWorld's Chief Financial Officer, Defendant Heaney, received the information within her reports in some form.

48.     Sarah Fischbeck joined SeaWorld's-branded San Diego park in 2007 as a water quality diver.  During her six years with SeaWorld, Ms. Fischbeck worked across SeaWorld's departments, regularly diving with the various animals and performing maintenance on SeaWorld's different exhibits. Ms. Fischbeck voluntarily

left SeaWorld in December of 2013, a decision she reportedly made due to poor treatment as an employee and SeaWorld's treatment of its animals.  In a two-part interview reported by *The Dodo* entitled "Ex-SeaWorld Employee: 'If You Speak Out Against It, You're Fired,'" Ms. Fischbeck publicly described SeaWorld's corporate culture as being "obsessed with secrecy," explaining that employees who saw anything go wrong at SeaWorld parks were "put under gag orders."   In particular, the articles report that "SeaWorld's secretive management policies were perhaps best highlighted during the release of 'Blackfish' in July 2013[.]" Describing SeaWorld's instructions to its employees regarding *Blackfish*, Ms. Fischbeck revealed that SeaWorld "actually had a collective meeting before it came out telling us to say it was fake," and that SeaWorld was "feeding us lines[.]"  Ms. Fischbeck further disclosed that employees were instructed to dissuade family and friends from seeing the film and that SeaWorld's entire response to *Blackfish* was "extremely hush-hush."

## IV.   OVERVIEW

### A.   SeaWorld's April 2013 IPO And Two Secondary Public Offerings

49.   SeaWorld is a theme park and entertainment company that owns and operates eleven theme parks that are grouped in key markets across the U.S., including water show parks that house or otherwise feature killer whales located in Orlando, Florida, San Diego, California, and San Antonio, Texas, and Busch Gardens.  The three SeaWorld-branded parks are the flagship parks of the SeaWorld brand.  SeaWorld owns or licenses a large portfolio of globally recognized brands, including SeaWorld and Shamu (the name of the Company's first performing orca).

50.   Until April 2013, SeaWorld was 100% privately held.  In particular, SeaWorld was privately owned by Busch Entertainment Corp. until December 2009,

when it was sold in full to Blackstone and renamed SeaWorld Entertainment.  In April 2013, Blackstone took SeaWorld public.  On or about April 24, 2013, the Company completed the IPO of its common stock at a price of $27.00 per share.  In the IPO, the Company issued and sold 10,000,000 shares of common stock, and certain selling stockholders offered and sold 19,900,000 shares of common stock (owned by Blackstone), including 3,900,000 shares of common stock pursuant to the exercise in full of the underwriters' option to purchase additional shares.

51.   On December 17, 2013, the Company completed the December SPO, a secondary offering of 18,000,000 shares of common stock (all of which were owned by Blackstone) at a price of $30.00 per share.

52.   On April 9, 2014, the Company completed the April SPO, a secondary offering of 17,250,000 shares of common stock (15,000,000 of which were owned by Blackstone and the other 2,250,000 of which were sold pursuant to the exercise in full of the underwriters' option to purchase additional shares) at a price of $30.00 per share.

**B.    SeaWorld's Operations**

53.   SeaWorld's brand and marketing efforts focus on the Company's unique animal-based attractions, particularly at its three branded parks.  According to public filings, across its eleven parks, SeaWorld maintains one of the world's largest zoological collections, including ninety-three (93) animal habitats with approximately 86,000 animals, including 8,000 marine and terrestrial animals and 78,000 fish.  These parks feature, among other things, orca, sea lion and dolphin shows, as well as zoological displays featuring various other marine animals.  The Company's parks also feature roller coasters and other mechanical thrill rides.

54.     The three SeaWorld-branded parks' main attraction for over fifty years has been its shows featuring orcas (i.e., killer whales), which—until March 2016—the Company has captured, bred and trained to perform.  "Shamu" – the name of the Company's first orca and SeaWorld's "globally recognized" and trademarked name for its killer whale shows – is a brand "synonymous with SeaWorld for much of the park's 50-year history," according to *The Voice of San Diego*.  SeaWorld's logo features a killer whale's dorsal fin.  At the time of the IPO, SeaWorld-branded parks housed twenty-nine (29) killer whales.  Currently, SeaWorld houses twenty-four (24) orcas in three parks – eleven (11) at SeaWorld San Diego, seven (7) at SeaWorld Orlando, and six (6) at SeaWorld San Antonio.  Five other orcas are on breeding loan to various establishments.

55.     To be sure, SeaWorld's killer whale shows have represented a "key point of differentiation" from other theme parks, and are a main driver of the Company's ability to attract customers to its flagship parks in Orlando and San Diego, as reported by *The Voice of San Diego*.  As noted in the Company's IPO Offering Materials, "each SeaWorld theme park showcases killer whales in specially designed amphitheaters."  Since 1964, hundreds of millions of people have attended SeaWorld's signature "Shamu Shows," which emphasize the killer whales' impressive intelligence, massive bodies, and complex social interactions with humans.  Before the Occupational Safety and Health Administration ("OSHA") banned human trainers from working in the water with captive killer whales in 2010, the signature climax of these shows was the iconic "rocket hop" maneuver in which the killer whale propelled a trainer out of the water.

56.     Orcas and orca shows thus constitute the core of the SeaWorld brand. Dave Goodman, former vice president and executive producer of entertainment at

SeaWorld's Orlando park explained to *The Voice of San Diego* that "[t]ying the human experience to the animal one is the vital thrust behind the Shamu shows and the park itself" and analogized that, "[*r*]*eplacing Shamu to Seaworld is like getting rid of Mickey to Disney*." As Atchison told *Bloomberg* in November 2014: "*Our killer whales, our killer whale program, and all of our animals are emblematic of the whole brand*."

57.    Despite SeaWorld's long reliance on its orca shows as its primary and signature attraction, on March 17, 2016, the Company announced that it was discontinuing its orca breeding program and its trademarked orca trick shows. SeaWorld did so under enormous public pressure and multi-year attendance declines after *Blackfish* spurred public backlash against the Company's treatment of its orcas. Indeed, SeaWorld's CEO acknowledged that SeaWorld's orca shows—once its selling point—was now driving consumers away. A March 24, 2016 *Forbes* article quotes Manby, stating: "[*SeaWorld] built the brand around Shamu many years ago and made people fall in love with killer whales . . . but now the paradox is that it's one of the leading reasons people are uncomfortable with SeaWorld*." In an op-ed Manby authored to announce the decision, published in the *Los Angeles Times*, Manby attributed SeaWorld's announcement to an "attitudinal change that we helped to create." And as the *Los Angeles Times* further reported on March 18, 2016, "[*t]hough Manby made no reference to 'Blackfish' in his op-ed, the film was largely responsible for that 'attitudinal change*.'"

### i.    The Amusement And Theme Park Industry

58.    The amusement and theme park industry is highly concentrated and dominated by five major players:  (i) SeaWorld; (ii) Disney; (iii) Universal; (iv) Cedar Fair LP; and (v) Six Flags, Inc.  According to IBISWorld – a group comprised

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

1  of industry-focused analysts, strategists, and researchers that provide comprehensive

2  information on, among other things, the amusement park industry in the U.S. – these

3  five companies collectively account for approximately 86.6% of the total U.S. theme

4  park industry revenue.   Notably, each year, IBISWorld issues the "IBISWorld

5  Industry Report – Amusement Parks in the US" ("IBISWorld Report"), and

6  SeaWorld has referenced the IBISWorld Report in its public statements and filings.

7  59.   Each year, the Themed Entertainment Association ("TEA") publishes a

8  *Theme and Museum Index – Global Attractions Attendance Report* ("TEA Report"),

9  in which it identifies the top theme parks and water parks, including SeaWorld, and

10  reports their performance for the calendar year.  TEA is a prominent group dedicated

11  to providing consumers with information about, among other things, theme parks like

12  SeaWorld.   SeaWorld also references and explicitly relies upon TEA data in its

13  public statements and filings.  Indeed, the TEA Reports represent the standard within

14  the theme park industry—as both the industry (including SeaWorld) and the market

15  relies upon data from the TEA Reports in analyzing attendance within the industry.

16  One key piece of information the TEA Reports provide, which theme park operators

17  including SeaWorld typically do not provide to investors, is attendance data for

18  individual theme parks.

19  60.   In the Company's 2013 Form 10-K, SeaWorld identified Disney and

20  Universal as its principal direct competitors.  Like SeaWorld, both Disney and

21  Universal operate theme parks in Orlando, Florida and Southern California.   In

22  Orlando, Disney operates Magic Kingdom, Epcot, Hollywood Studios, Animal

23  Kingdom, Blizzard Beach and Typhoon Lagoon, while Universal operates Universal

24  Studios Florida and Island of Adventure.  In Southern California, Disney operates

25  Disneyland and California Adventures, while Universal operates Universal Studios

26

27

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

Hollywood.  Within the theme park industry, Disney, Universal and SeaWorld are often referred to as the "Big Three."

61.    According to IBISWorld, families with children aged ten (10) to nineteen (19) make up the primary consumer market for the theme park industry.  As of August 2014, teenagers and children younger than eighteen (18) accounted for approximately 25.6% of all U.S. theme park attendees.  As noted by IBISWorld, due to the limited disposable income of this group, consumers between ages thirty-five (35) and fifty-four (54) years old typically accompany children to parks, and account for approximately 21.6% of the market.  In short, younger consumers typically drive a significant portion of demand and attendance for the industry as a whole.

62.    Consistent with this observation, SeaWorld noted in its 2013 Form 10-K that "families comprised 54% of our attendance with an average party size of 3.8 people."  Accordingly, SeaWorld's ability to ensure that its products are and remain appealing to this younger demographic are essential to its success.

### ii.    Attendance Drives SeaWorld's Revenues

63.    Amusement and theme parks derive the majority of their revenues from ticket sales.  Attendance, in turn, allows for in-park spending.  SeaWorld is no exception.  Throughout the Class Period, Defendants identified attendance as a key proxy for analyzing the success and stability of the Company's business operations.  Indeed, in its 2013 Form 10-K the Company stated, "[w]e generate most of our revenue from selling admission to our theme parks," and disclosed that admissions accounted for nearly two-thirds (approximately 63%) of its total 2013 revenue.

64.    Likewise, SeaWorld's quarterly filings with the SEC on Form 10-Q each include "attendance" as a key business metric evaluated by management, and represent that "[i]ncreased attendance drives increased admissions revenue to our

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

theme parks as well as total in-park spending." As SeaWorld explained in a recent proceeding before a federal court in Florida:

> Your Honor, Sea World keeps records of every guest who enters their parks. Those records include driver's license numbers, credit card numbers, addresses, information on each and every visit that the guest makes to the park, the dates of those visits, what the guest purchased at the park, names of minor children who purchase passes, et cetera. Sea World also keeps records of each telephone conversation between a guest and Sea World, and keeps notes in a computerized data system of those telephone conversations. These records, as you might imagine, Your Honor, are very voluminous.[5]

65.    Moreover, CW-5 confirmed that SeaWorld very closely monitored its attendance through various internal "home-grown" systems, including ParkWare, a real-time recording system that tracked attendance and various data regarding each visitor that entered a SeaWorld park. CW-5 explained that ParkWare enabled SeaWorld to gather data regarding each visitor to SeaWorld parks, as ParkWare recorded visitor data with a bar code for each park visitor that "clicked" through a SeaWorld turnstile. According to CW-5, SeaWorld maintains numerous databases beyond just ParkWare, and internal reports could be generated from each of these databases. Further, CW-5 confirmed that the universe of data collected from all of these databases could be emailed, imported into Excel, and analyzed by business analysts through one of SeaWorld's internal programs called Business Objects. The

---

[5] Transcript of Preliminary Pretrial Conference, *Jason Herman, et al. v. Sea World Parks & Entertainment, Inc.*, No. 8:14-cv-03028-MSS-JSS (M.D. Fla. Mar. 5, 2015), at 21:11-22. Notably, in the same case, a SeaWorld corporate manager attested that "[t]here are more than eight million individual notes in [SeaWorld's season pass] database since December 1, 2008." Declaration of Scott Trien (Dkt. No. 99-2), *Herman*, No. 8:14-cv-03028-MSS-JSS, at ¶8.

breadth of the attendance-related records that SeaWorld keeps demonstrates the importance that SeaWorld attributes to this key business metric.

66.     SeaWorld's growth strategy, as discussed in the materials SeaWorld filed in conjunction with the IPO ("IPO Offering Materials"), revolves around the Company's ability to "increas[e] [the Company's] existing theme park revenues through strategies designed to drive higher attendance and increase in-park per capita spending."  Further, the main purpose of SeaWorld's marketing efforts is to increase attendance.  As SeaWorld stated in its 2013 Form 10-K, "[o]ur marketing and sales efforts *are focused on generating profitable attendance*…."  The Company further acknowledged in its 2013 Form 10-K that reductions in attendance "can materially adversely affect [SeaWorld's] business, financial condition and results of operations."

67.     The Company's Forms 10-Q likewise represent within a section entitled "Principal Factors Affecting Our Results of Operations" that the Company's "*revenues are driven primarily by attendance in our theme parks* and the level of per capita spending for admission to the theme parks and per capita spending inside the theme parks for culinary, merchandise and other in-park experiences."  Thus, maintaining and driving attendance levels is a fundamental concern of SeaWorld's and critical to its revenues and results of operations.

68.     In order to generate attendance, companies operating amusement parks (or "operators") typically offer various ticketing options, ranging from traditional single-day or multi-day admission tickets granting entrance to a single park to package deals (or "bundles") that entail admission to several different parks, including parks run by different companies.  Companies operating multiple parks in a

31

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

1    particular geographic location generally offer consumers the ability to purchase

2    entrance to more than one of their parks for a discounted price.

3         69.    Moreover, in locations that are home to multiple parks operated by

4    various operators in the industry, the ability to offer joint and single ticketing

5    arrangements with discounts in cooperation with other theme parks, such as a multi-

6    park pass, can further boost ticket sales and attendance.  For example, Orlando,

7    Florida is home to seven of the largest amusement parks in the U.S.  As IBIS

8    explained in the Company's 2014 industry report, "[i]ndustry players have found that

9    there are synergies and promotions and other advantages in having a number of major

10   operators located in the same area."

11        70.    TEA explained that increased tourism within a particular destination like

12   Orlando tends to drive increased attendance at all theme parks operating within that

13   market.  Tourists who choose to vacation near theme park venues prefer to have a

14   range of options, and will vacation in places that offer multiple attractions in close

15   and convenient proximity.

16        71.    These principles apply to SeaWorld, which represented in its public

17   filings during the Class Period that it benefits from the "significant capital

18   investments made in developing the tourism industry in the Orlando area," and that

19   the "high concentration of theme parks operated by several companies" is beneficial

20   to SeaWorld's operations, both in Orlando and in San Diego.  Consistent with these

21   observations, SeaWorld reported in its 2013 Form 10-K that approximately 55% and

22   21% (or 76% combined) of its revenues in 2013 were generated in the States of

23   Florida and California, respectively.

24        72.    The Company further emphasized this point in its 2013 Form 10-K,

25   stating, "[w]e also participate in joint programs that are designed to provide visitors

26

27

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

to Florida and Southern California with options, flexibility and value in creating their vacation itineraries.  For example, we have partnered with several theme parks in Orlando to create the Orlando FlexTicket….We also created the 2-Park FlexTicket [in San Diego] in conjunction with Universal Studios, which allows guests to purchase a ticket providing access to SeaWorld San Diego and Universal Studios Hollywood."

73.    Because attending a park is usually an all-day (and sometimes multi-day) event for visitors, industry operators also generate significant revenues from the sales of food and beverage.  In 2013, food, merchandise and other revenue accounted for approximately 37% of SeaWorld's total revenue, according to the Company's 2013 Form 10-K.  In addition, parks generate revenue from merchandise sales, which IBISWorld estimated would account for approximately 16% of overall industry revenue.   The remainder of theme park revenues is typically derived from sponsorships, licensing and other fees.  Of course, a theme park operator's ability to generate revenues through the sale of food, beverages or merchandise depends entirely, as a threshold matter, upon attendance.

74.    Given how critical attendance is to a theme park's bottom line, theme park companies are focused on, and regularly, monitor, track, and account for, factors that may depress attendance.  Such factors, as discussed below, may include adverse weather conditions, annual holiday and school schedules (since school-age children are a critical target demographic), pricing strategies and, as mentioned above, location-related issues.  Companies typically list these factors as potential risks to performance within public financial filings.

75.    Moreover, because attendance statistics are critical to a theme park's bottom line, attendance figures are incredibly material to an investor's decision to

invest in a theme park company, like SeaWorld.  As the *San Antonio Express-News* recently explained, however, SeaWorld "doesn't usually provide information on attendance at specific parks in its SEC filings[,]" and on conference calls, "executives decline[] to offer more specific figures[,]" noting that Peter Crage, SeaWorld's current CFO, stated "We don't break that out."  Therefore, to understand the trends of this critical metric, investors must rely on the information available to the market— *i.e.*, the TEA Reports expressly relied upon by SeaWorld and analysts—that never provide the complete breakdown of attendance at *all* of SeaWorld's parks, or park-level attendance data on anything but an annual basis, and only for the largest theme parks.  Beyond that, investors are forced to rely upon only one source for *complete* information about attendance at SeaWorld parks: the Company—who investors trust, and the securities laws require, to tell the *complete* truth about such a critical business metric as attendance.

## C.   *Blackfish* Premieres At The Sundance Film Festival And Seizes Public Attention

76.   On January 19, 2013, just months before Blackstone took SeaWorld public in the IPO, Gabriela Cowperthwaite's documentary *Blackfish* premiered at the world-renowned Sundance Film Festival in Park City, Utah.  The documentary tells the disturbing story of Tilikum, a 12,000-pound bull orca implicated in the deaths of three people.  Cowperthwaite began work on *Blackfish* following Tilikum's well-publicized 2010 mutilation and killing of senior trainer Dawn Brancheau, which took place at SeaWorld Orlando.

77.   More generally, *Blackfish* is an indictment of SeaWorld's core brand and killer whale-as-entertainment business.  The film chronicles the apparent cruelty of baby orca capture methods, the dangers associated with the close human-killer whale

contact featured at SeaWorld's most popular shows, and the strains, both physical and psychological, of captivity on the killer whales held by SeaWorld. Featuring graphic images of trainers being mauled and whales being bitten or "raked" by fellow whales in captivity, as well as interviews of former SeaWorld trainers, SeaWorld spectators, and other experts such as OSHA employees and scientists, *Blackfish* makes the case that SeaWorld's business of keeping killer whales in captivity for the purpose of human entertainment and profit is cruel, dangerous, and immoral. In addition to its anti-captivity message, *Blackfish* suggests that in order to protect its brand and most popular, profitable and iconic attraction – its killer whale shows – SeaWorld cravenly covered up previous dangerous and fatal incidents involving Tilikum, blaming whale trainer error for the tragic incidents. An early review noted that the film makes "SeaWorld's entire operation look criminal."

78.    In particular, the film highlighted SeaWorld's willingness to disregard and ignore its own internal reports in order to protect its core brand. Specifically, *Blackfish* focused on SeaWorld's conduct in the OSHA proceedings that resulted in a 30-page opinion issued by Administrative Law Judge ("ALJ"), Ken S. Welch. *See Secretary of Labor v. SeaWorld of Florida, LLC*, OSHRC Dkt. No. 10-1705, 2012 OSAHRC LEXIS 40 (O.S.H.R.C.A.L.J. June 11, 2012). Therein, the ALJ found that: (i) SeaWorld proffered an expert opinion that was "speculative and ha[d] no basis in fact[,]" *id.* at *80; (ii) SeaWorld had adopted a corporate line that "the trainer is always at fault for the killer whale's undesirable behavior. In this closed system, any injuries sustained by a trainer will always be traceable to human error. It is not the operant conditioning program that is inadequate; it is the performance of the trainer that is flawed[,]" *id.* at *70-71; and (iii) despite a plethora of reports by "management personnel who instituted corporate-wide protocols and safety procedures" that were

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

"circulated among the SeaWorld parks" over a fifteen-year span, SeaWorld "insist[ed] it did not recognize the hazard posed by working in close contact with killer whales"—a position the ALJ found was "implausible" because "[n]o reasonable person reading these comments would conclude that SeaWorld was unaware that working in close contact with killer whales during performances creates a hazard for its trainers." *Id.* at *65-66.

79. Moreover, the film charged SeaWorld with having coerced its employees into telling "bold-faced lies" on the witness stand in the OSHA proceeding, specifically pointing to the testimony from SeaWorld's curator, Kelly F. Clark, that SeaWorld had no affiliation with a park called Loro Parque in Tenerife, Spain, to which SeaWorld had leased five killer whales. Directly contradicting Ms. Clark's testimony, the ALJ found the SeaWorld and Loro Parque "parks are intertwined" as "[m]anagement personnel at the parks are in constant communication with each other[,]" despite SeaWorld's "attempt[] to distance itself from the SeaWorld parks and from Loro Parque," and "to minimize evidence that working closely with killer whales is a recognized hazard," *id.* at *36-37. Ultimately, as the film showed, the ALJ assessed $12,000 in penalties against SeaWorld for its "serious" and "willful" violations of the law. *Id.* at *96. These findings by the ALJ were affirmed by the U.S. Court of Appeals for the District of Columbia Circuit. *SeaWorld of Florida, LLC v. Perez*, 748 F.3d 1202 (D.C. Cir. 2014). In short, *Blackfish* exposed SeaWorld's willingness to consciously disregard internal reports that jeopardized its core operations, as demonstrated by the OSHA proceedings. And while the film directly attacked SeaWorld's brand and business operations, the Company's response throughout the Class Period reflected a denial of, and inability to deal with, the impact of *Blackfish*.

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

80.     Following the critically acclaimed screening of the film at Sundance, on January 22, 2013, as was widely reported, CNN Films and Magnolia Pictures acquired the rights to *Blackfish* and immediately announced plans to screen the film on a broad public platform beginning in the summer of 2013.

