# Exhibit 18

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF CALIFORNIA
 3                       - - -
       LOU BAKER, individually   : CASE NO.
 4     and on behalf of all      : 3:14-cv-2129-MMA-AGS
       others similarly          :
 5     situated,                 :
              Plaintiff,          :
 6                               :
              -against-           :
 7                               :
       SEAWORLD ENTERTAINMENT,   :
 8     INC., et al.,             :
              Defendants.         :
 9                       - - -
10
11                  July 20, 2017
12                       - - -
13           Videotaped deposition of CHAD
14     WILLIAM COFFMAN, taken at the offices of
15     Kessler Topaz Meltzer & Check, 280 King of
16     Prussia Road, Radnor, Pennsylvania 19087,
17     beginning at 9:10 a.m., before LINDA
18     ROSSI-RIOS, a Federally Approved RPR, CCR and
19     Notary Public.
20                       - - -
21
22
23
24
25     Pages 1- 115
```

Page 1

```
 1   statistically significant stock price      10:02:21
 2   decline on that day so that there is a     10:02:24
 3   cause-and-effect relationship between      10:02:27
 4   company specific information and the       10:02:28
 5   stock price move. Whether the stock        10:02:30
 6   price decline was caused by the release    10:02:35
 7   itself or something said in a              10:02:41
 8   conference call or something said by an    10:02:44
 9   analyst in reaction to it, that I have     10:02:46
10   not parsed out.                            10:02:48
11   BY MR. YOUNGWOOD:                          10:02:50
12       Q.   Do you know if there was          10:02:51
13   negative news given that day?              10:02:53
14           MR. D'ANCONA: Objection to the     10:02:57
15   form.                                      10:02:59
16           THE WITNESS: I recall in my        10:02:59
17   analysis of this that there was some       10:03:01
18   negative news issued on this day, yes.     10:03:03
19   BY MR. YOUNGWOOD:                          10:03:05
20       Q.   What was that?                    10:03:06
21           MR. D'ANCONA: Objection to the     10:03:06
22   form.                                      10:03:08
23           THE WITNESS: I don't recall as     10:03:08
24   I sit here the universe of news that       10:03:10
25   was issued on that day. But I -- in my     10:03:13
                                                   Page 50
```

```
 1   process of my methodology, I would have    10:03:17
 2   reviewed the mix of information on that    10:03:21
 3   date to rule out the possibility that      10:03:28
 4   everything announced on that day was       10:03:31
 5   positive and, therefore, that this         10:03:33
 6   negative reaction was somehow              10:03:35
 7   irrational from a market efficiency        10:03:37
 8   standpoint.                                10:03:40
 9   BY MR. YOUNGWOOD:                          10:03:40
10       Q.   Is there something in your files  10:03:40
11   that would help us understand what it was you 10:03:41
12   concluded was negative on that date?       10:03:43
13           MR. D'ANCONA: Objection to the     10:03:49
14   form.                                      10:03:49
15           THE WITNESS: I don't think         10:03:49
16   there would be anything written in the     10:03:51
17   files. The files would -- I mean, the      10:03:53
18   materials I considered are obviously       10:03:56
19   already been provided to you, I            10:03:59
20   believe, in terms of what I would have     10:04:02
21   considered was the release itself, any     10:04:03
22   conference call, the analyst reports       10:04:07
23   before and after this announcement, and    10:04:11
24   any news articles that may have been       10:04:13
25   issued along -- in this -- right around    10:04:16
                                                   Page 51
```

```
 1   this time window.                          10:04:20
 2   BY MR. YOUNGWOOD:                          10:04:21
 3       Q.   Other than having you reread all  10:04:21
 4   of those materials, is there any way for me to 10:04:23
 5   determine what it was you thought was negative 10:04:26
 6   that day?                                  10:04:29
 7           MR. D'ANCONA: Objection to the     10:04:34
 8   form.                                      10:04:35
 9           THE WITNESS: Just to refresh my    10:04:35
10   recollection, you can show me              10:04:36
11   something. I don't -- just sitting         10:04:38
12   here, I don't -- I have not memorized      10:04:39
13   every element of what was released on      10:04:41
14   each of these six days. So I just          10:04:43
15   would have to refresh my recollection.     10:04:44
16   BY MR. YOUNGWOOD:                          10:04:46
17       Q.   Can you tell me anything          10:04:46
18   negative that was released on -- we're just 10:04:49
19   looking at line 2 right now in Exhibit 7, in 10:04:53
20   connection with line 2.                    10:04:56
21           MR. D'ANCONA: Objection to the     10:04:57
22   form.                                      10:04:58
23           THE WITNESS: I have a general      10:04:58
24   recollection that there were attendance    10:05:01
25   declines at SeaWorld announced that day    10:05:07
                                                   Page 52
```

```
 1   relative to the prior year. Again, I       10:05:12
 2   don't have all of the information from     10:05:17
 3   these announcements committed to           10:05:19
 4   memory. That sticks in my mind. But        10:05:21
 5   other than that, I don't recall            10:05:23
 6   anything as I sit here.                    10:05:24
 7   BY MR. YOUNGWOOD:                          10:05:26
 8       Q.   Let's skip ahead to -- we'll      10:05:43
 9   come back. But let's skip ahead to line 5. 10:05:44
10   Strike that. Let me -- hold on one second. 10:05:48
11           Let's go to line 5, please. So     10:05:51
12   this is the May time period. It looks like 10:06:16
13   first quarter results issued after close of 10:06:24
14   market on May 14th, you study the market date 10:06:26
15   of May 15th.                               10:06:30
16           Do I read the line correctly?      10:06:31
17       A.   Yes.                              10:06:33
18       Q.   Here you have a key statistic of  10:06:34
19   1.04. What does that mean?                 10:06:37
20       A.   That means that the abnormal      10:06:39
21   return measured on that day is 1.04 standard 10:06:41
22   deviations from zero.                      10:06:47
23       Q.   You do not indicate that your     10:06:48
24   statistical significance column, the last on 10:06:50
25   the page, the furthest to the right on the 10:06:52
                                                   Page 53
```

