# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOU BAKER, individually and on behalf of all others similarly situated, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SEAWORLD ENTERTAINMENT, INC., et al.,<br><br>Defendants. | Case No.: 14cv2129-MMA (AGS)<br><br>**<u>REDACTED</u>**<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>[Doc. No. 213] |

Lead Plaintiffs Arkansas Public Employees Retirement System ("APERS") and Pensionskassen for Børne-Og Ungdomspædagoger ("PBU") (collectively, "Plaintiffs") bring this putative securities fraud class action against Defendants SeaWorld Entertainment Inc. ("SeaWorld Entertainment"), The Blackstone Group L.P., James Atchison, James M. Heaney, and Marc Swanson (collectively, "Defendants") asserting claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. *See* Doc. No. 123 ("SAC"). Plaintiffs bring this action on behalf of all individuals and entities who purchased or acquired common stock of SeaWorld Entertainment, Inc. ("SEAS Common Stock") during the proposed class

period of August 29, 2013 and August 12, 2014, inclusive.

Plaintiffs now move for class certification pursuant to Federal Rule of Civil Procedure 23. *See* Doc. No. 213. Defendants filed an opposition to Plaintiffs' motion, to which Plaintiffs replied. *See* Doc. Nos. 215, 243. Defendants also filed a sur-reply, to which Plaintiffs filed a sur-sur-reply. *See* Doc. Nos. 246, 247. After entertaining the oral arguments of counsel at the hearing on November 13, 2017, the Court took the motion under submission for further review and consideration. For the reasons set forth below, the Court affirms its tentative ruling and **GRANTS** Plaintiffs' motion for class certification.

## BACKGROUND

This case involves statements and omissions made by Defendants in the wake of the 2013 documentary *Blackfish*. *Blackfish* tells the story of Tilikum, a 12,000-pound bull orca implicated in the deaths of three people, and chronicles the cruelty of killer whale capture methods, the dangers trainers face performing alongside killer whales during SeaWorld Entertainment's popular shows, and the physical and psychological strains killer whales experience in captivity. Through interviews with former trainers, spectators, employees of regulatory agencies, and scientists, *Blackfish* makes the case that keeping killer whales in captivity for human entertainment is cruel, dangerous, and immoral. *Blackfish* premiered at the Sundance Film Festival on January 19, 2013.

SeaWorld Entertainment is a theme park and entertainment company best known for its parks with shows featuring orca whales and its famous "Shamu" mascot. SeaWorld Entertainment is headquartered in Orlando, Florida, and owns and operates eleven theme parks within the United States, including: three SeaWorld-branded theme parks in Florida, Texas, and California; two Busch Gardens theme parks in Florida and Virginia; three water parks in Florida and Virginia; Discovery Cove, an attraction in Florida offering interactions with marine animals; and Sesame Place, a seasonal theme park in Pennsylvania. SeaWorld Entertainment's financial health is directly tied to its ability to attract and grow attendance at its parks.

SeaWorld Entertainment was a privately held company until it went public in April 2013 with an initial public offering of its common stock at a price of $27 per share. SAC ¶ 50.

In July 2013, *Blackfish* was released in select theaters in the United States and Canada, and made available for viewing by Netflix customers in the United Kingdom. In September and October 2013, *Blackfish* premiered in a variety of different countries, and was broadcast on CNN in a highly promoted screening on October 24, 2013. *Blackfish* was released on DVD and Blu-ray in the United States in November 2013, and made available for streaming on iTunes and Netflix in December 2013. The BBC also aired the film in the United Kingdom in November 2013.

In December 2013, SeaWorld Entertainment finished a secondary public offering of common stock at a price of $30 per share. *Id.* ¶ 51. SeaWorld Entertainment completed another secondary public offering in April 2014 at a price of $30 per share of common stock. *Id.* ¶ 52.

During the class period, which extends from August 29, 2013 to August 12, 2014, overall attendance declined at the eleven SeaWorld Entertainment parks. Specifically, Defendants reported the following declines in attendance as compared to 2012: a 9% decline in attendance in the second quarter of 2013; a 3.6% decline in attendance in the third quarter of 2013; and a 1.4% decline in attendance in the fourth quarter of 2013. This resulted in a 4.1% decline in overall attendance for 2013. Defendants reported a 13% decline in attendance for the first quarter of 2014.

SeaWorld Entertainment attributed the declines in attendance to adverse weather conditions, school and holiday schedules, and a new pricing strategy. However, other major theme park groups located in the United States, including Disney and Universal, realized increases in attendance during 2013, even though they both maintain parks in some of the same locations SeaWorld Entertainment does, and were therefore subject to some of the same adverse weather conditions. Disney and Universal parks were also subject to the same school and holiday schedules, and also increased prices at some of

their parks in 2013.

Unlike Disney and Universal, SeaWorld Entertainment parks were subjected to significant negative publicity as a result of the *Blackfish* documentary. The negative publicity included statements by celebrities on Twitter urging millions of their followers to watch *Blackfish* and avoid "SeaWorld." An online poll on CNN on October 23, 2015 reported that 86% of the 3,000 respondents would not take their kids to "SeaWorld" in light of the allegations in *Blackfish*. *Id.* ¶ 141. Some schools also canceled their annual field trips to SeaWorld Entertainment parks. Later in 2013, a number of artists slated to perform at a series of summer concerts at the SeaWorld-branded park in Florida and Busch Gardens in Florida cancelled their performances after receiving online petitions urging them to do so. *Id.* ¶¶ 145-147. Most of the artists cited the controversy surrounding *Blackfish* as the reason for their withdrawal, and a variety of international news sources reported on the cancellations. In December 2013, SeaWorld Entertainment published an open letter featured in major newspapers and on social media in order to refute "misconceptions" regarding the artist cancellations. *Id.* ¶ 149.

In late 2013 and early 2014, activists initiated a series of online petitions urging sponsors to end their relationships with SeaWorld Entertainment. A variety of media outlets reported on the petitions, amplifying their impact. In July 2014, Southwest Airlines announced it would not renew its 26-year partnership with SeaWorld Entertainment. *Id.* ¶ 156. Other corporate sponsors also ended their relationships with SeaWorld Entertainment in late 2014 and early 2015.

In March 2014, national media outlets reported that a California Assembly member had introduced legislation that would ban orca performances, breeding, and artificial insemination in California. *Id.* ¶ 159. The bill was colloquially referred to as "the *Blackfish* bill." Governor Brown signed the bill on September 13, 2016, officially banning orca breeding and captivity programs in California.