81.     The film reached increasingly broad swathes of the public throughout 2013.  On July 19, 2013, *Blackfish* was released in theaters in New York, New York, Los Angeles, California, and Toronto, Canada, among other places.  At its widest release, the documentary was shown in approximately ninety-nine (99) theaters for a total of fourteen (14) weeks.  Also in July 2013, the film was made available to British customers of Netflix, the leading online video streaming and mail-order service.  The next month, on August 26, 2013, *Blackfish* was released on DVD and Blu-ray Disc in the United Kingdom.  In September and October of 2013, the film premiered in Germany, Greece, Iceland, Spain and other international locations.

82.     The documentary was then broadcast to tens of millions more people on CNN during a highly promoted screening on October 24, 2013.  CNN reported that, according to Nielsen ratings, the *Blackfish* premiere topped cable news viewership that evening.  After the broadcast, CNN aired an Anderson Cooper special with, among others, Gabriela Cowperthwaite.  This was followed by a special edition of *Crossfire* with *Blackfish* associate producer Tim Zimmermann debating Grey Stafford, a conservationist, zoologist, and member of the International Marine Animal Trainers Association.  CNN re-aired the film numerous times in the days and weeks that followed.

83.     *Blackfish* was also released on DVD, Blu-ray Disc and iTunes in the U.S. on November 12, 2013.  The BBC aired the film in the United Kingdom on November 21, 2013.

84.     By December 2013, *Blackfish* was made available on Netflix in the U.S. At the time, Netflix maintained approximately thirty-one million U.S. domestic subscribers.

85.     On January 22, 2014, Cowperthwaite openly challenged SeaWorld to debate the issues raised by the film in a public forum.  Cowperthwaite stated:

> We challenge SeaWorld to debate these issues with our teams in a public forum, which we will be happy to arrange. Throughout the production and theatrical release of Blackfish, SeaWorld has refused to directly engage with the film or its points in any public way, despite repeated invitations. Instead of releasing more PR spin, written statements and online critiques (which often allow no comments), we encourage SeaWorld's leaders to step forward and address these issues openly and honestly in public debate. Let the public hear both sides of the argument (as we have always desired) and draw their own conclusions.

86.     SeaWorld declined to debate Cowperthwaite directly and continually attempted to downplay *Blackfish* throughout the Class Period, brazenly denying that it was having ***any*** impact on the Company's operations and attendance.

87.     As a result of *Blackfish*, by the time of the Company's April IPO, SeaWorld had become a public relations target for PETA, other advocacy groups and prominent celebrities across the nation.  Given that CNN and Magnolia Pictures planned for wide release of the film, the *Blackfish* effect, already significant, was primed to intensify.  Recognizing this, prior to the IPO, SeaWorld already had taken a number of steps that indicate SeaWorld's notice and internal understanding of the *Blackfish* effect on its core business.  As disclosed by Ms. Fischbeck, SeaWorld "actually had a collective meeting before [*Blackfish*] came out telling [SeaWorld employees] to say it was fake[.]"  According to Ms. Fischbeck, SeaWorld was "feeding [its employees] lines," and instructing SeaWorld employees to dissuade

38

family and friends from seeing the film.  And, *externally*, SeaWorld had begun a nationwide campaign to mitigate the harmful impact of *Blackfish* on the public's perception of the Company.

88.     Despite the fact that it was battling the *Blackfish* effect in a nationwide public relations campaign, rather than inform the public within the IPO Offering Materials that *Blackfish* was presently harming SeaWorld's "reputation, reduc[ing] attendance and negatively impact[ing] [SeaWorld's] business, financial condition and results of operations," the Company disclosed only that *Blackfish* "may" have a negative effect on attendance and other key metrics at some point in the future.  This same equivocal language was repeated in certain of SeaWorld's quarterly, annual and offering-related SEC filings prior to and throughout the Class Period.

89.     Meanwhile, SeaWorld continued to lose customers.  On August 13, 2013, Defendants reported SeaWorld's 2Q13 financial results.  Among other things, Defendants reported a 9% decline in attendance for the second quarter, representing a decrease of approximately 600,000 guests.  Defendants attributed the entire drop in attendance to three distinct factors:  (i) new pricing strategies (i.e., the Company's annual summer ticket price increases); (ii) adverse weather conditions; and (iii) the "unfavorable timing of Easter," which "caused an overlap with the spring break holiday period for schools."  On the earnings call that same day ("2Q13 Earnings Call"), while Atchison admitted that "over the long term these weather effects tend to even out," he claimed SeaWorld was "impacted much more than normal during the second quarter by these adverse weather conditions."

90.     Later in the 2Q13 Earnings Call, in response to an investment analyst question seeking further information concerning attendance, Heaney again attributed the entire decline to these same three factors, stating that each accounted for one-third

1   of the total decline.  Heaney further assured investors that "[t]he Easter effect,

2   obviously, won't repeat in the second half and that's one piece of attendance we'll

3   pick up in the third and fourth quarters."

### D. Defendants Mislead Investors Concerning The Impact Of *Blackfish* On The Company's Operations And Attendance

#### i. Defendants Repeatedly Deny That The Stark Attendance Decline At SeaWorld's Parks Was Caused, To Any Degree, By *Blackfish*

91.   As set forth above, SeaWorld's financial health is directly tied to its ability to attract and grow attendance at its parks.  Attendance at SeaWorld's parks declined each quarter during the Class Period following the premiere of *Blackfish*, yet Defendants repeatedly assured investors that *Blackfish* had not contributed, at all, to these drastic declines, and was not impacting SeaWorld's operations in any way. Rather, Defendants attributed the entire decline in attendance to a combination of three factors:  (i) adverse weather conditions; (ii) holiday and school schedules; and/or (iii) SeaWorld's pricing strategies.

92.   On the first day of the Class Period, August 29, 2013, following the 2Q13 earnings release, the *Los Angeles Times* questioned whether the decline in attendance was also attributable to the ever-growing *Blackfish* effect.  In response, Vice President of Communications Fred Jacobs ("Jacobs"), speaking on behalf of the Company, flatly denied that *Blackfish* or the public backlash spurred by the film was hurting attendance, stating that "Blackfish' has had no attendance impact."  That same day, Jacobs told *Bloomberg* that the Company "can attribute no attendance impact at all to the movie."

93.   Notably, one month prior, SeaWorld had dramatically intensified the Company's public relations campaign opposing *Blackfish*, as Jacobs reached out to

fifty (50) major film reviewers to "discredit" *Blackfish*.  The president of Magnolia Pictures – the film's distributor – Eamonn Bowles stated "[f]rankly, I've never seen anything like it."  The *New York Times* called this high profile action "an unusual pre-emptive strike" and an "aggressive public pushback" by a corporation.

94.    Indeed, SeaWorld was concerned enough about the negative publicity resulting from *Blackfish* that it hired communications firm, 42West to lead a public relations counter-attack. NPR called SeaWorld's counter-campaign "one of the clumsiest, most-ill advised acts of corporate crisis-management" in memory.  The Wire likewise reported "[the] magnitude of th[e] response [wa]s odd" and that it was "rare" for a corporation to target a documentary, hire a film publicist [42West] and "make sure critics and journalists are informed of the Company's response to a film."

95.    Also in or around July 2013, as the negative public perception of SeaWorld continued to intensify, SeaWorld released a public statement, speaking out against the film and claiming it was "inaccurate":

> *Blackfish*...is inaccurate and misleading and, regrettably, exploits a tragedy.... [T]he film paints a distorted picture that withholds...key facts about SeaWorld—among them...that SeaWorld rescues, rehabilitates and returns to the wild hundreds of wild animals every year, and that SeaWorld commits millions of dollars annually to conservation and scientific research.

96.    Shortly thereafter, on August 29, 2013, at least one analyst, S&P Capital IQ, remained skeptical about Defendants' story regarding the effect of *Blackfish*, stating that "we think SEAS confronts considerable negative public relations regarding captivity of killer whales in a high-profile documentary" and describing "negative publicity around a SeaWorld documentary" as an "overhang that will weigh on [SeaWorld's] shares."  Most analysts, however, took SeaWorld's word, accepting Defendants' bullish proffered explanations for the decreased 2Q13

41

attendance.  For example, a September 17, 2013 KeyBanc Capital Markets report dismissed concerns over whether the Company's lagging attendance was associated with *Blackfish*, stating:

> [w]hile building investor consternation has been evident in recent weeks following 2Q13 results and suspect publicity surrounding discounts and the potential impact of the Blackfish documentary, we believe the operational update provided by SEAS last week should ease some concerns [….] In our view, the vast majority of these transitory issues have had little to no impact on the business and that is now becoming apparent in the results.

97.     SeaWorld attendance kept falling.  On November 13, 2013, Defendants reported SeaWorld's 3Q13 financial results, including a 3.6% decline in attendance for the third quarter – a decrease of 600,000 guests, and a 4.7% decline overall for the first nine months of 2013 as compared to the same periods in the prior year.  The decline, Defendants represented, was attributable to adverse weather conditions in July, as well as the "expected result" of pricing strategies the Company implemented in the prior quarter.

98.     The following day, on November 14, 2013, Atchison stated to the *Wall Street Journal*:  "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it," adding "[i]ronically, our attendance has improved since the movie came out."  Defendants' spin efforts continued to work, as analysts from Wells Fargo, JPMorgan and Barclays, among others, accepted the Company's explanation for declining attendance and made no mention of the *Blackfish* controversy in published reports – even as the film exploded on social media in the weeks following the CNN premiere.  However, because SeaWorld's "attendance declines sustained in the third quarter" were "counter to trends at peers[,]" S&P Capital IQ's November 18, 2013 Stock Report questioned whether SeaWorld was

42

forthrightly disclosing the complete truth to the market: "In our opinion, the sharp drop in attendance, particularly when viewed in the context of better performance from peers, feeds concerns that negative publicity of the Blackfish documentary is impacting visitation."

99.   On December 20, 2013, Atchison similarly rejected the notion that *Blackfish* was in any way, shape or form, playing a part in the decline in attendance. As reported by the *Orlando Sentinel*, he stated:  "As much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business."

100.   The same day Atchison was denying any harm to the Company's attendance from *Blackfish*, SeaWorld responded to the film with an open letter purporting to rebut it, which the company placed in full-page ads in major American newspapers.   SeaWorld's "Open Letter from SeaWorld's Animal Advocates," was also posted to the Company's Facebook and Twitter accounts.   SeaWorld also devoted an entire section of its website to the documentary, entitled "Truth About Blackfish."

101.   CNN called the move "very interesting":

> [O]ne of the things we have talked with SeaWorld about is how they say, look, *Blackfish* has not had any impact whatsoever on the revenues and on the number of people attending.  But then you have to wonder, well, why would they go to such an expense and why would they take this out.  Part of it could be because they're starting to see an impact on a very key part of their audience…

102.   Similarly, speaking with the *Orlando Business Journal* on December 27, 2013, Timothy Coombs, crisis communications specialist and public relations professor with the University of Central Florida, commented on the Company's

43

unusual response, stating "the attention generated by Blackfish and the accompanying musical guest cancellations [discussed in ¶¶144-49, *infra*] did require a public statement to defend SeaWorld's mission and methods of operation." Likewise the *Seattle Post-Intelligencer* noted on January 24, 2014, "***SeaWorld has spent a considerable amount of money and energy lately trying to undermine and deflect the effectiveness of the film Blackfish***, but they are unable to make much progress – it just isn't possible to rewrite history in this age of independent media." Moreover, S&P Capital IQ maintained its continued skepticism about SeaWorld's forthrightness with the market, stating in its December 17, 2013 Stock Report: "In our opinion, management's passive responses in hopes attention would fade has proven difficult in today' social media environment, where messages can be amplified. . . . ***We believe the impact of sustained negative publicity from the Blackfish documentary will impact visitation into 2014***."  S&P further found it significant that the film's "addition to Netflix, musical act boycotts and a potential Oscar nomination" would bring *Blackfish* "further attention[.]"

103.  On March 13, 2014, Defendants reported SeaWorld's 4Q13 and FY13 financial results, during which the Company reported that for the third consecutive quarter overall attendance had declined – this time by 1.4%.  Moreover, Defendants reported that full year attendance in 2013 had declined by 4.1%, or approximately one million guests.

104.  Once again, Defendants claimed the 1.4% fourth quarter decline was the "expected result of planned pricing and yield management strategies implemented at the beginning of 2013," and blamed the full year decline on the same factors noted during the prior quarter – adverse weather conditions and where the holidays and school schedules had fallen on the calendar.

105.   Notably, according to CW-5, in her experience as a Financial Analyst for various theme parks, weather and timing of Spring Break are the two most common reasons given for a decrease in attendance within the industry.   In SeaWorld's case, however, CW-5 did not believe they could be the entire reason for the decrease.   Rather, she thought it was logical and obvious that *Blackfish* was the reason.   She further explained that, because Spring Break is such a high volume time, and one that can be planned for, companies always budget their attendance for this time.   In addition, CW-5 explained that although attendance can vary from day-to-day, if it decreases for weeks or months, it becomes a serious trend.   CW-5 stated that this was what happened at SeaWorld Orlando, which she believed was at least partially attributable to *Blackfish*.   She recalled noticing that the trend had already been going on for months by the spring of 2014.

106.   Barton Crockett, an FBR Capital Markets analyst, specifically pressed Defendants to discuss *Blackfish*, asking Atchison to "***comment on whether there's any impact that you've noticed at all on satisfaction or attendance*** or the desirability of SeaWorld for international licensees?   ***Has this had any impact on any of that?***"   In response, Atchison noted:  "I get asked that a lot" and proceeded to deny multiple times that SeaWorld had seen any such impact.   In fact, Atchison claimed that *Blackfish* was positively impacting SeaWorld by increasing awareness of the Company's brand and pointed to the Company's "record attendance" in the fourth quarter at its three branded parks, despite the overall 1.4% decline:

> With respect to the impact on our business, I get asked that a lot, too. ***As much as we're asked it, we can see no noticeable impact on our business***.  If you follow this -- even this recent announcement, our SeaWorld parks had record attendance in the fourth quarter of the year, and are out-performing our other parks by considerable margin.

\*\*\*

45

With respect to national surveys and data that we collect around our reputation efforts and image, there's awareness of the movie that kind of peaks and drops as CNN -- who is one of the owners of the movie, by the way -- CNN shows it repeatedly from time to time, so that does spike on occasion. ***But our surveys don't reflect any shift in sentiment about intent to visit our parks***.

***

A matter of fact, the movie in some ways has actually made perhaps more interest in marine mammal parks, and actually even about us. We have seen that reflected through certain visitor profiles, and certain guest comments and things we get. The movie did not get an Oscar nomination in January, and we continue to take proactive efforts around communicating with our guests and business partners and others.

***

But ultimately the assertions by the animal rights, animal activist community -- they don't necessarily burden themselves with fact, and we have to deal with that from time to time. ***But we have seen no impact on the business***.

107.   Atchison's statement that "SeaWorld parks had record attendance in the fourth quarter" and "are out-performing our other parks by considerable margin" was incredibly misleading for several reasons.    First, this "record attendance" pronouncement was misleading because, as SeaWorld reports in its SEC filings, "[a]pproximately two-thirds of the Company's attendance and revenues are generated in the second and third quarters of the year."  SeaWorld reported 4.5 million guests as its total attendance at all its parks in 4Q13, which only equated to roughly one-sixth of the total attendance (23.391 million) SeaWorld reported for FY 2013.  Therefore, this "record attendance" assertion created a misguided and disproportional impression on investors.  Second, Atchison's statement that SeaWorld-branded parks "are out-performing our other parks by considerable margin" was misleading because

46

Defendants failed to mention that many of the non-SeaWorld branded parks were partially or entirely ***closed during 4Q13***.  Specifically, according to SeaWorld's SEC filings, all of the following parks are closed for all or some of the winter quarter: (i) Aquatica Orlando (Season: May – September); (ii) Water Country USA (Season: May – September); (iii) Adventure Island (Season: March – October); (iv) Busch Gardens Virginia (Season: March – October; December); and (v) Sesame Place (Season: May – October; December).  Thus, for SeaWorld to boast that its three branded parks were out-performing its other parks by a considerable margin, when in fact many of those "other parks" were actually closed during the quarter, is misleading.  Third, Atchison provided no detail to support the basis of his claim that SeaWorld-branded parks experienced "record attendance."  While, on the same earnings call, Heaney explained that "[a]nother way to think about the attendance in the quarter was our SeaWorld branded parks were up in attendance and our other parks were down which nets down to the 1.4% decline[,]" SeaWorld admittedly does not disclose the attendance figures at its individual parks to its investors or the public.  Thus, SeaWorld's concealment of these figures prevents investors from being able to confirm the accuracy or falsity of this statement, leaving investors in the vulnerable position of having to exclusively rely upon *ipse dixit* statements like Atchison's regarding the quarterly attendance figures at individual SeaWorld parks.  For all of these reasons, Defendants' statements regarding the purported "record attendance" at SeaWorld-branded parks during 4Q13—which investors had no way of verifying— were dubious and misleading.

108.  SeaWorld's attendance slide continued.  On May 14, 2014, Defendants reported SeaWorld's 1Q14 financial results.  This time, Defendants announced a ***staggering 13% decline in attendance for the quarter***, which they again attributed,

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

1   in full, to factors other than *Blackfish* – the shift in the timing of Easter and Spring

2   Break and "above average precipitation in the Florida market as well as below

3   average temperatures in the Texas market for the first quarter of 2014."

4         109.   Despite the successive drops in attendance, most analysts continued to

5   accept Defendants' stated reasons for the decline.  For example, Macquarie (USA)'s

6   May 14, 2014 report noted "[a]ttendance drops are not new to SeaWorld as a public

7   company unfortunately, but again the reasons make sense and we are encouraged."

8    Likewise, JP Morgan's May 15, 2014 report noted, "[a]ttendance dropped 13% to

9   3.0m guests, with the roughly 0.5m loss in visitors attributed to weather (200K) and

10  Easter (250k) shifting out of the quarter.  Cold weather in Texas and rain in Florida

11  resulted in fewer operating days at some parks."  However, the lone skeptic, S&P

12  Capital IQ, again questioned whether SeaWorld was telling the complete truth to the

13  market, noting in its May 15, 2014 Stock Report that "***negative publicity from a***

14  ***Blackfish documentary (regarding captivity of killer whales) [had] notably weighed***

15  ***on the 2013 second half attendance***[,]" and stating that while SeaWorld's sharp 13%

16  drop in 1Q14 attendance is "partly attributable to this year's Easter holiday calendar

17  shift, ***we also see potentially lingering fallout from a recent documentary on killer***

18  ***whales***."    S&P Capital's market research and reports directly tie *Blackfish*

19  viewership, and the corresponding negative publicity surrounding it, to declining

20  attendance at SeaWorld parks during the Class Period.

21        110.   Further, at least one financial reporter, *The Motley Fool*, appeared to

22  doubt SeaWorld's denial of *Blackfish*'s impact, stating in a July 18, 2014 report,

23  "SeaWorld saw its attendance figures fall from 24.4 million in 2012 to 23.4 million in

24  2013, largely due to *Blackfish*." Like S&P, *The Motley Fool* connected the negative

25  publicity from *Blackfish* to SeaWorld's declining attendance, noting, "[s]trong brands

26

27

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

1   still need to be nurtured and protected[.]"   Nevertheless, SeaWorld—the primary

2   source, who investors trusted to provide the complete truth—continued to deny that

3   *Blackfish* had any impact on its business.

4      111.   Notwithstanding SeaWorld's public denials regarding *Blackfish*'s impact

5   on attendance, the Company continued to pour resources into its counterattack

6   against the film, including increased retaliation using websites and social media.

7   SeaWorld created a website devoted to "Why 'Blackfish' is Propaganda, Not a

8   Documentary."   And, in or around June 2014, SeaWorld provided funding and

9   promotional support for the roll out of Awesome Ocean—a website fiercely critical

10   of *Blackfish* and animal-welfare advocates.   According to his Linkedin.com page,

11   Awesome Ocean's Editor-in-Chief, Eric Davis has extensive experience in digital

12   marketing and brand management.   Speaking to the *Orlando Sentinel* on SeaWorld's

13   behalf, Fred Jacobs affirmed the importance of social media sites like Awesome

14   Ocean, stating "I would certainly characterize them as an important part of our

15   marketing and communications strategy."

16      112.   SeaWorld's aggressive response to *Blackfish* did not stop there.

17   According to *Bloomberg*, at least as early as Thanksgiving Day in 2013, SeaWorld

18   sent employees to infiltrate PETA and pose as animal rights activists.   A February 16,

19   2016 article on *The Dodo* reported that, according to a source close to SeaWorld, the

20   espionage campaign was authorized by SeaWorld vice president of communications,

21   Fred Jacobs.   Jacobs was later fired, a move that, according to the *Dodo's* source, was

22   an attempt to cover up the campaign.

23      113.   Manby finally acknowledged that SeaWorld had asked employees to

24   infiltrate PETA on a February 26, 2016 earnings call in a statement that *NonProfit*

25   *Quarterly* interpreted as "admit[ting] that the practice of spying was at least

26

27

49

authorized and possibly intentionally utilized by some in management[.]" SeaWorld's stock dropped 11% on this news.

114.   As set forth below, contrary to Defendants' representations concerning the putative lack of impact on attendance caused by *Blackfish*, Defendants knew or recklessly disregarded that *Blackfish* was, in fact, causing a decline in SeaWorld's attendance and negatively harming its reputation and operations during the Class Period.

> ## ii.   The Reasons SeaWorld Provided For The Entire Decline In Attendance In Each Quarter Throughout The Class Period Are Not Plausible

115.   To the extent adverse weather conditions, school and holiday schedule and pricing increases, did, in fact, impact SeaWorld's attendance figures from April 2013 through May 2014, these factors were not and could not have been the exclusive causes of the entire decline in attendance, as set forth below.