```
 1   page is blank. What does that mean?        10:06:56
 2      A.   That means that that movement is   10:06:58
 3   not sufficiently large to be statistically  10:07:00
 4   significant at the 95 or 99 percent level.  10:07:02
 5      Q.   Meaning we cannot draw any         10:07:06
 6   causal relationship between news announced on  10:07:08
 7   that date and the movement of the stock price.  10:07:12
 8   Is that fair to say?                        10:07:15
 9           MR. D'ANCONA: Objection to the     10:07:16
10       form. Incomplete hypothetical.         10:07:17
11       Assumes facts. And lacks foundation.   10:07:19
12           THE WITNESS: Based on this         10:07:21
13       analysis in isolation, that's correct.  10:07:22
14   BY MR. YOUNGWOOD:                          10:07:25
15      Q.   You haven't done any other        10:07:25
16   analysis?                                  10:07:26
17           MR. D'ANCONA: Objection to the     10:07:27
18       form.                                  10:07:27
19           THE WITNESS: No, I just don't      10:07:27
20       want it to be read to say that, you    10:07:29
21       know, hypothetically, if there were two  10:07:31
22       competing pieces of information        10:07:34
23       released on that day, one positive and  10:07:38
24       one negative, through further analysis  10:07:40
25       one might be able to ascertain the     10:07:43
                                              Page 54
```

```
 1       relevant size of each of those using   10:07:46
 2       some other type of analysis. But based  10:07:48
 3       on this analysis, as it stands right   10:07:51
 4       now, there's -- I'm not drawing a      10:07:52
 5       causal relationship between news       10:07:54
 6       released on that day and the movement  10:07:56
 7       in the stock price.                    10:07:58
 8   BY MR. YOUNGWOOD:                          10:07:59
 9      Q.   So in your last answer you        10:08:03
10   referred to the possibility of further    10:08:06
11   analysis that might ascertain the relevant  10:08:08
12   effect of each of the two pieces of news you  10:08:14
13   hypothesize, one positive, one negative. What  10:08:19
14   would that analysis look like?             10:08:22
15           MR. D'ANCONA: Objection to the     10:08:23
16       form.                                  10:08:23
17           THE WITNESS: Well, that would      10:08:23
18       be highly event specific and           10:08:24
19       circumstance specific. So I don't know  10:08:30
20       that I could speculate on -- and I     10:08:31
21       don't even know that there were two    10:08:33
22       competing piece of information. That   10:08:35
23       was just a pure hypothetical. In my    10:08:36
24       experience in the past there have been  10:08:40
25       occasions where there was clearly      10:08:42
                                              Page 55
```

```
 1       material positive and negative         10:08:46
 2       information released on a day, and     10:08:48
 3       through other techniques was able to   10:08:50
 4       try to isolate the impact of those.    10:08:52
 5       So, again, purely hypothetically, if on  10:08:55
 6       this day there was positive news and   10:08:58
 7       negative news and they were released at  10:09:00
 8       slightly different times, one might be  10:09:02
 9       able to look at intraday analysis to be  10:09:05
10       able to try to isolate the impact of   10:09:08
11       specific information. Or one could use  10:09:11
12       some sort of fundamental evaluation    10:09:13
13       technique to try to do that.           10:09:16
14   BY MR. YOUNGWOOD:                          10:09:18
15      Q.   What if -- let's assume they're   10:09:18
16   not, or at least at different times, or even  10:09:19
17   if they are, it's after markets are closed, if  10:09:22
18   they're at least in the same document, how do  10:09:26
19   you tease apart the effect of one statement  10:09:29
20   versus another on the price of the stock?  10:09:31
21           MR. D'ANCONA: Objection to the     10:09:33
22       form. Incomplete hypothetical.         10:09:34
23       Assumes facts.                         10:09:38
24           THE WITNESS: I think when          10:09:39
25       confronted with the need to do that,   10:09:40
                                              Page 56
```

```
 1       it's highly dependent on what the      10:09:42
 2       nature and the context of the          10:09:44
 3       information is. That's certainly       10:09:46
 4       something, in my experience, I've      10:09:50
 5       performed that type of analysis in the  10:09:51
 6       past. And I can say from experience    10:09:53
 7       every case is somewhat different       10:09:56
 8       because it depends on what the nature  10:09:57
 9       of the information is, what documents  10:10:00
10       may be available to assist in that     10:10:04
11       endeavor. Either public or nonpublic,  10:10:07
12       learned through discovery. And what    10:10:10
13       valuation techniques might be relevant  10:10:15
14       for the particular piece of information  10:10:17
15       at issue.                              10:10:19
16   BY MR. YOUNGWOOD:                          10:10:20
17      Q.   Let's go down to number 6. So     10:10:22
18   this relates, if I read your chart correctly,  10:10:25
19   to information released before the open of the  10:10:28
20   market on August 13, 2014, and you have a  10:10:31
21   t-statistic of 22.35 indicating statistical  10:10:36
22   significance. Do I read that correctly?    10:10:43
23      A.   It's technically negative 22.35,  10:10:45
24   but, yes, it's statistically significant.  10:10:50
25      Q.   Do you know -- and, therefore,    10:10:52
                                              Page 57
```