In August 2013, SeaWorld Entertainment Vice President of Communications Fred Jacobs stated "*Blackfish* has had no attendance impact," and that SeaWorld Entertainment

"can attribute no attendance impact at all to the movie." *Id.* ¶ 208.  In November 2013, SeaWorld Entertainment Chief Executive Officer James Atchison ("Defendant Atchison") stated "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it," and that "[i]ronically, our attendance has improved since the movie came out." *Id.* ¶ 217.  In December 2013 Defendant Atchison also stated that "[a]s much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business." *Id.* ¶ 219.  In a fourth quarter earnings call in March 2014, Defendant Atchison reiterated that he had "seen no impact on the business," and that surveys conducted by SeaWorld Entertainment did not "reflect any shift in sentiment about intent to visit our parks." *Id.* ¶ 229.  Lastly, in May 2014, SeaWorld reported a 13% decrease in attendance for the first quarter of 2014 and attributed the decline to the Spring Break holiday and adverse weather conditions.  *Id.* ¶ 232.

On August 13, 2014, SeaWorld Entertainment made the following statement regarding the decline in attendance in the second quarter of 2014: "the Company believes attendance in the quarter was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California." *Id.* ¶ 163.  When asked why proposed legislation tabled in April 2014 would now have an effect on attendance at SeaWorld Entertainment parks in August 2014, Defendant Atchison responded that at the time, SeaWorld Entertainment was "still grappling with what impact there would be related to the news attention around the legislation." *Id.* ¶ 234.  The same day, SeaWorld Entertainment's common stock price dropped nearly 33% ($9.25 per share).  *Id.* ¶ 164.

SeaWorld Entertainment continued to receive negative publicity after the end of the class period.  In November 2014, Defendant Atchison stated that negative attendance trends were the result of "a combination of factors, including negative media attention in California." *Id.* ¶ 185.  Defendant Atchison also participated in a Bloomberg Business article entitled, "Saving SeaWorld," in which he acknowledged that SeaWorld

Entertainment had struggled to find an effective approach in responding to widespread criticism and activism generated by *Blackfish*. Defendant Atchison resigned from his position as CEO of SeaWorld Entertainment in December 2014. News outlets subsequently reported that *Blackfish* is "widely considered to be at least partly responsible for SeaWorld's attendance drop." *Id.* ¶ 191.

## PROCEDURAL HISTORY

Plaintiffs filed their previous Consolidated Amended Class Action Complaint ("CAC") on February 27, 2015. Doc. No. 42. The CAC named twenty-seven Defendants, including all of the banking institutions that underwrote SeaWorld Entertainment's public offerings. The CAC also included five counts, including three claims under Sections 11, 12, and 15 of the Securities Act of 1933, and two claims under Sections 10(b) and 20 of the Securities Exchange Act of 1934.

The Court granted Defendants' motion to dismiss on March 31, 2016 and allowed Plaintiffs 60 days to amend. Doc. No. 102. Plaintiffs filed their Second Amended Consolidated Class Action Complaint on May 31, 2016. *See* SAC. Plaintiffs limited the defendants in the action to SeaWorld Entertainment, James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P. Plaintiffs also limited their causes of action to two counts for violations of Sections 10(b) and 20 of the Securities Exchange Act of 1934. *See id.* Plaintiffs seek the following relief on behalf of the class: (a) a declaration that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 and Plaintiffs' counsel as Class Counsel; (b) compensatory damages against Defendants jointly and severally, including interest; (c) reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and (d) awarding all equitable and other relief as the Court may deem just. *See id.*

On June 29, 2016, Defendants filed a motion to dismiss Plaintiffs' SAC for failure to state a claim under Rules 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4). Doc. No. 128. The Court heard oral argument on the motion, and denied Defendants' motion to dismiss. Doc. No. 142. On May 19,

14cv2129-MMA (AGS)

2017, Plaintiffs filed the instant motion.

**PLAINTIFFS' PROPOSED CLASS**

Plaintiffs seek to represent a class of all persons and entities who purchased or otherwise acquired SEAS Common Stock between August 29, 2013 and August 12, 2014, and who were damaged thereby.  SAC ¶ 1.  Excluded from the class are: (i) Defendants, (ii) present or former executive officers of SeaWorld, members of SeaWorld's Board of Directors, and members of their immediate families, (iii) any of the foregoing persons' legal representatives, heirs, successors or assigns, and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of SeaWorld.  *Id.*

**LEGAL STANDARD**

Federal Rule of Civil Procedure 23 governs the certification of a class.  Fed. R. Civ. P. 23.  "Parties seeking class certification bear the burden of demonstrating that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011) (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001)).  Rule 23(a) requires a party seeking class certification to establish the following four elements:

> (1) that the class is so large that joinder of all members is impracticable (numerosity); (2) that there are one or more questions of law or fact common to the class (commonality); (3) that the named parties' claims are typical of the class (typicality); and (4) that the class representatives will fairly and adequately protect the interests of other members of the class (adequacy of representation).

*Id.* at 980 (citing Fed. R. Civ. P. 23(a)).  The United States Supreme Court has made clear that "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Instead, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or

14cv2129-MMA (AGS)

fact, etc." *Id.*

At the certification stage, district courts must "engage in a 'rigorous analysis' of each Rule 23(a) factor when determining whether plaintiffs seeking class certification have met the requirements of Rule 23." *Ellis*, 657 F.3d at 980. "In many cases, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. . . ." *Id.* (internal citation and quotation omitted). "[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. More importantly, it is not correct to say a district court may consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Id.* at 981 (emphasis in original).

Once the prerequisites of Rule 23(a) are met, the Court must then determine whether the class action is maintainable under Rule 23(b). "Under Rule 23(b)(3), a class may be certified if the district court 'finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting Fed. R. Civ. P. 23(b)(3)); *see also Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1111 (9th Cir. 2014). "The party seeking certification bears the burden of demonstrating that he has met the requirements of Rule 23(b)." *Vinole*, 571 F.3d at 944 n.9.

## DISCUSSION

### I. Defendants' Request for Judicial Notice

As an initial matter, Defendants request that the Court take judicial notice of several documents in connection with their opposition to Plaintiffs' motion for class certification (Exhibits 1-3, and 8-10 to the Declaration of Chet A. Kronenberg). *See* Doc. No. 198-21. Plaintiffs do not oppose this request.