116.   According to the 2013 TEA Report, nearly all of the major theme park groups with locations in the U.S., including Disney and Universal, realized *increases* in domestic attendance for 2013, as compared to 2012.  For example, at its domestic parks, Disney reported a 7% increase for the first half of 2013 (including 2Q13), and comparable attendance figures to the prior year for the rest of 2013.  Moreover, Disney reported a record-setting 3% increase for 1Q14.  For its parks located in Orlando, Disney reported either an increase in or record attendance for every quarter within the Class Period.

117.   SeaWorld represents to investors that the Company benefits from the "high concentration of theme parks operated by several companies" in Orlando and Southern California, and that through its core attractions (i.e., orcas and other wild animals) it offers a "complementary experience to those offered by fantasy-themed

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

Disney and Universal parks."   Thus, when SeaWorld's competitor theme parks located in Florida and California—*i.e.* Disney and Universal—experienced increases in annual attendance for 2013 versus the prior year, SeaWorld should have seen comparable attendance figures.   The same is true for 2014.   However, as demonstrated below, SeaWorld did not see comparable attendance increases. Instead, it saw marked decreases in annual attendance in both 2013 and 2014, while its competitors enjoyed increases:

| Park | Location | 2012 Attendance | 2013 Attendance | Change (%) | 2013 Attendance | 2014 Attendance | Change (%) |
|---|---|---|---|---|---|---|---|
| Magic Kingdom [Disney] | Lake Buena Vista, FL | 17,536,000 | 18,588,000 | 6.0% | 18,588,000 | 19,332,000 | 4.0% |
| Epcot [Disney] | Lake Buena Vista, FL | 11,063,000 | 11,229,000 | 1.5% | 11,229,000 | 11,454,000 | 2.0% |
| Animal Kingdom [Disney] | Lake Buena Vista, FL | 9,998,000 | 10,198,000 | 2.0% | 10,198,000 | 10,402,00 | 2.0% |
| Hollywood Studios [Disney] | Lake Buena Vista, FL | 9,912,000 | 10,110,000 | 2.0% | 10,110,000 | 10,312,000 | 2.0% |
| Islands of Adventure [Universal] | Orlando, FL | 7,981,000 | 8,141,000 | 2.0% | 8,141,000 | 8,141,000 | 0.0% |
| Universal Studios Florida [Universal] | Orlando, FL | 6,195,000 | 7,062,000 | 14.0% | 7,062,000 | 8,263,000 | 17.0% |
| *SeaWorld Orlando [SeaWorld]* | *Orlando, FL* | *5,358,000* | *5,090,000* | *-5.0%* | *5,090,000* | *4,683,000* | *-8.0%* |
| Disneyland [Disney] | Anaheim, CA | 15,963,000 | 16,202,000 | 1.5% | 16,202,000 | 16,769,000 | 3.5% |
| Cal. Adventure [Disney] | Anaheim, CA | 7,775,000 | 8,514,000 | 9.5% | 8,514,000 | 8,769,000 | 3.0% |
| Universal Studios Hollywood [Universal] | Universal City, CA | 5,912,000 | 6,148,000 | 4.0% | 6,148,000 | 6,824,000 | 11.0% |
| *SeaWorld San Diego* | *San Diego,* | *4,444,000* | *4,311,000* | *-3.0%* | *4,311,000* | *3,794,000* | *-12.0%* |

51

| *[SeaWorld]* | CA | | | | | | | |
|---|---|---|---|---|---|---|---|---|

118.  As shown, each of SeaWorld's main competitors in the same geographic regions, Disney and Universal, attained either comparable or increased attendance figures (over the prior year) in both 2013 and 2014, often achieving record attendance in spite of the same generally-applicable factors to which SeaWorld attributed its attendance decline.  Indeed, a May 25, 2016 *Los Angeles Times* report noted that while the top 20 performing parks in North America experienced steady growth in 2013-2014, "[a]ttendance numbers at [SeaWorld] have been flagging since the release of the 2013 documentary 'Blackfish.'"  As alleged below, SeaWorld's attribution of its entire attendance declines to weather, school year and holiday calendars, and pricing strategies – simply does not hold water.

119.  **Adverse Weather**.  It is well known within the industry and to investors that seasonal factors bear upon theme park operations.  For instance, adverse weather conditions, particularly rain, can lead to "wash outs" at outdoor parks, most commonly during the summer months.  Therefore, park operators typically anticipate and account for the impact on their operations of normal weather swings and occasional adverse weather.  Of course, park operators in the same geographical location (like Disney, Universal, and SeaWorld in Orlando and southern California) are subject to the same weather conditions.

120.  As reported by IBIS, however, "SeaWorld's amusement parks are geographically dispersed, which helps the company protect itself from localized events and seasonal weather conditions."  Indeed, due to the location of its parks, seven of the Company's eleven parks – including those in Orlando and California – are able to stay open year-round.  Given this ability, Defendants regularly assured investors that weather-related impacts tend to flatten out over the course of a year.

52

For instance, during the 2Q13 Earnings Call, Atchison admitted that "over the long term these weather effects tend to even out."  Defendants nonetheless repeatedly blamed the weather as one reason for the decline in attendance during various quarters in the Class Period and in 2013 as a whole.

121.  For example, SeaWorld blamed one-third of the 9% decline in attendance during 2Q13 on adverse weather, including within Orlando.  But, as the *Orlando Sentinel* reported following the Company's earnings announcement: "Neither the Walt Disney Co. nor Comcast Corp. [which owns Universal], both of whom recently reported earnings for the same quarter, cited weather at Walt Disney World or Universal Orlando."  TIME too was skeptical of SeaWorld's weather-related explanation for decreased attendance, noting that, "Disney and Universal parks – which should also be affected by the factors mentioned – have been enjoying record-high visitor numbers."  Alluding to *Blackfish*, the TIME writer noted that "the downturn in visitor numbers has taken place during a summer when SeaWorld found itself as the unfortunate subject of a documentary film," suggesting that negative publicity from *Blackfish* – not rain – was driving decreased attendance.  But, again, investors were left to rely on SeaWorld's word.

122.  Similarly, in 1Q14, SeaWorld attributed its staggering 13% decline in attendance in part to "***adverse weather and fewer operating days in 2014***."  Yet, despite being subject to nearly identical weather patterns, particularly as applied to Orlando and California, Disney and Universal reported attendance figures for 1Q14 that were comparable to or higher than their attendance marks for the same quarter in the prior year.

123.  **School And Holiday Schedules**.  Both the holiday and school calendar impact theme park operations, attendance and revenue on a quarterly basis.  For

instance, whether Easter and/or Spring Break fall within the first or second fiscal quarter (i.e., in March or April) or overlap within a quarter has a discernible impact on attendance (and therefore revenue derived from attendance and in-park spending), boosting attendance in the quarter that contains Easter and Spring Break, and lowering the attendance in the quarter that does not.  As Heaney assured investors during the Class Period, however, such impact largely flattens out over the course of the full year:  "The Easter effect, obviously, won't repeat in the second half and that's one piece of attendance we'll pick up in the third and fourth quarters."

124.   Nonetheless, Defendants allocated blame for half of the 13% attendance decline in 1Q14 to the timing of Easter and Spring Break.  This was simply not plausible.  In response, *Motley Fool*, among others, asked "[h]as *Blackfish* hurt sales," and questioned SeaWorld's explanation in part due to the fact that rival parks in the same geographic area were unaffected by exactly the same factors:  "Disney is often compared to SeaWorld, and Mickey's theme parks saw increased attendance in the first quarter, while SeaWorld's dropped 13%, which it attributed to a late Easter (that wasn't in the first quarter) and weird spring-break timing.  But why didn't late Easter eggs and confused spring breakers have the same effect on Disney World?"  CW-5 also doubted SeaWorld's explanation, noting that weather and the timing of Spring Break are the two most common reasons given by parks for a decrease in attendance and that such reasons should not be taken as "gospel."  CW-5 went on to explain that because Spring Break is such a high volume time, and one that can be planned for, theme park companies carefully plan and budget their attendance for this time.

125.   **Pricing**.  It has become an "[a]nnual springtime tradition" in the theme park industry for operators – particularly those located in central Florida – to increase

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

1   ticket prices around Memorial Day in anticipation of the annual boom in tourism that

2   accompanies summer school vacations, according to TIME.  Each year, Disney,

3   Universal and SeaWorld seek to capitalize on the increased flow of consumers during

4   the summer months.  Notably, as reported by TIME, whenever one raises prices, at

5   least one of the others (if not both) follows suit.

6      126.  While for the entire 2013 fiscal year, SeaWorld blamed a purported

7   company-specific pricing strategy for some portion of the decline in attendance,

8   increased pricing and similar strategies actually boosted attendance figures at

9   SeaWorld's competitors.  For example, in the summer of 2013, each of the Big Three

10   implemented pricing increases.  In May 2013, TIME reported that Universal Orlando

11   raised the price of single-day admission to $92, becoming the first theme park to

12   cross the $90 admission mark.  Likewise, the *Los Angeles Times* noted that Disney

13   raised entry prices to both of its parks in June 2013, including raising a single-day

14   adult ticket *6%*.  In June 2013, SeaWorld too raised admission prices to $92 and $89

15   for a single-day adult ticket at SeaWorld Orlando and Busch Gardens Tampa,

16   respectively.

17      127.  Notwithstanding the fact that they also implemented pricing increases

18   applicable to their companies' flagship parks in Orlando, Disney and Universal,

19   unlike SeaWorld, met or beat prior attendance numbers in 2013, and throughout the

20   Class Period.  When Atchison claimed a portion of the 9% drop in 2Q13 was part of

21   SeaWorld's willing and "deliberate" effort to decrease the number of visitors as a

22   trade-off for high-priced admissions and revenues per guest, TIME again questioned

23   the veracity of the excuse, citing the experience of SeaWorld's competitors just down

24   the road.

25

26

27

128.   Additionally, while SeaWorld raised certain baseline ticket prices, in a historically rare and unexpected move, it slashed certain other ticket prices in multiple markets following the announcement of SeaWorld's 2Q13 9% attendance decline. *Bloomberg* reported on August 29, 2013 that SeaWorld Orlando had cut $42 off the price of a midweek ticket purchased online (a 46% discount) while SeaWorld San Antonio had started offering a free children's ticket with an adult ticket purchase midweek, a $71 value.  CW-2 believed that SeaWorld executives resorted to lowering prices in an attempt to attract guests.  As reported on August 29, 2013, Dennis Speigel, president of International Theme Park Services Inc., told *Bloomberg* "[w]hen you're seeing those kinds of discounts in the first part of August, that's telling you attendance is off."  Mary Waring, owner of a website that provides information about theme parks and theme-park centric vacation packages – told *Bloomberg* that in the "10-plus years" she had been listing SeaWorld coupons and deals online, she had "never seen a SeaWorld promotion" as "aggressive."

129.   In or around late-February 2014, both Disney and Universal raised prices for single-day admission tickets.  Commenting on Disney's early increase, Doug Mitchelson, a Deutsche Bank analyst, told the *Orlando Business Journal* that the early increase ***evidenced positive park attendance trends across the board***:  "The increase came more than three months earlier than last year, which suggests that park attendance trends must be healthy enough that [management] believes a price increase will not unduly negatively impact marketing."  Like clockwork, in May 2014 SeaWorld raised its general admission price $3 for both SeaWorld Orlando and Busch Gardens.  However, while Disney and Universal saw attendance rise, SeaWorld once again failed to catch on to the "healthy" "park attendance trend," ***dropping 13% in attendance for that quarter***.

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

**E.**     **Unlike Its Competitors, SeaWorld Was Plagued By *Blackfish*, Which Generated Extraordinary Negative Public Response and Media Attention Throughout The Class Period**

130.   Unlike Disney and Universal, prior to and throughout the Class Period SeaWorld was under continual fire arising from the damning indictment of the Company's business practices in *Blackfish*.  From the time the film premiered in January 2013, the media regularly reported on *Blackfish* and its potential negative impact on SeaWorld's reputation and business.  As its distribution and notoriety increased after January 2013, the film sparked a groundswell of anti-SeaWorld commentary and action from an ever-expanding bloc of public citizens, both prominent and grassroots.  This phenomenon was even given a name – the *Blackfish* effect – by observers.  It entailed traditional forms of protest, such as demonstrations and lobbying by interest groups, and also leveraged the influence of modern forms of social media, such as online petitions, issue-dedicated websites and celebrity statements on broadcast platforms such as Twitter.  These and other responses generated by *Blackfish* urged the public to boycott SeaWorld's parks in response to the Company's treatment of its killer whales, and put pressure on organizations and individuals doing business with SeaWorld to end existing or planned relationships with the Company.

131.   Such facts led the media, as well as analysts following and reporting on SeaWorld, to query whether at least a portion of the Company's remarkable attendance decline was attributable to consumer sentiment and brand harm from *Blackfish*.  However, despite the ever-growing public backlash stemming from the film, Defendants repeatedly assured investors that *Blackfish* was not having any impact whatsoever on SeaWorld's declining attendance.

     **i.**    **Social Media Platforms Like Twitter Successfully Moved The Public To Watch *Blackfish* And Boycott SeaWorld**

132.   In the Company's IPO Offering Materials, SeaWorld identified online and social media platforms as being key to its ability to "[d]rive [i]ncreased [a]ttendance." Ironically, however, these same platforms put SeaWorld on the defensive throughout the Class Period, as the negative perception of the Company generated by *Blackfish* spread like wildfire across the internet and Twitter following the film's premiere.

133.   Prior to the film's screening at Sundance, in December 2012 the Twitter username @blackfishmovie was created. Among other things, @blackfishmovie was used: (i) to promote the film and re-convey its message; (ii) strengthen opposition to SeaWorld; (iii) inform the public when and where the film was being screened; (iv) provide daily updates concerning the availability of the film on various platforms, such as Netflix, DVD and iTunes; and (v) provide real-time access to media coverage of the film and its impact on SeaWorld.

134.   According to CW-1, at or around the time of the IPO in April 2013, SeaWorld had a variety of hashtags that were intended to be used by SeaWorld fans such as #SeaWorldCares and #$SEAS, many of which were intended to celebrate the Company's fifty (50) year anniversary. In response to *Blackfish*, however, CW-1 stated that individuals were posting hundreds of anti-SeaWorld posts each day and would "hijack" (or include) those hashtags in order to spread their anti-SeaWorld messages by reaching SeaWorld followers. CW-1 recalled that a significant portion of the tweets specifically mentioned *Blackfish* and continued through the summer of 2013 as *Blackfish* was released in theaters domestically. Moreover, CW-2 believed that the backlash from *Blackfish* essentially ruined the Company's attempt to celebrate its 50[th] Anniversary in 2014.

58

1        135.   Prominent celebrities utilized Twitter to urge their millions of followers

2    – many of whom fell squarely within SeaWorld's target market of people between

3    ages ten (10) and nineteen (19) – to watch *Blackfish* and avoid SeaWorld.

4    Specifically, around the time of *Blackfish*'s theatrical release in July 2013, celebrities,

5    including Olivia Wilde, Ellen Page, Evan Rachel Wood and Kesha, each made

6    statements on their Twitter pages encouraging followers to watch the film, and

7    condemning the apparently inhumane treatment of animals by SeaWorld.  For

8    example, on July 17, 2013, Olivia Wilde, who maintains 1.5 million followers, wrote:

9    "Only movie I want to go see this week:  Blackfish. Watch out, Sea World. We are

10   on to you."  On August 12, 2013 Singer Kesha, who maintains 3.6 million followers,

11   urged her followers to watch the film writing, "ANIMALS! Learn the truth about

12   marine    mammal    theme    parks:    <u>http://t.co/jn7eSGQSzs</u>    <u>@humanesociety</u>

13   <u>@MagnoliaPics</u> <u>#Blackfish</u>."  Likewise, on September 8, 2013, Russell Brand, who

14   maintains more than 9 million followers tweeted, "Do watch "Black Fish". Don't go

15   to    SeaWorld,    a    stain    upon    humanity    posing    as    entertainment.

16   #liftedfromanearlyreviewofmine."

17       136.   The social media conversation generated by *Blackfish* reached a fever

18   pitch following the CNN premiere of the film on October 24, 2013.  This was no

19   accident.  Lila King, CNN's senior director for social news, explained that CNN

20   aimed to create a parallel experience on Twitter and TV stating, "Our approach was

21   to create a back channel to the broadcast, featuring live Tweets from experts […] and

22   many others."  King explained that CNN purposely integrated Twitter into the

23   broadcast by inviting "our audiences to join the conversation by showing the

24   #blackfish hashtag on the screen, and also curating the conversation in live blog on

25   CNN.com."

26

27

137.   CNN's strategy of deliberately leveraging social media on Twitter to boost TV ratings by creating a synergistic effect between its cable network and its internet and social media platforms worked.  On the CNN premiere night alone, there were 67,673 Tweets seen by 7.3 million people about *Blackfish*, which made it the most talked about show on CNN in October 2013.  According to CW-1, *Blackfish* became a trending topic shortly after it aired.  In the weeks following the premiere, as confirmed by CW-1, numerous high-profile celebrities, with some of the most followed accounts on Twitter, continued to Tweet about the film and their disdain for SeaWorld and its brand, thereby magnifying the scale of the controversy surrounding SeaWorld's apparent mistreatment of its orcas.

138.   For example, on November 3, 2013, then nineteen (19) year old singer and former Nickelodeon star Ariana Grande, who maintains 26.2 million followers on Twitter, wrote, "I highly recommend all of my fans watch #Blackfish and never go to @Seaworld again.  Used to love that place. Beyond heartbroken #Free Tilly." Grande's statement excoriating SeaWorld was the most re-tweeted of that night. Among other high-profile celebrities with massive Twitter followings to Tweet disparaging statements about SeaWorld in light of *Blackfish* were:  (i) Miley Cyrus, with 19.2 million followers; (ii) Stephen Fry, with 8.6 million followers; and (iii) Zach Braff, with 1.4 million followers.

139.   As reported by CNN on December 20, 2013, social media sites became and remained "filled with comments from people vowing they'll never go to the [SeaWorld-owned] parks again after viewing the film."  According to CW-1, by January or February 2014, SeaWorld began an effort to respond to social media postings as they occurred.  Typically, the Company would post a link to their "open letter," discussed above.  CW-1 worked within a so-called "war room" in which she

1    and other employees in Interactive Marketing worked on various digital media for the

2    Company's website in response to *Blackfish*.   However, CW-1 stated that when

3    SeaWorld would respond, the anti-SeaWorld sentiment would only magnify.

4        140.   According to CW-2, *Blackfish* was at least partially the reason for

5    declines in attendance in 2013 and early 2014, when she left the Company.   In fact,

6    CW-2 attended weekly meetings that were also attended by the General Manager, the

7    Vice President of Marketing and the Vice President of Finance for SeaWorld's San

8    Antonio park, where attendance at the park was discussed and, in at least one such

9    meeting held between the time of *Blackfish*'s release and February 2014, she recalled

10   that it was acknowledged that the negative press from *Blackfish* seemed to be having

11   an impact on attendance.

ii.   **External Polls And News Stories Showed That *Blackfish* Had Negatively Impacted The Public's Willingness To Attend SeaWorld Parks**

14       141.   In order to gauge public sentiment on *Blackfish*, various media groups

15   and publications conducted surveys to poll the public.   CNN, for example, ran a poll

16   during an October 25, 2013 episode of *Crossfire* asking viewers "[w]ould you take

17   your kids to SeaWorld" in light of the information revealed by *Blackfish*.   Of

18   approximately 3,000 responses, 86% stated "No."

19       142.   Tellingly, SeaWorld was caught red-handed attempting to manipulate

20   the results of a similar poll conducted by the *Orlando Sentinel* in January 2014.

21   Shortly after the poll began, it was revealed by the news group that more than 50% of

22   the responses were from an IP address owned by SeaWorld.   Ultimately, once this

23   tactic was uncovered and the poll was cleansed, two-thirds of voters responding to

24   that poll – which asked whether "CNN's 'Blackfish' [sic] documentary changes your

25   perception of SeaWorld" – answered in the affirmative.   Had SeaWorld not believed

26

27

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

that *Blackfish* was affecting its business, SeaWorld would have seen no need to manipulate the results of such polls in January of 2014.

143.   Similarly, *Blackfish* prompted schools to either cancel long-standing annual field trips to SeaWorld's parks or publicly swear off attending the parks until SeaWorld changed its policies.  For example, just weeks after *Blackfish* aired on CNN, in November 2013, San Diego's Point Loma High School produced a striking video response to the film, vowing never to return to the parks until the whales and animals were retired from show business.  The video entitled "Dear SeaWorld," received nationwide attention, was aired on CNN and reported on by numerous publications and received a "Compassionate Classroom Award" from PETA, which also made the video available on its website.  As reported by CNN in December 2013, Point Dume Marine Science Elementary School in Malibu, California – prompted by the concerns of a 10-year old – abruptly canceled its long-standing trip to the Company's park over concerns about the treatment of whales as shown in *Blackfish*.  These cancellations and others indicated that children and teens – the individuals who drive parents and families to travel to the parks – were no longer supporting SeaWorld.

### iii.   The "*Blackfish* Effect" Swallowed SeaWorld's Annual Music Festival

144.   Each year SeaWorld hosts "Bands, Brew & BBQ," a live concert series at SeaWorld Orlando and Busch Gardens in Tampa during February and March, featuring top classic rock and country bands and artists, BBQ from Central Florida's top local smokehouses, and other festivities.  The concerts are included with regular admission to the parks.  According to SeaWorld's public filings, the Company's market is "further diversified among a more stable base of local visitors, non-local domestic visitors and international tourists."  "Bands, Brew and BBQ" is part of the

62

Company's stated business strategy to "increase non-peak demand through seasonal and special events and concerts" – i.e., to drive off-season attendance in prime markets.  SeaWorld Orlando and Busch Gardens in Tampa depend on the annual "Bands, Brew and BBQ" concert series to increase park attendance and overall revenue during the typically slow mid-winter months.