```
 1  you have drawn a conclusion that the        10:10:58
 2  information released that day before the open  10:10:59
 3  of the market had a causal relation with the   10:11:02
 4  decrease in the stock that day?             10:11:10
 5          MR. D'ANCONA: Objection to the      10:11:11
 6  form.                                       10:11:12
 7          THE WITNESS: Again, consistent      10:11:12
 8  with my prior answer, I've concluded        10:11:13
 9  that the firm specific information          10:11:15
10  released on that day had a causal           10:11:17
11  impact on the stock price. Whether          10:11:19
12  that was information in the earnings        10:11:21
13  release itself, the conference call or      10:11:24
14  reactions of analysts or other news         10:11:26
15  articles, I have not endeavored to          10:11:29
16  identify, you know, the specific source     10:11:31
17  of what caused the price movement. But      10:11:35
18  some firm specific information released     10:11:37
19  in that announcement or in the wake of      10:11:39
20  that announcement, in my view, caused       10:11:41
21  the stock price decline.                    10:11:45
22          MR. D'ANCONA: Just -- I'm           10:11:45
23  sorry, just before we get into your         10:11:48
24  next exhibits, would it be okay to take     10:11:50
25  a quick break?                              10:11:51
```
Page 58

```
 1      Q.  Yes, sir. No, 163, page 69.        10:23:51
 2      A.  Oh, 163, okay.                     10:23:57
 3      Q.  You'll see starting the second     10:23:58
 4  sentence, first sentence refers to the     10:24:07
 5  August 13th date, second sentence says,    10:24:11
 6  "Specifically, SeaWorld stated 'attendance, in  10:24:11
 7  [second] quarter was impacted by demand    10:24:16
 8  pressures related to recent media attention 10:24:19
 9  surrounding proposed legislation in the state 10:24:22
10  of California [i.e., the 'Blackfish Bill'].'"  10:24:29
11         Do you see that sentence?           10:24:34
12      A.  I do.                              10:24:35
13      Q.  Now if you go to Exhibit 4 to      10:24:36
14  your deposition, this August Form 8-K. Have 10:24:38
15  you seen this Exhibit 4 before? In fact, I'm 10:24:48
16  sorry, just clarify the date, if you actually 10:24:56
17  look on the third page of Exhibit 4 it is  10:24:57
18  dated August 13th in the signature block kind 10:25:00
19  of, so the date we've been discussing.     10:25:03
20      A.  Yes. I mean, I'm generally         10:25:04
21  familiar with this 8-K. I don't think I    10:25:06
22  printed it out, I may have viewed it as an 10:25:09
23  electronic file, but, yes, I'm familiar with 10:25:12
24  this 8-K.                                  10:25:13
25      Q.  If you look -- if you could turn   10:25:14
```
Page 60

```
 1          VIDEOGRAPHER: The time is          10:11:52
 2  10:11. Off the video record.               10:11:55
 3          - - -                              10:11:55
 4          (A recess was taken.)              10:11:55
 5          - - -                              10:22:56
 6          VIDEOGRAPHER: The time is now      10:22:56
 7  10:22. Back on the video record.           10:22:58
 8          - - -                              10:22:58
 9          (Exhibit 4, Form 8-K,              10:22:58
10          was marked for identification.)    10:22:58
11          - - -                              10:23:00
12  BY MR. YOUNGWOOD:                          10:23:00
13      Q.  Mr. Coffman, I want to stick       10:23:01
14  with this August 13, 2014, date that we were 10:23:03
15  discussing before the break, and I've given 10:23:07
16  you what's been marked as now Coffman      10:23:10
17  Exhibit 4 which is a Form 8-K. I think it's 10:23:13
18  dated as of August 12, 2014, but I will    10:23:22
19  represent to you that was after the close of 10:23:25
20  the market on that date. I think it relates 10:23:26
21  to the August 13th date that you were      10:23:29
22  studying. I'll show you that in a second.  10:23:32
23  Before I do, I want to turn you to Exhibit 2, 10:23:34
24  Coffman Exhibit 2, paragraph 163, page 69. 10:23:38
25      A.  You said paragraph 169?            10:23:48
```
Page 59