Generally, a court must take judicial notice if a party requests it and supplies the

14cv2129-MMA (AGS)

court with the requisite information. Fed. R. Evid. 201(d). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see Mack v. South Bay Beer Distributors,* 798 F.2d 1279, 1282 (9th Cir. 1986) (citing *Sears, Roebuck & Co. v. Metropolitan Engravers, Ltd.,* 245 F.2d 67, 70 (9th Cir. 1956)). While a court may take judicial notice of matters of public record, it may not take judicial notice of a fact that is subject to reasonable dispute. Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).

The Court previously took judicial notice of Exhibits 1, 3, 8 and 10, all of which were filed with the SEC, in connection with Defendants' motion to dismiss Plaintiffs' CAC. *See* Doc. No. 102 at 8-9. Exhibit 2 is an excerpt from SeaWorld's Prospectus, filed with the SEC on or about December 12, 2013. Exhibit 9 is a transcript of SeaWorld's Fourth Quarter 2013 Financial Results Conference Call, held on or about March 13, 2014. Because these documents are publicly-available and capable of accurate determination, the Court **GRANTS** Defendants' request for judicial notice. *See In re New Century*, 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008) ("It is well-established that courts may take judicial notice of SEC filings."); *see also In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 495 (W.D. Wash. 2009) (taking judicial notice of conference call transcripts).

## II.    Plaintiffs' Motion for Class Certification

Defendants oppose certification on several grounds. First, Defendants contend Plaintiffs do not satisfy Rule 23(a)'s adequacy and typicality requirements because: a) Plaintiffs' investment decisions were not typical; b) PBU may be subject to atypical standing defenses; and c) Plaintiffs have not instituted mechanisms to ensure coordination of their efforts in the litigation. *See* Doc. No. 215. Second, Defendants assert Plaintiffs cannot meet Rule 23(b)(3)'s predominance requirement because: a) Defendants rebut Plaintiffs' presumption of reliance; and b) Plaintiffs fail to proffer a

damages model that is susceptible to proof on a class-wide basis. *See id.* The Court addresses each requirement of Rule 23(a) and Rule 23(b)(3) below.

## A. <u>Rule 23(a)</u>

### 1. Numerosity

Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, Plaintiffs allege the class consists of "potentially thousands of investors in SEAS Common Stock, which was traded on the New York Stock Exchange." Doc. No. 213-1 at 8. Defendants do not dispute that Rule 23(a)(1)'s numerosity requirement is met in this case. Accordingly, the Court finds that the numerosity requirement is satisfied. *See Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 602-03 (C.D. Cal. 2015) ("'As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members[.]'") (quoting *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000)).

### 2. Commonality

Rule 23(a)(2) requires that there be a question of law or fact common to the class. *See* Fed. R. Civ. P. 23(a)(2). The common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Commonality therefore "requires plaintiffs to demonstrate that the class members have suffered the same injury, not merely violations of the same provision of law." *Parsons v. Ryan*, 754 F.3d 657, 674–75 (9th Cir. 2014) (citations and quotations omitted). Accordingly, "[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Id.* at 675 (quoting *Evon v. Law Offices of Sidney Mickell,* 688 F.3d 1015, 1029 (9th Cir. 2012)). As the Supreme Court has noted, "for purposes of Rule 23(a)(2) even a single common question will do." *Dukes*, 564 U.S. at 359 (internal quotation and alteration omitted).

Here, Plaintiffs argue several common questions of law and fact exist, including:

(i) whether Defendants violated federal securities law; (ii) whether Defendants' statements during the class period misrepresented or omitted facts about the business and management of the company; (iii) whether those statements and/or omissions were material; (iv) whether Defendants acted with the requisite state of mind; (v) whether the market price of SEAS Common Stock was artificially inflated during the class period due to the alleged material misrepresentations and omissions; and (vi) whether Defendants' conduct resulted in damages to the class. *See* Doc. No. 213-1 at 9. Defendants do not dispute that Rule 23(a)(2)'s commonality requirement is satisfied. As such, the Court finds this requirement is met. *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009) ("all class members are unified by an interest in proving the same common course of conduct regarding [the defendants'] allegedly fraudulent . . . representations"); *Schaefer v. Overland Express Family of Funds*, 169 F.R.D. 124, 128 (S.D. Cal. 1996) (finding Rule 23(a)(2) was met in a securities fraud case when the legal claims arose from common misrepresentations).

### 3. *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons*, 754 F.3d at 685. The typicality requirement "assure[s] that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (quoting *Hanon*, 976 F.2d at 508).

Plaintiffs argue that their claims are typical of all class members, as they purchased SEAS Common Stock during the class period for investment purposes. Defendants claim

the typicality requirement is not met for two reasons.

First, Defendants contend █████████████████████████
████████████████████████████████████████████████
██████████████████████          ████████████████████
██████████████████████████████████
███████████████████████████████████████████
██████████     ██████████████████████████
██████████████████████████████████████
███████████████████████████ "demonstrate[s] that Plaintiffs
did not rely on the statements they themselves contend were false or misleading to the
market." Doc. No. 215 at 9.

In response, Plaintiffs claim that "Westwood possessed and relied only on
SeaWorld's market price and public information when deciding to trade SeaWorld
shares." Doc. No. 243 at 5. ██████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

Here, ████████████████████████████████
██████████████ , the record reflects that Westwood based its trading decisions on
information ██████████████████████████████
████████████████████████████ ; *see Blackie v. Barrack*, 524
F.2d 891, 907 (9th Cir. 1975) (investors may "purchase because of a favorable price
trend, price earnings ratio, or some other factor," but that decision is based on "the truth
of the representations underlying the stock price"). "Most investors think they are a little
smarter than average and see opportunities others have missed. Still, they all rely on
publicly available data (with the exception, of course, of investors trading on insider



---

[1] Citations to this document refer to the pagination assigned by the CM/ECF system.

information).” *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 253 (N.D. Cal. 2013).

Defendants’ reliance on *GAMCO Investors, Inc. v. Vivendi, S.A.* is misplaced. 927 F. Supp. 2d 88 (S.D.N.Y. 2013). In *GAMCO*, following class certification and a bench trial, the district court found that an investor who relied on “a private method of valuation” to purchase shares of the defendant company could not rely on the fraud-on-the-market theory. *Id.* at 102. In fact, the investor continued to purchase stock after the fraud had been fully disclosed; thus, the defendant had proven that “but for the alleged misrepresentations and omissions, Plaintiffs would have been *more* likely to invest in [the defendant company].” *Id.* (emphasis in original). Here, however, Westwood sold its SeaWorld shares shortly after learning of the alleged fraud. *See* Doc. No. 243-1 at 823; *see also In re Diamond Foods, Inc.*, 295 F.R.D. at 253 (distinguishing *GAMCO* where the plaintiffs’ investment manager recommended selling shares based on concerns about alleged fraud).