145.   In late 2013, as the *Blackfish* controversy continued ablaze, nearly every act slated to perform at "Bands Brew and BBQ" received a petition through Change.Org (along with significant pressures from other social media platforms) imploring the band or artist to cancel its performance.  Change.org is the world's largest online petition platform and seeks to empower individuals to create change by offering them the ability to start a campaign and mobilize supporters.  These particular petitions were successful, prompting nearly every artist scheduled to perform at the series in February and March 2014 to withdraw. Beginning in November 2013 and through mid-January 2014, the following artists canceled their performances:  (i) The Barenaked Ladies; (ii) Willie Nelson; (iii) Cheap Trick; (iv) Heart; (v) Martina McBride; (vi) 38 Special; (vii) Trisha Yearwood; (viii) REO Speedwagon; (ix) Pat Benatar; and (x) Beach Boys.

146.   For example, The Barenaked Ladies – the first to withdraw – received a petition signed by 11,782 supporters, prompting the group to alert the public on their Facebook page:  "This is a complicated issue, and we don't claim to understand all of it, but we don't feel comfortable proceeding with the gig at this time."  Activists successfully directed similar online petitions at other performers including Willie Nelson, Trisha Yearwood, and Cheap Trick.

147.   In nearly every instance, the artist specifically cited the controversy surrounding *Blackfish* as the basis for the cancellation. In explaining his decision to

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

1    cancel, Willie Nelson condemned SeaWorld's practices, stating, "I don't agree with
2    the way they treat their animals, […] it wasn't that hard a deal for me."  Likewise,
3    sisters Nancy and Ann Wilson of Heart acknowledged their decision to cancel at
4    SeaWorld was "due to the controversial documentary film."

5    148.   These cancellations attracted international attention, as news sources
6    reported on each successive cancellation over the seven week period beginning
7    November 27, 2013 with The Barenaked Ladies' announcement and continuing
8    through January 15, 2014 with the Beach Boys' announcement that they would not
9    perform.  A December 11, 2013 *Orlando Sentinel* article entitled, "Will SeaWorld
10   face long-term 'Blackfish' backlash?" noted that, at a minimum, withdrawals from
11   the concert series "threatened to sabotage SeaWorld's 'Bands, Brew and BBQ'
12   program," which the park depended on "to drive traffic during the typically slow
13   midwinter months."  Potentially much more damaging, the article noted that the
14   cancellations might help "sustain *Blackfish* in the public consciousness, raising the
15   risk that the film and its criticisms could do lasting damage to SeaWorld's brand."

16   149.   Atchison admitted in his December 20, 2013 interview with the *Orlando*
17   *Sentinel* that the cancellations "ended up getting more coverage and became a story
18   of its own."  Atchison further explained that the Company decided to publish the
19   December 2013 full-page open letter on social media and within major newspapers in
20   order to refute what he described as "misconceptions that were floating around
21   related to that coverage."  SeaWorld's ad, entitled "Open Letter from SeaWorld's
22   Animal Advocates" was widely viewed as evidence that the Company was
23   "concerned about potential long-term brand damage from *Blackfish*," as reported by
24   the *Sentinel*, and was, according to CNN and the *Orlando Business Journal*,

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

concerned by both *Blackfish*'s "impact on a very key part of their audience" and "the attention generated by Blackfish and the accompanying musical guest cancellations."

### iv.   In The Wake Of *Blackfish*, Long-Standing SeaWorld Sponsors And Strategic Partners Jumped Ship

150.   Amidst the growing negative publicity directed at SeaWorld throughout the Class Period, pressure from activists to cut ties with SeaWorld and extensive media coverage of this pressure, many SeaWorld corporate partners terminated their relationships with SeaWorld.

151.   For example, in October 2013, activists initiated a Change.org petition urging Southwest Airlines to end its relationship with SeaWorld.  By January 2014, the petition had garnered 27,000 signatures.  In a widely reported story, dozens of protesters delivered the petition to Southwest's headquarters in Dallas on January 9, 2014, prompting the airline to publicly respond.  According to CW-1, Southwest contacted SeaWorld and inquired about *Blackfish* in response to a slew of negative Facebook and Twitter messages Southwest was receiving due to its association with SeaWorld.    Southwest did not cut ties with SeaWorld immediately, but acknowledged the *Blackfish* controversy stating: "We are engaged with SeaWorld related to the recent concerns being raised. We are in a listening and education mode."

152.   In November 2013, petitions by PETA and the public implored Macy's to ban SeaWorld from participating in the annual Macy's Thanksgiving Parade later that month.  According to the *Huffington Post*, Macy's also received more than 80,000 emails to this end, while an online petition started by PETA seeking a similar ban likewise received more than 80,000 signatures.

153.   The impact of these petitions, collectively signed by hundreds of thousands of individuals, was amplified by extensive media coverage of them.  For example, a January 15, 2014 article on CNBC entitled, "Southwest Air, others, pressured to break ties with SeaWorld" discussed the Change.org petition directed at Southwest and noted that "on Change.org alone, there are more than two dozen 'Blackfish'-inspired petitions, including one asking Toys R Us to stop selling a SeaWorld-themed Barbie and another asking Groupon to stop featuring discounted SeaWorld deals."  Similarly, a January 13, 2014 National Geographic article reporting on the *Blackfish* effect noted that there were more than twenty-one (21) *Blackfish*-inspired Change.org petitions, including many aimed at destroying SeaWorld's relationships with corporate sponsors and partners, among them Southwest Airlines, Toys R Us, and Groupon.

154.   A Change.org petition was also effective in persuading Taco Bell, which had been offering discounts on tickets to SeaWorld, to cut ties with SeaWorld in May 2014.  Likewise, on May 16, 2014, after consulting PETA, STA Travel, a company which provides flights, accommodation, tours and expeditions for 2.5 million students and young people, announced that it would stop booking trips to SeaWorld in Orlando and San Diego.

155.   By this point, association with SeaWorld was perceived as being so toxic that on June 22, 2014 Outdoor Play, a company specializing in outdoor apparel and equipment, declined to fill an order placed by SeaWorld.  The CEO of Outdoor Play wrote in a letter to SeaWorld, "Although I would love to take your money, our company does not support the ethics of your business model."  Likewise, on July 24, 2014, Savings.com, a company that specializes in digital coupons, stopped offering

1  deals on SeaWorld tickets after Savings.com's chief executive officer was contacted

2  by PETA and watched *Blackfish*.

3      156.   This trend of companies terminating their relationships with SeaWorld

4  was amplified when Southwest Airlines, after enduring the intense and well-

5  publicized efforts of activists for almost ten (10) months, announced on July 31, 2014

6  that it would not be renewing its 26-year partnership with SeaWorld.  While a press

7  release stated that the break was mutual and based on "shifting priorities," every

8  major news source reporting on the announcement noted that Southwest had been

9  subject to massive activist pressure in the form of protests and a Change.org petition

10  signed by more than 32,000 people, urging it to terminate the partnership.

11      157.   Following the Southwest Airlines announcement, other important

12  corporate partners followed suit, and ended their relationships with SeaWorld.  In

13  October 2014, the *Orlando Sentinel* reported that Virgin America, JetBlue, and

14  Alaska Airlines also had terminated their promotional partnerships with SeaWorld.

15  In November 2014, the *Orlando Sentinel* reported that Panama Jack, an Orlando-

16  based sunscreen company, would end its relationship with SeaWorld effective

17  February 2015.  Finally, on November 14, 2014, Hyundai Motors America

18  Communications Executive Director Chris Hosford confirmed that Hyundai had

19  "ended its relationship with SeaWorld."  Remaining sponsors American Express and

20  British Airways are currently subject to similar pressures through Change.org

21  petitions, signed by 75,000 and 265,000 individuals, respectively.

22      158.   The fallout for SeaWorld from *Blackfish*-generated controversy is

23  ongoing.  On January 15, 2015, the *Orlando Sentinel* reported that the Miami

24  Dolphins, which had previously offered ticketholders free admission to SeaWorld,

25  had ended its marketing partnership with SeaWorld.

26

27

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

**v.    Proposed California Legislation Inspired By *Blackfish* Threatened SeaWorld's Ability To Hold Captive Orcas In California**

159.    On March 7, 2014 national media outlets reported that California Assembly member Richard Bloom had introduced legislation in the state Assembly that would ban orca performances, breeding or artificial insemination in the state of California.    The proposed legislation was closely associated with *Blackfish* in widespread public reporting.

160.   For example, in a March 7, 2014 article entitled "'Blackfish' Inspires California Orca Bill," U.S. News & World Report reported:

> The Oscar-shortlisted documentary "Blackfish" has already created a public relations nightmare for SeaWorld, and now it looks like the theme park's worst fears could be coming true. ***The film, which alleges that killer whales are gravely mistreated by the aquatic entertainment theme parks, has inspired a California lawmaker to introduce legislation that would ban the captivity of orcas***.
>
> ….
>
> The bill would ban orca performances, breeding and artificial insemination in the state. Orcas would only be allowed kept in captivity for the purposes of rehabilitation and release. It would also ban the import and export of killer whales across state lines, meaning the 10 killer whales currently in captivity California would have to stay there, but in sea pens not open to public, unless they can be returned to the wild.

161.    The media repeatedly noted the direct link between *Blackfish* and the proposed bill.    Indeed, some press outlets coined the proposed legislation "The *Blackfish* Bill."    For example, *The Voice of San Diego* published an article on March 7, 2014 entitled "So-Called *Blackfish* Bill Could Devastate SeaWorld," which noted

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

that the proposed bill contained measures "largely motivated by *Blackfish*" and that the "movie's director, as well as three opponents of SeaWorld's treatment of killer whales interviewed in the film, appeared" with the sponsor of the bill at the press conference announcing the bill.  Similarly, on April 8, 2014, *USA Today* reported "Assemblyman Richard Bloom, D-Santa Monica, has proposed legislation banning the use of orcas for performance purposes at California aquatic theme parks as a result of details revealed in the movie *Blackfish*."  Several other articles published on March 7, 2014 in outlets as diverse as *NPR* and *The Hollywood Reporter* repeatedly referenced *Blackfish* when reporting on the proposed bill and its potentially disastrous effects for SeaWorld's business.  Accordingly, the direct link between *Blackfish* and the California legislation it precipitated were squarely in the public eye.

162.  However, as TIME reported in its online news platform on April 8, 2014, "the so-called *Blackfish* bill" was tabled "for further study at a committee hearing in Sacramento."   According to TIME, the study was expected to take approximately twelve (12) months.  The California Assemblyman who introduced the bill was later quoted by *Bloomberg* as stating, with respect to the bill's tabling in April 2014:  "SeaWorld went to the mat on this issue," and brought in "big guns" to lobby for the bill to be tabled.

## F.    The Truth Concerning *Blackfish*'s Impact On SeaWorld Emerges

163.  On August 13, 2014, SeaWorld finally admitted, for the first time, that *Blackfish* was hurting attendance at SeaWorld parks.  Specifically, SeaWorld stated "***attendance in the [second] quarter was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California*** [i.e., the '*Blackfish* Bill']."  Although SeaWorld refused to say the word "*Blackfish*", SeaWorld's statement "***effectively serve[d] as an admission that, despite claims to***

69

1  *the contrary, the movie ha[d] indeed had an adverse effect on the business*."[6]

2  Myriad news sources reporting on this announcement construed SeaWorld's

3  statement as a belated admission that *Blackfish* was hurting attendance—an

4  admission so stark that The *Wall Street Journal* described it as an "about face."

5      164.  In direct response to this news, SeaWorld's common stock price tanked

6  $9.25 per share, or nearly 33%.

7      165.  More specifically, on August 13, 2014, SeaWorld:  (i) filed with the

8  SEC the Company's quarterly report on Form 10-Q for the three-month period ended

9  June 30, 2014 (the "2Q14 Form 10-Q"), which was signed by Heaney and Swanson;

10  (ii) issued a press release announcing its second quarter 2014 results ("2Q14 Press

11  Release"); and (iii) held the Company's second quarter earnings conference call

12  ("2Q14 Earnings Call"), in which Atchison and Heaney participated on behalf of

13  SeaWorld.  SeaWorld disclosed dismal revenues, driven by weak attendance levels,

14  for the second quarter and the first half of 2014, severely cut its revenue guidance for

15  the year, and attributed its disappointing performance in part to *Blackfish*-related

16  causes.

17      166.  SeaWorld disclosed that in 2Q14 its revenues had fallen 1%, or $6.1

18  million, compared to 2Q13, and that its revenues for the first half of 2014 were down

19  $32.5 million, or 5%, compared to the first half of 2013.  The Company further

20  disclosed that in 2Q14 it had earned $0.43 per diluted share, and revised its revenue

21  guidance for 2014 sharply downwards, stating "the Company now expects full year

22  2014 revenue … to be down in the range of 6-7% … compared to the prior year."

---

[6] "SeaWorld Finally Confirms a *Blackfish* Backlash to Investors," *Adweek.com*, August 13, 2014.

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

167.   In an attempt to explain these disappointing results, SeaWorld stated that the "decrease in revenue was driven by a 4.3% decline in attendance" in the first half of 2014, and that "[a]ttendance for the first half of 2014 was largely impacted by a decrease at the Company's destination parks primarily in the second quarter as discussed in the preceding section."  In "the preceding section," SeaWorld stated that "lower attendance at the Company's destination parks [was] due to a combination of factors," including the school calendar, new attractions at the Company's competitor parks, and a delay in opening a SeaWorld attraction.  "[I]n addition," SeaWorld stated, "*the Company believes attendance in the quarter was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California*."

168.   The Company's reference to "legislation" obviously was a reference to the so-called "*Blackfish* Bill," and the entire *"Blackfish* effect" caused by the film.  *See* ¶¶160-61.  Indeed, no reasonable person could construe SeaWorld's August 13, 2014 disclosure as anything but an admission that *Blackfish* was a cause of SeaWorld's attendance declines.  Although SeaWorld specifically referred to the legislation instead of more candidly calling *Blackfish* by name, it was widely understood that SeaWorld's reference to the *Blackfish* Bill was an admission of the impact of *Blackfish* itself.  For example, on August 12, 2014, Cinemablend.com reported:

> SeaWorld reveal[ed] the financial results for the second quarter of 2014, and within the wording **the company finally admits that they have a bit of a *Blackfish* problem** . . . . While SeaWorld didn't specify *Blackfish*'s impact by name, the quote you read above is actually a huge step when compared to the amount of denial that was coming out of the company about the documentary.

1

2      169.   That same day, the *Wall Street Journal* reported that SeaWorld blamed

3   its "disappointing second-quarter results" on the "recent media debate about its

4   treatment of captive orcas, saying the negative attention has hurt attendance."  The

5   report further stated that "the controversy was sparked last year in the wake

6   of *Blackfish*," and that the Company's attribution of attendance declines to "demand

7   pressures related to recent media attention surrounding proposed legislation" was a

8   reference to the California bill proposed in March 2014 "aiming to restrict

9   SeaWorld's ability to showcase some animals in that state."

10      170.   SeaWorld's announcement was widely recognized as a long overdue

11   acknowledgment of *Blackfish*'s impact on the Company since the film debuted.

12   Indeed, several media sources observed that SeaWorld's announcement was the end

13   of the Company's long period of denial regarding *Blackfish*'s effect on SeaWorld's

14   business.  Indeed, the *Wall Street Journal* concluded that the Company's admission

15   that *Blackfish* had hurt attendance and revenues represented "***an about face for***

16   ***SeaWorld***, which late last year was singing a different tune," citing Atchison's

17   December 2013 statement that *Blackfish* had "had no impact on our business."

18   Similarly, in an August 13, 2014 *New York Magazine* article entitled "SeaWorld:

19   Remember When We Said That *Blackfish* Movie Didn't Hurt Us? Well Never Mind,"

20   Kevin Roose noted that SeaWorld attempted to first ignore the film then attack it, all

21   while maintaining that the film had no impact on business.  Specifically, Roose

22   noted:

23

24         SeaWorld changed course, and admitted, finally, that the backlash is
           taking a toll after all. . . . ***In today's press release, SeaWorld admitted***
25         ***for the first time that Blackfish may be hurting attendance***, blaming

26

27

---

72

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

people skipping their parks owing to 'recent media attention surrounding proposed legislation in the state of California.

171.  Roose likened SeaWorld's conduct to that of Big Tobacco, "which remained enormously profitable even as its public image was being attacked, then woke up years later to find that, actually, all those anti-smoking ad campaigns had made a mark." *Adweek.com* reported, in an August 13, 2014 article entitled, "SeaWorld Finally Confirms a *Blackfish* Backlash to Investors:"

> SeaWorld has been very insistent in its messaging since CNN's Blackfish expose surfaced with variations on 'The documentary is skewed and it will not affect our business in any way.' . . . Today, however, the company officially changed its tune in a telling press release. . . . Earlier this year, USA Today tied the law [the Blackfish Bill], proposed by California assemblyman Richard Bloom, directly to 'details revealed in the movie Blackfish.' Even if the act (which has been 'tabled' in the interest for further research) fails to pass, ***this release effectively serves as an admission that, despite claims to the contrary, the movie has indeed had an adverse effect on the business.***

172.  The *Christian Science Monitor* likewise reported on August 13, 2014, "[**f**]**or** *the first time*, SeaWorld is saying that media attention surrounding the treatment of its animals is hurting attendance at its parks."  The report quoted an industry expert as follows:

> "'[SeaWorld's] attendance has been flat since Blackfish came out,' Andy Brennan, lead analyst at IBISWorld, an industry research group, said in an interview.  'Essentially the company in previous statements said the decline in attendance was caused by other factors, but now they are having to justify bad earnings and why stock prices are going down.'  Mr. Brennan said SeaWorld 'is underperforming compared to

73

[other companies] in industry' and that the negative attention is to blame."

173. Moreover, on August 14, 2014, the *New York Post* directly tied SeaWorld's announcement to *Blackfish* and quoted another industry expert who also explicitly recognized the longstanding effect of *Blackfish* on SeaWorld:

> Investors in SeaWorld got soaked Wednesday as shares of the embattled theme-park operator tumbled 33 percent – erasing $832 million from shareholder portfolios. The company said it expects revenue to decrease by up to 7 percent this year – a drop greater than Wall Street expected – as the fallout from "Blackfish," a documentary last year about the alleged harm caused to orca whales in captivity, started to hurt attendance. Last month, amid the "Blackfish" controversy, Southwest Airlines announced it would end its 26-year partnership with the Orlando, Fla., company. . . . Dennis Speigel, president of International Theme Park Services, a consulting firm, said the short-term investment focus of the private-equity giant likely hurt SeaWorld during a time it needed to shift its business strategy. "They didn't take the offensive soon enough on 'Blackfish,'" he told The Post. "An owner for whom this was the core focus may have addressed it differently." . . . "This snowball is getting larger and larger and it has to be crushed by SeaWorld," Speigel said, alluding to the "Blackfish" controversy.

174. These publications were not alone in their assessment of SeaWorld's announcement. Far from it, as the following table demonstrates, SeaWorld's August 13, 2014 announcement was widely recognized as a long overdue admission that *Blackfish* had negatively affected SeaWorld's business for some time.

| Source | Title | Quote | Date |
|---|---|---|---|
| **Financial Times** | *SeaWorld Shares Hit as Negative Publicity* | "Shares in SeaWorld tumbled 33 per cent on Wednesday after the amusement park group forecast a revenue decline of 6.7 per cent this year, driven in part by | 8/13/14 |

74

| | | | |
|---|---|---|---|
| | *From Film Hits Revenue* | negative publicity from a film criticising the treatment of its captive killer whales…. The film *Blackfish*, released in 2013, spawned protests that the company said particularly hit revenues at its San Diego park….**[T]his quarter marks the first time management has mentioned *Blackfish*-related issues in its earnings results**" | |
| **Skift.com** | *SeaWorld Concedes Blackfish Hurt Attendance in Second Quarter* | "Shares of SeaWorld Entertainment were tanking August 13 after the theme park company conceded that adverse publicity about restrictive California legislation, which comes on the heels of the Blackfish documentary, negatively impacted attendance." | 8/13/14 |
| **Times of San Diego** | *SeaWorld Stock Takes Dive as Park Admits 'Blackfish' Protests Hit the Mark* | "**SeaWorld's stock (NYSE: SEAS) took a serious hit Wednesday as the company admitted the PETA/*Blackfish* protests have taken a toll on the amusement parks' bottom line.** . . . The documentary *Blackfish*, which outlined activists' concerns about killer whales kept in captivity, along with a campaign launched by PETA, the animal rights group, against SeaWorld, helped drive state lawmakers to consider banning parks from using orcas in shows. The legislation stalled, but the criticism persists." | 8/13/14 |
| **IndieWire.com** | *'Blackfish' Backlash Hurts SeaWorld's Bottom Line* | "When 'Blackfish' was released, SeaWorld said the documentary wouldn't hurt business, but clearly that hasn't been the case. With all the talk of measuring the impact of documentaries, in the case of 'Blackfish,' Gabriela Cowperthwaite's documentary about the danger of keeping whales in captivity, **the effect is clear: SeaWorld reported today that its stock has dropped, largely due to the film.**" | 8/13/14 |
| **San Diego Union Tribune** | *SeaWorld Stock Plunges, 'Blackfish' Blamed* | "[SeaWorld] shares tumbled 32 percent to $19.16 in mid-day New York trading after falling to $19.30, the lowest since they started trading in April 2013. Before Wednesday, SeaWorld shares had retreated 23 percent in a year following the release of 'Blackfish'. . . . The company acknowledged for the first time that pressure from animal-rights groups is reducing attendance, said Barton | 8/13/14 |

| | | Crockett, an analyst at FBR & Co. . . .” | |
|---|---|---|---|
| **New York Times** | *Media Scrutiny Drags on Earnings at SeaWorld* | “SeaWorld is still reeling from the effects of the negative media attention it has received over its treatment of captive orca whales. . . . The drop in stock price is the latest indication of the damage inflicted by the adverse coverage in the news media. SeaWorld came under scrutiny last year after the release of ‘Blackfish,’ a documentary that presents a harsh look at killer whales in captivity.” | 8/13/14 |
| **The Daily Beast** | *Whale Mistreatment Charges Sink SeaWorld* | “SeaWorld Entertainment shares fell 33 percent on Wednesday, indicating that allegations of animal mistreatment are taking a financial toll. . . . Animal-rights activists have been hitting SeaWorld hard since *Blackfish*, a movie that accuses the park of mistreating orca whales, came out last year. **For the first time, SeaWorld executives admitted that the bad publicity has hurt its bottom line, rather than attribute the drop to ticket price increases or holiday schedules as they have in the past.**” | 8/13/14 |
| **CNBC’s “Mad Money with Jim Cramer”** | *The Mad Dash: “SeaWorld Sinks”* | “It’s almost as if people were on strike. They’re not going to SeaWorld. This is amazing. . . . Do we think it could be because of a documentary? You know, this *Blackfish* documentary’s been out there for a long time. I have to tell you, it’s gotta, yeah, it’s gotta play a role. I mean, this is astounding—the decline. . . . **The documentary had to have played a big role.**” | 8/13/14 |
| **Forbes** | *SeaWorld Shares Plummet As Killer Whale Protests Hurt Parks* | “Shares of amusement parks operator SeaWorld fell drastically on Wednesday morning after the company reported disappointing earnings for the second quarter. The cause: more fallout from attention to SeaWorld’s treatment of orcas. . . . The 2013 hit documentary ‘Blackfish,’ which focused on the captivity of one orca who killed three people, shed light on the consequences of keeping the animals in captivity. The media attention has hurt SeaWorld’s bottom line.” | 8/13/14 |
| **DailyMail.com** | *SeaWorld’s Profits Fall* | “Shares of SeaWorld Entertainment Inc. (SEAS) fell Wednesday after the theme | 8/13/14 |