```
 1  to -- it's a little confusing because the page 10:25:15
 2  numbers, I think, don't show up at the     10:25:17
 3  beginning and then they show up as the     10:25:19
 4  document progresses, but there is a page   10:25:21
 5  numbered 2 that's four or five pages into the 10:25:23
 6  document.                                  10:25:26
 7      A.  I see that.                        10:25:26
 8      Q.  And there's a heading that says    10:25:26
 9  "Year to Date Results." Immediately above  10:25:28
10  that heading is a sentence that you'll see in 10:25:34
11  part matches the sentence from paragraph 163 10:25:36
12  of Coffman Exhibit 2 that I had you read. The 10:25:39
13  sentence in the 8-K says in addition "...'the 10:25:42
14  Company believes attendance in the quarter was 10:25:44
15  impacted by demand pressures related to recent 10:25:46
16  media attention surrounding proposed       10:25:50
17  legislation in the state of California.'"  10:25:53
18         Do you see that?                    10:25:55
19      A.  I see that.                        10:25:55
20      Q.  But if you go up a sentence --     10:25:56
21  and you see that matched paragraph 163. I'll 10:26:02
22  go up a sentence in a moment. Let me ask you, 10:26:07
23  can I derive in any way from your Exhibit 7 to 10:26:09
24  your report, which is Coffman Exhibit 1, a 10:26:15
25  causal relationship between the sentence I 10:26:19
```
Page 61

16 (Pages 58 - 61)

**Page 62**

1   just read that speaks of demand pressures   10:26:23
2   related to proposed legislation in the State   10:26:27
3   of California and the change in the stock   10:26:31
4   price that day, specifically to that sentence?   10:26:32
5           MR. D'ANCONA:  Objection to the   10:26:36
6   form.                                           10:26:38
7           THE WITNESS:  There's nothing   10:26:38
8   that precludes that but Exhibit 7   10:26:39
9   itself doesn't establish that.   10:26:42
10  BY MR. YOUNGWOOD:                               10:26:43
11      Q.   Because there could have been   10:26:43
12  other news that day?                             10:26:44
13          MR. D'ANCONA:  Objection to the   10:26:45
14  form.                                           10:26:46
15          THE WITNESS:  Yes.               10:26:46
16  BY MR. YOUNGWOOD:                               10:26:47
17      Q.   And, in fact, the other news   10:26:47
18  might have been in this 8-K.  Correct?   10:26:51
19          MR. D'ANCONA:  Objection to the   10:26:54
20  form.                                           10:26:54
21          THE WITNESS:  That's plausible.   10:26:54
22  That's not something I've analyzed.   10:26:59
23  BY MR. YOUNGWOOD:                               10:27:01
24      Q.   Or it might have been in the   10:27:01
25  analyst -- in the earnings calls.  Correct?   10:27:02

**Page 63**

1           MR. D'ANCONA:  Objection to the   10:27:03
2   form.                                           10:27:04
3           THE WITNESS:  If you're asking   10:27:05
4   me if there might have been additional   10:27:06
5   firm specific information in the   10:27:08
6   earnings calls, that's plausible, yes.   10:27:11
7   BY MR. YOUNGWOOD:                               10:27:13
8       Q.   Let's look at the 8-K just as   10:27:13
9   one example.  Now I will refer you to the   10:27:14
10  sentence immediately before the one I just   10:27:17
11  read.  It says, "This increase was offset by   10:27:18
12  lower attendance at the Company's destination   10:27:21
13  parks due to a combination of factors,   10:27:24
14  including a late start to summer for some   10:27:26
15  schools in the Company's key source markets,   10:27:29
16  new attraction offerings at competitor   10:27:31
17  destination parks, and a delay in the opening   10:27:34
18  of one of the Company's new attractions."   10:27:35
19          Do you see that?                 10:27:38
20      A.   I see that.                     10:27:40
21      Q.   Do you have any ability, based   10:27:42
22  on the analysis that you've done, to tell me   10:27:43
23  which, if any, of these factors affected the   10:27:46
24  price of the stock that day?             10:27:48
25          MR. D'ANCONA:  Objection to the   10:27:49

**Page 64**

1   form.  Just generally does he have the   10:27:50
2   ability?                                 10:27:53
3           MR. YOUNGWOOD:  Based on the   10:27:54
4   analysis he's done.                      10:27:55
5           MR. D'ANCONA:  Sitting here   10:27:57
6   right now can he do it?  Is that what   10:27:58
7   you're asking?                           10:28:00
8           MR. YOUNGWOOD:  I think the   10:28:00
9   question is clear.                       10:28:01
10          MR. D'ANCONA:  Objection to the   10:28:01
11  form.                                    10:28:02
12          THE WITNESS:  I think what   10:28:02
13  you're asking me is, is there anything   10:28:03
14  in my report or in the analysis I've   10:28:06
15  completed to date that would allow me   10:28:11
16  to draw a conclusion about that.  The   10:28:14
17  answer is no.                            10:28:17
18  BY MR. YOUNGWOOD:                        10:28:17
19      Q.   And are you aware of an analysis   10:28:20
20  that you could perform that would, for   10:28:23
21  example, enable you to tease apart the effect   10:28:26
22  of new attraction offerings of competitor   10:28:30
23  destination parks from media attention   10:28:36
24  surrounding proposed legislation in the State   10:28:40
25  of California in terms of effect on the stock   10:28:42

**Page 65**

1   price?                                   10:28:44
2           MR. D'ANCONA:  Objection to the   10:28:44
3   form.  Assumes facts.  Lacks             10:28:45
4   foundation.  Incomplete hypothetical.    10:28:48
5           THE WITNESS:  As I sit here      10:28:50
6   right now, I've not thought about how    10:28:52
7   one can do that, so I don't want to try  10:28:56
8   to speculate about that.                 10:28:58
9   BY MR. YOUNGWOOD:                        10:28:59
10      Q.   Do you know what caused the     10:29:01
11  stock to drop that day?                  10:29:03
12          MR. D'ANCONA:  Objection to the  10:29:09
13  form.  Asked and answered.               10:29:09
14          THE WITNESS:  I have not formed  10:29:10
15  an opinion about precisely what caused   10:29:16
16  the stock to decline on that day.  I've  10:29:18
17  read the news reports and analyst        10:29:21
18  reports surrounding that day including   10:29:24
19  some that are documented in the          10:29:28
20  Complaint, so I have sort of a very      10:29:31
21  general sense of what the market was     10:29:34
22  focused on, but I don't -- I have not    10:29:37
23  drawn any particular conclusion about    10:29:39
24  what precisely caused the stock price    10:29:41
25  to move that day.                        10:29:43

17 (Pages 62 - 65)