Additionally, Defendants emphasize the fact that ███████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████  ████████████████████.
According to Plaintiffs, there is “*no* evidence that Westwood knew during the class period that SeaWorld’s public denials of *Blackfish*’s impact were false.” Doc. No. 243 at 6 (emphasis in original). ██████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████. *See In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *6 (N.D. Cal. Dec. 22, 2016) (noting that the “record here does not suggest Plaintiffs possessed material non-public information or otherwise operated under materially distinct

factual circumstances from other class members."); *cf. Markewich v. Ersek*, 98 F.R.D. 9, 10-11 (S.D.N.Y. Aug. 23, 1982) (denying motion for class certification where the plaintiff purchased securities on the advice of a broker where evidence supported the contention that the broker had access to nonpublic information). Moreover, as previously mentioned, Westwood sold its SeaWorld shares shortly after the August 13, 2014 disclosure, further supporting a finding that Plaintiffs did not have access to nonpublic information.

As such, the Court finds that Plaintiffs are not subject to a unique defense ███████ ████████████████████████████████████████████████████████████████ ███████████████████████████. Such information was readily available to the other class members. *See In re Diamond Foods, Inc.*, 295 F.R.D. at 252-53 ("[t]hat an investment advisor thinks it is smarter than the rest of the market in evaluating truthful public data in the market should not be a license for manipulators to pump false information into the public domain to grossly inflate a stock price."); *Darquea v. Jarden Corp.*, 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008) (noting that even where the lead plaintiffs' investment advisors testified that the alleged misrepresentations at issue were not crucial to their decision to recommend the purchase of the relevant stock, "there is no reason to believe that the defense will draw any extraordinary attention or divert the trial from the main issues").

Second, Defendants claim Plaintiff PBU may be subject to atypical standing defenses ███████████████████████████████. ████████████████████████████. "PBU's atypical burden of establishing standing 'is likely to consume [PBU's] time' and 'rais[es] the potential for conflict with [its] duty to represent the class.'" *Id.* at 11 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 600 (N.D. Ill. 2009)). Defendants contend that they ████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████

-14-                                    14cv2129-MMA (AGS)

Here, Defendants' argument is insufficient to defeat typicality.  The record reveals ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████ Thus, Defendants have not shown PBU is atypical.

In sum, the Court concludes that Plaintiffs have satisfied the typicality requirement.  Plaintiffs' claims are "typical of the claims" of the class, and there is insufficient evidence in the record to support a finding that Plaintiffs are subject to atypical defenses.  Fed. R. Civ. P. 23(a)(3); *see also In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at \*6 ("Plaintiffs' claims are generally founded on the same alleged facts and legal theories as the claims of other Class members . . . .") (internal quotation marks omitted).

### 4. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'"  *Ellis*, 657 F.3d at 985 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).  This requirement satisfies due process for absent class members who are bound by entry of judgment.  *Hanlon*, 150 F.3d at 1020.

Here, Defendants do not raise any potential conflicts of interest, and the Court is unaware of any such conflicts in this case.  Thus, the Court finds the first question of the adequacy test is met.

Regarding the second question, however, Defendants assert that Plaintiffs are not adequate class representatives because they have not shown that they are able to

14cv2129-MMA (AGS)

coordinate their efforts in the litigation.  Doc. No. 215 at 11 (citing *Schriver v. Impac Mortg. Holdings, Inc.*, 2006 WL 6886020, at *8 (C.D. Cal. May 2, 2006)).[2] ██████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ █.[3]  Defendants further contend Plaintiffs submitted a misleading declaration wherein PBU and APERS assert they "have discussed with each other mechanisms for joint decision-making, including the implementation of communication procedures to enable PBU and APERS to confer with or without counsel, via telephone and/or e-mail. . . ."  Doc. No. 215-19 at 6.[4]  Defendants claim the submission of a misleading declaration is "independently a sufficient reason to find [Plaintiffs] inadequate to represent the class."  Doc. No. 215 at 12.

In response, Plaintiffs assert ████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ ████████████████.  Moreover, Plaintiffs claim that Defendants misrepresent the record regarding mechanisms for joint decision making, ██████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ████████████████████

████████.

Here, the Court finds that Plaintiffs PBU and APERS are adequate class

_____

[2]  The district court in *Schriver* considered the adequacy of the plaintiffs at the appointment of the lead plaintiff stage.  *See id.*  Here, in contrast, the Court appointed PBU and APERS as lead plaintiffs nearly three years ago.  *See* Doc. No. 25.

[3]  Citations to documents 215-7 and 215-8 refer to the pagination assigned by the CM/ECF system.

[4]  Citations to this document refer to the pagination assigned by the CM/ECF system.

representatives that will prosecute the action vigorously on behalf of the class. *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

██████████████████████████████
██████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████

Lastly, Plaintiffs assert that Lead Counsel Nix Patterson & Roach, LLP ("NPR") and Kessler Topaz Meltzer & Cheek, LLP ("Kessler Topaz"), are "highly experienced and amply qualified to serve as counsel for the proposed Class." Doc. No. 213-1 at 12. Defendants do not contest this point, and the Court finds no reason why NPR and Kessler Topaz are not qualified to represent the proposed class, or would not otherwise be adequate pursuant to Rule 23(g). As such, the Court appoints NPR and Kessler Topaz as Class Counsel.

In sum, the Court finds that Plaintiffs and Class Counsel have shown that they will "fairly and adequately protect the interests of the class," thereby satisfying the adequacy requirement. Fed. R. Civ. P. 23(a)(4).