76

| | | | |
|---|---|---|---|
| | *$42MILLION Below Wall Street's Expectations After Devastating Blackfish Documentary* | "park operator reported second-quarter profit and sales that missed Wall Street expectations and cut its outlook for the year. The Orlando, Florida-based company also said it believes attendance during the period was hurt by negative publicity surrounding its treatment of killer whales, which are trained to perform tricks. A documentary last year called Blackfish suggested that the company's treatment of the killer whales provokes violent behavior from them, which in turn has led to the death of trainers." | |
| **International Business Times** | *'Blackfish' Effect: SeaWorld Stock Plunges After Controversial Film Sparks Ethical Debate* | "SeaWorld's stock took a nosedive Wednesday after the company reported fewer ticket sales and lower second-quarter earnings. . . . SeaWorld Entertainment Inc. (NYSE:SEAS), owned by the private-equity company Blackstone, has downplayed the effect of 'Blackfish,' a film that blasted the park for its treatment of orcas. SeaWorld ascribed its 4.3 percent attendance drop over the past year to bad weather, competition with other theme parks and changes to school schedules, **but it recognized the role of 'Blackfish' in recent protests against the park.**" | 8/13/14 |
| **New York Post** | *SeaWorld Stock Sinks Over 'Blackfish' Killer Whale Outrage* | "SeaWorld has a whale of a problem. Shares of the theme-park operator—home to beloved killer whale Shamu—tanked more than 34 percent Wednesday after the company slashed its full-year forecast and second-quarter results fell far short of expectations. SeaWorld, owned by the private-equity giant Blackstone, said attendance at its parks has been hurt by the debate over its treatment of captive orcas. . . The company has been under fire from animal activists who argue it's wrong to keep orcas for the amusement of audiences. That message was hammered home in last year's 'Blackfish.'" | 8/13/14 |

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

| | | | |
|---|---|---|---|
| **Los Angeles Times** | *S&P Cuts SeaWorld Credit Rating Amid Orca Controversy* | "SeaWorld officials had previously attributed lower attendance numbers to bad weather, higher ticket prices and a shift in the timing of Easter this year. **But SeaWorld conceded in its earnings report Wednesday that negative publicity over charges that it mistreats its killer whales has hurt attendance.** The criticism of SeaWorld gained momentum last year with the release of a documentary, "Blackfish," that accused the theme park company of mistreating the orcas featured in its shows." | 8/14/14 |
| **Washington Post** | *'Blackfish' Takes Its Toll: SeaWorld Shares Take a Nose-Dive* | "The 2013 documentary suggests the theme park's treatment of orcas, also called killer whales, prompted gruesome attacks. Since its release last year, it has evoked backlash from animal rights advocates, corporations and lawmakers. It has moved legislators to attempt to ban their captivity, companies to pull out of partnerships and researchers to study large ocean animals. Now, SeaWorld is paying the price. Crediting animal activism, the company acknowledged for the first time Wednesday the fallout that followed the film's release, admitting attendance issues in San Diego, according to CNN Money. **Although the company did not name 'Blackfish,' it stated SeaWorld has been hurt by negative media attention.**" | 8/14/14 |
| **The Guardian** | *SeaWorld Shares Tumble 33% Following Blackfish Documentary* | "Shares in the amusement park SeaWorld fell 33% after a 6-7% decline in the company's revenues was forecast – **with falling attendances driven in part by the negative publicity surrounding the documentary film Blackfish**. . . . The director of Blackfish, Gabriela Cowperthwaite, backed a recent motion by a member of California's state assembly to outlaw orca performance. In April the vote was delayed so that a period of review, potentially lasting as long as 18 months, can get under way. James Atchison, SeaWorld chief executive and president, acknowledged the impact of the bill on the company's bottom line." | 8/14/14 |

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

| | | | |
|---|---|---|---|
| **Chicago Tribune** | *SeaWorld credit rating, stocks plummet in response to 'Blackfish'* | "SeaWorld is still feeling the 'Blackfish' effect as the company's shares fell a whopping 22 percent over the past year, down 33 percent on Wednesday alone, when it reported lackluster second quarter earnings at the close of the regular trading day." | 8/14/14 |
| **Entertainment Weekly** | *SeaWorld Says Backlash Following 'Blackfish' Has Affected Its Revenue* | "For months after the release of *Blackfish*, a documentary about the negligent treatment of orca whales in captivity, SeaWorld denied allegations that negative press was affecting earnings or attendance. Now, as the company failed to hit an expected revenue mark in its second quarter, **it's admitting that the backlash, likely fueled in part by *Blackfish*, is taking its toll**. . . . Though the motion [for legislation in California] was tabled this April as lawmakers decided to wait on the results of a further study, SeaWorld's recognition that *Blackfish* has affected its business is a significant change in the company's PR." | 8/14/14 |
| **ProjectCasting.com** | *SeaWorld Finally Admits That the Blackfish Movie Has Hurt the Company* | "Since the release of *'Blackfish'*, a documentary critical of the treatment of Orcas at SeaWorld many people have condemned, boycotted, and downright despised the theme park attraction. Months following the release of *'Blackfish'*, SeaWorld went on a Public Relations campaign discrediting the documentary. Furthermore, SeaWorld execs argued that despite the bad PR for *'Blackfish'*, people are still interested in attending the theme park. **However, SeaWorld announced on Wednesday that the documentary *'Blackfish'* had negatively affected the amusement park sales and revenue.**" | 8/14/14 |

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

| | | | | |
|---|---|---|---|---|
| **Washington Post** | *After 'Blackfish,' SeaWorld hurt financially but keeps up political spending* | "SeaWorld Entertainment has suffered financially since the release of the 2013 documentary 'Blackfish' that accused the theme park of mistreating its main attraction – killer whales.  The company last week reported second-quarter losses, its stock plummeted and its Standard & Poor's credit rating was downgraded.  **And for the first time publicly, SeaWorld Entertainment attributed its financial woes, at least in part, to the bad publicity from the film.**" | 8/19/14 |
| **CNN Money** | *SeaWorld Stock Gets Soaked, Plunges 33%* | "SeaWorld has come under fire after the airing of 'Blackfish' last year. . . . The film has led to proposed legislation in California, home of SeaWorld's San Diego park, to ban the holding of so-called "killer whales" in captivity. . . . In its earnings release Wednesday, SeaWorld acknowledged that attendance in San Diego was hurt by recent media attention around the legislation. It was the first time the company actually admitted attendance problems because of animal activism, said Barton Crockett, an analyst at FBR Capital Markets…." | 8/19/14 |
| **Wayne Pacelle, President and CEO of The Humane Society of the United States** | *A Whale of a Reaction to Blackfish and SeaWorld* | "First came the company's August 13th revelations concerning its underwhelming financial performance over the course of 2014, a year in which SeaWorld's credit rating and stock value plummeted as investors lost faith with the company in what analysts are calling "the Blackfish effect." . . . The year also saw more than a dozen scheduled musical acts and its longtime corporate partner, Southwest Airlines, abandon SeaWorld and leave it without that support and those cultural moorings. . . . The fraying of SeaWorld's business model will one day be the subject of case studies in business schools and schools of communications.  For now, it's providing one of the most vivid examples in the turn of fortune for a major corporation that is on the wrong side of public opinion on a long-standing humane concern.  In just a few short years, the company has lost its feel-good cachet, seen its value downgraded, mishandled a tragic incident by re- | 8/28/14 |

80

Second Amended Consolidated Class Action Complaint

Case No. 14-cv-2129

| | | victimizing Dawn Brancheau, and maintained against all available evidence that its revenue model and business prospects were not being affected by swelling public skepticism and rejection." | |
|---|---|---|---|
| **National Public Radio** | *SeaWorld Hopes New Orca Habitats Will Stem a Tide of Criticism* | "[SeaWorld], which has parks in San Diego, San Antonio and Orlando, Fla., saw its attendance drop in recent months. **The company blames that, in part, on fallout from *Blackfish*,** a documentary film that's critical of SeaWorld's treatment of its captive killer whales." | 9/11/14 |

175. As all of these industry and market observers noted, SeaWorld's announcement was understood by the market to be an admission by the Company— for the first time—that *Blackfish* had negatively impacted both attendance and revenue throughout the Class Period.

176. Atchison later conceded that SeaWorld should have responded to *Blackfish* earlier in an August 20, 2014 interview with the *Orlando Sentinel*, entitled "SeaWorld CEO: We should have done more to fight 'Blackfish.'" According to the *Orlando Sentinel*, Atchison told the paper that "SeaWorld . . . Should have done more to counter the anti-captivity documentary 'Blackfish' and in the future will promote its rescue and conservation efforts more aggressively." Atchison went on to explain "[in] hindsight, yeah we probably [should have come out more forcefully, sooner, against *Blackfish*], because the movie was so misleading, so full of falsehoods and so unfair in its framing and characterizing of what we do. . . . It's a delicate balance though, because one of the worst things you can do is to turn it into the movie SeaWorld doesn't want you to see." Undoubtedly, SeaWorld was on notice and aware that *Blackfish* was impacting its business long before it finally admitted such on August 13, 2014. However, as Atchison's own explanation makes clear, despite

this knowledge, SeaWorld's chosen strategy was to ignore *Blackfish* and deny its credibility—both to the public and investors.

177.   After the Company disclosed that *Blackfish*-related attendance declines had caused weak revenues and a downward revision of guidance, SeaWorld's common stock price plunged, as reported by industry, business and financial press. For example, the *Wall Street Journal*'s online site, *WSJ Blog*, reported during trading on August 13, 2014 that SeaWorld's common stock price was "tank[ing]" on news that "protests and negative publicity took a significant toll on the company's second-quarter results."

178.   Dow Jones also published a wire during trading on August 13, 2014, reporting that SeaWorld had "slashed its revenue guidance for the year as the theme-park operator reported underwhelming results and attendance for the second quarter. Shares of the company—which acknowledged that media attention about legislation in California to end the orca shows weighed on attendance—fell nearly 30% in morning trading as its results for the period missed analysts' expectations by a wide margin."

179.   This admission was of major significance because *Blackfish* and the fallout surrounding it were tied to how the public viewed SeaWorld.  As *Bloomberg* reported on November 20, 2014, SeaWorld's attendance was declining "because of changing perceptions of killer whale shows" and "*Blackfish* has gone from being a public relations problem to a potentially catastrophic threat to a $1.4 billion-a-year business."  Damage to SeaWorld's brand and reputation would constitute a different and direr threat to its ability to generate future earnings than issues stemming from transitory effects of weather or the holiday calendar because harm to brand or reputation risks a structural shift in consumer taste away from a company's existing

product.  Indeed, the predictions of *Bloomberg* and other commentators regarding the impact of *Blackfish* proved true.  Ultimately, *Blackfish* and the ensuing shift in public opinion regarding SeaWorld's treatment of orcas led to a historic change in SeaWorld's business model.  As detailed below, on March 17, 2016, SeaWorld stated that it would end all orca breeding programs and phase out the Company's theatrical orca whale trick shows.  *See* ¶¶199-203.

180.  Understanding the significance of SeaWorld's admission on August 13, 2014, investment analysts focused on the health of the Company's brand during the 2Q14 Earnings Call.  For example, Robert Fishman of MoffettNathanson LLC pointedly asked if SeaWorld had sought to measure how its "brand is perceived today versus maybe a year ago?"  The admission that *Blackfish*-related issues were, in fact, impacting park attendance, was very bad news for the Company in the eyes of investors.

181.  In response to the August 13, 2014 disclosure, SeaWorld's common stock price declined a staggering $9.25 per share, or nearly 33%, from a closing price of $28.15 per share on August 12, 2014, to a closing price of $18.90 per share on August 13, 2014.   This decline eliminated more than $830 million from the Company's market capitalization in just one day.

### G.   The Aftermath Of The Fraud and the Continued Impact of *Blackfish*

182.  On August 14, 2014, S&P lowered SeaWorld's corporate credit rating to BB- from BB, pushing the rating further below investment grade, also known as junk status.  The negative outlook reflected S&P's expectation that SeaWorld still faced significant challenges regarding "reputational risk and potential improvements in operating performance beyond 2014."   Additionally, S&P cited "negative media

83

reports that have specifically targeted the company's use of orca whales for entertainment purposes" as contributing to "lower attendance and spending at the parks" as a reason for the downgrade.

183.  As discussed above, SeaWorld suffered new blows in the following months as additional corporate sponsors and marketing partners cut ties with the Company.  *See* ¶¶150-58.

184.  Reports of grassroots protests and school groups organizing to prevent school sponsored associations with SeaWorld continued to arise, threatening to further erode gate attendance.  On November 6, 2014, it was reported that California State University Long Beach students planned to stage a protest to demand that the university stop selling discounted SeaWorld tickets due to the theme park's alleged mistreatment of killer whales. The rally came after California State University Long Beach Associated Students Inc. passed a resolution to end the sale of SeaWorld tickets in the University Student Union, which the trustee board for the student union ultimately moved to support.

185.  Following the announcement of extremely poor attendance figures and earnings in the third quarter earnings call on November 12, 2014, Atchison reiterated his commentary from the 2Q14 Earnings Call regarding negative attendance trends, explaining that "the decline resulted from a combination of factors, including negative media attention in California."  The declining attendance trend was ongoing and Atchison noted that "[c]onsistent with the update we provided in August, the attendance trends the Company experienced in the latter part of the second quarter continued into the third quarter."  Referring to decreased attendance at SeaWorld's Orlando and San Diego parks, he admitted the Company was not "happy with it or accepting of it, but we're seeing similar trends through those two parks, as has been

1   reported previously in our Q2 numbers."  Alluding to efforts to repair the damage
2   *Blackfish* had caused to SeaWorld's brand, he stated, "[o]n the reputation side, we
3   have introduced a number of aggressive and proactive initiatives and campaigns to
4   make sure the truth is being told, address public perceptions, and raise and protect
5   brand awareness."

6       186.  Following that call, Atchison granted wide-ranging access to a
7   *Bloomberg Business* reporter for a November 20, 2014 piece entitled, "Saving
8   SeaWorld," in which he discussed the negative impact of *Blackfish* on SeaWorld's
9   reputation and ticket sales.  *Bloomberg* reported that, "SeaWorld acknowledges that
10  ticket sales have declined because of changing perceptions of killer whale shows"
11  and noted that "[f]or SeaWorld, whose logo features an orca's dorsal fin, *Blackfish*
12  has gone from being a public relations problem to a potentially catastrophic threat to
13  a  $1.4 billion-a-year business."  Commenting on the crucial importance of
14  SeaWorld's killer whale shows to SeaWorld's business model, Atchison admitted,
15  "Our killer whales, our killer whale program, and all of our animals are emblematic
16  of the whole brand."  He acknowledged that *Blackfish* had long been on the
17  Company's radar and that he was aware of the "notable momentum" the film gained
18  when "CNN started airing it…[r]epeatedly," but that the Company had struggled to
19  find an effective approach in responding to widespread criticism and activism
20  generated by the film.

21      187.  Weeks later, on December 11, 2014, the *Daily Mail* reported that
22  Atchison had "resigned following low visitor numbers in the wake of a 2013 film,
23  Blackfish, which criticized [the Company's treatment] of killer whales."  As reported
24  by the *Tampa Bay Times* that same day, however, a SeaWorld spokesman "would not
25  say whether Atchison's decision was voluntary."  According to an analyst with

26
27

Pacific Asset Management, "[SeaWorld's] board was likely looking for someone who can better handle SeaWorld's public-relations problems."  Also on December 11, 2014, the *Wall Street Journal* confirmed that Atchison would "depart as chief executive" and that SeaWorld would unveil "a restructuring plan that comes as it has faced controversy over its treatment of killer whales."

188.  The following day, the *Washington Post*, reported that "Atchison's departure comes on the heels of what has been a terrible year for the company[]" in which "revenue fell by more than seven percent, and its attendance dropped by nearly five percent."  The paper went on to note, "[t]he changing of the guard is likely the result of something that occurred in July 2013: namely the release of the documentary 'Blackfish.'"  A recent *Orlando Sentinel* report similarly linked Atchison's departure to *Blackfish*, stating that Atchison "resign[ed] as CEO in 2014 amid financial struggles and controversy over the documentary 'Blackfish.'"

189.  CW-5 also stated that she believed Atchison's response to *Blackfish* cost the CEO his job.  She believed Atchison's strategy to ignore *Blackfish* and wait for it to go away did not work and that it was apparent that SeaWorld did not have a contingency plan in the event that ignoring *Blackfish* did not work.

190.  Days later, SeaWorld announced plans to cut "about 300 jobs" as part of the $50 million cost-saving restructuring plan it had announced in its 3Q14 report.  CW-5 attributed this layoff as a large impact from *Blackfish*.  Indeed, CW-5 explained that as the 2015 budget was being compiled in the last months of 2014, budgets were repeatedly returned with requests to cut more and more expenses.  Ultimately, there were no other costs to cut except labor, resulting in the layoff.  In reporting on this development, the *Wall Street Journal* explained that the cuts occurred as SeaWorld "continues to deal with the backlash from animal-rights

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

activists and consumers about its treatment of animals, especially killer whales," and noted that, "[t]he documentary 'Blackfish,' which has been screened in cinemas and broadcast multiple times by CNN, raised these criticisms to a higher level of public awareness, harming the company's financial results."

191. CBS reported on December 12, 2014 that "'Blackfish' is widely considered to be at least partly responsible for SeaWorld's attendance drop." On January 6, 2015, *Fortune* likewise concluded that "SeaWorld has had a bad few years, with park attendance down and the company's reputation taking a beating due to the controversial anti-SeaWorld documentary *Blackfish*." Similarly, on February 26, 2015, the *Orlando Sentinel* noted SeaWorld's "attendance and stock value have declined, in part because of negative publicity over its killer whales. The issue went mainstream after the 2013 documentary 'Blackfish'...."

192. Unsurprisingly, when SeaWorld disclosed its full year financial information on February 27, 2015, it reported an overall decline in attendance for 2014. Specifically, SeaWorld's 2014 10-K reported a 4.2% decline in attendance in 2014 as compared to 2013. The Company's net income also dropped from $51.9 million in 2013 to $49.9 million in 2014. Acknowledging the impact of *Blackfish*, SeaWorld primarily attributed the decline in attendance to "negative media attention in California and a challenging competitive environment in Florida."

193. In an effort to reform its image and boost flailing attendance rates, SeaWorld made several strategic moves in early 2015. First, on March 19, 2015, SeaWorld announced that Joel Manby had been appointed as President and Chief Executive Officer, effective April 7, 2015. SeaWorld touted Manby's proven track record in the entertainment and theme park industries "[e]ven in the most challenging business environments[.]"

194.   Second, the Company launched a new ad campaign aimed at restoring its image.   According to the *Orlando Sentinel*, Interim CEO D'Alessandro told analysts on February 26, 2015 the Company was engaging in a "targeted marketing campaign starting April 1 [that] will focus on consumers who feel ambivalent about SeaWorld."   As with its prior campaigns, the focus of the new campaign was to refute the claims made by *Blackfish* and animal rights activists.   For example, according to NPR, in one video, SeaWorld's head veterinarian, Chris Dold, told viewers "So don't believe what PETA and *Blackfish* are saying.  Our killer whales live lives just as long as killer whales in the wild."

195.   During this same time, former SeaWorld trainer John Hargrove, who was featured in *Blackfish*, released a book, *Beneath the Surface: Killer Whales, SeaWorld, and the Truth Beyond 'Blackfish'*, which was harshly critical of SeaWorld's treatment of its animals.   SeaWorld took the same aggressive tack with Hargrove that it had with *Blackfish*.   In an email to ABC News, Jacobs accused Hargrove of repeatedly making statements that were "misleading, false or in conflict with statements [Hargrove] has made previously."   And, within days of the book release, SeaWorld attempted to discredit Hargrove by sending reporters a five-year-old video in which Hargrove was under the influence of alcohol and used derogatory language.

196.   All told, the *Guardian* reported on August 6, 2015, that SeaWorld spent more than $10 million on its marketing blitz. Nevertheless, attendance and revenue continued to fall.  SeaWorld reported in an 8-K released on August 6, 2015, that its second quarter net income had dropped from $37.4 million in 2014 to $5.8 million in 2015, ***an 84% decrease.***   Attendance in 2Q15 was also down by more than 100,000

from attendance in 2Q14.   SeaWorld attributed the decline to "continued brand challenges in California" as well as the timing of Easter and record rainfall in Texas.