```
 1   particular case, the whole purpose of      10:38:17
 2   the analysis is to look for days in which  10:38:20
 3   there was firm specific news and to look   10:38:22
 4   for an effect on the stock price. So       10:38:24
 5   when I found a date with firm specific     10:38:26
 6   news on this earnings release, then a      10:38:29
 7   stock price movement, that -- I see no     10:38:32
 8   reason to exclude that. And also the       10:38:35
 9   -- that's why I perform multiple           10:38:40
10   analyses. So the analysis that focuses     10:38:42
11   on the proportion of days that are         10:38:47
12   statistically significant gives equal      10:38:51
13   weight to this date than the other         10:38:55
14   dates. So I do one analysis that is --     10:38:56
15   at least one of my analyses are            10:39:01
16   independent of the size of that            10:39:03
17   movement relative to the others.           10:39:05
18   BY MR. YOUNGWOOD:                          10:39:07
19       Q.   Continuing with Exhibit 7 to      10:39:12
20   Coffman Exhibit 1, I want to ask you about 10:39:14
21   line 4.                                    10:39:18
22       A.   Okay.                             10:39:20
23       Q.   So line 4 has a t-statistic of    10:39:21
24   2.03, which is barely above your threshold of 10:39:26
25   1.96. Fair to say?                         10:39:32
                                              Page 74
```

```
 1       MR. D'ANCONA: Objection to the       10:39:34
 2   form.                                     10:39:34
 3       THE WITNESS: I don't know that        10:39:35
 4   I agree with the term "barely," but       10:39:35
 5   it's generally close to the threshold.    10:39:41
 6   BY MR. YOUNGWOOD:                         10:39:43
 7       Q.   Did you do any analysis to see   10:39:43
 8   how much less the stock would have had to move 10:39:45
 9   to have resulted in the t-stat for that line 10:39:48
10   being below your 1.96 threshold?          10:39:51
11       MR. D'ANCONA: Objection to the        10:39:54
12   form.                                     10:39:55
13       THE WITNESS: No, I saw no             10:39:55
14   reason to do that.                        10:39:56
15   BY MR. YOUNGWOOD:                         10:39:57
16       Q.   If I look at Footnote 1, you     10:39:57
17   indicate a number of the assumptions and  10:40:01
18   methodologies that you used associated with 10:40:05
19   this analysis including the elimination from 10:40:07
20   your analysis of certain dates. Correct?  10:40:13
21       MR. D'ANCONA: Objection to the        10:40:17
22   form. The document speaks for itself.     10:40:17
23       THE WITNESS: Yes. That's              10:40:21
24   correct.                                  10:40:40
25   BY MR. YOUNGWOOD:                         10:40:40
                                              Page 75
```

```
 1       Q.   That's that last sentence of     10:40:41
 2   Footnote 1, that certain dates at least have 10:40:42
 3   been excluded?                            10:40:45
 4       A.   Yeah. I mean, the whole          10:40:46
 5   paragraph talks about what your question  10:40:47
 6   related to, which is the assumptions and  10:40:49
 7   methodologies, but the last sentence focuses 10:40:51
 8   on dates that have been removed from the  10:40:53
 9   estimation, yes.                          10:40:55
10       Q.   Am I correct in your peer index  10:40:56
11   that you created, you excluded Disney and 10:41:19
12   Comcast?                                  10:41:22
13       MR. D'ANCONA: Objection to the        10:41:24
14   form. Misstates -- I guess which peer     10:41:24
15   index?                                    10:41:32
16   BY MR. YOUNGWOOD:                         10:41:33
17       Q.   Well, you refer to a peer index  10:41:33
18   in both the second to the last and third to 10:41:36
19   last sentences.                           10:41:39
20       A.   I believe this is described in   10:41:43
21   more detail in the text of my report.     10:41:45
22       Q.   Sure, let's go there.            10:41:48
23       A.   In particular, Footnote 43 where 10:41:50
24   I talk about that the peer index is composed 10:41:56
25   of Six Flags and Cedar Fair. And I also   10:42:00
                                              Page 76
```

```
 1   considered an alternative index that included 10:42:06
 2   Disney and Comcast, but what's reported in 10:42:10
 3   Exhibit 7 excludes those companies, but I also 10:42:16
 4   considered an alternative index that included 10:42:19
 5   those companies. I excluded those companies 10:42:22
 6   for the reasons identified -- in my primary 10:42:24
 7   analysis for the reasons described in Footnote 10:42:26
 8   43 in my report.                          10:42:30
 9       Q.   When you included those two      10:42:30
10   companies, what was the t-statistic for the 10:42:32
11   March 13/14 dates that we've been looking at 10:42:37
12   at line 4 of Exhibit 7?                   10:42:40
13       A.   I don't recall off the top of my 10:42:41
14   head.                                     10:42:43
15       Q.   Was it higher or lower than      10:42:43
16   2.03?                                     10:42:46
17       A.   I don't recall off the top of my 10:42:46
18   head.                                     10:42:48
19       Q.   Have you produced a copy of the  10:42:48
20   analysis that you did that includes those two 10:42:50
21   companies as part of your peer index?     10:42:54
22       A.   I believe we produced all the    10:42:56
23   underlying data in the programs. I don't  10:42:59
24   recall if there was a summary file produced of 10:43:02
25   that. I just asked my staff to turn over all 10:43:04
                                              Page 77
```

20 (Pages 74 - 77)

**Page 78**