**B.** **Rule 23(b)(3)**

### 1. Predominance

"Under Rule 23(b)(3), the court must find that questions of law or fact common to class members predominate over any questions affecting only individual members." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (internal quotation marks omitted). "Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 469 (2013) (internal quotation marks omitted) (emphasis in original).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*")

(quoting Fed. R. Civ. P. 23(b)(3)).  "To succeed on the merits, plaintiffs alleging securities fraud under [Section 10(b) of the Securities Exchange Act of 1934 and] Rule 10b-5 'must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Stockwell*, 749 F.3d at 1112 (quoting *Amgen*, 568 U.S. at 460-61).  "Predominance is a test readily met in certain cases alleging . . . securities fraud . . . ."  *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Here, Defendants argue individual issues predominate regarding the fourth and fifth elements of Plaintiffs' Section 10(b) claim—reliance and damages.  *See* Doc. No. 215 at 12.  Specifically, Defendants contend Plaintiffs: a) lack a viable class-wide theory of reliance, as "none of the alleged misrepresentations resulted in any price inflation of SeaWorld shares;" and b) fail to show damages can be measured on a class-wide basis. *Id.* at 13, 19.  The Court addresses Defendants' arguments in turn.

a.  Reliance

i.  *Presumption of Reliance*

Pursuant to the "fraud on the market" theory, plaintiffs in a securities class action may invoke a presumption of class-wide reliance by demonstrating that the common stock at issue traded in an efficient market.  *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988).  This is based on the hypothesis that "in an open and developed securities market, the price of a company's stock is determined by the available material information" and that "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements[.]"  *Id.* at 241-42.

In order to invoke *Basic*'s presumption of reliance, a plaintiff "must prove that: (1) the alleged misrepresentations were publicly known, (2) the stock traded in an efficient market, and (3) the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'"  *In re Diamond Foods, Inc.*, 295 F.R.D. at 247 (quoting *Basic*, 485 U.S. at 248 n.27)).

1    Here, Plaintiffs contend that the prerequisites for invoking the fraud on the market

2    presumption are "easily met." Doc. No. 213-1 at 15. Plaintiffs claim that the alleged

3    false statements and omissions "occurred during conference calls and public interviews,

4    and were reflected in SEC filings and news stories[.]" *Id.* Additionally, all class

5    members "purchased SEAS Common Stock after the actionable statements/omissions

6    were made and before disclosure of the relevant truth concealed by Defendants." *Id.*

7    Lastly, the market was efficient throughout the class period. *See id.*

8        Defendants do not dispute, and the Court agrees, that Plaintiffs have satisfied the

9    prerequisites for invoking *Basic*'s presumption of reliance. The Court finds that the

10   alleged misstatements were publicly made, and that the relevant transactions took place

11   between the time the alleged misrepresentations were made and when the alleged truthful

12   disclosures were made. The Court addresses market efficiency below.

13       The Ninth Circuit utilizes the five-factor test set forth in *Cammer v. Bloom*, 711 F.

14   Supp. 1264, 1287 (D.N.J. 1989), in determining market efficiency. *See Binder v.*

15   *Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999). The *Cammer* factors consider: (1)

16   whether the stock trades at a high weekly volume; (2) whether securities analysts follow

17   and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4)

18   whether the company is eligible to file SEC Registration Form S-3; and (5) whether there

19   are "empirical facts showing a cause and effect relationship between unexpected

20   corporate events or financial releases and an immediate response in the stock price." 711

21   F. Supp. at 1287.

22       Plaintiffs present an event study conducted by their expert, Mr. Coffman, who

23   opines that the market for SEAS Common Stock was efficient through the class period.

24   *See* Doc. No. 213-22 (hereinafter "Coffman Rpt."). "The event study method is an

25   accepted method for the evaluation of materiality [and] damages to a class of

26   stockholders in a defendant corporation." *In re Diamond Foods, Inc.*, 295 F.R.D. at 251.

27       Here, the Court finds that Plaintiffs have met their burden in demonstrating that

28   SeaWorld Common Stock traded in an efficient market. The average weekly trading

volume was 4.9 million shares, equating to 5.41% of total outstanding shares. Coffman Rpt. ¶ 28; *see also Cammer*, 711 F. Supp. at 1293 ("Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."). Moreover, "[t]here were at least 44 reports issued during the Class Period and . . . 6 separate firms that issued reports on SeaWorld, including major firms such as Barclays, JP Morgan, and Wells Fargo." Coffman Rpt. ¶ 33. SEAS Common Stock traded on the New York Stock Exchange during the class period, further supporting a finding of market efficiency. *Id.* ¶ 39. Regarding the fourth factor, SEAS was not S-3 eligible until April 2014, as SeaWorld had been public for approximately four months at the beginning of the class period. *Id.* ¶ 44. Mr. Coffman concluded, however, that he "found no evidence that SeaWorld was not [S-3] eligible starting in April 2014 . . . ." *Id.* Finally, regarding the last factor, the results of Mr. Coffman's event study reveal "a clear cause-and-effect relationship between new public information about SeaWorld and the market price of SEAS Common Stock." *Id.* ¶ 48. The event study took into account "market and industry factors," and "examined the price response of SEAS Common Stock to multiple earnings releases and guidance updates throughout the Class Period, including the corrective disclosure on August 13, 2014." Doc. No. 213-1 at 21; *see also* Coffman Rpt. ¶¶ 48-58. Specifically, Mr. Coffman found that "of the six regular quarterly earnings announcements and guidance updates SeaWorld issued during the Class Period, five resulted in statistically significant price movements above the 95% confidence level." Coffman Rpt. ¶ 57.

Accordingly, the Court finds that Plaintiffs have made a preliminary showing that they are entitled to *Basic*'s presumption of reliance in this case.

### ii.    Rebutting the Presumption of Reliance

Defendants contend that they have rebutted the presumption of reliance by showing lack of price impact from the alleged fraud.

A defendant may introduce evidence at the class certification stage that the alleged

misrepresentation did not affect stock price to rebut the *Basic* presumption. "*Basic* itself 'made clear that the presumption was just that, and could be rebutted by appropriate evidence,' including evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2414 (2014) ("*Halliburton II*") (citing *Halliburton I*, 563 U.S. at 811). "Any showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance[.]" *Basic*, 485 U.S. at 248. If the presumption is successfully rebutted, "a Rule 10b-5 suit cannot proceed as a class action" because individual questions will predominate over common questions of law and fact. *Halliburton II*, 134 S. Ct. at 2416.

Defendants present an event study conducted by their expert, Dr. Torous, who opines that Mr. Coffman never examined whether the alleged misrepresentations were associated with a statistically significant price impact. *See* Doc. No. 215-13 (hereinafter "Torous Rpt."). Specifically, Defendants argue that of the six dates Defendants are alleged to have made a material misrepresentation, there is no statistically significant evidence of price inflation. *See* Doc. No. 215 at 14-19; Torous Rpt. ¶ 14. Dr. Torous claims Mr. Coffman arbitrarily removed dates from consideration, resulting in a bias in favor of finding that SeaWorld's stock price reaction on an event day was statistically significant. Torous Rpt. ¶ 30. In his event study, Dr. Torous "included all market dates unrelated to any alleged misrepresentation or corrective disclosure identified in the SAC, and excluded all alleged misrepresentation dates and the alleged corrective disclosure date from the estimation," which he refers to as the "corrected Coffman study." *Id.* ¶ 31. "The corrected Coffman event study demonstrates a lack of price impact following all six alleged misrepresentations." *Id.* ¶ 33.