197.   Meanwhile, commentators continued to attribute SeaWorld's attendance declines to *Blackfish*.  The *Guardian* reported on August 6, 2015, "[**f]ollowing the release of the documentary, attendance collapsed** and the company lost more than half its market value on Wall Street and its formed CEO was forced out."  That same day, CBS News concluded "SeaWorld has been trying to recover from the 2013 documentary film 'Blackfish' that suggested the treatment of captive orcas provokes violent behavior.  Park attendance dropped after the release of the documentary."

198.   In an effort to stem public backlash against its killer whale program, SeaWorld proposed a $100 million program to double the size of its orca tanks at its San Diego Park.  On October 11, 2015, the California Coastal Commission approved SeaWorld's plan under the condition that SeaWorld end its breeding program in California.   Media attributed the California Coastal Commission's decision to the continued public scrutiny of SeaWorld's killer whale program in the wake of *Blackfish*.  For example, on October 11, *CNN* reported the decision "followed hours of impassioned speeches by hundreds of supporters and opponents of the project" noting that "interest in orcas, and the conditions they live under at SeaWorld, rose after the 2013 documentary 'Blackfish' aired on CNN."  The same day, the *Voice of San Diego* wrote "[c]laims in the movie [*Blackfish*]—which [SeaWorld] denies— inspired a recent state Coastal Commission decision to force the company to slowly phase out its killer whale program[.]"

### H.   SeaWorld's About Face

199.   On March 17, 2016, SeaWorld announced a dramatic and historic shift in its business model, stating that it would end all orca breeding programs and phase

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

1   out the Company's theatrical orca whale trick shows.    Reporting on the

2   announcement, *ABC News* noted, "***Manby . . . acknowledged that "Blackfish" did***

3   ***have an impact***, saying 'whether it's a movie, whether it's customers riding us, there

4   is no doubt the mindset of society has changed.  I think we have to change with it.'"

5   According to the *Wall Street Journal*, on an analyst call related to the announcement,

6   Manby acknowledged, "[t]here's been a ton of pressure....People today and

7   millennials and moms and dads want vacations with meaning, and they are willing to

8   support organizations that have it."

9        200.  Manby cast SeaWorld's dramatic operational shift as a necessary

10   response to public opinion.  Indeed, while Manby did not originally intend to end the

11   killer whale program at SeaWorld, after reviewing attendance trends and public

12   opinion research and talking to fellow business leaders, he determined it was the most

13   prudent move for the Company.  On April 20, 2016, the *Orlando Sentinel* reported

14   Manby made the decision to end the killer whale program because he "saw twin

15   losing battles looming ahead — one against declining attendance, another against

16   increased legislation targeting orcas in captivity," noting that "SeaWorld has been

17   fighting both after the 2010 death of a trainer and the subsequent anti-captivity

18   documentary 'Blackfish.'"   As Manby told *Bloomberg* on May 2, 2016, several

19   things convinced SeaWorld to end the killer whale program: "Customer feedback,

20   conversations with other business people and a decision by the California Coastal

21   Commission to prohibit orca breeding in the state if SeaWorld pursued a plan to

22   expand its whale habitat."  Manby also acknowledged in *New York Magazine* that his

23   decision was spurred by the fact that SeaWorld had lost the public's trust, stating "***I***

24   ***mean, we can say that what Blackfish was saying is not true, and we have facts to***

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

1  *back it up, but if we're the only ones saying it, we're not going to have the*
2  *credibility to win that.*"

3  201.  In other words, Manby and SeaWorld could not continue to deny the
4  profound impact of *Blackfish* or ignore the Company's own data regarding public
5  sentiment, as his predecessor had done, and remain a viable business.  Indeed,
6  according to the *Orlando Sentinel*, Manby told fans in an online forum "*I understand*
7  *you may feel betrayed . . . [b]ut . . . the data showed, and trends showed, it was a*
8  *SeaWorld without whales or it would probably be a world without SeaWorld.*"
9  Manby also told *Forbes* "[t]he world is moving in a different direction, . . . . Society
10 is changing and moving in a different direction, and we needed to get ahead of it.
11 Our research showed it would be a losing battle [to continue the shows in the face of
12 this rising tide of hostility]."

13 202.  In particular, SeaWorld's consumer research found that the Company's
14 breeding ban led to improved public perception of the Company and an increased
15 likelihood of people to visit the SeaWorld parks.  For example, in a March 17, 2016
16 presentation to investors, Manby cited detailed third-party consumer studies of
17 several demographic groups by market that the Company commissioned to test the
18 announcement of SeaWorld's new business model.  The results of the study found,
19 *inter alia*, favorability of opinions about SeaWorld improved by 11-27 points and
20 consideration of those likely to visit SeaWorld improved 5-17 points.  In addition,
21 Manby told the *San Diego Tribune*:

23   We tested the announcement in disguise before we made it, and the
     actual results in the marketplace were exactly the same. Out of every
24   eight people, seven were very supportive or extremely supportive.
25   This was the general population, and that was who we were going
     after…. And the willingness of people to visit our parks went up

91
Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

dramatically as well. Out of every five people, four are more likely to come to our parks now. Those are incredible statistics.

203.   Tellingly, SeaWorld acknowledged that its new business model would significantly increase attendance and revenue.  According to the *Wall Street Journal*, SeaWorld "expects to save $15 million in reputational-management costs, and it sees attendance rising by 380,000 to 940,000 in the next three to five years…. SeaWorld also expects revenue to increase by $20 million to $80 million during the same time frame."   According to PETA Vice President Lisa Lange, "[a] corporation like SeaWorld only changes because its financially prudent to do so, and it's financially prudent to do so because people just aren't going and their stocks are falling."

204.   Once again, the national media noted the impact of *Blackfish* on SeaWorld's surprising shift.  For example, the *Washington Post* reported that "after years of defiance, SeaWorld is finally letting go of its killer whale program" because ***"the domino effect that followed 'Blackfish'… has simply proven too crippling to ignore."***  Likewise, NPR commented that since *Blackfish* put SeaWorld's treatment of its whales in the spotlight, "in a steady campaign on social media, critics have demanded SeaWorld end its orca breeding program." And, the *Motley Fool* reported on March 22, 2016, "SeaWorld has been out of favor since the moment it went public at $27 in 2013," and "remains a busted IPO, but that's not unexpected ***given the 2013 and 2014 slides in attendance as a result of fallout from the Blackfish documentary***." The financial blog went on to note "[a]ttendance inched slightly higher last year, but revenue still retreated as ***SeaWorld has to discount admissions to drum up park guests.***"  Indeed, nearly every media report on the announcement mentioned *Blackfish* as a factor precipitating SeaWorld's changed business model.

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

205.   Following SeaWorld's announcement, investors and experts questioned why the Company took so long to come to this decision.   Activist Investor Greg Taxin ("Taxin"), whose Luma Asset Management has a 4% stake in SeaWorld commented:

> *We believe the company took far too long to respond effectively to the challenge of 'Blackfish'*… and that the board bears responsibility for the delayed response, ineffective response for several years that has cost shareholders significant value.   We just think it would be useful to have new people on the board who have proven extremely able in this industry to help navigate these future issues that may arise.

206.   Taxin also told *Bloomberg News* on March 21, 2016, **"[t]he board at SeaWorld was asleep for many, many years**, and we think it needs to change," and that "[t]he directors of the Orlando, Florida-based company don't have a background in theme parks and lack experience 'in areas we think are critical.'"   Likewise, the *San-Diego Union-Tribune*, noted on March 17, 2016, that Manby had taken over following the resignation of Atchison "who had presided over declines in revenue and attendance[,]" and that "SeaWorld observers had faulted the company for doing too little to blunt the ongoing criticism."   The report also noted theme park consultant Dennis Speigel's recognition that Manby's move away from killer whale shows as prudent business.   Speigel told the San-Diego Union Tribune,

> They have to re-invent their product.   The public has spoken, and in that regard they're reacting to it.   I think this will improve their stock value and future attendance and revenues.   The SeaWorld in 10 years will not be the SeaWorld we know today, and make no mistake, this is all emanating from Joel Manby's management position.

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

207.   In response to shareholder feedback and an apparent recognition of the inept response of its board to *Blackfish*, on April 15, 2016, SeaWorld announced the addition of two independent, veteran theme park industry executives – Ron Benison and Donald Robinson – to its Board of Directors.  The new directors were brought on to replace outgoing board members, Joe Baratta, who is also the Global Head of Private Equity, and former CEO, Atchison, who remained on the board after his tenure as CEO.  Atchison will remain a consultant with SeaWorld, earning $620,000 per year through 2017, according to his current consulting agreement with the Company.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

### A.   August 29, 2013 – SeaWorld's Statements To The Media

208.   On August 29, 2013, the first day of the Class Period, the *Los Angeles Times* called into question the Company's representation to investors that the 6% decline in attendance across SeaWorld-owned parks over the first half of 2013 was attributable to bad weather, and suggested that bad publicity stemming from *Blackfish* may have played a role.  In response, Jacobs, speaking on behalf of the Company, flatly denied the suggestion that *Blackfish* or the public backlash spurred on by the film was hurting attendance, stating that "'***Blackfish' has had no attendance impact***."  That same day – again denying that negative publicity from *Blackfish* was impacting the gates at SeaWorld-owned parks – Jacobs told *Bloomberg* that "***[w]e [SeaWorld] can attribute no attendance impact at all to the movie***."

209.   Jacobs' statements on behalf of the Company were express and explicit denials of any *Blackfish*-related impact on SeaWorld's attendance, whatsoever.  Up until August 29, 2013, SeaWorld had refused to publicly acknowledge *Blackfish* by

name and had only tacitly referred to any possible effect *Blackfish* "may" or "might" have on its attendance in veiled, contingent fashion.  However, Jacobs' statements affirmed to the investing public that *Blackfish* definitively "had no attendance impact" and that SeaWorld "attribute[d] no attendance impact at all to the movie."

210.   Yet, each of Jacobs' August 29, 2013 statements made on behalf of the Company set forth above in ¶208 was materially false and misleading because by the time of each statement:

a) CW-1 stated that by the April 2013 IPO there were at least a couple hundred anti-SeaWorld posts a day on Twitter, many of which mentioned *Blackfish* and also hijacked SeaWorld's hashtags in order to reach existing SeaWorld fans.  SeaWorld had internal discussions concerning these posts and potential responses.

b) CW-3 recalled that during the time frame from *Blackfish*'s premiere in January 2013 to April 2013, attendance at SeaWorld San Diego was "tanking," down approximately 30% from the budgeted attendance.  CW-4 likewise stated that there was a noticeable dip in attendance following the premiere, which continued throughout the Class Period.

c) According to CW-2, CW-3 and CW-4, SeaWorld held ECMs approximately monthly at parks for all employees.  At such meetings, attendance was discussed.  Moreover, according to former SeaWorld employee, Sarah Fischbeck, SeaWorld held "a collective meeting before [*Blackfish*] came out telling [SeaWorld employees] to say it was fake," and otherwise instructing SeaWorld employees how to respond to *Blackfish*.  According to CW-2, CW-3 and CW-4, there were several instances in 2013 when *Blackfish* was discussed.  According to CW-2, in one such instance, the San Antonio park's general manager tried to "boost morale" by expressing "this too shall pass," indicating that *Blackfish* was, in fact, plaguing the Company long before Jacobs' August 2013 statements.  CW-2 stated that Atchison attended one such meeting and specifically discussed *Blackfish*.  CW-4 recalled

95

that these meetings would typically be put together when Atchison was in town.

d)    Immediately following the premiere of *Blackfish* at Sundance in January 2013, PETA implemented a devastating public relations campaign related to *Blackfish*, which urged consumers and businesses to boycott the Company's parks.  Among other things, PETA launched www.seaworldofhurt.com – a website which discussed *Blackfish*, attacked SeaWorld's treatment of its captured animals, and sought to instigate changes in the Company's core business model and attractions.

e)    As reported by TIME and other publications, all of the major theme parks in SeaWorld's geographic locations, including Disney and Universal, attained comparable, increased or record attendance figures after they too hiked ticket prices in May or June 2013, consistent with the "annual tradition."  *See* ¶¶125-29.

f)    As reported by *Bloomberg* on May 7, 2013, attendance at Disney's domestic parks rose 8% percent in the same quarter, as compared to SeaWorld's 9% decline, notwithstanding the fact that Disney's primary U.S.-based parks are located in the same geographic markets as SeaWorld's Orlando, Tampa and San Diego parks – and therefore operated under the same weather conditions (and, of course, holiday and school schedules). Moreover, historical data confirms that attendance at SeaWorld-branded parks and Disney and Universal parks in Florida and California ordinarily rise and fall together.  *See* ¶¶17-20, 116-18.

g)    SeaWorld was in the midst of an unprecedented attendance decline, having reported a 9.5% decline in its 2Q13 attendance, dropping "from approximately 7.2 million in 2012 to 6.6 million guests in 2013[,]" a trend that revealed something beyond the ordinary factors of weather and schedules was occurring.

h)    *Blackfish* had reached an even larger domestic and international audience, thus increasing the probability that the film was having or would have an impact on the Company's operations and attendance.   For example, on July 19, 2013, *Blackfish* was

96

released in U.S. theaters.  Also in July 2013, the film was made available to British customers of Netflix.

i)   In January 2013, almost immediately following the film's showing at Sundance, SeaWorld began an extensive nationwide public relations campaign in an attempt to counteract the film's predictable negative effect on public opinion.  Outrage at the practices reflected in the film, and unwillingness to attend the Company's parks had dramatically intensified the Company's public relations campaign opposing *Blackfish* by August 2013. Prior to its release in major markets in the U.S., in July 2013, Jacobs emailed fifty (50) major film reviewers to "discredit" *Blackfish* with a point-by-point refutation of eight claims made in the film.  Eammon Bowles, president of Magnolia Pictures, stated publicly "[f]rankly, I've never seen anything like it."

j)   SeaWorld employees believed Defendants' statements that *Blackfish* did not have an effect on SeaWorld's attendance "were pretty false" according to CW-3.   In fact, CW-3 described SeaWorld San Diego's attendance during the period after the IPO as "off," and, both she and CW-4 believed that the negative publicity due to *Blackfish* had an impact.

k)   Prior to 2013, the July 4th holiday was one of SeaWorld's biggest events, but, according to CW-3, in 2013 the San Diego park was "abnormally slow" during that holiday.  Similarly, CW-4 recalled that in mid-July through at least August 2013, SeaWorld cancelled almost all of their extra dining services the San Diego park would normally set up for the increased summer crowds due to low attendance.

l)   Likewise, as reported by the *Orlando Sentinel*, the Company purchased the rights to Web domains associated with the film title, such as BlackfishFacts.com and TheTruthAboutBlackfish.com, evidencing the Company's internal concern over the growing impact of *Blackfish* on SeaWorld's operation and attendance.

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

m)   Prominent celebrities were urging their millions of followers and the public in general to see *Blackfish* and to then boycott SeaWorld's parks in light of the revelations of *Blackfish* concerning the Company's practices. *See* ¶¶132-40.

n)   As reported by the *Huffington Post* on August 10, 2013, the *Blackfish* effect was so strong that upon viewing the film, executives from Disney's Pixar announced that the company would alter the movie storyline for the sequel to "Finding Nemo," entitled "Finding Dory," so as to remove references to captive sea animal parks.

**B.   November 13, 2013 – 3Q13 Form 10-Q, Press Release And Earnings Call**

211.   On November 13, 2013, SeaWorld:   (i) filed with the SEC the Company's 3Q13 Form 10-Q, which was signed by Heaney and Swanson; (ii) issued a press release announcing its third quarter 2013 results ("3Q13 Press Release"); and (iii) held the Company's 3Q13 Earnings Call, in which Atchison and Heaney participated on behalf of SeaWorld.

212.   In the 3Q13 Press Release, among other things, SeaWorld again reported a decline in attendance:   "[a]ttendance for the first nine months of 2013 declined by 4.7% compared to the same period in 2012 from 19.9 million to 18.9 million guests." According to the Company, "[a]ttendance was impacted by new pricing and yield management strategies implemented at the beginning of 2013 that increased revenue but reduced low yielding and free attendance, adverse weather conditions in the Company's second quarter and in July, and the negative impact of an early Easter in 2013."

213.   SeaWorld then discussed the specific causes of the decline in attendance for the third quarter – none of which, according to the Company, included *Blackfish* or negative publicity arising from the film:

98

Attendance trends improved in the third quarter compared to the second quarter reversing a negative trend earlier in the year, with a 3.6% decline versus a 9.5% decline in the second quarter. Attendance trends also improved steadily within the quarter with July attendance down 5.7% due to adverse weather and August/September attendance down 1.8% as weather conditions improved. Preliminary attendance in October showed continued improvement with attendance comparable to prior year levels. In addition to adverse weather, the attendance decline in the third quarter was an expected result of planned strategies that increased revenue but reduced low yielding and free attendance. These strategies were implemented at the beginning of 2013 to increase revenues and operating margins through higher quality attendance, which the Company achieved in the third quarter.

214.   Each statement set forth in ¶¶212-13 was repeated in substantial form within SeaWorld's 3Q13 Form 10-Q.

215.   During the 3Q13 Earnings Call, Defendants continued to omit material facts concerning the impact of *Blackfish* on attendance. For example, Heaney repeated the declining attendance figures announced in the 3Q13 Press Release and re-affirmed that one half of the 3.6% decline was attributable to new pricing initiatives, while the "remainder of the attendance decline" was due to adverse weather not *Blackfish*:

Attendance trends improved in the third quarter compared to the second quarter, reversing a negative trend earlier in the year with a 3.6% decline in the third quarter versus a 9.5% decline in the second quarter. This improvement continued into October and November, with attendance running flat with prior year levels. Roughly half of the 3.6% decline in the third quarter was expected due to new pricing and yield management strategies implemented at the beginning of 2013 to increase revenue, per capita revenue and operating margin. The remainder of the attendance decline in the third quarter was due to adverse weather in July when we had above average precipitation

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

1
2
3

in all of our markets, including record precipitation in Florida. Weather conditions improved in August and September, and our attendance trends improved accordingly.

4
5
6
7
8
9
10
11
12
13

216.   Each of Defendants' statements set forth in ¶¶212-15 blaming adverse weather conditions and/or pricing and yield management strategies for the decline in SeaWorld's attendance figures was materially false and misleading for the reasons set forth above in ¶210 because – in addition to being subject to the same "adverse weather" conditions as SeaWorld in Orlando and Southern California – Disney and Universal also implemented pricing increases applicable to the quarter and nonetheless reported comparable or higher attendance figures for the quarter than in the preceding year, as discussed above in ¶¶125-29 and recognized by S&P Capital IQ's November 18, 2013 observation that SeaWorld's 3Q13 attendance declines were "counter to trends at peers."

14

**C.     November 14, 2013 – Atchison's Statements To The Media**

15
16
17
18
19

217.   On or around November 14, 2013, Atchison again rejected the assertion that *Blackfish* had or was having any impact on the Company's attendance. Specifically, Atchison stated to the *Wall Street Journal:* "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it," adding "[i]ronically, our attendance has improved since the movie came out."

20
21
22
23

218.   In addition to the reasons set forth above in ¶¶210 and 216, Atchison's statement denying that *Blackfish* had or was having any impact on the Company's business as of November 14, 2013 was materially false and misleading because by the time of his statement:

24
25
26

a)     *Blackfish*, which had already inspired public outrage against SeaWorld, now had reached an even larger global audience. Notably, on October 24, 2013, CNN aired *Blackfish* to an

100

27

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

estimated twenty-one (21) million viewers, and continued to air and discuss the film multiple times a day thereafter.  According to CW-1, media exposure for *Blackfish* just kept getting worse from October forward.

b)   For SeaWorld San Diego, after CNN aired *Blackfish*, CW-3 noticed a drop in attendance of approximately 20% compared with previous years, reflected in the budgeted attendance report that she and others received, which she stated must have been attributable, at least in part, to *Blackfish*.

c)   External polls evidenced that consumers were no longer interested in attending SeaWorld's parks after viewing *Blackfish*, including an October 25, 2013 poll conducted by *CNN* asking "[w]ould you take your kids to SeaWorld" in light of the information revealed by *Blackfish*.  Of approximately 3,000 responses, 86% stated "No."  *See* ¶¶141-42.

d)   Teenagers and high school classes like San Diego's Point Loma High School, discussed above in ¶143, started refusing to attend SeaWorld's parks until the Company changed its business practices, drawing additional nationwide attention to *Blackfish*.

e)   *Blackfish* had sparked enormous opposition to SeaWorld's float at the annual Macy's Thanksgiving Day Parade, as Macy's received more than 80,000 emails urging it to ban SeaWorld from participating in light of *Blackfish*.

f)   Further to ¶¶132-40, above, after viewing *Blackfish*, more and more prominent celebrities took to Twitter to campaign against SeaWorld's parks.  For example, on September 8, 2013, Russell Brand tweeted to his 9.06 million followers:  "Do watch "Black Fish".  Don't go to SeaWorld, a stain upon humanity posing as entertainment…."  On October 28, 2013, Stephen Fry similarly tweeted to his 8.6 million followers:  "Finally watched @Blackfishmovie blackfishmovie.com I hope Seaworld goes out of business.  Horrifying."

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

**D.      December 20, 2013 – Atchison's Statements To The *Orlando Sentinel***

219.   As reported by the *Orlando Sentinel*, on December 20, 2013, Atchison continued to conceal the impact of *Blackfish* on the Company's business and deny the negative publicity the film had spawned.  For example, Atchison stated ***"[a]s much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business***."