```
 1  the relevant information.  I don't         10:43:06
 2  specifically know if there's a file related 10:43:08
 3  specifically to that, but I believe all the 10:43:12
 4  computer code that I considered and relied  10:43:14
 5  upon was provided.                          10:43:16
 6     Q.  So we'll -- and you don't know       10:43:16
 7  the names of the files sitting here today?  10:43:17
 8     A.  Not as I sit here, no.               10:43:19
 9     Q.  We'll follow up through counsel.     10:43:21
10  I don't believe we have it, but it's obviously 10:43:22
11  possible that we didn't see it.             10:43:25
12     A.  Okay.                                10:43:26
13     Q.  Going back or maybe continuing       10:43:26
14  on Exhibit 7, did you do an analysis of the 10:43:28
15  March 13/14 that included the dates that you 10:43:35
16  list that you excluded in the last sentence of 10:43:39
17  Footnote 1?                                 10:43:43
18        MR. D'ANCONA:  Objection to the      10:43:44
19     form.  It's vague and ambiguous.         10:43:45
20        THE WITNESS:  As I understand        10:43:46
21     your question, you're asking did I run   10:43:49
22     a version of the analysis that didn't    10:43:51
23     exclude those dates?  And I believe the  10:43:52
24     answer to that is no.                    10:43:56
25  BY MR. YOUNGWOOD:                           10:43:57
```

**Page 79**

```
 1     Q.  Would it surprise you, then, to      10:43:57
 2  learn that if you do include those dates, the 10:44:00
 3  t-statistic for that date drops below 1.96? 10:44:02
 4     A.  That would not surprise me at        10:44:06
 5  all.                                        10:44:08
 6     Q.  Why would that not surprise you?     10:44:08
 7     A.  Because the purpose of the test      10:44:10
 8  is to evaluate the magnitude of the stock   10:44:15
 9  price reaction relative to a situation in   10:44:19
10  which there was no news released.  And so in 10:44:22
11  order to do that, in developing the regression 10:44:28
12  model, to the extent there are days with news 10:44:31
13  incorporated into the estimation window, days 10:44:38
14  with at least obviously significant news, that 10:44:44
15  would bias the test towards having a larger 10:44:47
16  what's referred to as root-mean-squared error 10:44:55
17  or volatility.  It would result in a bias   10:45:00
18  volatility measurement for what you would   10:45:03
19  expect on days with no news.  So it's actually 10:45:04
20  important to exclude days in which there's  10:45:07
21  obvious significant news to prevent a bias of 10:45:09
22  the test.  In other words, had those been left 10:45:17
23  in, it would be understating a statistical  10:45:20
24  significance on that date.                  10:45:28
25     Q.  Are you aware of which               10:45:31
```

**Page 80**

```
 1  statements the plaintiffs in this matter have 10:45:52
 2  alleged to be false and misleading?         10:45:55
 3     A.  I don't have them committed to       10:45:57
 4  memory, but I recall reading them and have a 10:46:02
 5  general understanding of their -- what they 10:46:04
 6  are.                                        10:46:05
 7     Q.  So let me try to do this as          10:46:06
 8  shorthanded as we can.  I'm happy to.       10:46:07
 9        Two ways I want to show it to         10:46:13
10  you.  First I will just show you, if you turn 10:46:15
11  to Exhibit 2 of the Complaint, just Roman   10:46:18
12  numeral II, there's a table of contents.  And 10:46:23
13  under Section V it lists six dates.  Do you 10:46:27
14  see that?                                   10:46:32
15     A.  I see that.                          10:46:32
16     Q.  And then I'm going to hand you       10:46:33
17  what I'm going to mark now as Exhibit 5.  It 10:46:35
18  gives the statements in a bit more detail.  10:46:37
19  It's -- let me explain to you what 5 is.    10:46:39
20           - - -                              10:46:39
21        (Exhibit 5, Appendix B,               10:46:39
22        was marked for identification.)       10:46:39
23           - - -                              10:47:01
24  BY MR. YOUNGWOOD:                           10:47:01
25     Q.  I'm going to give you what's         10:47:01
```

**Page 81**

```
 1  been marked, Mr. Coffman, as Exhibit 5.  It's 10:47:04
 2  a court filing filed July 27, 2016.  It is  10:47:06
 3  Appendix B to a brief that the plaintiffs   10:47:10
 4  submitted to the court, and it has within it 10:47:14
 5  more detailed summary of those statements.  I 10:47:16
 6  think it's probably the easiest way for us to 10:47:22
 7  do this efficiently.  I don't think this    10:47:24
 8  document was listed as a document you       10:47:27
 9  previously considered, but I'll ask you if you 10:47:28
10  think you've seen it before?                10:47:30
11     A.  I don't recall reviewing this in     10:47:31
12  this form and I don't see that it actually  10:47:42
13  lists all the dates that are -- I do now.   10:47:46
14     Q.  I think it matches.                  10:47:52
15     A.  Yep, I got it.  Okay.                10:47:54
16     Q.  So looking at this document,         10:47:55
17  I'll come back to the first entry in a second, 10:48:00
18  but the second and the third entry -- second 10:48:02
19  entry is an 11/13 statement that I will     10:48:06
20  represent to you was made after the close of 10:48:09
21  market on November 13th, and the next       10:48:13
22  statement is a statement that I will represent 10:48:16
23  to you is made before the opening of the    10:48:18
24  market on the 14th.  And the 14th,          10:48:22
25  13th/14th -- say that better.  The 13th is the 10:48:28
```

21 (Pages 78 - 81)

Page 102