Further, Dr. Torous asserts that even Mr. Coffman's "flawed event study" confirms that SEAS Common Stock shares did not experience a statistically significant price increase in connection with any alleged misrepresentations, with the exception of March

13, 2014.  *Id.* ¶ 35.  Dr. Torous asserts that this result is inaccurate, and by using the corrected Coffman study, the March 13, 2014 date is no longer statistically significant. *Id.*  Defendants argue that "[i]t is no surprise that Defendants' alleged misrepresentations had no price impact" because the "market had been saturated with speculation about the potential impact of *Blackfish* on SeaWorld."  Doc. No. 215 at 18.  "Dr. Torous conducted a detailed review of market analyst and media reports throughout the relevant class period, and determined that 'analysts and news media had reached their own conclusions about the potential effect of *Blackfish* on SeaWorld's business.'"  *Id.* (citing Torous Rpt. ¶ 26).

   As an initial matter, to the extent Defendants seek to challenge the materiality of the alleged misrepresentations, such an argument is a premature truth-on-the-market defense.  *See Amgen*, 568 U.S. at 482 (noting that when "news of the [truth] credibly entered the market" is "a matter for trial" and "the potential immateriality of Amgen's alleged misrepresentations and omissions is no barrier to finding that common questions predominate.") (internal citations omitted); *Aranaz v. Catlyst Pharma. Partners Inc.*, 302 F.R.D. 657, 671 (S.D. Fla. 2014) ("a truth-on-the-market defense may not be used at the class certification stage to prove an absence of price impact so as to show a lack of predominance because it goes to materiality").  ██████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████.  Accordingly, Defendants' argument that the alleged misrepresentations did not alter the total mix of information is premature.

   Regarding the alleged lack of price impact, Plaintiffs contend that "'[p]rice impact in securities fraud cases is not measured solely by price increase on the date of the misstatement; it can be quantified by decline in price when the truth is revealed.'"  Doc. No. 243 at 8 (citing *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016)).  This is known as the price maintenance theory.  Thus, Plaintiffs contend Defendants' focus on the price impact at the time of each alleged

misrepresentation "ignor[es] price impact at the time of [the alleged August 13] corrective disclosure." *Id.* at 9 (citing *Hatamian*, 2016 WL 1042502, at *7).

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ Mr. Coffman found a statistically significant price decline of SEAS Common Stock on the alleged disclosure date of August 13, 2014, wherein the stock price fell nearly 33%. Coffman Rpt. ¶ 22. The t-statistic reported in the Coffman Report was -22.35, indicating that there is greater than 99% confidence that this finding is not due to chance. *See id.*, Exh. 7. Dr. Torous does not dispute that the price decline on this day was statistically significant. *See* Torous Rpt. ¶¶ 40-46.

Defendants advance two arguments in opposition to Plaintiffs' price maintenance theory. First, Defendants assert that Plaintiffs' price maintenance theory is "contrary to binding Supreme Court precedent holding that a defendant can rebut the fraud-on-the-market presumption by showing *either* that the misrepresentation *or* its correction did not affect the stock price—not both as Plaintiffs contend." Doc No. 246 at 2 (emphasis in original). Defendants urge this Court to rely on the recent Eighth Circuit decision in *IBEW Local 98 Pension Fund v. Best Buy Co.*, wherein the Eighth Circuit determined a finding of no price impact was dispositive, and that the defendants "rebutted the *Basic* presumption by submitting direct evidence (the opinions of both parties' experts) that severed any link between the alleged . . . misrepresentations and the stock price at which plaintiffs purchased." 818 F.3d 775, 783 (8th Cir. 2016). However, *Best Buy* is distinguishable from the case at bar. There, the Eighth Circuit noted that the "allegedly 'inflated price' was established by [a] non-fraudulent" disclosure. 818 F.3d at 783. Here, in contrast, Plaintiffs contend that each of the allegedly false misstatements "propped up SeaWorld's stock price[.]" Doc. No. 247 at 4.

Further, the Second, Seventh, and Eleventh Circuits have all reached contrary conclusions, holding that "the lack of price movement on the dates of the alleged

misrepresentations does not rebut the *Basic* presumption." *Waggoner v. Barclays PLC*,-- F.3d --, 2017 WL 5077355, at \*19 (2d Cir. Nov. 6, 2017); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 259 (2d Cir. 2016) (noting that "securities-fraud defendants cannot avoid liability for an alleged misstatement merely because the misstatement is not associated with an uptick in inflation."); *Glickenhaus & Co. v. Household Intern., Inc.*, 787 F.3d 408, 418 (7th Cir. 2015) (same); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011) ("There is no reason to draw any legal distinction between fraudulent statements that wrongfully prolong the presence of inflation in a stock price and fraudulent statements that initially introduce that inflation.").

As such, the Court finds persuasive the reasoning of the Second, Seventh, and Eleventh Circuits, and agrees that Defendants cannot rebut the presumption of reliance by only arguing that the alleged misrepresentations did not affect the stock price. *See Barclays*, 2017 WL 5077355, at \*19; *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at \*13 (S.D. Fla. Mar. 16, 2016) ("Measuring price change . . . at the time of the corrective disclosure, rather than at the time of the corresponding misrepresentation, allows for the fact that many alleged misrepresentations conceal a truth, and thus maintain a stock's price."); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at \*6 (S.D. N.Y. Sept. 24, 2015) ("[T]hat the misstatements had no impact on the stock price when made is insignificant."). Because Defendants introduce no evidence of a lack of price impact associated with the August 13 disclosure, Defendants fail to rebut the presumption of reliance.[5]

Second, Defendants assert that even if this Court adopts Plaintiffs' price

---

[5] In light of the Court's finding that Defendants fail to rebut the presumption of reliance, the Court declines to determine at this time whether there was a statistically significant price movement associated with the alleged misrepresentation on March 13, 2014. In any event, the Court declines to narrow the class period at this stage of the litigation. Defendants' argument that "under no circumstances could a class be certified before March 13, 2014" because "Plaintiffs still fail to submit any evidence that SeaWorld's stock price was inflated *before* March 13, 2014" is misplaced. Doc. No. 215 at 19 (emphasis in original). As discussed in detail above, the "lack of a statistically significant price increase does not necessarily equate to lack of price impact." *Hatamian*, 2016 WL 1042502, at \*7.