220.   In addition to the reasons set forth above in ¶¶210, 216 and 218, Atchison's statement denying the impact of *Blackfish* on the Company's business and attendance as of December 20, 2013 was materially false and misleading because:

    a)   Beginning as early as November 2013, as a direct consequence of *Blackfish*, nearly every act SeaWorld had booked to headline the Company's annual "Bands, Brews & BBQ" concert series in February and March 2014 at the Orlando and Tampa parks cancelled their appearances following the public backlash directed towards SeaWorld due to *Blackfish*.  *See* ¶¶144-49.  These cancellations received significant media attention, including from *The New York Times*, *CNN*, *Orlando Sentinel* and *National Geographic*.

    b)   Beginning as early as December 2013 – as Atchison admitted during the December 20 interview – events such as the artist cancellations forced SeaWorld to launch what *ABC News* and the *Orlando Sentinel* called a "big PR blitz" to attempt to counteract the snowballing *Blackfish* effect.  SeaWorld's efforts included placing full-page ads in the country's largest newspapers and on social media defending SeaWorld's brand.

    c)   By December 2013, *Blackfish* was poised to reach even more viewers, as the film was made available on Netflix.  Moreover, by December 2013, the *Blackfish* effect had continued to spread on social media, particularly through the use of Twitter and online petitions on Change.org or related websites.  As reported by *CNN*, social media sites were "filled with comments from people

102

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

vowing they'll never go to the [SeaWorld-owned] parks again after viewing the film."

d)    In December 2013, SeaWorld again resorted to offering unprecedented discounts as the Company continued to battle negative publicity related to *Blackfish*. For example, SeaWorld turned to Groupon to promote tickets, allowing users to buy as many as ten (10) tickets to SeaWorld Orlando for $59 each – 40% below the basic gate price. During a telecast of Legal View with Ashleigh Banfield on December 19, 2013, Peter Shankman, a CNN Social Medial Consultant, reported that this type of ticket promotion by SeaWorld had "never happened before" and demonstrated the "incredible hit they've taken."

e)    As discussed above in ¶¶132-40, after viewing *Blackfish*, prominent celebrities took to Twitter to campaign against SeaWorld's parks. For example, Arianna Grande, who maintains 24.6 million followers, implored fans to watch the film and boycott SeaWorld: "I highly recommend all of my fans to watch Blackfish and never go to SeaWorld again."

f)    Beginning in December 2013, SeaWorld could no longer utilize its longstanding soundtrack accompanying orca shows at its parks because of public backlash over *Blackfish*. Specifically, Joan Jett issued a cease and desist letter to SeaWorld demanding that the Company no longer use her music – the song "I Love Rock and Roll" – during orca whale shows. After viewing *Blackfish*, Jett wrote that she was "among the millions who saw 'Blackfish' and [was] sickened that [her] music was blasted without [her] permission at sound-sensitive marine mammals."

g)    *Blackfish* prompted numerous schools to either cancel long-standing field trips to SeaWorld's parks or publicly swear off attending the parks until SeaWorld changed its policies. For example, as reported by *CNN*, Point Dume Marine Science Elementary School in Malibu, California canceled its long-standing annual trip to the Company's park over concerns about the treatment of whales as shown in *Blackfish*.

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

h)   *Blackfish* sparked enormous opposition to SeaWorld's float at the annual Macy's Thanksgiving Day Parade.  As reported by CNN on November 25, 2013, an online petition released by PETA asking that the SeaWorld float be removed from the parade received more than 80,000 signatures.  Similarly, prominent celebrities like Alec Baldwin publicly urged Macy's to ban the SeaWorld float.  In an open email to Macy's, Baldwin wrote: "Please don't be a party of SeaWorld's crisis-management plan," as reported by *The New York Times* on November 18, 2013.

i)   As SeaWorld later admitted, SeaWorld sent its employees to pose as animal-rights activists to infiltrate *Blackfish*-related protests.  According to *Bloomberg*, this espionage campaign began as early as November 28, 2013 at the Macy's Thanksgiving Day Parade in 2013.  *See* ¶112.

**E.   March 13, 2014 – 4Q13 And FY 2013 Press Release And Earnings Call**

221.   On March 13, 2014, SeaWorld issued a press release ("4Q13 Press Release") announcing its fourth quarter 2013 results and its results for the year ended December 31, 2013 ("FY 2013") and held the Company's 4Q13 Earnings Call, in which Atchison and Heaney participated on behalf of SeaWorld.

222.   In the 4Q13 Press Release, among other things, the Company reported a decline in both the 4Q13 and full-year attendance.

223.   SeaWorld reported that its 2013 attendance had declined by 4.1%, from 24.4 million guests in 2012 to 23.4 million guests in 2013.  It stated three reasons for this decline – none of which was *Blackfish*:  "The decline was primarily attributable to the expected result of planned pricing and yield management strategies that increased revenue but reduced low yielding and free attendance.  Also contributing to the decline in full year attendance was unexpected adverse weather conditions in the Company's second quarter and July as well as the impact of an early Easter in 2013."

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

224.   With respect to the fourth quarter, SeaWorld reported that "consolidated fourth quarter attendance declined by 1.4% to 4.5 million guests in 2013" and attributed the entire decline to "planned pricing and yield management strategies" the Company had implemented in January 2013:

> The attendance decline was the expected result of planned pricing and yield management strategies implemented at the beginning of 2013. Attendance trends improved sequentially through the year with a 1.4% decline in the fourth quarter compared to a 3.6% decline in the third quarter and a 5.7% decline in the first half of the year.

225.   In addition to the reasons set forth above in ¶¶210, 216, 218 and 220, each of Defendants' statements set forth above in ¶¶223-24 regarding the causes of the decline in SeaWorld's attendance figures was materially false and misleading because:

    a)    According to the 2013 TEA Report and discussed above in ¶¶17-20 and 116-18, nearly all of the major theme park groups with locations in the U.S. – including Disney and Universal – experienced *increases* in full year attendance for 2013 despite many being located in the same geographic market as the Company's SeaWorld Orlando and Busch Gardens Tampa parks and subject to the same calendar as SeaWorld, laying bare the Company's attempt to attribute attendance declines in 2013 to adverse weather and holiday timing.  Specifically, Disney and Universal experienced increases of 4.8% and 5.3%, respectively.

    b)    As reported in the 2013 TEA Report and discussed above in ¶¶17-20 and 116-18, nearly all of the largest *individual* theme parks in the U.S. likewise experienced significant year-over-year attendance increases in 2013, including those located in the same geographic market as SeaWorld.  For example, while SeaWorld's parks in Orlando and San Diego experienced a 5% and 3% year-over-year loss in attendance, respectively, Disney's Magic Kingdom, Epcot, Animal Kingdom and California Adventures realized gains in year-over-year attendance of 6.0%, 1.5%, 2.0%

105

and 9.5%, respectively.  Universal Studio's parks in Florida and Hollywood, California similarly experienced year-over-year increases in attendance of 14% and 4%, respectively.

c)   By the first quarter of 2014, there were more than two dozen *Blackfish*-related petitions on Change.org, including one petition asking country singer and American Idol winner Scotty McCreery to cancel a March 1, 2014 show that collected nearly 30,000 signatures.

d)   During 4Q13, prominent sponsors – some of which the Company specifically identified within Class Period filings with the SEC – were under public pressure to terminate long-standing partnerships with SeaWorld, as discussed above in ¶¶150-58 and by CW-1.

e)   As the *Seattle Post-Intelligencer* reported on January 24, 2014, "SeaWorld has spent a considerable amount of money and energy lately trying to undermine and deflect the effectiveness of the film Blackfish, but they are unable to make much progress – it just isn't possible to rewrite history in this age of independent media."

226.   During the 4Q13 Earnings Call, Defendants continued to omit material facts concerning the impact of *Blackfish* on park attendance.  For example, in explaining why 4Q13 attendance had fallen by 1.4%, Heaney stated that the decline was caused by "planned pricing and yield management strategies." Addressing the full 2013 attendance decline, Heaney explained that such decline was caused both by pricing strategies and bad weather.

227.   Each of Heaney's statements set forth above in ¶226 regarding the causes of the decline in SeaWorld's attendance figures was materially false and misleading for the reasons set forth above in ¶¶210, 216, 218, 220 and 225.

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

228.   During the 4Q13 Earnings Call, an FBR Capital Markets analyst Barton Crocket specifically pressed Defendants on whether *Blackfish* had had any impact whatsoever on SeaWorld, including attendance:

> Then if I could switch gears to get you to touch on the big thing that has been in the media.  Obviously, the animal activism discussion from the documentary, from legislation, from bands making statements – it's been in the news.  And if you have a fair response to that, in terms of it being unfair, given everything you guys do to help conservation and make that part of your brand.  ***But leaving aside the fairness of it, I was just wondering if you could comment on whether there's any impact that you've noticed at all on satisfaction or attendance or the desirability of SeaWorld for international licensees?  Has this had any impact on any of that***?

229.   In response, Atchison stated in no uncertain terms that the Company had "***seen no impact on the business***" stemming from *Blackfish* and that surveys conducted by the Company did not "***reflect any shift in sentiment about intent to visit [SeaWorld's] parks***" as a result of *Blackfish*.  In fact, Atchison boldly claimed just the opposite – that *Blackfish* was ***positively impacting SeaWorld*** by increasing interest in the park and its wildlife.  Specifically, Atchison assured investors that:

> With respect to the impact on our business, I get asked that a lot, too.  ***As much as we're asked it, we can see no noticeable impact on our business***.  If you follow this -- even this recent announcement, our SeaWorld parks had record attendance in the fourth quarter of the year, and are out-performing our other parks by considerable margin.
>
> ***
>
> With respect to national surveys and data that we collect around our reputation efforts and image, there's awareness of the movie that kind of peaks and drops as CNN -- who is one of the owners of the movie, by the way -- CNN shows it repeatedly from time to time, so that does

spike on occasion. ***But our surveys don't reflect any shift in sentiment about intent to visit our parks***.

***

A matter of fact, the movie in some ways has actually made perhaps more interest in marine mammal parks, and actually even about us. We have seen that reflected through certain visitor profiles, and certain guest comments and things we get. The movie did not get an Oscar nomination in January, and we continue to take proactive efforts around communicating with our guests and business partners and others.

***

But ultimately the assertions by the animal rights, animal activist community -- they don't necessarily burden themselves with fact, and we have to deal with that from time to time. ***But we have seen no impact on the business***.

230. In addition to the reasons set forth above in ¶¶210, 216, 218, 220 and 225, each of Atchison's statements set forth above in ¶229, which outright denied the impact *Blackfish* was having on SeaWorld's attendance figures and business as of March 13, 2014, was materially false and misleading because:

    a)    PETA was actively campaigning against the Company on the national stage in light of the mistreatment of animals depicted by *Blackfish*, including by staging demonstrations at prominent events such as the January 1, 2014 Rose Parade.

    b)    Recognizing the impact of *Blackfish* on the public's willingness to attend the SeaWorld's parks, the Company attempted to manipulate the results of a January 2014 public poll conducted by the *Orlando Sentinel*, which asked whether "CNN's 'Blackfish' [sic] documentary changes your perception of SeaWorld." *See* ¶¶141-42.

    c)    As SeaWorld reports in its SEC filings, "[a]pproximately two-thirds of the Company's attendance and revenues are generated in

108

the second and third quarters of the year." SeaWorld reported 4.5 million guests as its total attendance at all its parks in 4Q13, which only equated to roughly one-sixth of the total attendance (23.391 million) that SeaWorld reported for FY 2013. Therefore, the assertion that "SeaWorld parks had record attendance" created a misguided and disproportional impression on investors.

d)      Despite claiming that SeaWorld-branded parks "are out-performing our other parks by considerable margin[,]" Defendants failed to mention that many of the non-SeaWorld branded parks were partially or entirely *closed during 4Q13*. Specifically, according to SeaWorld's SEC filings, all of the following parks are closed for all or some of the winter quarter: (i) Aquatica Orlando (Season: May – September); (ii) Water Country USA (Season: May – September); (iii) Adventure Island (Season: March – October); (iv) Busch Gardens Virginia (Season: March – October; December); and (v) Sesame Place (Season: May – October; December).

e)      Atchison provided no detail to support the basis of his claim that SeaWorld-branded parks experienced "record attendance." And, SeaWorld admittedly does not disclose the attendance figures for its individual parks to investors or the public, leaving investors with no way of verifying Atchison's remarks.

**F.      May 14, 2014 – 1Q14 Form-10Q, Press Release And Earnings Call**

231.    On May 14, 2014, SeaWorld:  (i) filed with the SEC the Company's 1Q14 Form 10-Q, which was signed by Heaney and Swanson; (ii) issued a press release announcing its first quarter 2014 financial results ("1Q14 Press Release"); and (iii) held the Company's 1Q14 Earnings Call, in which Atchison and Heaney participated on behalf of SeaWorld.

232.    In the 1Q14 Press Release and 1Q14 Form 10-Q, among other things, SeaWorld reported a staggering *13% decrease in attendance for the first quarter 2014*, which the Company attributed to factors other than *Blackfish*:

109

Attendance in the first quarter was impacted by a shift in the timing of Easter into the second quarter of 2014, which caused a shift in the Spring Break holiday period for schools in many of the Company's key source markets.   Attendance was also impacted by adverse weather, particularly above average precipitation in the Florida market as well as below average temperatures in the Texas market for the first quarter of 2014.

233.   During the 1Q14 Earnings Call, Heaney echoed the representations in the Company's 1Q14 Press Release, claiming "[t]he shortfall in attendance is attributable to the shift of Easter and spring break into the second quarter, as well as adverse weather and fewer operating days in 2014.  Prior years where Easter was in late April, the Company experienced a similar shift in first-quarter attendance."

234.   In addition to the reasons set forth above in ¶¶210, 216, 218, 220, 225 and 230, each of Defendants' statements set forth above in ¶¶232-33 regarding the causes of the *13%* decline in SeaWorld's attendance figures was materially false and misleading because:

    a)    *Blackfish* had inspired a proposed bill, which could devastate SeaWorld's business model.   On March 7, 2014, California Assemblyman Richard Bloom introduced the Orca Welfare and Safety Act, which would ban SeaWorld's San Diego park from featuring orcas in entertainment performances and from breeding, importing and exporting orcas.  *See* ¶¶159-62.  National media uniformly tied this bill directly to *Blackfish*.  For example, *USA Today* reported the bill to be "a result of details revealed in the movie *Blackfish*."

    b)    Regardless of whether Defendants could precisely quantify the impact of *Blackfish* on attendance as of 1Q14, it was clear that it was having some negative impact, as evidenced by Atchison's comments concerning the impact of the *Blackfish*-inspired killer whale legislation.  Specifically, as Atchison admitted during the Company's August 12, 2014 second quarter earnings conference

110

call ("2Q14 Earnings Call"), in May the Company was "still grappling with what impact there would be related to the news attention around the legislation.  So I'm not sure that we had a clear view...."  Despite the fact that *Blackfish* had been plaguing the Company for over a year and a half, Atchison claimed that in May 2014 Defendants thought "it was too early to call and tell what kind of impact" *Blackfish* may have.  Given this uncertainly, Defendants could not reasonable reject *Blackfish* as a cause of SeaWorld's attendance decline. Indeed, Atchison conceded that SeaWorld should have responded to *Blackfish* earlier in an August 20, 2014 interview with the *Orlando Sentinel*. *See* ¶176. Undoubtedly, SeaWorld was on notice and aware that *Blackfish* was impacting its business long before it finally admitted such on August 13, 2014.  However, SeaWorld's chosen strategy was to ignore *Blackfish* and deny its credibility—both to the public and investors

    c)    While Defendants blamed adverse weather conditions and the shift of Easter and spring break into the second quarter for the decline in SeaWorld's attendance figures, Disney and Universal – both of which were subject to the same "adverse weather" conditions and shifts in holiday and school calendars – reported comparable (Universal) or record (Disney) attendance figures for 1Q14.  For instance, Disney reported a 3% increase in attendance at its domestic parks for the quarter.  *See* ¶¶115-24.

## VI.  ADDITIONAL SCIENTER ALLEGATIONS

### A.  Defendants' Actual Knowledge Of And/Or Reckless Disregard For Material Facts Contrary To Their Public Statements

235.  As alleged herein, SeaWorld and the Individual Defendants acted with scienter in that each Defendant:  (i) knew or recklessly disregarded that the public statements or documents issued or disseminated in the name of the Company (or in their own name) were materially false and misleading when made; (ii) knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  SeaWorld and the Individual Defendants by virtue of their receipt of information reflecting the true facts regarding SeaWorld, and their control over, receipt and/or modification of SeaWorld's materially misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

236.   As alleged herein, numerous facts support a strong inference that, during the Class Period, SeaWorld and the Individual Defendants knew or recklessly disregarded the false and misleading nature of information that they caused to be disseminated to the investing public, which artificially inflated the trading prices of the Company's common stock during the Class Period.  The misrepresentations and omissions of material fact alleged herein concerning:  (i) the then-existing impact (or purported lack thereof) of *Blackfish* on SeaWorld's attendance, brand and reputation; and (ii) the cause of the decline in the Company's attendance figures on a quarterly and year-end basis, could not have been made during the Class Period without the knowledge and complicity or reckless disregard of the personnel at the highest levels of the Company, including Atchison, Heaney and Swanson.  The nature of these facts is of such prominence to investors that it would be absurd to suggest that management was without knowledge of the underlying matters.

237.   The Individual Defendants, because of their positions with SeaWorld, controlled the contents of the Company's public statements during the Class Period.  In this regard, each was provided with, or had access to, copies of the documents alleged herein to be false and/or misleading prior to or shortly after, their issuance, had access to the data underlying the representations therein and had the ability and opportunity to prevent the materially false and misleading statements from being

made and/or to cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were materially false, misleading, and incomplete.  As a result, the Individual Defendants are responsible for the accuracy of SeaWorld's corporate statements, and each is therefore responsible and liable for the representations contained therein and/or omitted therefrom.

238.   SeaWorld knowingly and/or recklessly made the materially false and/or misleading statements and omissions of material fact alleged herein based on the fact that Atchison, Heaney and Swanson, the Company's CEO, CFO, and CAO throughout the Class Period, knew and/or recklessly disregarded that the Company's statements were materially false and/or misleading, and/or omitted material facts at the times that such statements were made.  Each of these Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management, and their knowledge may be imputed to the Company.

239.   Further contributing to a strong inference of scienter, the fraud alleged herein concerns the very core of SeaWorld's operations – park attendance – the Company's key proxy for the success and stability of its business operations.  Indeed, SeaWorld represented to investors in public filings that:  (i) its revenues are "driven primarily by attendance," as approximately 63% of SeaWorld's 2013 revenue came from selling admission tickets; (ii) the Company's entire growth strategy revolves around "increas[ing] [the Company's] existing theme park revenues through strategies designed to drive higher attendance and increase in-park per capita

spending"; and (iii) reductions in attendance "can materially adversely affect [SeaWorld's] business, financial condition and results of operations."

240.   Thus, as SeaWorld's top officers, the Individual Defendants controlled the Company's day-to-day operations and were informed of and responsible for monitoring important developments concerning attendance.  Indeed, throughout the Class Period, Atchison and Heaney were among those responsible for making specific communications to analysts and the press in response to specific questions concerning the Company's attendance, the purported causes of its decline and the impact of *Blackfish* on the Company's operations.  In each instance, Defendants affirmatively and conclusively denied that *Blackfish* had or was having any impact whatsoever on the Company.  In doing so, Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public, which artificially inflated the trading prices of the Company's common stock during the Class Period.

241.   Statements made by SeaWorld and the Individual Defendants strongly suggest each had access to the disputed information, and the total mix of allegations makes such a conclusion irrefutable.  Indeed, on the basis of these facts, it would be absurd to suggest that these Defendants did not have knowledge of the information contradicting their public statements.

242.   With this in mind, the vast majority of Defendants' material misrepresentations and omissions, explicitly or implicitly, denied that *Blackfish* had had or was having any impact whatsoever on attendance.  These statements could not have been made with any reasonable basis in fact, as Atchison in large part confirmed himself during the 2Q14 Earnings Call and in post-Class Period interviews.

243.   The scienter of SeaWorld and the Individual Defendants also can be inferred from the fact that the fraud here concerns materially false and misleading statements and omissions intended to conceal the impact of *Blackfish* on the Company's brand and reputation.   *Blackfish* attacked the single most important component of SeaWorld's brand – its treatment of orcas.   In this regard, the Company's efforts to maintain the public's perception of the Company had developed into another "core operation" by the beginning of the Class Period, requiring constant oversight on a day-to-day basis.  In light of the significant, public nature of the potential threat to the Company arising from *Blackfish*, it is unlikely that top management was unaware of facts undermining any purported belief or representation concerning the film's impact.

244.   In addition to the duties of full disclosure imposed on SeaWorld and the Individual Defendants as a result of making affirmative statements and reports to the investing public, these Defendants also had a duty to disclose information required to update and/or correct their prior misstatements and/or omissions, and to update any statements or omissions that had been become false or misleading as a resulting of intervening events.  Further, these Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01, *et seq*.) and Regulation S-K (17 C.F.R. Section 29.10, *et seq*.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information. Atchison and Heaney also had duties under the Sarbanes-Oxley Act of 2002 to ensure that SeaWorld's Forms 10-Q and 10-K filed with the SEC did not misrepresent or

omit any material facts.  Both Atchison and Heaney certified that SeaWorld's Forms 10-Q and 10-K issued during the Class Period "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" with respect to the periods covered by those filings.