```
 1   of the risk for which, given that      11:10:48
 2   theory as an assumption, I proposed a  11:10:52
 3   particular loss causation and damages  11:10:56
 4   opinion. So that's fair. I wasn't      11:10:59
 5   supporting, I didn't view it as        11:11:03
 6   supporting their legal argument.       11:11:05
 7  BY MR. YOUNGWOOD:                       11:11:08
 8     Q.   And that materialization of the 11:11:12
 9  risk theory was not adopted by the court which  11:11:15
10  is why the court rejected the subclass. 11:11:17
11  Correct?                                11:11:21
12         MR. D'ANCONA: Objection to the   11:11:21
13     form. Lacks foundation. And to the  11:11:22
14     extent this calls for any sort of legal 11:11:24
15     conclusion.                          11:11:29
16         THE WITNESS: My understanding -- 11:11:30
17     again, I haven't read that opinion in a 11:11:32
18     while. But my understanding of the   11:11:34
19     basic problem that the court had with 11:11:38
20     the proposed damages model in that case 11:11:42
21     is that it diverged from the usual   11:11:45
22     out-of-pocket method. So from an     11:11:48
23     economic or from an economist        11:11:54
24     standpoint, that was really the primary 11:11:56
25     difference between that theory and   11:11:59
```

Page 103

```
 1     what's normally done. And they       11:12:01
 2     referred to that as materialization of 11:12:04
 3     the risk theory. However, I do note  11:12:06
 4     that that phrase "materialization of  11:12:09
 5     the risk" is used by many people in  11:12:11
 6     many different contexts to mean      11:12:14
 7     different things. So I would just -- 11:12:16
 8     when I'm referring to it in this     11:12:18
 9     particular question, and my          11:12:19
10     understanding of what was at issue in 11:12:22
11     the BP case is that it was really in 11:12:23
12     that particular theory, the departure 11:12:28
13     from the out-of-pocket method that was 11:12:30
14     objectionable.                       11:12:33
15  BY MR. YOUNGWOOD:                       11:12:33
16     Q.   Have you considered what the    11:12:34
17  appropriate measure of damages would be in 11:12:35
18  this case?                              11:12:39
19         MR. D'ANCONA: Objection to the   11:12:41
20     form to the extent you mean has he   11:12:42
21     calculated it.                       11:12:45
22         MR. YOUNGWOOD: I'm not asking    11:12:45
23     if he calculated it.                 11:12:46
24         THE WITNESS: My understanding    11:12:47
25     is the plaintiffs in this case are   11:12:49
```

Page 104

```
 1     seeking an out-of-pocket measure of  11:12:50
 2     damages which is the standard approach 11:12:53
 3     in these types of cases.             11:12:57
 4  BY MR. YOUNGWOOD:                       11:12:59
 5     Q.   And to calculate such a measure 11:12:59
 6  of damages, one would need a corrective 11:13:01
 7  disclosure. Correct?                    11:13:03
 8         MR. D'ANCONA: Objection to the   11:13:05
 9     form to the extent it calls for legal 11:13:06
10     conclusion. Calls for speculation.   11:13:08
11         THE WITNESS: My understanding    11:13:13
12     of the law at least is that there needs 11:13:21
13     to be some revelation of the truth,  11:13:23
14     relevant truth that was obscured by the 11:13:26
15     misstatements and omissions. Whether 11:13:28
16     you call that a corrective disclosure 11:13:30
17     or something else, I don't know. But 11:13:32
18     there has to be some revelation of the 11:13:34
19     relevant truth.                      11:13:36
20  BY MR. YOUNGWOOD:                       11:13:37
21     Q.   I don't think I asked this      11:13:37
22  specifically. You have not formed a view as 11:13:38
23  to whether or not there was such a revelation 11:13:41
24  of the truth in this case?              11:13:43
25     A.   That's not something I've been  11:13:44
```

Page 105

```
 1  asked to evaluate and I have formed no opinion 11:13:46
 2  on.                                     11:13:49
 3     Q.   You haven't done a materialization 11:13:49
 4  of the risk analysis similar to what you did 11:13:51
 5  in Ludlow in this case either. Is that correct? 11:13:53
 6         MR. D'ANCONA: Objection to the   11:13:56
 7     form. Objection to the form. It's    11:13:56
 8     vague and ambiguous.                 11:13:57
 9         THE WITNESS: I haven't done any  11:13:58
10     kind of analysis like that, no.      11:14:00
11  BY MR. YOUNGWOOD:                       11:14:01
12     Q.   Have you considered whether or  11:14:02
13  not a materialization of the risk theory of 11:14:03
14  damages would be appropriate for this case? 11:14:06
15         MR. D'ANCONA: Objection to the   11:14:07
16     form. It's vague and ambiguous. To   11:14:08
17     the extent it calls for any sort of  11:14:10
18     legal conclusion.                    11:14:12
19         THE WITNESS: That's not          11:14:13
20     something I've considered or formed an 11:14:14
21     opinion on.                          11:14:16
22  BY MR. YOUNGWOOD:                       11:14:17
23     Q.   Let me actually refer you to    11:14:17
24  paragraph 77 of your report, Coffman    11:14:19
25  Exhibit 1. You say in paragraph 77, "...it is 11:14:22
```

27 (Pages 102 - 105)