maintenance theory, "class certification should be denied because Plaintiffs' theory, by Plaintiffs' own admission, requires a corrective disclosure." Doc. No. 246 at 5 (internal quotation marks and citation omitted). Defendants argue that the August 13, 2014 statement "cannot be considered to be a corrective disclosure because it only addressed a decline in attendance in the second quarter of 2014—a quarter about which no alleged misrepresentations were made—and did not address statements concerning attendance in 2013 or the first quarter of 2014." *Id.*

Plaintiffs contend this argument is "not a challenge as to whether there was a statistically significant price reaction following the alleged corrective disclosure (all parties and experts agree there was); rather, it is a class loss causation argument that is premature . . . at this stage." Doc. No. 247 at 4. The Court agrees. "[I]nquiries into loss causation are properly addressed by a fact-finder on the merits; Plaintiffs need not show loss causation as a condition of class certification." *Hatamian*, 2016 WL 1042502, at * 9 (citing *Halliburton I*, 563 U.S. at 813) (finding the circuit court erred in requiring the plaintiff "to show loss causation as a condition of obtaining class certification"); *see also Amgen*, 568 U.S. at 475 ("loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified."). Accordingly, Defendants' argument is premature at this time.

### iii. *Conclusion*

In sum, Defendants have not introduced evidence that "severs the link between the alleged misrepresentation and . . . the price received (or paid) by [Plaintiffs.]" *Basic*, 485 U.S. at 248. Accordingly, the Court finds that Defendants fail to rebut the presumption of reliance.

### b. Damages

Defendants, relying on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), argue that Plaintiffs fail to proffer a class-wide method for computing damages. Thus, according to Defendants, individual damages assessments will predominate. *See* Doc. No. 215 at 19.

The plaintiff "must show a class wide method for damages calculations as a part of the assessment of whether common questions predominate over individual questions." *Lambert*, 870 F.3d at 1182 (citing *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). The Ninth Circuit recently articulated that "uncertain damages calculations alone cannot defeat class certification because *Comcast* stood only for the proposition that 'plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Id.* (citing *Leyva*, 716 F.3d at 513-14). Thus, "[u]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." *Id.*

Plaintiffs contend that they will utilize the standard measures of damages in "virtually all Section 10(b)" cases—the "out-of-pocket" methodology. Doc. No. 213-1 at 21. Plaintiffs' expert, Mr. Coffman, opines that the "out-of-pocket" methodology can be applied using a common formula for the entire class. Coffman Rpt. ¶ 77. Specifically, "the standard methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the Class." *Id.* ¶ 78. "Damages for any individual class member could then be calculated formulaically" from the data. *Id.*

In opposition, Defendants again focus on the purported lack of a corrective disclosure in this case. Specifically, Defendants assert that "Mr. Coffman's deposition confirms that he made no effort to form a view as to whether the 'out-of-pocket' model could actually apply to the specific facts of this case." Doc. No. 215 at 20. Defendants argue Mr. Coffman omits factual analysis from his damages opinion because "he cannot identify any 'corrective disclosure' in this case." *Id.* Defendants further assert that the August 2014 statement cannot serve as a corrective disclosure in this case, as the August 2014 statement relates only to attendance declines in the *second quarter* of 2014—not

attendance in 2013 or the first quarter of 2014. *See id.* at 21-22 (emphasis added).[6] Thus, Defendants conclude that given "the lack of corrective disclosure in this case, Mr. Coffman's proposed 'out-of-pocket' damages method collapses, leaving only a hypothetical damages model untethered to Plaintiffs' theory of liability." *Id.* at 23.

In response, Plaintiffs assert that "Defendants' argument [ ] that Plaintiffs cannot satisfy *Comcast* without proof of a corrective disclosure—i.e., loss causation," is misplaced. Doc. No. 243 at 13. In *Hatamian*, the district court noted that the defendants attacked the "'fit' between an alleged corrective disclosure and a prior alleged fraudulent statement." 2016 WL 1042502, at *9. The district court stated, however, that "[t]his is nothing more than an attack on loss causation, or Plaintiffs' ability to 'show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss.'" *Id.* (emphasis in original) (citing *Halliburton I*, 563 U.S. at 813). The Court agrees. ██████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ Accordingly, Defendants' argument is premature at this time.

---

[6] Defendants cite to the Court's March 31, 2016 order granting Defendants' first motion to dismiss, wherein the Court stated that "[e]ven if one infer[ed] that the statement was really a tacit reference to the so-called Blackfish effect as a whole, rather than just the California legislation, the statement only refers to attendance during the second quarter of 2014, not the entire Class Period." 2016 WL 2993481, at *11 (S.D. Cal. Mar. 31, 2016). However, the Court expressly declined to consider loss causation. *See id.* at *18 ("the Court declines to address [Defendants' loss causation argument] at this time as it appears that th[is] issue[] will be best considered after Plaintiffs have first pleaded a material misrepresentation or omission under the requisite pleading standards."). Further, the Court denied Defendants' motion to dismiss the SAC, finding Plaintiffs sufficiently allege loss causation. *See* Doc. No. 142.

Defendants also rely upon the Fifth Circuit's decision in *Ludlow v. BP, P.L.C.*, based on the BP oil spill, wherein the circuit court found that the plaintiffs' proposed "materialization of the risk" theory of damages "hinges on a determination that each plaintiff would not have bought BP stock *at all* if not for the alleged misrepresentations— a determination not derivable as a common question, but rather one requiring individualized inquiry."  800 F.3d 674, 690 (5th Cir. 2015) (emphasis in original). Defendants argue Plaintiffs' SAC asserts the same theory of liability found incapable of class-wide damages in *Ludlow*.  *See* Doc. No. 215 at 24 (citing SAC ¶ 253).

Notably, the Fifth Circuit in *Ludlow* considered two sub-classes: one involving plaintiffs who purchased stock before the oil spill (the pre-spill class), and another involving purchasers of the stock after the spill started (the post-spill class).  800 F.3d at 680.  The pre-spill damage theory is based on a materialization of the risk theory, where "BP allegedly misstated the efficacy of its safety procedures, creating an impression that the risk of a catastrophic failure was lower than it actually was."  *Id.* at 689.  Thus, the plaintiffs claimed that when the risk was materialized (i.e., the spill occurred), and BP's stock price fell, the investors who were defrauded into taking on that heightened risk could recover the bulk of that fall as damages.  *Id.*  The Fifth Circuit affirmed the district court's determination that this theory of damages was not capable of class-wide determination.  *Id.* at 690.