245.   The following facts also support a strong inference of Defendants' scienter:

a)   SeaWorld's decision to remove Atchison as CEO after the Class Period, as discussed above in ¶¶187-89 and 206-07.

b)   SeaWorld was both aware of and took affirmative steps to counteract the strong anti-SeaWorld sentiment on numerous social media platforms following *Blackfish*, including by establishing project or "war" rooms and groups responsible for real-time responses to such sentiment, as stated by CW-1.

c)   According to CW-1, SeaWorld's brand-specific hashtags, created for its followers, were being hijacked by activists and coupled with *Blackfish*-inspired attacks on SeaWorld, ensuring that the *Blackfish* effect would continue to intensify.

d)   According to CW-3, SeaWorld's Finance Department made accessible to mid- and high-level management SeaWorld's Daily Attendance Budget via a shared network.  CW-3 believed that Atchison, as the CEO of the Company, would have access to similar data on a daily basis.  During the time period after CNN aired *Blackfish* and before the new fiscal year, SeaWorld revised the Daily Attendance Budget, and did so again during 2014.  CW-3 believed the Daily Attendance Budget was revised as a result of declining attendance due, at least in part, to *Blackfish*.  According to CW-4, the Daily Attendance Budget was also a key attendance-based forecasting tool, as discussed above in ¶46.

e)   According to CW-3, SeaWorld armed employees with literature and instructions on how to handle any incidents or inquiries tied

116

to *Blackfish*. According to CW-2, SeaWorld executives circulated an email to employees directing them not to engage in discussion about *Blackfish* with customers. According to Sarah Fischbeck, SeaWorld "actually had a collective meeting before [*Blackfish*] came out telling [SeaWorld employees] to say it was fake," and SeaWorld was "feeding [its employees] lines," and instructing them to dissuade family and friends from seeing the film.

      f)    According to CW-2, CW-3 and CW-4, SeaWorld held an ECM every month at parks for all employees. At such meetings, attendance and *Blackfish* were discussed. CW-2 stated that Atchison attended one such meeting at the San Antonio and specifically discussed *Blackfish*, declaring that the negativity towards SeaWorld arising from the film would go away. CW-4 stated that the San Diego park would typically try and schedule such meetings when Atchison was in town and could attend.

## B. Motive And Opportunity – Insider Selling By CEO Atchison

246. During the Class Period, Defendants were also motivated to artificially inflate SeaWorld's stock price during the Class Period in order to benefit their own personal financial situation with the proceeds from insider stock sales.

247. Atchison in particular disposed of a substantial portion of his personal holdings in SeaWorld common stock in eight sales between December 2, 2013 and March 6, 2014, while in possession of material inside information concerning the enduring impact *Blackfish* was having on the Company's attendance. He sold all of this stock prior to the disclosure of the Company's year-end 2013 and 4Q13 results, which showed the Company's continuing attendance declines. The Company's stock price would not again (during the Class Period) reach the levels at which Atchison sold his personal holdings in March 2014. And only five months later, Atchison would admit that the Company's attendance was harmed by *Blackfish* and that in

1  March and April 2014 the Company had struggled to understand how the "*Blackfish*

2  *Bill*" would impact its attendance and revenues.

3       248.   In this regard, according to Forms 4 filed with the SEC, Atchison made

4  eight Class Period sales of his personal holdings of SeaWorld common stock, selling

5  a total of ***154,000 shares***, for proceeds of ***$4,662,235.37***, between December 2, 2013

6  and March 6, 2014, as reflected in the table below:

| Date | Number of Shares | Weighted Avg. Price | Proceeds |
|---|---|---|---|
| 12/2/2013 | 28,300 | $29.9148 | $846,588.84 |
| 12/3/2013 | 16,821 | $29.6883 | $499,386.89 |
| 12/4/2013 | 4,879 | $29.727 | $145,038 |
| 1/2/2014 | 50,000 | $29.0736 | $1,453,680 |
| 2/3/2014 | 45,100 | $31.5052 | $1,420,884.52 |
| 2/3/2014 | 4,900 | $31.9523 | $156,566.27 |
| 3/5/2014 | 2,196 | $35.0321 | $76,892.94 |
| 3/6/2014 | 1,804 | $35.0321 | $63,197.91 |
| **Totals** | **154,000** | | **$4,662,235.37** |

16       249.   These sales were suspicious as to amount and/or size because of the

17  gross amount of proceeds they generated, which dwarfed Atchison's total 2013

18  compensation (as disclosed by the Company) of $2,552,000, and also because they

19  disposed of ***20%*** of Atchison's total holdings of SeaWorld common stock, even when

20  including for calculation purposes not only vested common stock, but also unvested

21  and restricted common stock.

22       250.   The foregoing tightly-clustered sales were suspiciously timed in that

23  they were Atchison's only sales during the entire Class Period, they occurred within a

24  brief, discrete time window, and prior to the Company's disclosure of its full 2013

25  and 4Q13 performance, including attendance declines that were not in keeping with

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

what any other large domestic theme park reported, and because SeaWorld's common stock price traded at its highest level during all of 2014 on March 6, 2014, when Atchison made his final sale.

251. Further, Atchison's Forms 4 indicate that each of the foregoing trades was made pursuant to a Rule 10b5-1 trading plan. The Company has not disclosed any facts about Atchison's Rule 10b5-1 trading plan (or plans) in effect during the Class Period. Rather, the Company stated in its 2013 10-K that it does "not undertake any obligation to disclose, or to update or revise any disclosure regarding, any such plans and specifically do not undertake to disclose the adoption, amendment, termination or expiration of any such plans." Thus pertinent facts, such as when Atchison entered into the plan or plans under which he made the foregoing trades, are not available because they have not been publicly disclosed. However, to the extent Atchison entered into the applicable trading plan or plans during the Class Period, this, too, would support a finding of scienter.

## VII.  LOSS CAUSATION

252. Defendants' alleged unlawful conduct directly caused the losses incurred by Plaintiffs and the Class. Throughout the Class Period, the prices of SeaWorld common stock were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions regarding the purported non-effect of *Blackfish* on the Company's attendance, and thus, revenues. The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public. The true facts became known for the first time by investors and the market through a corrective disclosure on August 13, 2014.

253. When the true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of SeaWorld

119

1   common stock declined immediately and precipitously as the artificial inflation was
2   removed from the market price of the stock, causing substantial damage to Plaintiffs
3   and the members of the Class.

4       254.   On August 13, 2014, on its 2Q14 Earnings Call and in the 2Q14 Press
5   Release, SeaWorld announced surprisingly poor results for the second quarter and
6   first half of the year, with earnings of 43 cents a share – well below the consensus
7   analyst estimate of 59 cents a share – and slashed its prior 2014 revenue guidance
8   from between $1.49 billion and $1.52 billion to between $1.36 billion and $1.37
9   billion.  The Company made clear in its press release that the primary driver for its
10  disappointing second quarter and first half 2014 earnings was a "decline in
11  attendance" of 4.3% in the first half of 2014 (versus the first half of 2013).  Critically,
12  it acknowledged, for the first time, that attendance at its parks had been negatively
13  affected by the public response to *Blackfish* – specifically, what the Company termed
14  "demand pressures related to recent media attention surrounding proposed legislation
15  in the state of California."

16      255.   After the August 13, 2014 disclosure by the Company, shares of
17  SeaWorld common stock fell by a staggering $9.25, or 32.9%, from $28.15 per share
18  at the close on August 12, 2014 to $18.90 per share at the close on August 13, on
19  extremely heavy volume.

20      256.   As confirmed by industry, financial and business press articles and the
21  2Q14 Earnings Call:  (i) the Company's reference to "demand pressures" from
22  "proposed legislation" referred to the so-called "*Blackfish* bill" put forward by a
23  California Assemblyman in March 2014; and (ii) the August 13, 2014 statements
24  marked the first time that the Company had admitted that *Blackfish*-related issues
25  were hurting attendance and the Company's revenues, both current and going

26
27

1    forward.   These admissions were reported widely as notable new disclosures that

2    underlay the sharp August 13, 2014 stock price decline.  *See* ¶¶163-75.

3          257.   For example, on August 13, 2014, the *Wall Street Journal*'s online site,

4    *WSJ Blog*, reported that SeaWorld's stock price was declining after the Company had

5    "blamed" its "disappointing second-quarter results" and lowered revenue guidance on

6    "the recent media debate about its treatment of captive orcas, saying the negative

7    attention has hurt attendance."  The report noted "the controversy was sparked last

8    year in the wake of *Blackfish*," and explained that the Company's reference to

9    "demand pressures related to recent media attention surrounding proposed

10    legislation" that hurt attendance was a reference to the California bill proposed in

11    March 2014 (*see* ¶¶159-62, *supra*), which "aim[ed] to restrict SeaWorld's ability to

12    showcase some animals in that state."

13          258.   The report described SeaWorld's admission that *Blackfish*-related issues

14    were hurting attendance and thus, revenues, as "***an about face for SeaWorld***," citing

15    Atchison's prior statements that *Blackfish* had "had no impact on our business."

16          259.   Other financial press outlets also reported that, in SeaWorld's August

17    13, 2014 public disclosures that preceded the stock price decline that day, SeaWorld

18    had blamed its attendance decline on the *Blackfish* effect.  For example, the *Financial*

19    *Times* reported on August 13, 2014 that "this quarter marks ***the first time***

20    management has mentioned *Blackfish*-related issues in its earnings results."

21          260.   The *Los Angeles Times* reported on August 14, 2014 that the Company's

22    attendance-driven revenue miss preceded this price decline:  "[s]hares of SeaWorld

23    Entertainment Inc. plunged 33% on Wednesday after the company's earnings missed

24    Wall Street expectations.  The Orlando, Fla.-based company also conceded for the

25    first time that attendance at its theme parks has been hurt by negative publicity

26

27

1  concerning accusations by animal-rights activists that SeaWorld mistreats killer
2  whales," publicity which, according to the article, followed *Blackfish*.

3  261. Similarly, the *Washington Post* reported on August 14, 2014, in an
4  article headlined, "*Blackfish' Takes Its Toll: SeaWorld Shares Take A Nose-Dive*"
5  that SeaWorld "acknowledged ***for the first time*** Wednesday the fallout that followed
6  the film's release, admitting attendance issues in San Diego." And the *Orlando*
7  *Sentinel* reported on August 14, 2014 that "Wednesday was ***the first time*** SeaWorld
8  had acknowledged that controversy about its whales had taken a toll on attendance."

9  262. Discussion that occurred during the Company's 2Q14 Earnings Call
10  further confirms that the reference to "demand pressures" from "proposed
11  legislation" was in fact a reference to the so-called "*Blackfish* bill" introduced in
12  March 2014, as discussed above in ¶¶159-62.

13  263. It was foreseeable to SeaWorld and the Individual Defendants that
14  concealing from investors the actual and reasonably forecast impact that negative
15  publicity from *Blackfish* was having on attendance at the Company's parks and
16  SeaWorld's brand and reputation, would artificially inflate the price of SeaWorld
17  common stock during the Class Period. It was similarly foreseeable that the ultimate
18  disclosure of the concealed information would cause the price of SeaWorld common
19  stock to drop significantly as the inflation caused by earlier misstatements was
20  removed from the stock by the corrective disclosure set forth herein.

21  264. Accordingly, the conduct of these Defendants as alleged herein
22  proximately caused foreseeable losses under the Exchange Act to Plaintiffs and
23  members of the Class.

24
25
26
27

## VIII.  PLAINTIFFS AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

265.   At all relevant times, the market for SeaWorld's common stock was open and efficient for the following reasons, among others:

a)   SeaWorld's common stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient electronic stock market;

b)   As a registered and regulated issuer of securities, SeaWorld filed periodic public reports with the SEC;

c)   SeaWorld regularly communicated with public investors via established market communication mechanisms, including regularly disseminating press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as conference calls with analysts and investors and other communications with the financial press and other similar reporting services; and

d)   SeaWorld was followed by securities analysts employed by major brokerage firms, including Wells Fargo Securities, LLC, FBR Capital Markets, and Macquarie Research, which authored reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

266.   As a result of the foregoing, the market for SeaWorld's common stock promptly digested current information regarding the Company from all publicly available sources, and the prices of SeaWorld common stock reflected such information.   Based upon the materially false and misleading statements and omissions of material fact alleged herein, SeaWorld common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and all other members of the Class purchased SeaWorld common stock relying upon the integrity of the market price of SeaWorld common stock and other market information relating to SeaWorld.

123

267.   Under these circumstances, all Class members suffered similar injuries through their purchases and/or acquisitions of SeaWorld common stock at artificially inflated prices, and the presumption of reliance under the fraud-on-the-market doctrine applies.

268.   Further, at all relevant times, Plaintiffs and the other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Plaintiffs and the other members of the Class would not have purchased or otherwise acquired SeaWorld common stock at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its operations, Plaintiffs and the other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972) ("*Affiliated Ute*").

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

269.   The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

270.   None of the statements complained of herein was a forward-looking statement.  Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

271.   To the extent that any materially false and/or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the

124

1  statement.  As set forth above in detail, given the then-existing facts contradicting
2  Defendants' statements, the generalized risk disclosures made by Defendants were
3  not sufficient to insulate Defendants from liability for their materially false and
4  misleading statements.

5      272.  To the extent that the statutory safe harbor may apply to any materially
6  false and/or misleading statement alleged herein, or a portion thereof, Defendants are
7  liable for any such false and/or misleading forward-looking statement because at the
8  time such statement was made, the speaker actually knew the statement was false, or
9  the statement was authorized and/or approved by an executive officer of SeaWorld
10  who actually knew that the statement was false.

11      273.  Moreover, to the extent that Defendants issued any disclosures
12  purportedly designed to "warn" or "caution" investors of certain "risks," those
13  disclosures were also materially false and/or misleading because they did not disclose
14  that the risks that were the subject of such warnings had already materialized and/or
15  because Defendants SeaWorld, Atchison, Heaney and Swanson had actual
16  knowledge of existing, but undisclosed, material adverse facts that rendered such
17  "cautionary" disclosures materially false and/or misleading.

18  **X.  CLASS ACTION ALLEGATIONS**

19      274.  Plaintiffs bring this action as a class action pursuant to Federal Rules of
20  Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class, consisting of
21  all persons and entities who:  (i) purchased or otherwise acquired the publicly traded
22  common stock of SeaWorld between August 29, 2013 and August 13, 2014.
23  Excluded from the Class are:  (i) Defendants; (ii) present or former executive officers
24  of SeaWorld, members of SeaWorld's Board of Directors, and members of their
25  immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and
26
27

(1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors or assigns; and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of SeaWorld.

275.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery from Defendants, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class.  Members of the Class may be identified from records maintained by SeaWorld or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

276.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

277.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

278.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

     a)   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

     b)   whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts

126

about the business, operations, and management of the Company; and

    c)    to what extent the members of the Class have sustained damages, and the proper measure of damages.

279.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.  CAUSES OF ACTION

### COUNT I
### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b(5) Promulgated Thereunder
### (Against SeaWorld and the Individual Defendants)

280.  Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This claim is brought against SeaWorld and the Individual Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, by Plaintiffs on behalf of themselves and all other members of the Class.

281.  During the Class Period, SeaWorld and the Individual Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to knowingly and/or recklessly make and/or approve the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs and the other Class members; (ii) artificially inflate and/or maintain the market price of SeaWorld's common stock; and (iii) cause Plaintiffs and the other members of the

127

1    Class to purchase or otherwise acquire SeaWorld common stock at artificially
2    inflated prices.  In furtherance of their unlawful scheme, plan, and course of conduct,
3    SeaWorld and the Individual Defendants took the actions alleged herein.

4          282.  While in possession of material adverse non-public information,
5    SeaWorld and the Individual Defendants, individually and in concert, directly and
6    indirectly, by the use of means and instrumentalities of interstate commerce, the U.S.
7    mails, and the facilities of a national securities exchange:  (i) employed devices,
8    schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or
9    failed to disclose material facts necessary to make the statements that they made not
10   misleading; and (iii) engaged in acts, practices, and a course of business that operated
11   as a fraud and deceit upon the purchasers of the Company's common stock in an
12   effort to maintain artificially high market prices for SeaWorld common stock, in
13   violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
14   thereunder.  As alleged herein, the material misrepresentations contained in, or the
15   material facts omitted from, these Defendants' public statements included, but were
16   not limited to, materially false and/or misleading representations and omissions
17   during the Class Period regarding the impact (or purported lack thereof) of *Blackfish*
18   and the negative publicity created by the film on the Company's business and
19   attendance.  SeaWorld and the Individual Defendants are sued as primary participants
20   in the wrongful conduct alleged herein.

21         283.  By virtue of their high-level positions at the Company during the Class
22   Period, the Individual Defendants were authorized to make public statements, and
23   made public statements during the Class Period on SeaWorld's behalf.   These
24   Defendants also were privy to and participated in the creation, development, and
25   issuance of the materially false and misleading statements alleged herein, and/or were

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

aware of the Company's and their own dissemination of information to the investing public that they either knew, or recklessly disregarded, was materially false and misleading.

284.   In addition to the duties of full disclosure imposed on SeaWorld and the Individual Defendants as a result of making affirmative statements and reports to the investing public, these Defendants also had a duty to disclose information required to update and/or correct their prior misstatements and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events.  Further, SeaWorld and the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01, *et seq*.) and Regulation S-K (17 C.F.R. Section 229.10, *et seq*.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information.  Atchison and Heaney also had duties under the Sarbanes-Oxley Act of 2002 to ensure that SeaWorld's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

285.   SeaWorld and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  These Defendants' material misrepresentations and omissions were done knowingly or recklessly, and for the purpose and effect of concealing the truth with respect to SeaWorld's

1    operations, business, performance, and prospects from the investing public and

2    supporting the artificially inflated price of its common stock.

3         286.   The dissemination of the materially false and misleading information

4    and failure to disclose material facts, as set forth above, artificially inflated the

5    market price of SeaWorld's common stock during the Class Period.  In ignorance of

6    the fact that the market prices of SeaWorld's common stock were artificially inflated,

7    and relying directly or indirectly on the materially false and misleading statements

8    made by SeaWorld and the Individual Defendants, and on the efficiency and integrity

9    of the market in which the Company's common stock trades, or on the absence of

10   material adverse information that was known to or recklessly disregarded by

11   SeaWorld and the Individual Defendants but not disclosed in public statements by

12   these Defendants during the Class Period, Plaintiffs and the other members of the

13   Class purchased SeaWorld's common stock during the Class Period at artificially

14   inflated prices.  As the previously misrepresented and/or concealed material facts

15   eventually emerged, the price of SeaWorld's common stock substantially declined.

16        287.   At the time of the material misrepresentations and omissions alleged

17   herein, Plaintiffs and the other members of the Class were ignorant of their falsity,

18   and believed them to be true.  Had Plaintiffs and the other members of the Class

19   known the truth with respect to the business, operations, performance, and prospects

20   of SeaWorld, which was misrepresented and/or concealed by SeaWorld and the

21   Individual Defendants, Plaintiffs and the other members of the Class would not have

22   purchased SeaWorld's common stock, or if they had purchased such stock, would not

23   have done so at the artificially inflated prices that they paid.

24

25

26

27

288. By virtue of the foregoing, SeaWorld, Atchison and the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II
### For Violations Of Section 20(a) Of The Exchange Act
### (Against the Individual Defendants and Blackstone)

289. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Claim is brought against the Individual Defendants and Blackstone pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a) by Plaintiffs on behalf of themselves and all other members of the Class.

290. During the Class Period, the Individual Defendants were senior executive officers of SeaWorld and were privy to, and monitored, confidential and proprietary information concerning SeaWorld, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

291. Because of their high-level positions at SeaWorld, the Individual Defendants had regular access to non-public information about its business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to him or her in connection therewith.

292. The Individual Defendants acted in concert and each was a controlling person of SeaWorld within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions, participation in the Company's

day-to-day operations, and knowledge of the statements filed by the Company with the SEC and other statements disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the various statements Plaintiffs allege were materially false and misleading and/or omitted material facts.  The Individual Defendants were each provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after those statements were issued, and each had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

293.  In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

294.  Blackstone owned a majority of the voting power of all outstanding shares of the Company's common stock at the time of the filing of the IPO Offering Materials, such that SeaWorld was a "controlled company" within the meaning of the corporate governance standards of the New York Stock Exchange.

295.  As set forth above, the Individual Defendants and SeaWorld violated Section 10(b) and Rule 10b-5 by making or causing to be made the materially false and misleading statements and omissions of material fact alleged herein.  By virtue of their participation in the underlying violations of Section 10(b) and Rule 10b-5, Blackstone and the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful

conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of the Company's common stock during the Class Period.

## XII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

a)   Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d)   Awarding all equitable and other relief as the Court may deem just and proper.

## XIII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all triable claims and issues.

Dated:  May 31, 2016                    Respectfully Submitted,

**KIRBY NOONAN**
**LANCE & HOGE LLP**

__/s/ Ethan T. Boyer_____
David J. Noonan (Bar No. 55966)
Ethan T. Boyer (Bar No. 173959)
350 10th Avenue, Suite 1300
San Diego, California 92101

133

Tel: (619) 231-8666
Fax: (619) 231-9593
dnoonan@knlh.com
eboyer@knlh.com

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Eric L. Zagar (Bar No. 250519)
Joshua E. D'Ancona
Joshua A. Materese
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com
jdancona@ktmc.com
jmaterese@ktmc.com

**NIX, PATTERSON**
**& ROACH, LLP**
Jeffrey J. Angelovich
Bradley E. Beckworth
3600 N. Capital of Texas Hwy.,
Suite 350
Austin, TX 78746
Tel: (512) 328-5333
Fax: (512) 328-5332
jangelovich@npraustin.com
bbeckworth@nixlawfirm.com

-and-

Susan Whatley
205 Linda Drive
Daingerfield, TX 75638
Tel: (903) 645-7333
Fax: (903) 645-4415
susanwhatley@nixlawfirm.com

134

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Jeffrey A. Almeida
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8505
Fax: (646) 722-8501
jeisenhofer@gelaw.com
jalmeida@gelaw.com

*Counsel for Additional Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system.  Based upon the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Timothy Gordon Blood | tblood@bholaw.com |
| Chet A Kronenberg | ckronenberg@stblaw.com |
| Jeffrey Almeida | jalmeida@gelaw.com |
| Bradley E. Beckworth | bbeckworth@nixlawfirm.com |
| Jeffrey J. Angelovich | jangelovich@npraustin.com |
| Susan Whatley | susanwhatley@nixlawfirm.com |
| Laurence M. Rosen | lrosen@rosenlegal.com |
| Jonathan Youngwood | jyoungwood@stblaw.com |
| Joshua E. D'Ancona | jdancona@ktmc.com |
| Joshua A. Materese | jmaterese@ktmc.com |

1         I certify under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct

3

4    DATED:  May 31, 2016                    /s/ Ethan T. Boyer

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Second Amended Consolidated Class Action Complaint
Case No. 14-cv-2129