```
 1   clear that damages in this matter can be         11:14:31
 2   calculated using a methodology common to the     11:14:34
 3   Class.  Indeed, the standard and well-settled    11:14:36
 4   formula for assessing damages for each class     11:14:40
 5   member under Section 10(b) is 'out-of-pocket'    11:14:43
 6   method...."  And I won't keep reading.  But      11:14:47
 7   how can you have reached that conclusion if      11:14:49
 8   you haven't reached a conclusion that there      11:14:51
 9   was a corrective disclosure or revealing of      11:14:53
10   the truth?                                       11:14:57
11           MR. D'ANCONA:  Objection to the          11:14:57
12       form.  Calls for -- well, to the extent      11:14:58
13       it calls for some sort of legal              11:15:03
14       conclusion.                                  11:15:04
15           THE WITNESS:  Well, the approach         11:15:05
16   to analyzing the question of damages in          11:15:08
17   this case is done on a class-wide                11:15:11
18   basis.  In other words, it doesn't               11:15:14
19   depend on any particular investor or --          11:15:15
20   and, therefore -- so, for example,               11:15:19
21   hypothetically the damages analysis              11:15:25
22   could reach a conclusion that there was          11:15:30
23   zero damages.  So that would be true             11:15:31
24   class wide.  So if there was a finding           11:15:34
25   of fact that there was no corrective             11:15:36
                                              Page 106
```

```
 1   disclosure, then this formula and                11:15:43
 2   methodology is still appropriate, it             11:15:45
 3   would just give you zero damages.  So            11:15:47
 4   the point is that that determination             11:15:51
 5   rises and falls on a class basis.                11:15:54
 6           VIDEOGRAPHER:  Counsel, just so          11:15:58
 7       you know, there's about five minutes         11:15:59
 8       before I'll have to change cards.            11:16:00
 9           MR. YOUNGWOOD:  Okay.  Thank             11:16:02
10       you.  Thank you.                             11:16:04
11   BY MR. YOUNGWOOD:                                11:16:14
12       Q.   You also refer to artificial            11:16:15
13   inflation in this paragraph 77.  Have you        11:16:17
14   formed a view as to whether or not at any        11:16:21
15   point during the class period there was          11:16:23
16   artificial inflation in the SeaWorld stock, in   11:16:25
17   the value of the SeaWorld stock?                 11:16:28
18       A.   I have not reached an opinion           11:16:30
19   that there was.  I understand sort of the        11:16:35
20   logical economic basis to suggest that there     11:16:39
21   was, but I haven't formed an opinion as to       11:16:42
22   whether there was or was not.                    11:16:45
23       Q.   You haven't done any work to            11:16:46
24   form such an opinion?                            11:16:47
25           MR. D'ANCONA:  Objection to the          11:16:48
                                              Page 107
```

```
 1       form.  Vague.  Ambiguous.                    11:16:49
 2           MR. YOUNGWOOD:  Strike that.             11:16:53
 3       I'll withdraw that question.                 11:16:54
 4   BY MR. YOUNGWOOD:                                11:16:55
 5       Q.   Is there any other work that            11:16:55
 6   you've been asked to do that you -- let me ask   11:16:56
 7   that more carefully.  Was there any work you     11:16:59
 8   were asked to do that you didn't do?             11:17:02
 9           MR. D'ANCONA:  Objection to the          11:17:05
10       form to the extent you're asking about       11:17:06
11       something else other than the contents       11:17:08
12       of this report.                              11:17:10
13   BY MR. YOUNGWOOD:                                11:17:12
14       Q.   In connection with this case.           11:17:12
15       A.   If your question is, was I asked        11:17:13
16   to form opinions on things that I declined to    11:17:16
17   do, the answer is no.                            11:17:20
18       Q.   Well, were there -- was there           11:17:27
19   work suggested to you that might have            11:17:28
20   supported or not supported the opinions that     11:17:29
21   you did form that you were asked to do that      11:17:32
22   you did not do?                                  11:17:37
23           MR. D'ANCONA:  Objection to the          11:17:38
24       form to the extent this would invade         11:17:40
25       attorney work product.                       11:17:44
                                              Page 108
```

```
 1           THE WITNESS:  I don't think --           11:17:45
 2       there's nothing I was ever asked not to      11:17:47
 3       do in forming my opinions.                   11:17:49
 4   BY MR. YOUNGWOOD:                                11:17:51
 5       Q.   I'm asking a different                  11:17:51
 6   direction.  Were you asked to do something and   11:17:53
 7   you declined to do it?                           11:17:54
 8       A.   No.                                     11:17:55
 9           MR. YOUNGWOOD:  Why don't we go          11:17:57
10       off the record.                              11:17:57
11           VIDEOGRAPHER:  The time is now           11:17:58
12       11:18.  This concludes disc one.             11:17:59
13             - - -                                  11:17:59
14       (A recess was taken.)                        11:17:59
15             - - -                                  11:29:04
16           VIDEOGRAPHER:  The time is now           11:29:04
17       11:29.  This begins disc two.                11:29:09
18   BY MR. YOUNGWOOD:                                11:29:12
19       Q.   Mr. Coffman, is there anything          11:29:14
20   in any of your answers to any of the questions   11:29:16
21   that I asked you today that on reflection you    11:29:18
22   would like to change?                            11:29:21
23       A.   Not that I'm aware of, no.              11:29:22
24       Q.   Or having done -- having spoken         11:29:23
25   for the last couple of hours, anything in your   11:29:26
                                              Page 109
```