Here, however, Plaintiffs do not advance a materialization of the risk theory of damages.  In fact, Plaintiffs clearly assert an "out-of-pocket" damages methodology.  *See* Doc. No. 213 at 22 ("The standard formula for assessing damages for each Class Member is the artificial inflation per share at the time of purchase, less the artificial inflation at the time of sale," which is "applicable on a class-wide basis.").  Thus, the case at bar is actually analogous to the post-spill class in *Ludlow*.  As the Fifth Circuit noted, the plaintiffs' theory of damages in the post-spill class was that "because of BP's misstatements, the stock price was higher than it should have been.  The damages model, in turn, relied on a theory that the 'inflation' in the stock price caused by the

misstatements would be exposed by the fall in the price when certain 'corrective events' brought the 'true' information to the market's attention." 800 F.3d at 680. The Fifth Circuit affirmed the district court's order certifying the post-spill class. As such, Defendants' reliance on *Ludlow* is misplaced.

On this record, the Court finds that Plaintiffs' proposed damages model is sufficiently linked to their theory of liability. Defendants' arguments to the contrary are unavailing. *See Blackie*, 524 F.2d at 905 ("The amount of damages is invariably an individual question and does not defeat class action treatment. . . . [W]e are confident that should the class prevail[,] the amount of price inflation during the period can be charted and the process of computing individual damages will be . . .a mechanical task."). Accordingly, the Court finds that Plaintiffs have sufficiently shown damages are capable of measurement on a class-wide basis.

c.    Conclusion

In sum, the Court concludes that Plaintiffs have sufficiently demonstrated that questions of law or fact common to class members predominate over any individual questions, thereby satisfying the predominance requirement of Rule 23(b)(3).

**2.    *Superiority***

"In addition to establishing predominance of a common question, a class proponent must also demonstrate that the class action is superior to other methods of adjudicating the controversy." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1123 (9th Cir. 2017) (citing Fed. R. Civ. P. 23(b)(3)).

Here, Plaintiffs assert the superiority requirement is satisfied because thousands of individual claims will unnecessarily burden the judiciary, Plaintiffs are unaware of any other action asserting similar claims to those asserted in this action, the geographic dispersion of class members makes it desirable to litigate in this forum, and there are no foreseeable management difficulties that would preclude this action from being maintained as a class action. *See* Doc. No. 213-1 at 24-25. Defendants do not dispute that the superiority requirement is met. Thus, the Court finds that the superiority

requirement of Rule 23(b)(3) is satisfied.  *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation.")

## C.    "**In-Out" Traders**

Finally, Defendants argue that any class must exclude "in-out" traders who sold SEAS common stock shares prior to August 13, 2014.  *See* Doc. No. 215 at 25. Defendants claim that traders who sold their securities prior to the alleged corrective disclosure on August 13, 2014 will be unable to prove economic loss based on the alleged misrepresentations.  *See id.*  Plaintiffs contend that it is premature to exclude in-out traders at the class certification stage, as Defendants can move for summary judgment on this issue, if appropriate.  *See* Doc. No. 243 at 15 n.31.

In-out traders are those who "purchased stock during the period of misrepresentation but sold it before any disclosure which either partially or completely corrected the misrepresentation."  *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987), *overruled on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990).  "Proof of causation of economic loss is an element of a cause of action for securities fraud."  *In re Juniper Networks Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)). "Thus, in order to determine whether in-and-out traders should remain part of the proposed class, it is necessary to demonstrate that they might be able to prove a loss, i.e., damages."  *Id.* (quoting *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 544 (E.D. Va. 2006)).

"District Courts in the Ninth Circuit have been in conflict with each other over whether in-and-out traders are appropriately included."  *McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 699 (W.D. Wash. 2010).  Plaintiffs rely on *Buttonwood Tree Value Partners, LP v. Sweeney*, where the district court declined to exclude in-out traders because "it remains an open question as to whether the [first in time disclosure currently identified by

the parties] was [indeed] the first corrective disclosure, or the first time damages occurred." 2013 WL 12125980, at *15 (C.D. Cal. Sept. 12, 2013) (internal citation omitted); *see also McGuire*, 267 F.R.D. at 699 (including in-out traders in the class at the class certification stage). Defendants rely on *In re Juniper Networks*, where the district court excluded in-out traders who sold their Juniper securities prior to the first date on which the plaintiffs allege that partially curative disclosures were made to the public. 264 F.R.D. at 594; *see also In re UTStarcom, Inc. Sec. Litig.*, 2010 WL 1945737, at *11-12 (excluding in-out traders who sold their stock before the first alleged corrective disclosure).

Here, unlike *Buttonwood*, where it was unclear whether the first corrective disclosure identified by the parties was the indeed the first corrective disclosure, the SAC alleges only one corrective disclosure—the August 13, 2014 statement. Thus, only those who held SEAS Common Stock through that date were allegedly harmed. All other persons or investors who may have bought or acquired SEAS Common Stock during the proposed class period, but sold prior to August 13, 2014, "would not have suffered any injury because they would have also sold the stock at an alleged artificially inflated price, and the level of artificial inflation present in the stock cannot change, absent any intervening corrective disclosures." Torous Rpt. ¶ 56.

Accordingly, the Court excludes in-out traders from the class (i.e., those who sold their SEAS Common Stock shares prior to August 13, 2014).

<u>CONCLUSION</u>

Based on the foregoing, the Court **GRANTS** Plaintiffs' motion for class certification. The Court certifies Plaintiffs' class as follows:

> All persons and entities who purchased or otherwise acquired the publicly traded common stock of SeaWorld Entertainment, Inc. between August 29, 2013 and August 12, 2014, who did not sell such acquired securities before August 13, 2014, and were damaged. Excluded from the class are: (i) Defendants, (ii) present or former executive officers of SeaWorld, members of SeaWorld's Board of Directors, and members of their immediate families,

(iii) any of the foregoing persons' legal representative, heirs, successors or assigns, and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of SeaWorld.

The Court appoints APERS and PBU as Class Representatives. Additionally, the Court appoints the law firms Nix Patterson & Roach, LLP and Kessler Topaz Meltzer & Cheek, LLP as Class Counsel.

**IT IS SO ORDERED.**

Dated: November 29, 2017

HON. MICHAEL M. ANELLO
United States District Judge