# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOU BAKER, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiff,<br><br>v.<br><br>SEAWORLD ENTERTAINMENT, INC., et al.,<br><br>                                    Defendants. | Case No.:  14cv2129-MMA (AGS)<br><br>**<u>REDACTED</u>**<br><br>**ORDER AFFIRMING TENTATIVE RULINGS RE: DAUBERT MOTIONS AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. Nos. 344, 347, 351, 355, 358, 359] |

Lead Plaintiffs Arkansas Public Employees Retirement System ("APERS") and Pensionskassen for Børne-Og Ungdomspædagoger ("PBU") (collectively, "Plaintiffs") and Defendants SeaWorld Entertainment, Inc. ("SeaWorld"), The Blackstone Group L.P. ("Blackstone"), James Atchison, James M. Heaney, and Marc Swanson (collectively, "Defendants") appeared before the Court on Friday, October 11, 2019 at 9:00 a.m. for a hearing on the parties' *Daubert* motions and Defendants' motion for summary judgment. In anticipation of the hearing, the Court issued tentative rulings on the pending motions. *See* Doc. No. 463.  For the reasons set forth below, the Court **AFFIRMS** its tentative rulings.

Plaintiffs bring this securities fraud class action against Defendants asserting claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated under § 10(b). *See* Doc. No. 123 ("SAC"). Plaintiffs bring this action on behalf of all individuals and entities who purchased or acquired common stock of SeaWorld throughout the Class Period (August 29, 2013 to August 12, 2014).

This case involves statements and omissions made by Defendants in the wake of the 2013 documentary *Blackfish*. *Blackfish* tells the story of Tilikum, a 12,000-pound bull orca implicated in the deaths of three people, and chronicles the cruelty of killer whale capture methods, the dangers trainers face performing alongside killer whales during SeaWorld's popular shows, and the physical and psychological strains killer whales experience in captivity. Through interviews with former trainers, spectators, employees of regulatory agencies, and scientists, *Blackfish* makes the case that keeping killer whales in captivity for human entertainment is cruel, dangerous, and immoral. *Blackfish* premiered at the Sundance Film Festival on January 19, 2013.

SeaWorld is a theme park and entertainment company. During the Class Period, SeaWorld owned and operated eleven theme parks in the United States: SeaWorld Orlando, SeaWorld San Diego, SeaWorld San Antonio, Aquatica Orlando, Aquatica San Diego, Discovery Cove, Busch Gardens Tampa, Busch Gardens Williamsburg, Adventure Island, Water Country USA, and Sesame Place. SeaWorld's brand and reputation are among the company's most important assets. SeaWorld has been subjected to criticism related to captivity issues, even prior to the release of the 2013 documentary *Blackfish*.

Mr. Atchison served as SeaWorld's Chief Executive Officer ("CEO"), President,

---

[1] These material facts are taken from the parties' separate statements and responses thereto, as well as the supporting declarations and exhibits. Disputed material facts are discussed in further detail where relevant to the Court's analysis. Facts that are immaterial for purposes of resolving the current motions are not included in this recitation.

and Director from before the start of the Class Period until January 2015. Mr. Heaney has served as SeaWorld's Chief Financial Officer from before the start of the Class Period to present. Mr. Swanson has served as SeaWorld's Chief Accounting Officer from before the start of the Class Period to present. Defendants Atchison, Heaney, and Swanson are collectively referred to as the "Individual Defendants."

Blackstone is a multinational private equity, investment banking, alternative asset management, and financial services corporation based in New York, New York.

On July 19, 2013, *Blackfish* was released in approximately ninety-nine (99) select theaters across the United States and the film's theatrical run lasted fourteen weeks. On October 24, 2013, CNN aired *Blackfish* for the first time, where it was broadcast to tens of millions more people than during the film's theatrical run. "The social media generated by *Blackfish* reached a fever pitch following the CNN premiere of the film." SAC ¶ 136. *Blackfish* was also made available for viewing on Netflix and iTunes in late 2013. At this time, Netflix maintained approximately thirty-one (31) million U.S. domestic subscribers. *See id.* ¶¶ 84, 220(c).

In 2013 and throughout the Class Period, social media reaction to *Blackfish* remained elevated. Consumers contacted SeaWorld and vowed to never visit its parks because of *Blackfish*. *See, e.g.*, PX 399, PX 385, PX 399. Additionally, *Blackfish* publicity led partners and sponsors to end or table partnerships and promotions with SeaWorld.

Company-wide attendance declined in 2013 and 2014. Specifically, as compared to the prior year, attendance was down 9.5% in 2Q13, 3.6% in 3Q13, and 1.4% in 4Q13. This resulted in a 4.1% decline in overall attendance for 2013. SeaWorld further reported a 14% decline in attendance in 1Q14. SeaWorld's attendance was up 0.3% for 2Q14, ▮

Plaintiffs challenge several statements made by SeaWorld executives as false

and/or misleading during the Class Period.  On August 29, 2013, the *Los Angeles Times* published an article quoting SeaWorld's Vice President of Communications, Fred Jacobs, as stating, "*Blackfish* has had no attendance impact."  PX[2] 88.  *Bloomberg* also published an article quoting Jacobs as stating that "[w]e can attribute no attendance impact at all to the movie[.]"  *Id.*; *see also* PX 10 at 183.  Jacobs testified at his deposition that he did not believe either statement was true when he made it.  PX 10 at 183-84, 194.

Beginning in July 2013, SeaWorld received survey results from the TNS omnibus survey (the "Omnibus survey").  The survey inquired about awareness of the movie *Blackfish*, whether respondents had seen, or intended to see the movie, and whether respondents identified SeaWorld as the company the movie was about.  SeaWorld's Director of Budgeting and Forecasting, Joshua Powers, ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████ Further, Powers testified that from August 29, 2013 through November 13, 2013, ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ █████████████

Plaintiffs further challenge three statements made during 4Q13.  First, SeaWorld's earnings release for 3Q13, published on November 13, 2013, attributed a 3.6% attendance decline in 3Q13 to only "adverse weather" and "planned strategies that increased revenue but reduced low yielding and free attendance."  SAC ¶ 213.  Second, on November 14, 2013, SeaWorld's Chief Executive Officer, James Atchison, was quoted by the *Wall Street Journal* as stating, "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it. . . .  Ironically, our attendance

---

[2]  Citations to "PX" refer to the Exhibits to the Hill Declaration, filed in support of Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment. *See* Doc. No. 394-1.

14cv2129-MMA (AGS)

has improved since the movie came out." PX 100.  Third, on December 20, 2013, Atchison was quoted by the *Orlando Sentinel* as stating, "As much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business." PX 106.  From November 14, 2013 through December 20, 2013, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

On March 13, 2014, SeaWorld issued its earnings release for 4Q13 and fiscal year 2013.  Defendants attributed SeaWorld's attendance decline for 4Q13 and FY13 to factors other than *Blackfish*, including weather and yield management strategies. Additionally, during the earnings call, Atchison made the following statements: (a) "As much as we're asked it, we can see no noticeable impact on our business;" (b) "But our surveys don't reflect any shift in sentiment about intent to visit our parks;" (c) "A matter of fact, the movie in some ways has actually made perhaps more interest in marine mammal parks, and actually even about us;" and (d) "But we have seen no impact on the business." PX 115.  From December 21, 2013 through March 13, 2014, ██████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

Lastly, in SeaWorld's May 14, 2014 earnings release for 1Q14, SeaWorld attributed its 13% attendance decline for the quarter to weather and the shift in the Easter holiday from 1Q14 to 2Q14.  ████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████  PX 122 at 141.

SeaWorld reported its 2Q14 results in a Form 8-K filed with the SEC on August 13, 2014.  While attendance was up 0.3% versus the prior year, SeaWorld explained that this was "offset by lower attendance at its destination parks due to a combination of factors."  Doc. No. 359-2 (hereinafter "Youngwood Decl."), Ex. 29 at 2.  Specifically, attendance in the second quarter was impacted by factors including, "a late start to summer for some schools in the Company's key source markets, new attraction offerings at competitor destination parks, and a delay in the opening of one of the Company's new attractions[.]"  *Id.*  Moreover, "the Company believes attendance in the quarter was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California."  *Id.*  SeaWorld revised its earnings estimates downward: "For the full year of 2014, the Company now expects full years 2014 revenue and Adjusted EBITDA to be down in the range of 6-7% and 14-16%, respectively, compared to the prior year."  *Id.*  SeaWorld's common stock price dropped by 33%, or $9.25 per share, following the announcement.  Plaintiffs commenced the instant action on September 9, 2014.  *See* Doc. No. 1.

## *DAUBERT* MOTIONS

Defendants move to exclude the testimony of three of Plaintiffs' experts: Dr. Steven Feinstein (Doc. No. 346[3]), Chad Coffman, CFA (Doc. No. 349), and Dr. James Gibson (Doc. No. 353).  Plaintiffs move to exclude the testimony of two of Defendants'

_____

[3]  All further citations to the electronically filed briefs in this Order refer to the sealed versions.

experts: Dr. Craig Lewis (Doc. No. 354) and Dr. Randolph Bucklin (Doc. No. 357).

## 1. Legal Standard

Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. As the Ninth Circuit explained:

> Under *Daubert* and its progeny, including *Daubert* II, a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).
>
> "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id*. at 564 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id*. at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id*. at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id*. at 969-70.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043-44 (9th Cir. 2014). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Id*. at 1044.

**2. Motion to Exclude Expert Opinion and Testimony of Dr. Steven Feinstein**

Defendants seek to exclude the testimony of Dr. Steven Feinstein, who was retained by Plaintiffs to evaluate the conclusions in the Expert Report of Martin Dirks, dated January 22, 2019, and Section III of the Expert Report of Dr. Craig M. Lewis, dated January 22, 2019. *See* Doc. No. 346. Feinstein is an Associate Professor of Finance at Babson College, and the founder and President of Crowninshield Financial Research, Inc., a financial economics consulting firm. Doc. No. 346-1 (hereinafter "Feinstein Reb. Rpt.") ¶ 11. Feinstein has his Ph.D. in Economics from Yale University, a Master of Philosophy degree in Economics from Yale University, a Master of Arts in Economics from Yale University, and a Bachelor of Arts degree in Economics from Pomona College. *See id.* ¶ 12. Additionally, Feinstein holds the Chartered Financial Analyst ("CFA") designation. *See id.* Defendants contend that Feinstein's testimony is inadmissible because Feinstein's rebuttal report: (a) does not rebut anything in Defendants' experts' initial reports; and (b) rests on an erroneous legal standard. *See* Doc. No. 346 at 5-6.

*a. Feinstein's Rebuttal Opinions*

Defendants contend that Feinstein has not submitted a rebuttal report because he "talks *past* Mr. Dirks rather than rebutting his methodologies and conclusions[.]" Doc. No. 346 at 6 (emphasis in original). Thus, Feinstein's report "is simply an untimely affirmative report not submitted by the deadlines set in the Case Management Order."[4] *Id.* In response, Plaintiffs point out that Defendants "do not address or even mention Professor Feinstein's testimony concerning the flawed conclusions in the Lewis Report."

---

[4] In their reply brief, Defendants assert that Feinstein's rebuttal report is subject to exclusion pursuant to Federal Rule of Civil Procedure 26, which governs a party's duty to disclose during discovery. Notably, Defendants do not mention Rule 26 in their opening brief. As such, the Court need not address this argument. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Regardless, for the reasons set forth below, the Court finds that there is no Rule 26 violation and that Feinstein's rebuttal report is admissible.

Doc. No. 378 at 7.[5]  Additionally, Plaintiffs maintain that Feinstein's criticisms of Dirks' opinions render his report admissible.  *See id.*

Pursuant to the Scheduling Order entered in this case, January 15, 2019 was the deadline for the parties to designate affirmative experts, and January 22, 2019 was the deadline to serve expert reports.  *See* Doc. No. 333.  On March 1, 2019, Plaintiffs served Feinstein's rebuttal report.

"Rebuttal disclosures of expert testimony are 'intended solely to contradict or rebut evidence on the same subject matter identified by another party' in its expert disclosures."  *In re High-Tech Emp. Antitrust Litig.*, No. 11-cv-2509-LHK, 2014 WL 1351040, at *3 (N.D. Cal. Apr. 4, 2014) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)). Rebuttal expert reports may respond to "new unforeseen facts brought out in the other side's case."  *Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-cv-4236-BLF, 2016 WL 4272430, at *3 (N.D. Cal. Aug. 15, 2016) (citing *Columbia Grain, Inc. v. Hinrichs Trading*, LLC, No. 14-cv-115-BLW, 2015 WL 6675538, at *2 (D. Idaho Oct. 30, 2015)). However, "[r]ebuttal testimony cannot be used to advance new arguments or new evidence."  *Id.* at *2 (internal quotation marks omitted).  A rebuttal report "is not the time to change methodologies to account for noted deficiencies; instead, it is to respond to criticisms of such methodologies."  *Id.* (internal quotation marks omitted).  "[O]ffering a different, purportedly better methodology is a proper way to rebut the methodology of someone else."  *TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, No. 14-cv-341-JVS, 2016 WL 7042085, at *4 (C.D. Cal. Aug. 17, 2016). "Rebuttal testimony is proper as long as it addresses the same subject matter that the initial experts

---

[5]  Plaintiffs assert that Defendants have waived any challenge to Feinstein's criticisms concerning the Lewis report because they did not raise this argument in their opening brief.  *See* Doc. No. 378 at 7.  In their reply brief, Defendants contend that Feinstein's fundamental errors permeate his entire report, rendering it subject to exclusion in full.  *See* Doc. No. 404 at 9.  Even if the Court considered Defendants' arguments, Feinstein's rebuttal report is admissible in full because his opinions do not rest on an erroneous legal standard and because he properly rebuts the opinions of Dirks and Lewis.

14cv2129-MMA (AGS)

address." *Perez v. State Farm Mut. Auto Ins. Co.*, No. 6-cv-1962-JW, 2011 WL 8601203, at *8 (N.D. Cal. Dec. 7, 2011). Courts "have permitted additional data to be used in a rebuttal report so long as it is of the same subject matter." *Kirola v. City & Cty. of S.F.*, No. 7-cv-3685-SBA (EMC), 2010 WL 373817, at *2 (N.D. Cal. Jan. 29, 2010).[6]

Here, upon review, Feinstein's rebuttal report clearly responds to the Dirks and Lewis reports. For example, Feinstein summarizes that "[t]he crux of both the Dirks Report and the Lewis Report is that the alleged misstatements and omissions were immaterial to investors." Feinstein Rpt. ¶ 3. Additionally, contrary to Defendants' contention, nearly every paragraph in the rebuttal report challenges the findings of Dirks and Lewis. *See id.* ¶¶ 33-46. Feinstein determines that "[t]he conclusions of both Mr. Dirks and Dr. Lewis on the question of materiality are at odds with the facts of the case and generally accepted financial economic principles and published empirical research." *Id.* ¶ 4. "The misstatements and omissions alleged by Plaintiffs were clearly material to investors from an economic perspective." *Id.* ¶ 9. Feinstein's criticisms contradict Dirks' opinion on the same subject matter—i.e., whether Defendants' misstatements and omissions were material.

Accordingly, Feinstein properly rebuts the findings of Dirks and Lewis. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1220 (S.D. Cal. 2010) (overruling objection to expert's rebuttal report because "Regan's analysis contradicts Holder's opinion on the same subject matter, specifically, whether REMEC used assumptions,

---

[6] In their reply brief, Defendants assert that it is not sufficient for rebuttal testimony to merely address the same subject matter as the opposing side's expert. *See* Doc. No. 404 at 2 (citing *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1192 (S.D. Cal. 2016)). In *Kinder Morgan*, this Court found that "[a] party with the burden of proof on an issue 'should not be allowed to secretly prepare an army of 'rebuttal' experts . . . If they were allowed to do so, their work would not be subject to a direct response from any opposing expert. This immunity, combined with the element of surprise,' is simply unfair." *Id. Kinder Morgan*, however, is inapposite because the circumstances of that case rendered it "unfair" for the expert to submit a rebuttal report when he "should have been disclosed as an initial expert, which would have given Kinder Morgan's experts month to prepare rebuttal reports." *Id.* at 1192, 1193. There are no similar circumstances in this case rendering it unfair for Feinstein to opine on the same subject matter as Dirks and Lewis.

estimates, and forecasts to evaluate goodwill that complied with GAAP.").

### b. Feinstein's Materiality Standard

Defendants next argue that Feinstein's testimony is irrelevant and inadmissible because his opinion concerning the materiality of Defendants' misstatements and omissions "rests on an erroneous legal standard[.]" Doc. No. 346 at 2. In opposition, Plaintiffs assert that Feinstein "does not, under any fair reading of his testimony, adopt, apply, reject or attempt to analyze any legal definition of 'materiality.'" Doc. No. 378 at 11. Specifically, Feinstein "is not offering a 'legal' opinion and does not offer an opinion on the application of the legal definition of materiality." *Id.* at 12. Essentially, the parties' dispute centers on whether Feinstein's materiality standard is "distinct from" and "entirely conflict[s]" with the materiality standard set forth by the Supreme Court and applied by Dirks and Plaintiffs' expert, Chad Coffman. Doc. No. 346 at 5.

In his rebuttal report, Feinstein defines economic materiality as "the importance of information, announcements, and/or events to investors and the market, such that these items would affect the valuation of a security." Feinstein Reb. Rpt. ¶ 7. As defined by the Supreme Court, "the materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

Defendants claim that Feinstein's economic materiality standard "differs considerably" from the materiality standard adopted by the Supreme Court because Feinstein disregards the concepts of "the reasonable investor" and the "total mix of information." Doc. No. 346 at 7.

At his deposition, Feinstein testified that his "definition is better" than the one used by Dirks (and Coffman), but explained that his definition does not contradict, undermine, or reject the definition of legal materiality. Doc. Nos. 346-2, 378-3 (hereinafter "Feinstein Dep.") at 107. Feinstein testified that the legal definition and economic definition are "consistent." *Id.* at 112. "If there's an understanding that significantly

altering the total mix of information means such that there's a valuation effect, then they're the same thing." *Id.* at 113-14. Thus, if the phrase "such that value is affected" was added to the legal definition, the economic and legal definitions are "synonymous." *Id.* at 119. Further, when asked whether he considered Dirks' definition of materiality in drafting his report, Feinstein admitted that he "didn't think there was any significant difference between the two [definitions] that merited more discussion than I put in my report[.]" *Id.* at 122.

Moreover, Feinstein testified that the concept of the reasonable investor is "implicit in the term 'valuation.'" *Id.* at 114. "Value - - value is what a reasonable buyer would pay to a reasonable seller, both provided with necessary information and neither under any compunction to transact." *Id.* Feinstein also explained that the "definition of valuation would include mix of information and reasonableness of the parties involved." *Id.* at 104. Thus, according to Feinstein, the concepts of "the reasonable investor" and the "total mix of information" are subsumed within his analysis.

When asked why Feinstein simply did not accept Dirks' definition of materiality, Feinstein responded, "[b]ecause I'm an economist and so I use the economic definition." *Id.* at 116. "I think that there is some vulnerability for an economist to use the legal definition" and according to Feinstein, "an economist shouldn't be making - - shouldn't be drawing legal conclusions. The economist can draw economic conclusions." *Id.* 116-17.[7] Thus, consistent with Ninth Circuit authority, Feinstein is not offering a legal conclusion. *See Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (explaining that it is well-known that matters of law are generally "inappropriate subjects for expert testimony."). Defendants rely on *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1108 (S.D. Cal. 2012) to support their

---

[7] A district court in Arizona previously excluded Feinstein from testifying about materiality because the court found his opinions too closely resembled a legal opinion, which would usurp the role of the jury. *See Sekuk Glob. Enter. v. Apollo Grp., Inc.*, No. 4-cv-2147-PHX-JAT (D. Ariz. Nov. 5, 2007) (Doc. No. 377).

contention that Feinstein's opinions rest on an erroneous legal standard. There, the district court excluded the testimony of an expert economist who opined that with respect to loss causation, "corrective disclosures have to be made 'in such a way that a reasonable investor can reasonably infer that a fraud has occurred.'" *Id.* at 1107. However, the court noted that there is no requirement that a reasonable investor infer that a fraud has occurred. *See id.* at 1108. The court concluded that the expert's analysis "is based on a loss causation standard that is incompatible with that set forth by the Ninth Circuit." *Id.*

Here, unlike *In re Novatel Wireless Sec. Litig.*, Feinstein does not attempt to add any requirements to the definition of materiality. Rather, Feinstein appropriately opines on the concept of materiality in the field of economics. *See S.E.C. v. Leslie*, No.7-cv-3444, 2010 WL 2991038, at *8, 9 (N.D. Cal. July 29, 2010) (finding expert's materiality opinions on whether the information was sufficiently important from an "accounting perspective" permissible but noting his "opinion with respect to legal concepts and conclusions of law are excludable."). Indeed, a change in stock price (or valuation) is one factor the trier of fact may consider with respect to materiality. *See id.* at *8.

As such, the Court finds that Feinstein's materiality opinions do not rest on an erroneous legal standard. Feinstein discusses the concept of economic materiality with support from economic authorities that Defendants do not challenge. Thus, exclusion on this basis is improper.

*c. Summary*

In sum, the Court finds that Feinstein responds to and criticizes the materiality opinions of Dirks and Lewis in his rebuttal report. Additionally, although Feinstein's materiality opinions stem from an economic perspective, his opinions do not rest on an erroneous legal standard. Accordingly, the Court **DENIES** Defendants' motion to exclude the opinions and testimony of Dr. Steven Feinstein.

**3.    Motion to Exclude Expert Opinion and Testimony of Mr. Chad Coffman**

Defendants move to exclude the testimony of Chad Coffman, CFA, who has been

retained by Plaintiffs to offer expert testimony as evidence of loss causation, materiality, and economic damages. *See* Doc. No. 349. Coffman is the President of Global Economics Group, a Chicago-based consulting firm. *See* Doc. No. 349-1 (hereinafter "Coffman Rpt.") ¶ 1. Coffman conducted a full event study regression analysis as the foundation for his loss causation and damages opinions.[8]

Defendants do not challenge Coffman's qualifications or the relevance of his opinions. Nor do Defendants challenge Coffman's event study methodology. Rather, Defendants move to exclude three of Coffman's opinions as unreliable: (a) that certain information disclosed on August 13, 2014 was "corrective"; (b) that $7.52 of SeaWorld's stock decline is attributable to the corrective information; and (c) that damages should be measured using a constant dollar inflation ("CDI") methodology. *See* Doc. No. 349. In opposition, Plaintiffs assert that Defendants' arguments do not warrant exclusion of his testimony under *Daubert*. *See* Doc. No. 375 at 2. Plaintiffs concede that "[i]f the Court excludes Coffman's testimony, Plaintiffs cannot prove loss causation and damages at trial, thereby ending the case." *Id.* at 9. The Court proceeds by reviewing Coffman's event study before addressing Defendants' arguments for exclusion.

### a. Coffman's Event Study

Coffman performed an event study as the foundation for his opinions in this case. "The use of an event study is often necessary to provide an evidentiary basis for a reasonable jury to determine the existence of loss causation and damages." *Mauss v. NuVasive, Inc.*, No. 13cv2005-JM (JLB), 2018 WL 656036, at *5 (S.D. Cal. Feb. 1, 2018).

"An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large such that simple random movement can be

---

[8] An event study is a statistical method of measuring the effect of a particular event on the price of a company's stock. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1269.

rejected as the cause." Coffman Rpt. ¶ 59. Coffman explains that a well-accepted method for performing an event study is to estimate a regression model over a period of time (referred to as an "estimation window") to observe the typical relationship between the market price of the security at issue and broad market factors. *See id.* ¶ 60. In this case, Coffman used an estimation window of 120 trading days prior to the event of interest to evaluate the relationship between SeaWorld and market factors. *See id.* Coffman controlled for market factors by using a broad market index (the S&P 500 Total Return Index, or "Market Index") and an equal weighted peer index ("Peer Index"). *See id.*

By including the Market Index in his regression, Coffman factored out the influence of any news that impacted stock values generally on the date of interest, which in this case is August 13, 2014, the date on which Coffman believes Defendants disclosed certain information that was corrective of previous statements regarding *Blackfish*. *See id.* ¶ 61. "This is how the regression distinguishes, and explicitly removes, the impact of general market and industry news from observed stock price and allows the 'abnormal return' to be interpreted as a company-specific price movement." *Id.*

SeaWorld's Common Stock declined by 32.86% on August 13, 2014, "the largest single-day price drop in SeaWorld's roughly 16-month trading history." *Id.* ¶ 63. Coffman opines that the "abnormal return of 33.30% (the observed -32.86% return minus the expected return of positive 0.44%) is statistically significant at well beyond the 95% confidence level, *even after controlling for all factors that may have influenced the broader market or the industry on August 13, 2014*." *Id.* (emphasis in original). Coffman concludes that "firm-specific information (including the corrective information) caused SeaWorld's stock price to decline. This provides further evidence that investors saw the information regarding whether *Blackfish* and related publicity was affecting SeaWorld's business as important." *Id.* ¶ 62. "[T]he sheer size of this abnormal return strongly supports the conclusion that the stock price was reacting to a more permanent shift in demand as opposed to short term factors." *Id.* ¶ 64.

*b. August 13, 2014 Disclosure*

On August 13, 2014, SeaWorld issued a press release that announced, among other things, SeaWorld's results for the second quarter of 2014 and SeaWorld's revised guidance for the year moving forward. *See* Doc. No. 347, Ex. 4. Specifically, SeaWorld announced its lower attendance at its destination parks was due to a combination of factors including:

> a late start to summer for some schools in the Company's key source markets, new attraction offerings at competitor destination parks, and a delay in the opening of one of the Company's new attractions. **In addition, the Company believes attendance in the quarter was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California**.

*Id.* at 2 (emphasis added).

Coffman opines that the reference to proposed legislation in California was "understood to reference a negative impact on SeaWorld's business caused by publicity related to *Blackfish*." Coffman Rpt. ¶ 108. Coffman explains that "[a]nalyst and media reaction indicate[] that the market understood the August 13 Corrective Disclosure to relate to *Blackfish* and to be a reversal of Defendants' earlier statements that the film had not caused any impact to the Company's business." *Id.* ¶ 7. Coffman concludes that the statement regarding proposed legislation in California constitutes a corrective disclosure. *See id.*

Defendants argue that Coffman's opinions regarding the alleged corrective disclosure should be excluded for three reasons. *See* Doc. No. 349. First, the alleged corrective disclosure relates back only to the second quarter 2014. *See id.* at 7-8. Second, Defendants contend Coffman improperly bases his opinion on a selective compilation of analyst and media reports. *See id.* at 9. Third, Defendants assert that Coffman impermissibly fails to consider the impact of SeaWorld lowering its annual guidance. *See id.* at 11.

<u>Language of the Alleged Corrective Disclosure</u>

As a preliminary matter, Defendants argue that the alleged corrective disclosure relates back only to the second quarter 2014 and cannot disclose an impact that occurred in 2013 or the first quarter of 2014. *See id.* at 8.

Plaintiffs "can satisfy loss causation by showing that the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013) (emphasis in original) (internal quotation marks omitted). The fact that the language of the alleged corrective disclosure refers to the second quarter 2014 does not render Coffman's opinions unreliable. Coffman opines that investors viewed SeaWorld's disclosure as an admission that *Blackfish* was negatively impacting its business and would continue to do so going forward. *See* Coffman Rpt. ¶¶ 7-9. Defendants assert that Coffman admitted that the corrective information was limited to the second quarter of 2014. *See* Doc. Nos. 349-6, 375-2 (hereinafter "Coffman Dep.") at 81 ("Within that section, it appears that all the references to 'the quarter,' I would interpret as being the second quarter of 2014."). Coffman also testified, however, that the corrective information "goes beyond that" and encompasses all of the information described in paragraphs 73-78 of his report. *Id.* at 78.

Accordingly, Coffman's testimony regarding the alleged corrective disclosure will be helpful to a jury and exclusion of his testimony on this basis is improper. *See Alaska Rent-A-Car, Inc.*, 738 F.3d at 969-70 ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").

ii. <u>Analyst Reports and News Articles</u>

Next, Defendants contend that Coffman improperly bases his opinion on a selective compilation of analyst and media reports. *See* Doc. No. 349 at 9 ("Mr. Coffman's 'analysis' is simply a summary of cherry picked quotes out of a small sample of analyst and media reports issued on August 13, 2014 and August 14, 2014.").

However, upon his review of *hundreds* of reports and articles, Coffman formed the opinion that even though Defendants did not mention *Blackfish* by name, "the market immediately understood the August 13, 2014 disclosure as an admission that *Blackfish* had impacted the Company." Doc. No. 375 at 13; *see also* Coffman Rpt. ¶ 7.[9] Contrary to Defendants' assertion that Coffman simply lists and summarizes these reports and articles, Coffman's opinion of *how* the market interpreted SeaWorld's statements from the August 13, 2014 press release will assist the trier of fact in determining loss causation. *See In re Novatel Wireless Sec. Litig.*, No. 8cv1689-AJB (RBB), 2013 WL 12144150, at *7 (S.D. Cal. Oct. 25, 2013) (denying *Daubert* motion where the expert's review of press releases and analyst reports established "the requisite link between those disclosures and earlier alleged misrepresentations"); *cf. In re Nuveen Funds/City of Alameda Sec. Litig.*, Nos. C 08-4575 SI, C 09-1437 SI, 2011 WL 1842819, at *8 (N.D. Cal. May 16, 2011) (excluding expert's opinion on loss causation "because he did not perform any investigation or analysis to support his conclusion that plaintiffs' losses were caused by defendants' fraud.").

Defendants further contend that Coffman's report lacks any reliable principles and methods because it disregards reports, or portions of reports, that contradict his position. *See* Doc. No. 349 at 10. For example, Defendants submit as exhibits three reports issued after the August 13, 2014 press release that either do not attribute declining attendance to *Blackfish* or limit the impact of the film to only attendance in the second quarter. *See id.*, Exs. 7, 8, 9.

In Appendix A to his report, Coffman lists more than one hundred analyst reports and news articles he considered in forming his opinions in this case. *See* Coffman Rpt.,

---

[9] *Cf. In re BP p.l.c Sec. Litig.*, MDL No. 10-MD-2185, 2016 WL 3090779, at *27 (S.D. Tex. May 31, 2016) (concluding that some corrective events identified by Coffman were not corrective because "there is no indication that the market understood BP's dividend cut to relate in any way to the flow rate of the leak. To the contrary, Plaintiffs' own evidence indicates that the market viewed the dividend cut as a response to increasing political pressure.").

Ex. A at 11, 16.  Specifically, Coffman considered "SEAS analyst reports supplied by Investext via Thomson Reuters for the period August 13, 2013 to December 30, 2014, and "[o]ther analyst reports, including but not limited to" the more than one hundred analyst reports and news articles he identifies by name.  *See* Coffman Rpt., Ex. A at 11. Coffman also testified at his deposition that he did not recall any analyst reports that did not mention "what I refer to as the Blackfish Effect in one way or another."  Coffman Dep. at 155.

Defendants assert that "[c]ourts have expressly rejected expert analyses, like Mr. Coffman's, that highlight favorable studies while ignoring contradictory evidence."  Doc. No. 349 at 10.  Defendants further cite *In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, a Multi-District Litigation proceeding, where more than 3,000 plaintiffs alleged that they or their loved ones suffered a heart attack, stroke, or other adverse cardiovascular event as a result of taking a medication called Celebrex.  524 F. Supp. 2d 1166, 1169 (N.D. Cal. 2007).  The district court excluded the testimony of Dr. Neil Doherty, the plaintiffs' cardiology expert, because he "reject[ed] or ignor[ed] the great weight of the evidence that contradicts his conclusion."  *Id.* at 1176.  The court further noted that Dr. Doherty "lack[ed] . . . relevant experience and training" and his opinion that rejected the weight of authority on the topic "is not a scientifically valid methodology."  *Id.*

Here, unlike *In re Bextra and Celebrex Sales Practices and Prod. Liab. Litig.*, Defendants do not challenge Coffman's experience and training.  Nor do Defendants submit any evidence that Coffman rejected or ignored the "great weight of evidence that contradicts his conclusion."  *Id.*  Rather, Defendants point to a handful of analyst reports that Coffman did not explicitly identify in his non-exhaustive list of reports he considered.[10]  Coffman's analysis of the market's reaction to the August 13, 2014

---

[10]  *Barber v United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001), is similarly inapposite. There, the plaintiff sued United Airlines for negligence after sustaining injuries on an airplane from

statements is not subject to exclusion under *Daubert* on this basis. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1219 (S.D. Cal. 2010) (noting that the determination of weight and sufficiency of expert evidence is the sole province of the jury); *Odyssey Wireless, Inc. v. Apple Inc.*, Nos. 15-cv-1735-H-RBB, 15-cv-1738-H-RBB, 15-cv-1743-H-RBB, 2016 WL 7644790, at *15 (S.D. Cal. Sept. 14, 2016) (declining to exclude expert's testimony because the defendant's "disagreement with the facts underlying that opinion go to the weight to be afforded the testimony and not its admissibility.").

### iii.  Lowered Annual Guidance

Third, Defendants assert that Coffman fails to consider the impact of SeaWorld lowering its annual guidance. "[A]ll that supports Mr. Coffman's opinion that the August 13 Statement constituted a corrective disclosure is his claim (first raised on rebuttal) that the stock drop was too large to be explained solely by the second quarter results."[11] Doc. No. 349 at 11. Defendants maintain that Coffman's opinion excludes without analysis the most likely explanation, *i.e.*, the market's reaction to the announcement of lowered revenue and guidance for the year, and simply assumes that the market interpreted these disclosures as backward-looking and corrective, rather than forward-looking. *See id.* Thus, because Coffman "omitted a critical factor from his analysis, [his] opinion is *per se* unreliable." *Id.* at 12.

Defendants' arguments are unpersuasive, as Coffman considered SeaWorld's lowered earnings guidance and determined that it was part of the corrective information. In his report, Coffman describes that on the date of the corrective disclosure:

---

turbulence. *Barber*, 17 F. App'x at 437. The Seventh Circuit affirmed the district court's exclusion of expert testimony because the expert: (1) relied on weather data to support his opinion, but rejected some weather data that contradicted his opinion; (2) rejected the testimony of the pilot and copilot; and (3) did not give any additional data or information that he relied on, which formed the basis of rejecting some of the weather data and the opinions of the copilots. *See id.*

[11]  Contrary to Defendants' assertion, Coffman did include this information in his initial report. *See* Coffman Rpt. ¶ 64 ("[T]he sheer size of this abnormal return strongly supports the conclusion that the stock price was reacting to a more permanent shift in demand as opposed to short term factors.").

> SeaWorld issued a press release which, in effect, acknowledged for the first time the adverse impact that *Blackfish*-related public reaction was having on SeaWorld's business. The press release summarized financial results for 2nd Quarter 2014 and the first half of 2014 that were well below consensus expectations, lowered guidance for future financial performance, and clearly stated that *Blackfish*-related public reaction was contributing to such underperformance.

Coffman Rpt. ¶ 7. Coffman further explains that "[i]n addition to announcing worse than expected performance for 2Q 2014, the Company also lowered its revenue and EBITDA guidance for the full year, thus signaling one or more negative impacts were not temporary." *Id.* ¶ 75. Coffman observes that the market viewed the disclosure as involving two potential structural issues that would lower expectations and guidance going forward: (1) *Blackfish*; and (2) competition. *See id.* ¶¶ 88-100. As Plaintiffs point out, to the extent that the lowered annual guidance reflected both corrective information and competition, Coffman disaggregated the price-impact of confounding information related to competition. *See id.* ¶¶ 108-09.

Thus, Coffman did not omit from consideration SeaWorld's lowered annual guidance and exclusion of Coffman's testimony on this basis is improper. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1273 ("When a study accounts for the 'major factors' but not 'all measurable variables,' it is admissible.") (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)); *cf. In re DVI, Inc. Sec. Litig.*, No. 3-cv-5336, 2010 WL 3522090, at *11 (E.D. Pa. Sept. 3, 2010) (rejecting Coffman's "insolvency theory" because it "does not require any form of corrective disclosure and does not exclude non-fraud factors").

### c. *Disaggregation*

Defendants next argue that Coffman's opinion apportioning the stock drop should be excluded as unreliable and flawed because Coffman improperly relies on non-public data to apportion the market's reaction to public information and that his apportionment

methodology is inherently arbitrary.  *See* Doc. No. 349 at 13, 15.

i.   Coffman's Disaggregation Opinion

Coffman opines that based upon his event study analysis, "there was a statistically significant abnormal decline in the market price of SEAS Common Stock on August 13, 2014 of $9.37 per share after controlling for market and industry effects on that day." Coffman Rpt. ¶ 10.  Experts must also "separate the loss caused by the disclosure of corrective information . . . from loss caused by the disclosure of other company-specific information."  *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1273-74.  In his report, Coffman explains the steps he took to disaggregate other company-specific information (which he refers to as transitory factors) that was included in the August 13, 2014 alleged corrective disclosure.  *See* Coffman Rpt. ¶¶ 100-29.  These transitory factors include, among other things, weather patterns and school schedules.  *See id.*, Ex. 2.  Coffman determined that "the most that the transitory items could reasonably contribute to the abnormal stock price decline on August 13, 2014 was $0.25 per share (the full EBITDA miss in the current quarter)."  *Id.* ¶ 107.  "Notably, neither the Company nor analysts cited any of these items as substantially contributing to the lowered earnings guidance going forward."  *Id.*  "[N]o less than $9.12 per share of the stock price decline on August 13, 2014 is due to the more permanent information disclosed that day."  *Id.*

Aside from these transitory factors, SeaWorld's disclosure identified two factors driving SeaWorld's underperformance: (1) demand pressures related to legislation; and (2) competitive issues relating to new attraction offerings at competitor destination parks. *See id.* ¶¶ 108-09.  Coffman attributes an additional $1.60 to competitive forces.  *See id.* ¶ 129.  Coffman ultimately concludes that the remaining $7.52 of the drop is attributable to *Blackfish*.  *See id.*

ii.   Reliance on Non-Public Data

First, Defendants argue that "Coffman's apportionment analysis improperly relies on non-public information to which the market did not have access."  Doc. No. 349 at 13. Defendants contend that Coffman's use of non-public data contradicts opinions he

rendered earlier in this case. In opposition, Plaintiffs maintain that Coffman properly considers internal documents as one factor in his disaggregation opinions, as Defendants "cite no economic or legal authority to support this bizarre contention." Doc. No. 375 at 16-17.

At the class certification stage, Coffman concluded that SeaWorld traded in a semi-strong efficient market, whereby "all widely available public information is . . . reflected in a security's current market price." Coffman Dep. at 45. At his deposition, Coffman confirmed that he still believes this to be the case. In his expert report, Coffman determines, upon review of attendance data produced in discovery, that the impact of competition as a confounding factor is reasonably isolated to be a concern of SeaWorld Orlando. Coffman Rpt. ¶ 111.

> As shown in Exhibit 3, ███████████████████████████
> ███████████████████████████████████████████████████
> ███████████████████████████████████████████████████
> ████████████████ As a result, it is reasonable to assume that the remaining 64.9% of the attendance decline cannot be explained by some unidentified competitive pressure in those markets that is not acknowledged by the Company or analysts. For that reason, I find that, at a minimum, 64.9% of the remaining price decline of $9.12 (or $5.92 per share) is attributable to *Blackfish* and related publicity.

*Id.*

Here, Coffman's consideration of non-public data as one factor in forming his loss causation opinions does not contradict opinions he previously rendered. Notably, Coffman does not opine that *all* privately available information is reflected in SeaWorld's stock price. Moreover, courts have approved loss causation analysis premised in part on internal company documents. *See Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 995 (D. Ariz. 2015), *aff'd Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018); *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 413 (D. Conn. 2010) (finding the expert's disaggregation analysis proper where he also considered

public statements and an internal document).[12]

Defendants further contend that Coffman's use of non-public data is unsound "because he uses it to draw conclusions that are inconsistent with public information available to the market." Doc. No. 349 at 14. Defendants rely on statements made by SeaWorld's then-CEO Jim Atchison in the earnings call. Specifically, Atchison explained that he thinks "the competitive stakes and a bit of the arms race in Southern California and Orlando, in particular, those two markets, is not going to wane." Doc. No. 347, Ex. 10 at 7.[13] He further indicated, "[w]e've talked a little bit about the legislation in California that affected our San Diego park." *Id.* Defendants claim that Coffman ignored these statements and arbitrarily allocated half of the attendance declines in Orlando and the entirety of attendance declines in the San Antonio and San Diego parks to *Blackfish*. *See* Doc. No. 349 at 15.

In his report, Coffman cites to a several statements made by Atchison from the earnings call transcript. *See* Coffman Rpt. ¶¶ 109-10. Upon review of all statements made on August 13, 2014, Coffman observed:

> I am not aware of a rationale for a sudden structural shift in competition in the California market in the 2nd Quarter 2014 and the first half of 2014. While the Company cited to competitive pressure from Disney's new Fantasyland in Orlando and Universal's opening of Harry Potter at its Orlando park, there was no mention of a fundamental change in competition in the San Diego market (or the San Antonio market where it has a third orca park). Analysts did not discuss specific competitive forces outside of Orlando in their post-release reports, either.

---

[12] Defendants' reliance on *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 393 (9th Cir. 2010) is misplaced as the court there made no reference to an expert's disaggregation analysis premised in part on internal documents and concluded that two analyst reports and one internal email were not indicative of what the market learned of and reacted to "in light of the agglomeration of evidence supporting a contrary conclusion."

[13] Citations to this document refer to the pagination assigned by the CM/ECF system.

*Id.* ¶ 110.

Thus, contrary to Defendants' contention, Coffman did not ignore Atchison's statements. Rather, Coffman observed that the market interpreted Atchison's statements in a different way than Defendants. "Whether [Coffman] chose the correct factors and gave them the correct weight is for the jury." *S.E.C. v. Moshayedi*, No. SACV1201179JVSMLGX, 2013 WL 12129282, at *6 (C.D. Cal. Nov. 20, 2013).

Accordingly, Coffman's use of internal information, as one factor in his analysis, does not justify exclusion of his testimony. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1220 (finding that the defendants can test the weight of an expert's opinion by vigorous cross examination and presentation of contrary evidence at trial).

### iii. Apportionment Methodology

Second, Defendants argue that Coffman's methodology apportioning only $1.60 of SeaWorld's August 13, 2014 stock price drop to competition is "impermissibly arbitrary." Doc. No. 349 at 15. Defendants contend that Coffman assumes—without support—that attendance at three SeaWorld parks is the only factor that can explain SeaWorld's stock price decline on August 13, 2014. *See id.*

In reaching his conclusion that $1.60 of the price drop is attributable to competition, Coffman notes that in the press release or earnings call transcript, SeaWorld "did not ascribe any specific measure of attendance impact to competitive pressures or identify a new competitive pressure that was not previously disclosed." *Id.* ¶ 112. Coffman concludes that the impact of competition as a confounding factor is reasonably isolated to be a concern for SeaWorld Orlando. *Id.* ¶ 111. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *See id.* "As a result, it is reasonable to assume that the remaining 64.9% of the attendance decline cannot be explained by some unidentified competitive pressure in those markets that is not acknowledged by the Company or analysts." *Id.* "For that reason, I find that, at a

minimum, 64.9% of the remaining price decline of $9.12 or ($5.92 per share) is attributable to *Blackfish* and related publicity." *Id.*

For the remaining 35.1% (or $3.20 per share of the $9.12 price decline), "there is the potential for the price movement to be confounded by competitive effects," but any confounding impact "is far from certain, and may not exist at all[.]" *Id.* ¶ 112. For example, Wells Fargo published a report after the August 13 statement indicating that "[w]hile competitive pressures appear modestly greater than thought (Orlando), media fallout from extreme animal rights activists in CA appear to have materially impacted June San Diego attendance/admission results."). Coffman Rpt. ¶ 112 n.110. Moreover, internal records and deposition testimony revealed that demand pressures related to *Blackfish* were also observed as causing some measure of 2014 performance decline. *See id.* ¶ 113.

Coffman explains that "[b]ecause the Company recognized impact from negative publicity at Orlando in the first half of 2014, it is appropriate to apportion some of the negative Orlando performance to that factor, as opposed to apportioning it entirely to competition." *Id.* at 114. However, "to ensure that I am not overstating the artificial inflation, I attribute 50% (or $1.60) of the stock price decline that is specifically attributable to Orlando ($3.20 per share) to the corrective information about *Blackfish* and the remainder to competitive forces." *Id.* ¶ 127. Notably, Coffman acknowledges that "[t]he finder of fact, based on the totality of the evidence, could select an alternative percentage . . . and attribute the entire decline in Orlando to competitive pressures (which I believe is far too conservative and inconsistent with the facts)[.]" *Id.* ¶ 128. As a result, "the artificial inflation per share dissipated on August 13, 2014 would be $5.92 per share" as opposed to $7.52 per share. *Id.*

Defendants point to several weaknesses in Coffman's analysis. █████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████ *See* Doc. No. 349 at 17-18. However, "Defendants may explore these

perceived deficiencies through cross examination." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1219; *see also Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). Coffman supports his conclusions with facts from the Company's statements made on August 13, 2014, analyst reports, attendance data, and economic principles. As such, Coffman's disaggregation opinions are admissible. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1218 (concluding that the expert "explains the steps of his analysis and justifies the numbers he used; consequently, his expert opinion is admissible.").[14]

### d. Constant Dollar Inflation Methodology

Lastly, Defendants assert that Coffman's Constant Dollar Inflation ("CDI") methodology used to calculate Plaintiffs' damages is unreliable. *See* Doc. No. 349 at 19. Defendants challenge Coffman's decision to apply the CDI method and contend that application of the CDI method in this case is illogical because inflation of SeaWorld's stock could not have been constant during the Class Period. *See id.* at 20-25.

### i. Coffman's Explanation of the CDI Methodology

Coffman indicates that in his experience, "the most commonly used and accepted methodology for quantifying artificial inflation throughout a class period attributable to fraud is the Constant Dollar Inflation method." Coffman Rpt. ¶ 130. The CDI method "assumes that the per share artificial inflation that is dissipated in response to a corrective disclosure should be carried back in time to the actionable misstatements and/or omissions." *Id.* This methodology implies "that the artificial inflation per share was $7.52 throughout the Class Period." *Id.*

_____

[14] *In re Moody's Corp. Sec. Litig.*, No. 07-cv-8375 (GBD), 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2013) is distinguishable from the case at bar. There, the district court excluded Coffman's testimony because neither his report "nor any other evidence proffered by Plaintiffs establish that market forces and other factors unrelated to Moody's alleged mismanagement of its conflicts of interest did not play a significant role in Plaintiffs' economic loss." *Id.*

Coffman explains that "no method of back-casting inflation is perfect" but he carefully considered whether using the CDI method in this case is reasonable, compared to the "constant percentage" inflation approach. *See id.* ¶ 130 n.120. Coffman selected the CDI method because "the general nature and substance of what Plaintiffs allege was misrepresented to the market did not change over the Class Period." *Id.* ¶ 131. Plaintiffs allege that *Blackfish* and its related publicity negatively impacted SeaWorld's brand and reputation with the public and as a result, impacted SeaWorld's business. *See id.* Plaintiffs claim that Defendants made statements to the market that such impacts were not occurring and were in fact, contradicted by information Defendants possessed. *See id.*

"Assuming Plaintiffs' allegations as true, the most reliable method available to determine the impact this information would have on the stock price at any time during the Class Period is to observe the impact it actually had when it was ultimately disclosed—namely August 13, 2014." *Id.* ¶ 132. "At any point in time during the Class period, the corrective information would have signaled to investors, as it did on August 13, 2014, an impairment to SeaWorld's brand and reputation and therefore a structural issue . . . in value and demand for the Company's premier parks and products." *Id.* ¶ 135. "If the market came to understand that SeaWorld's business . . . was negatively impacted by *Blackfish*, it is a reasonable expectation that the Company's stock price would suffer significantly." *Id.* ¶ 136. Coffman opines that the CDI method "may be overly conservative if the trier of fact accepts that SeaWorld's business was being impacted by *Blackfish* and related publicity at the start of the Class Period." *Id.* ¶ 137. "An earlier acknowledgement by Defendants at a time when public awareness of *Blackfish* was relatively less than the date of the Corrective Disclosure may have caused a more significant decline in the Company's stock price." *Id.*

ii.  Reliability of CDI

Defendants first argue that "Coffman's use of constant dollar inflation to conclude that SeaWorld's stock was inflated by the same amount at all times during the Class

Period is based on untenable assumptions and is the product of a flimsy, unsupported methodology." Doc. No. 349 at 21. In opposition, Plaintiffs assert that Defendants misstate Coffman's testimony and have failed to demonstrate that Coffman's testimony is unreliable. *See* Doc. No. 375 at 21-23.

Here, Coffman identifies facts to support his decision to utilize CDI in this case, notes that analysts were focused on whether *Blackfish* was impacting SeaWorld even prior to the first day of the Class Period, and explains why CDI would be more reliable under the facts of this case than constant percentage inflation, another commonly utilized theory in securities fraud cases. *See* Coffman Rpt. ¶¶ 130-136. Moreover, the constant dollar inflation method is commonly used to calculate 10b-5 damages. *See In re Novatel Wireless Sec. Litig.*, 2013 WL 12247558, at *3 n.3. Additionally, the jury is ultimately responsible for deciding whether CDI, or another calculation, is a reasonable measurement of damages. *See id.*; *cf. In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *7 (excluding expert's loss causation opinion utilizing the constant dollar inflation method because expert conceded "he did not perform any computations or statistical analysis to determine whether there was a causal relationship between the corrective disclosure and the supposed decline in the value of the Notes."). As such, Coffman's decision to use the CDI method in this case is sufficiently reliable for purposes of *Daubert*. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1218 (finding that an expert's explanation of the steps of his analysis and justification for his conclusions render his testimony admissible under *Daubert*).

iii.    Inflation During Class Period

Second, Defendants maintain that Coffman offers no explanation as to why a disclosure that *Blackfish* was impacting SeaWorld at any point during the Class would result in a $7.52 stock drop. *See* Doc. No. 349 at 19. Coffman, however, explains that "[i]nherent in any Company acknowledgement of a *Blackfish* impact would be that SeaWorld's corporate brand and corporate reputation had been harmed. Damage to a corporate brand or a company's reputation constitutes a structural change in value and

demand for the company's products or services, rather than a one-time temporary setback." Coffman Rpt. ¶ 136. In response to disclosure of harm to its reputation, "the market would understand that SeaWorld faced a structural change in demand and therefore reasonably anticipate that SeaWorld's financial results would be negatively impacted" for a longer period of time. *Id.*

Defendants further assert that Coffman's CDI method fails to take into account that any impact from *Blackfish* on SeaWorld could not have affected SeaWorld's business in exactly the same magnitude each day of the Class Period. *See id.* at 22. Plaintiffs, however, point out that this argument "confuses viewership with market reaction[.]" Doc. No. 375 at 23. There is no evidence in the record that SeaWorld's stock price reaction to an admission of *Blackfish* impact would track viewership levels by consumers. Additionally, Coffman explains that the market may have reacted more adversely to an admission of a *Blackfish* impact earlier in the Class Period when public awareness of *Blackfish* was relatively less than on August 13, 2014. *See* Coffman Rpt. ¶ 137.

Thus, the Court finds that Defendants' challenges to Coffman's CDI method do not support exclusion under *Daubert*. These challenges can be addressed on cross examination. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1220 (finding that the defendants can test the weight of an expert's opinion by vigorous cross examination and presentation of contrary evidence at trial). Additionally, whether CDI best approximates damages is a decision best left to the jury. *See In re Novatel Wireless Sec. Litig.*, 2013 WL 12247558, at *7.

*e. Summary*

In sum, Coffman explains the steps of his analysis and applies accepted methodologies in reaching his conclusions. Accordingly, the Court **DENIES** Defendants' motion to exclude the opinions and testimony of Chad Coffman. *See Alaska Rent-A-Car, Inc.*, 738 F.3d at 969-70 ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it

would be helpful to a jury.").

**4.     Motion to Exclude Expert Opinion and Testimony of Dr. James Gibson**

Defendants move to exclude the testimony of Dr. James L. Gibson, who was retained by Plaintiffs to provide expert testimony on: (1) whether the empirical data possessed and analyses performed by SeaWorld support Defendants' public statements regarding *Blackfish* and its related publicity; and (2) whether the attendance variance analyses and goodwill-related analyses of operation impact conducted by SeaWorld were methodologically sound and support Defendants' public statements regarding *Blackfish* and its related publicity.  *See* Doc. No. 353.

Gibson is the President of Research Services International and a political science professor at Washington University in St. Louis.  Doc. No. 353-2 (hereinafter "Gibson Rpt.") ¶ 2.  Gibson has forty (40) years of experience in analyzing empirical data.  *See id.* ¶ 3.  Gibson received his Ph.D. in Political Science from the University of Iowa, a Master of Arts in Political Science from the University of Iowa, and a Bachelor of Arts degree in Political Science, with highest honors, from Emory University.  *See* Gibson Rpt., Appx. B.  Defendants do not challenge Gibson's qualifications.

Gibson divides his report into two sections.  In Section II.A, Gibson lists the alleged false or misleading statements made by Defendants, summarizes empirical data in SeaWorld's possession from January 2013 through May 2014, and then triangulates[15] this information with events at SeaWorld and its internal communications.  *See* Gibson Rpt. ¶¶ 19-201.  ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████  *See id.* ¶ 9.  ████████

---

[15]  As defined by Gibson, triangulation "means that analysts refer to a variety of available data in trying to reach a conclusion."  Gibson Rpt. ¶ 16.  "Any given unit of information may not be dispositive on an empirical question; but when all or most units of information point toward the same conclusion— when they triangulate—it is appropriate to increase one's confidence in the conclusion."  *Id.*

*See id.* ¶¶ 202-311.

*See id.* ¶ 10.

Gibson also submitted an Expert Rebuttal Report on March 1, 2019. *See* Doc. No. 353-3 (hereinafter "Gibson Reb. Rpt."). In his rebuttal report, Gibson responds to the opinions set forth in Randolph Bucklin's expert report. *See id.* ¶ 2. Gibson employs the same methodology as his affirmative report and concludes that the expert report of Randolph Bucklin, dated January 22, 2019, does not "lead [Gibson] to question or change" the analyses or conclusions in his affirmative report. *Id.* ¶ 2.

Defendants contend that Gibson's opinions are inadmissible under *Daubert* because: (a) he did not conduct any quantitative or econometric analyses and his opinions are not based on a reliable objective method; (b) Gibson's report consists of improper summary testimony that requires no expertise to interpret; and (c) Gibson's opinions regarding attendance analyses fail *Daubert*'s "fit" requirement because they answer a factually or legally irrelevant question. Doc. No. 353 at 2. The Court addresses Defendants' arguments in turn.

*a. Reliability*

Defendants first assert that Gibson's triangulation method "involves nothing more than assembling summary narratives based on materials selected for him by counsel" and is unreliable. Doc. No. 353 at 7. In opposition, Plaintiffs assert that Gibson's conclusions are "based on the methodology of empirical analysis." Doc. No. 372 at 7. Plaintiffs further contend that after Gibson summarized his conclusions based on empirical analysis, he applied triangulation to support his conclusions. *See id.* at 13. In

reply, Defendants argue that Gibson's empirical analysis "does not describe a reliable methodology whose application would turn [his] opinions into something other than argumentative evidentiary summaries." Doc. No. 413 at 4.

As a preliminary matter, Plaintiffs assert that "Defendants do not challenge" Gibson's empirical analysis methodology. Doc. No. 372 at 7. Contrary to Plaintiffs' contention, Defendants challenge Gibson's alleged failure to employ any valid underlying methodology. That Defendants do not use the specific phrase "empirical analysis" in the underlying motion is not dispositive. Moreover, Gibson's report seldom uses the phrase "empirical analysis" or "empirical analyses." Additionally, Gibson does not define this methodology in his report. Rather, in their opposition brief, Plaintiffs explain that "[e]mpirical analysis is the systematic and rigorous analysis of empirically observable information." Doc. No. 372 at 7. As such, Defendants neither ignore nor have waived any objection to this methodology.

Turning to the heart of Gibson's empirical analysis, Plaintiffs assert that "Gibson analyzed empirical evidence SeaWorld possessed during the Class Period and determined whether it did or could have supported Defendants' causal statements regarding *Blackfish* and its related publicity." Doc. No. 372 at 12. Specifically, Gibson reviewed statements made during the Class Period, deposition transcripts, and documents produced in discovery in reaching his conclusions. *See* Gibson Rpt. ¶¶ 12-311. Defendants contend "[i]t cannot be that Dr. Gibson's review of the evidentiary record becomes reliable expert testimony simply because as a political scientist Dr. Gibson might conduct a similar qualitative review of a body of facts or data in the course of his academic research." Doc. No. 413 at 5.

Plaintiffs claim that the court in *Hsingching Hsu v. Puma Biotechnology, Inc.*, No. SACV 15-00865 AG (JCGx), 2018 WL 4945703 (C.D. Cal. Oct. 5, 2018), relied on "precisely the [same] type of expert testimony" as that offered by Gibson. *Id.* at 12 n.17. In *Hsingching Hsu*, the court denied the defendants' motion to exclude the expert testimony of Dr. Lavin, a biostatistician, who opined on: (1) whether the "Kaplan-Meier

curves—a graphical depiction of the effectiveness of a drug compared to a placebo"—were narrowing or separating; (2) whether there is a record that the defendants ever assessed the Kaplan-Meier curves beyond two years before the investor call; and (3) whether biostatisticians generally keep "audit trails" of reports they run. 2018 WL 4945703, at *7.

Plaintiffs' reliance on *Hsingching Hsu*, however, is misplaced. Most importantly, unlike Gibson, Dr. Lavin did not apply an empirical analysis methodology. Rather, Dr. Lavin applied his own biostatistical analysis of the shape and movement of the Kaplan-Meier curves over a two-year period. *See Hsingching Hsu v. Puma Biotechnology, Inc.*, No. SACV 15-00865 AG (JCGx) (Doc. No. 408-1, Ex. 1). While Dr. Lavin's opinion that the Kaplan-Meier curves were actually narrowing over time related to whether the defendants' statements were false or misleading, Dr. Lavin performed multiples analyses of the two-year Kaplan-Meier curves and then formed his conclusion. *See id.* Gibson, however, performs no such technical analysis in reaching his conclusions. Unlike Dr. Lavin, whose testimony was necessary to assist the trier of fact in analyzing the Kaplan-Meier curves (i.e., the jury could not analyze the graphs without the aid of an expert), the data Gibson reviewed in reaching his conclusions does not require an expert's interpretation.

████████████████████████████████████████████████

████████████████████████████████████████████████ Doc. No. 372 at 9. Defendants assert that Plaintiffs cite to "no cases in which an expert was qualified based on application of 'empirical analysis' comparable to that of Dr. Gibson[.]" Doc. No. 413 at 4. The Court similarly is unable to find any case law supporting Gibson's methodology consisting of solely evaluating empirical research. *Cf. Giuliano v. Sandisk Corp.*, No. C 10-02787 SBA, 2015 WL 10890654, at *6 (N.D. Cal. May 14, 2015) (denying *Daubert* motion where the expert's empirical analysis consisted of reviewing evidence and creating an econometric regression model). While Gibson cites to a handful of sources concerning the standards and principles of empirical data

analysis, the majority are cited only in his rebuttal report (*see* Gibson Reb. Rpt. ¶¶ 12 n.35, 13 n.38, 17 n.49, 63 n.138, 85 n.189, 86 n.190), and the sources cited in his affirmative report fail to demonstrate that Gibson applied the empirical analysis methodology in an accepted and systematic way (*see* Gibson Rpt. ¶¶ 16 n.24, 115 n.241, 210 n.448, 215 n.452, 245 n.494).

Further, Defendants maintain that Gibson's triangulation method is unreliable. *See* Doc. No. 413 at 1-2. In opposition, Plaintiffs indicate that Gibson applied "triangulation by examining and identifying deposition testimony and internal Company documents that he found corroborated his conclusions overwhelmingly." Doc. No. 372 at 22. Plaintiffs cite to two cases in support of Gibson's application of triangulation in this case. Both cases, however, are inapposite to the case at bar.

In *Ramah Navajo Sch. Bd., Inc. v. Sebelius*, the expert developed his opinion by "interview[ing] fifty members of the Ramah Navajo community." No. 07-cv-289 MV, 2013 WL 12303945, at *9 (D.N.M. May 9, 2013). The expert then triangulated his findings by comparing the interviewees' data to data and information collected by other trained researchers with whom he was working. *See id.* The expert then presented his findings to tribal leaders, who indicated his findings were accurate. *See id.* Moreover, in *Garcia v. Los Banos Unified Sch. Dist.*, the expert used a peer reviewed social adjustment questionnaire that generated quantitative results. No. 1:04-CV-6059-SMS, 2007 WL 715526, at *11 (E.D. Cal. Mar. 8, 2007). The expert then applied triangulation by conducting an observational interview of the plaintiff for several hours, reviewing depositions, and reviewing books. *See id.*

Here, unlike both cases, Gibson's triangulation involved reviewing data from the same body of evidence that he relied on in applying his "empirical analysis" methodology and concluding that the deposition testimony and company documents corroborated his initial findings. In *Ramah Navajo Sch. Bd., Inc.* and *Garcia*, the experts conducted independent research and verified their results using additional research methods. Neither expert applied triangulation by solely reviewing deposition testimony

and internal company documents.

Accordingly, the Court finds that Gibson's methodologies are unreliable in this context. *See Primiano*, 750 F.3d at 565 (holding that expert testimony is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.").

### b. Soundness

Defendants argue that the Court should also find Gibson's methodologies have not been soundly applied because he "reviewed, summarized, and drew simple inferences from evidence hand selected by Plaintiffs' counsel." Doc. No. 413 at 1. "[T]his proffered expert testimony usurps the role of the fact finder and does not reflect the sound application of any reliable methodology." *Id.* In opposition, Plaintiffs assert that "Gibson soundly applied triangulation by examining and identifying deposition testimony and internal Company documents that he found corroborated his conclusions overwhelmingly." Doc. No. 372 at 22.

*Johns v. Bayer Corp.*, a case relied on by Defendants, is particularly instructive. No. 09cv1935 AJB (DHB), 2013 WL 1498965 (S.D. Cal. Apr. 10, 2013). There, the plaintiffs' expert authored a report that "provide[d] a 'chronological picture'" of relevant market research. *Id.* at *28. The expert's report "quot[ed] extensively from both third-party market research reports and [the defendant's] own internal documents." *Id.* The defendant sought to exclude the expert's testimony, and the plaintiffs argued that the expert's testimony "will help the trier of fact understand over a 'decade's worth of complex market research[.]'" *Id.* The district court, however, concluded that although the testimony was "arguably reliable" and "relevant," it "must nevertheless be excluded[.]" *Id.* The court reasoned that "[n]one of this evidence or testimony requires the providence of an expert," and the plaintiffs could elicit testimony from "[defendant's] representatives" and the "authors of the research reports" regarding "the results and conclusions reached by the third-party market research firms, and the impact [of] these results." *Id.*

Plaintiffs attempt to distinguish *Johns* in a footnote claiming that the majority of the report in that case "served no purpose other than 'a synopsis of Bayer's marketing . . . during . . . the Class Period.'" Doc. No. 372 at 21. Plaintiffs' criticism of *Johns*, however, also applies with equal force to Gibson's report. "[T]he documents cited by" Gibson "can independently come into evidence and counsel can make the argument as well as" [Gibson]. *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 6887043, at *6 (N.D. Cal. Nov. 14, 2017). As Defendants note, the market research materials were intended for a lay audience—SeaWorld's management and board of directors. *See, e.g.*, Gibson Rpt. ¶ 157 ███████████████████████ ████████████████████████████████ Thus, jurors are capable of reviewing these same documents and drawing their own inferences. *See In re Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *5 (excluding expert's opinion because it "invades the authority of the trier of fact to determine for itself the plain meaning of the facts and documents" and "contains no professional standards or principles and utilizes no specialized knowledge.").

Further, "[j]uries are likelier to credit experts, who are expected to help the jury reach the right conclusion, more than simple documentary evidence." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 12-cv-00630-LHK, 2014 WL 794328, at *9 (N.D. Cal. Feb. 25, 2014). Permitting Gibson's testimony runs the risk of unduly influencing the jurors who are competent to review the evidence and reach their own conclusions about the reasonableness, or lack thereof, of SeaWorld's attendance analyses and market research. *See Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063-64 ("Maintaining *Daubert*'s standards is particularly important considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony.").

Accordingly, the Court finds that Gibson's methodologies have not been soundly applied in this context.[16]

---

[16] As such, the Court declines to consider Defendants' final argument for exclusion.

*c. Summary*

In sum, the Court **GRANTS** Defendants' motion to exclude the opinions and testimony of Dr. James Gibson.[17]  Dr. Gibson is not permitted to testify as an expert witness for Plaintiffs in this matter.

**5.      Motion to Exclude Expert Opinion and Testimony of Dr. Craig Lewis**

Plaintiffs move to exclude the testimony of Dr. Craig Lewis, who was retained by Defendants to: (1) assess the market's views on whether *Blackfish* was impacting SeaWorld's business during the Class Period; and (2) opine on whether SeaWorld's August 13, 2014 disclosure constituted a "corrective disclosure."  *See* Doc. No. 354 at 1.

Lewis is the Madison S. Wigginton Professor of Finance at the Owen Graduate School of Management at Vanderbilt University.  *See* Doc. No. 354-1 (hereinafter "Lewis Rpt.") ¶ 1.  After completing his Ph.D. in Finance from the University of Wisconsin-Madison, Lewis began his academic career at Vanderbilt University.  *See id.*  Lewis's research interests cover areas of corporate finance.  *See id.*  Lewis has published papers in leading economic and finance journals about accounting fraud, convertible debt financing, corporate capital formation, forecasting stock market volatility, herding by equity analysts, and the regulation of financial markets.  *See id.*  Lewis teaches graduate-level courses generally in the area of corporate finance covering company valuation, corporate financial policy, and derivative securities.  *See id.* ¶ 2.  Lewis is the recipient of several awards for his publications and teaching excellence.  *See id.* ¶¶ 2-3.  Additionally, Lewis served as the Director of the Division of Economic and Risk Analysis and as Chief Economist at the U.S. Securities and Exchange Commission from June 2011 to May 2014, where he also was an Economic Fellow from January 2011 to June 2011.  *See id.* ¶

---

[17]  For the reasons discussed below, because the Court grants Plaintiffs' motion to exclude Dr. Randolph Bucklin from offering any opinions or testimony, Dr. Gibson's rebuttal opinions to Bucklin's opening report must also be excluded.  *See Internet Servs. LLC v. Immersion Corp.*, No. C-06-02009 CW (EDL), 2008 WL 2051028, at *2 (N.D. Cal. May 13, 2008) ("absent any initial expert report to rebut, th[is] [rebuttal] report[] must be excluded.").

3.

In his report, Lewis opines that throughout the Class Period, there was significant publicly available information regarding *Blackfish* which would allow investors to independently assess whether the film or related negative publicity affected attendance and SeaWorld's business. *Id.* ¶ 16. Lewis also analyzes SeaWorld's August 13, 2014 earnings release, in which SeaWorld announced that the company believed attendance in the Second Quarter 2014 was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California. *See* Doc. No. 354-13. Lewis concludes that: (a) the disclosure related to attendance in 2Q14 and is not a correction of alleged misstatements or omissions concerning prior quarters; (b) the disclosure did not revise any financial or attendance-related disclosures over the Class Period; and (c) analyst commentary confirms that the disclosure did not correct any prior alleged misstatements or omissions by Defendants. *See* Lewis Rpt. ¶ 17. As a result, Lewis concludes that "[b]ecause there was no correction of prior information on August 13, 2014, it is my view that there are no damages associated with SeaWorld's August 13, 2014 stock price decline." *Id.*

Lewis also submits an Expert Rebuttal Report wherein he evaluates the opinions set forth in Chad Coffman's Expert Report. *See* Doc. No. 354-2 (hereinafter "Lewis Reb. Rpt."). Specifically, Lewis opines that: (1) Coffman's opinion that SeaWorld's August 13, 2014 disclosure constitutes a corrective disclosure is incorrect; (2) Coffman's opinion that the alleged misstatements and omissions concerned information that was important to investors is fundamentally flawed; (3) Coffman has not provided a coherent economic theory of how $7.52 per share of artificial inflation entered SeaWorld's stock price starting on the first day of the Class Period and stayed constant during the Class Period; and (4) Coffman's apportionment analysis is incorrect and pure conjecture. *See id.* ¶¶6-10. Plaintiffs challenge opinions set forth in both Lewis's opening and rebuttal reports. *See* Doc. No. 354. The Court addresses Plaintiffs' arguments in turn.

/ / /

*a. Opening Report Opinions*

With respect to Lewis's opening report, Plaintiffs argue: (i) Lewis's materiality testimony is unreliable and will confuse and mislead the jury; and (ii) Lewis's testimony concerning the alleged corrective disclosure is unreliable because the testimony has no basis in law or fact. *See* Doc. No. 354 at 5, 9.

i. Reliability of Materiality Testimony

Plaintiffs contend that Lewis's observations concerning materiality in Section III of his report, which Lewis refers to as his market analysis opinion, should be excluded because he testified at his deposition that he is not offering an affirmative opinion on the materiality of the alleged misstatements. *See* Doc. No. 354 at 6.

In Section III of his report, Lewis opines that "there was clearly a wide range of public views among analysts about the potential impact that *Blackfish* may have had on the Company" and "there was significant publicly-available data and information that would have allowed investors to independently assess whether *Blackfish* or negative publicity associated with the film was affecting attendance and SeaWorld's business." Lewis Rpt. ¶¶ 59, 16.[18]  Lewis acknowledged at his deposition that he is not offering an opinion on materiality. *See* Doc. No. 354-3 (hereinafter "Lewis Dep.") at 92. Additionally, when asked what information he would need to make a materiality assessment, Lewis stated, "I can't answer that without—without thinking about it more." *Id.*

Defendants maintain that Lewis's analysis of the information available to investors is offered to provide a background for his ultimate conclusion that the alleged corrective disclosure did not correct prior misstatements and did not damage Plaintiffs. *See* Doc. No. 389 at 6.  Additionally, Lewis's review of SEC filings, analyst reports, and news

_____

[18]  In his rebuttal report, Lewis opines that Plaintiffs' evidence "does not prove" materiality and that "[t]his result is consistent with Mr. Jacobs's statement not being material or important to investors." Lewis Rpt. ¶¶ 26-34, 37.  Plaintiffs do not challenge these opinions.

articles constitutes a review of the total mix of information available to a reasonable investor—a "prerequisite for a materiality analysis[.]" *Id.*

In reply, Plaintiffs assert that in explaining his loss causation opinion (Section IV of his report), Lewis does not indicate he is relying on his market analysis opinion, nor does he cite a single observation, finding, or conclusion related to his market analysis opinion. *See* Doc. No 406 at 2. Thus, Plaintiffs maintain that Lewis's market analysis opinion is irrelevant and unreliable. *See id.*

The Supreme Court has explained that under securities laws, "an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (internal quotation marks and alterations omitted). "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (internal quotation marks omitted).

Here, Defendants have failed to meet their burden of proving the admissibility of this testimony by a preponderance of proof. *See Daubert*, 509 U.S. at 592 n.10. Lewis concedes that he is not offering an affirmative opinion on materiality and does not rely on his market analysis opinions in reaching his conclusions on loss causation. Accordingly, Lewis's market analysis opinion does not speak to materiality or loss causation (or any other element of Plaintiffs' claims) and is irrelevant. *See id.* at 591 ("Expert testimony which does not relate to any issue in the case is not relevant" and must be excluded).[19]

ii.    Reliability and Relevancy of Corrective Disclosure Testimony

Plaintiffs next contend that Lewis's conclusion that the August 13, 2014 disclosure is not corrective of any alleged misstatement or omission is neither relevant nor reliable because it: (1) adopts a standard for loss causation that is contrary to well-settled Ninth

_____

[19]  As such, the Court need not analyze Plaintiffs' remaining argument that Lewis's market analysis opinion is unreliable.

Circuit law; (2) lacks a basis in any discernible scientific methodology; and (3) does not take into account certain core facts. *See* Doc. No. 354 at 9-14.

First, with respect to the applicable legal standard, Lewis indicates in his report:

I understand that to prove loss causation, plaintiffs in securities class actions (as in this case) typically allege that defendants' fraudulent misstatements and omissions during the class period artificially inflated the stock price and that the artificial inflation previously present in the stock price dissipated *after a "corrective" disclosure revealed the truth about the prior alleged fraud*, causing the stock price to fall.

Lewis Rpt. ¶ 77 (emphasis added). Additionally, at his deposition, Lewis described a corrective disclosure as "a disclosure that corrects a past misstatement or omission." Lewis Dep. at 125. Contrary to Plaintiffs' contention, Lewis did not opine that a corrective disclosure must literally admit the falsity of prior statements. Indeed, Plaintiffs' own expert, Coffman, essentially applied the same loss causation standard as Lewis. *See* Coffman Rpt. ¶ 28 (evaluating "whether the August 13 Corrective Disclosure released new, Company-specific information *that was curative of the alleged misrepresentations*.") (emphasis added).

Lewis's opinion is consistent with the law in the Ninth Circuit. To prove loss causation, "plaintiffs need only show a causal connection between the fraud and the loss" by "tracing the loss back to the very facts about which the defendant lied." *First Solar*, 881 F.3d at 753 (internal quotation marks and citations omitted). "Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Id.* (quoting *Nuveen Mun. High Income Opportunity Fund*, 730 F.3d at 1120). The Ninth Circuit explained that "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Id.* at 754 (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)).

Plaintiffs also assert that Lewis "shockingly admitted he did not read" the Supreme

Court's opinion in *Dura Pharmaceuticals, Incorporated v. Broudo*, 544 U.S. 336 (2005) and did not draft the paragraphs of his report that reference that decision. Doc. No. 354 at 11. Lewis disclosed this fact in his report, which did not list any judicial opinions among the "List of Documents Considered." *See* Lewis Rpt., App'x C. Moreover, Lewis acknowledged that the paragraph discussing the Supreme Court's holding in *Dura* was drafted by the "Analysis Group" he worked with that identified and selected quotes from the case. Lewis Dep. at 125-127. Courts have admitted expert testimony where the expert worked with attorneys in preparing their reports. *See Acentra Inc. v. Staples, Inc.*, No. CV 07-5862 ABC (RZx), 2010 WL 11459205, at *5 (C.D. Cal. Oct. 7, 2010) (finding the expert "was involved enough to have prepared the [report] to satisfy Rule 26" where she worked with attorneys as a group and as a team to create the report) (internal quotation marks omitted). Thus, Plaintiffs' argument is unavailing.

Further, Plaintiffs claim Lewis did not fully understand the alleged misstatements and assumed that all of Defendants' alleged misstatements were truthful. *See* Doc. No. 534 at 11-12. For example, Lewis testified at his deposition that he did not recollect an unequivocal denial of a *Blackfish* impact during the Class Period. *See* Lewis Dep. at 44. Plaintiffs cite to a statement made by Mr. Jacobs on August 29, 2013 that "*Blackfish* has had no attendance impact[.]" *See* Coffman Rpt., App'x C. Plaintiffs' critiques go to the weight of Lewis's testimony, and not the admissibility. *See Primiano*, 598 F.3d at 564 ("Shaky but admissibly evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

Second, Plaintiffs contend that Lewis failed to perform an event study to analyze SeaWorld's stock price movements during the Class Period. *See* Doc. No. 354 at 13. However, "Defendants ha[ve] absolutely no obligation to conduct their own event study." *Cunha v. Hansen Nat. Corp.*, No. 08-1249-GW(JCx), 2013 WL 12124073, at *7 (C.D. Cal. June 20, 2013). Rather, event studies are often necessary for plaintiffs to meet their loss causation burden. *See In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014-16 (C.D. Cal. 2003) (granting summary judgment because the plaintiffs'

expert's report was "deficient for failure to provide an 'event study' or similar analysis" and therefore plaintiffs could not "carry their burden of proof on th[e] issue."). Additionally, Lewis accepted the returns Coffman estimated using his event study methodology for purposes of his own analysis. *See* Lewis Dep. at 22. Lewis analyzed analyst and media reports in reaching his conclusion that the alleged corrective disclosure did not reveal any news related to *Blackfish* and was limited in time to the second quarter of 2014. *See* Lewis Rpt. ¶¶ 84-88. Lewis's analysis will assist the trier of fact in determining loss causation. *See* Fed. R. Evid. 702. Lewis's failure to conduct an event study does not render his testimony inadmissible.

Third, with respect to Plaintiffs' argument that Lewis failed to consider core facts, Plaintiffs assert that Lewis disregarded dozens of contemporaneous press and industry reactions to the alleged corrective disclosure as well as internal SeaWorld records. *See* Doc. No. 354 at 14-15. However, Lewis reviewed more than 150 news and analyst reports in preparing his opening report. *See* Lewis Rpt., App'x C (listing materials relied upon, including analyst reports cited by Plaintiffs' expert, Mr. Coffman). Moreover, Lewis need not consider internal documents in reaching his opinion on loss causation, because the corrective disclosure analysis concerns whether the "share price dropped as a result of the market learning of and reacting to" a relevant truth. *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 392 (emphasis added). As discussed above with respect to Coffman, there is no binding authority forbidding an expert from considering internal information as one factor in his or her analysis. However, an expert is by no means required to do so. Thus, exclusion on this basis is improper.

### b. Rebuttal Report Opinions

Regarding Lewis's rebuttal report, Plaintiffs contend: (i) Lewis's testimony regarding Coffman's disaggregation analysis is unreliable; (ii) Lewis's testimony concerning the price maintenance theory of inflation has no basis in law or fact; and (iii) Lewis is not qualified to opine on the constant dollar inflation methodology; thus, his testimony on the subject should be excluded. *See* Doc. No. 354 at 16, 18, 21.

### i. Reliability of Disaggregation Testimony

Plaintiffs argue that Lewis's testimony concerning Coffman's disaggregation analysis lacks any reasonable or reliable basis because Lewis did not attempt an independent disaggregation analysis and undertook no evaluation to test or measure how new information moved SeaWorld's stock price on August 13, 2014. *See id.* at 17.

In his rebuttal report, Lewis opines that Coffman's apportionment of SeaWorld's abnormal price decline ($9.37 on August 13, 2014) to artificial inflation and other factors is flawed. Lewis Reb. Rpt. ¶ 52. Lewis explains that: (1) Coffman's reliance on non-public data incorrectly assesses investors' reactions to news released on August 13, 2014 "using data that investors *did not have*" (*id.* ¶ 54); (2) the assumptions underlying Coffman's analysis are arbitrary and inconsistent with the information available to the market (*id.* ¶ 56); and (3) the analysis is inconsistent with contemporaneous market commentary (*id.* ¶ 60).

Contrary to Plaintiffs' contention, Lewis did conduct alternative apportionment calculations. *See id.* ¶¶ 62-63. Specifically, Lewis posed five hypotheticals using Coffman's framework to "illustrate the subjective nature of [Coffman's] analysis." *Id.* ¶ 62. Lewis's testimony involves specialized knowledge that will assist the trier of fact. *See* Fed. R. Evid. 702.[20] To the extent Plaintiffs take issue with Lewis's opinion that a disaggregation analysis cannot rely on internal company materials, Plaintiffs "may make use of the traditional methods of testing the weight of an expert's opinion by vigorous cross examination and presentation of contrary evidence." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1220.

Further, identifying flaws in Coffman's analysis is proper rebuttal testimony. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab.*

---

[20] Plaintiffs' reliance on *Ollier v. Sweetwater Union High Sch. Dist.*, 267 F.R.D. 339 (S.D. Cal. 2010), *aff'd*, 768 F.3d 843 (9th Cir. 2014) and *Colony Holdings, Inc. v. Texaco Ref. & Mktg/, Inc.*, No. SACV00217DOC(MLGX), 2001 WL 1398403, at *3 (C.D. Cal. Oct. 2001) is misplaced, as neither case concerns rebuttal testimony.

*Litig.*, 978 F. Supp. 2d 1053, 1069 (C.D. Cal. 2013) ("As a rebuttal witness, he may rely largely on other expert reports, as he does, and point out flaws in their methodologies or conclusions."); *TCL Commc'ns Tech. Holdings Ltd.*, 2016 WL 7042085, at *5 ("[D]efendant [may] properly present expert rebuttal of the plaintiff's expert by putting forth its own expert who . . . claims that . . . the plaintiff's expert's methodology was conducted improperly in some way."). As such, Lewis's rebuttal testimony concerning Coffman's disaggregation analyses is admissible.

ii. Price Maintenance Theory Testimony

Plaintiffs contend that Lewis's testimony rebutting the price maintenance theory of inflation "is premised on the incorrect assumption that the law requires Plaintiffs to prove that alleged misstatements caused discernible, raw stock price increases[.]" Doc. No. 354 at 18. Plaintiffs claim Lewis: (1) disregarded the theory in his rebuttal report; (2) articulated a standard that has no relation to the well-settled law on the price maintenance theory; and (3) failed to consider relevant evidence considering the price maintenance theory. *See* Doc. No. 354 at 18-21.

First, Plaintiffs contend that Lewis impermissibly bases his opinion on the incorrect assumption that Plaintiffs are not relying on a price maintenance theory here. *Id.* at 20. Notably, neither Coffman's opening nor rebuttal reports mention the price maintenance theory. Regardless, in his rebuttal report, Lewis indicates, "[w]hile he does not address the issue of how inflation entered SeaWorld's stock price, it is possible that Mr. Coffman plans to advance a 'price maintenance' explanation for why SeaWorld's stock price did not react positively to Mr. Jacobs's alleged misstatement." Lewis Reb. Rpt. ¶ 38. "The price maintenance theory would suggest that instead of providing any new information to investors, Mr. Jacobs's allegedly false statement may simply have confirmed investors' existing belief that, according to SeaWorld management, *Blackfish* was not affecting attendance." *Id.* "According to this theory, Mr. Jacobs's allegedly false statement prevented the stock price from declining as it otherwise would have if Mr. Jacobs had acknowledged a *Blackfish* effect." *Id.* "Therefore, the lack of a positive price

reaction following Mr. Jacobs's statement would not necessarily prove that his statement did not inflate SeaWorld's stock price." *Id.* Lewis went on to criticize any such theory, claiming "Coffman has provided no evidence to support a 'price maintenance' theory." *Id.* ¶ 39. Thus, Contrary to Plaintiffs' contention, Lewis did not disregard the price maintenance theory in his rebuttal report.

Second, Plaintiffs assert that Lewis "applie[d] a standard that has no relation to the . . . well-settled law on the price maintenance theory." Doc. No. 354 at 19. However, the price maintenance theory is not "well-settled law[.]" Doc. No. 354 at 19. Indeed, in the Court's Class Certification Order, the Court indicated it found "persuasive the reasoning of the Second, Seventh, and Eleventh Circuits" because the Ninth Circuit has yet to address the theory. *See* Doc. No. 259 at 24. Moreover, Lewis applied the theory in a manner consistent with the courts that have accepted the price maintenance theory. *See* Lewis Reb. Rpt. ¶ 38.

Third, Plaintiffs argue that Lewis's opinion criticizing Coffman for failing to explain how artificial inflation entered the stock price on the first day of the Class Period should be excluded. *See* Doc. No. 354 at 20. Plaintiffs allege that the first misstatement occurred on August 29, 2013, when Jacobs stated that *Blackfish* has had no attendance impact. In his rebuttal report, Lewis points out that Coffman's own analysis shows no price impact on that day. Lewis explains that Jacobs's comments had been publicly released the previous day. *See* Lewis Reb. Rpt. ¶ 40.

Plaintiffs argue that Lewis was "somehow not aware that Mr. Jacobs' statement on August 28, 2013, ***was not the first time*** SeaWorld had told the market *Blackfish* was not having an impact on the Company's business[.]" Doc. No. 354 at 20 (emphasis in original). Plaintiffs maintain that Lewis's testimony on this issue should be excluded because he did not review an August 14, 2013 *Bloomberg* article wherein Jacobs denied that *Blackfish* was impacting SeaWorld's attendance. *See* Doc. No. 354 at 20.

At his deposition, Plaintiffs' counsel asked Lewis if a statement is not new, or no new information is provided to the market, would Lewis expect to the statement to have

any effect on the stock price. Lewis Dep. at 171. Lewis responded, "That's right. In an efficient market if the statement had been made publicly five days ago, I wouldn't expect the stock price reaction to be related to Mr. Jacobs' statements, that's correct." *Id.* at 171-72. Thus, Plaintiffs claim that by his own admission, Lewis's testimony concerning the price maintenance theory must be struck. Doc. No. 354 at 21.

It is unclear, however, why Lewis's failure to consider the August 14, 2013 *Bloomberg* article renders his testimony on the price maintenance theory entirely inadmissible. Coffman did not rely on this article in any of his reports; thus, Lewis would not have had occasion to consider it in forming his rebuttal opinions. Moreover, Plaintiffs do not allege that Jacobs's statement in the *Bloomberg* article constitutes a misstatement. As such, Plaintiffs' challenges are better suited for cross examination.

Accordingly, Lewis's price maintenance rebuttal testimony is admissible. *See Alaska Rent-A-Car, Inc.*, 738 F.3d at 969-70 (noting that courts are "not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").

### iii. Constant Dollar Inflation Testimony

Lastly, Plaintiffs argue that Lewis's criticisms of Coffman's use of the constant dollar inflation ("CDI") methodology should be excluded because Lewis is not qualified to opine on the CDI methodology and his opinion is based on insufficient facts. *See* Doc. No. 354 at 21-22.

In his rebuttal report, Lewis contends that Coffman's CDI methodology is flawed:

> Given th[e] fluctuating publicity related to *Blackfish* over the Class Period, it is illogical to assume that a qualitative but-for disclosure similar to the alleged corrective disclosure on August 13, 2014 would have conveyed the same signal about an impairment in SeaWorld's reputation, or would have affected investors' expectations about future attendance and future cash flows to the same extent, and would have elicited the same stock price reaction, regardless of when during the Class Period that but-for disclosure was made.

Lewis Reb. Rpt. ¶ 51.

Plaintiffs claim that Lewis is not qualified to opine on the CDI methodology because he admitted at his deposition that he had not heard of the methodology prior to this litigation, does not know whether it is considered an acceptable methodology in the financial community, and is not aware if courts have accepted it in the context of securities fraud class action damages analyses. *See* Lewis Dep. at 190-91. Plaintiffs rely on *AIG Ret. Servs., Inc. v. Altus Fin. S.A.*, No. CV 05-1035-JFW (CWx), 2011 WL 13213589 (C.D. Cal. Sept. 26, 2011), to support their claim that Lewis's credentials "fail to justify the admission of his unsupported conclusions on this topic." Doc. No. 354 at 22. Plaintiffs' reliance is misplaced as the court in that case excluded opening opinions by experts—not opinions set forth in a rebuttal report—concerning what "a prudent commissioner" and a "reasonable FRB [federal reserve board]" member would do in specific circumstances. *AIG Ret. Servs., Inc.*, 2011 WL 13213589, at *2-3. The court found that although the experts were qualified and have substantial experience in their respective fields, "they have not adequately explained how their experience leads to certain conclusions reached[.]" *Id.* at *3.

Here, however, Lewis's background as a former Chief Economist for the SEC whose work focused on "forecasting stock market volatility," "company valuation," and "research on equity analysts earrings forecasts" qualifies him to point out flaws in Coffman's damages methodology. Lewis Rpt. ¶¶ 1-3; *see also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 978 F. Supp. 2d at 1060 ("[a]s a rebuttal witness, [Lewis] may rely largely on [Plaintiffs'] expert reports, as he does, and point out flaws in their methodologies or conclusions.").

Moreover, Lewis's criticisms mirror concerns noted by other courts. *See In re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 119 (W.D. Pa. 2003) (recognizing that attempts to utilize the CDI methodology can be "complicated by the reality that the degree of price inflation on any given day during the class period may well differ from the degree of inflation on a different day during the same period."). Thus, Plaintiffs fail to demonstrate

that Lewis is unqualified to rebut Coffman's CDI opinions.

Additionally, Plaintiffs assert that Lewis's opinion is based on insufficient facts or data because Lewis admits he has not reviewed any internal company documents in this case. *See* Doc. No. 354 at 22. As noted above with respect to Defendants' motion to exclude Coffman's testimony, while courts have approved loss causation analysis premised in part on internal company documents, *see Smilovits*, 119 F. Supp. 3d at 995, *aff'd First Solar*, 881 F.3d at 754, Plaintiffs offer no authority that experts *must* consider internal company documents in forming their conclusions. Thus, Plaintiffs' argument is unavailing.

   *c. Summary*

The Court **GRANTS IN PART** Plaintiffs' motion and precludes Dr. Craig Lewis from offering any affirmative market analysis opinions or testimony. The Court **DENIES IN PART** Plaintiffs' motion as to Dr. Craig Lewis's loss causation opinions, as well as the opinions set forth in his rebuttal report.

**6.    Motion to Exclude Expert Opinion and Testimony of Dr. Randolph Bucklin**

Plaintiffs further seek to exclude the testimony of Dr. Randolph E. Bucklin, who was retained by Defendants to provide an opinion on the approaches used by SeaWorld to assess factors affecting attendance, examine SeaWorld's market research, and to discuss the issues involved in measuring the effects of factors driving SeaWorld's attendance. *See* Doc. No. 357.

Bucklin is a Professor of Marketing at UCLA Anderson School of Management. *See* Doc. No. 357-1 (hereinafter "Bucklin Rpt.") ¶ 1. Bucklin received his Ph.D. in Business from Stanford University, a master's degree in Statistics from Stanford University, and his bachelor's degree in Economics from Harvard University. *See id.* Bucklin has been on the UCLA faculty for thirty (30) years and was promoted to tenure in 1995. *See id.* Bucklin's "expertise is in the quantitative analysis of customer choice behavior" where he "stud[ies] how customers behave and how their purchase decisions respond to changes in marketing activity." *Id.* ¶ 2. Plaintiffs do not dispute Bucklin's

qualifications.  *See* Doc. No. 409 at 7 n.10.

In his report, Bucklin opines that: ███████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████  *See id.* ¶ 7.

Bucklin also submits an Expert Rebuttal Report, dated March 1, 2019.  *See* Doc. No. 357-2 (hereinafter "Bucklin Reb. Rpt.").  In his rebuttal report, Bucklin responds to the opinions set forth in James Gibson's Expert Report.  *See id.* ¶ 2.  Bucklin ultimately concludes that "[n]one of the opinions offered in the Gibson Report change my opinions offered in the Bucklin Report."  *Id.* ¶ 5(d).

Plaintiffs assert that Bucklin's opinions should be excluded because: (a) they are not based on reliable principles or methodologies that were reliably applied to the facts; (b) Bucklin's opinions will not help the jury reach any conclusion necessary to this case and fail *Daubert*'s "fit" or relevancy requirement; and (c) they are based on insufficient facts or data.  *See* Doc. No. 357 at 3-5.

*a.  Reliability*

Plaintiffs first contend that Bucklin did not use any scientific or established standard to evaluate SeaWorld's analyses and purported conclusions.  *See* Doc. No. 357 at 7.  Bucklin's "'business setting' methodology is not based on sound science or the rigorous standards of Bucklin's professional field.  Nor is it capable of objective or independent validation."  *Id.* at 10.  In response, Defendants claim that Bucklin drew on aspects of his professional and academic training to evaluate SeaWorld's marketing and attendance analyses.  *See* Doc. No. 383 at 10.  Further, because SeaWorld "conducted its market research and data analysis in a business rather than an academic research setting,

any reliable expert opinion must account for that business setting to fit the facts of the case." *Id.*

In analyzing reliability, courts must assess whether "the reasoning or methodology underlying the testimony is scientifically valid" and "properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. A court's goal is to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "The reliability inquiry is 'a flexible one.'" *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Kumho Tire*, 526 U.S. at 149). The Supreme Court has identified factors that may be used for evaluating the reliability of an expert: "whether the scientific theory or technique has been tested, peer reviewed, identified as having a particular rate of error, and generally accepted in the scientific community[.]" *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (citing *Daubert*, 509 U.S. at 592-94).

At his deposition, Plaintiffs' counsel questioned Bucklin about his methodology. Bucklin testified as follows:

> Q. I'm asking you, in your analysis to support the opinions you're offering in this case, did you apply that same standard that you apply in your academic research?
>
> . . .
>
> THE WITNESS: Well, I think in this case we're looking at a business situation. We're not looking at a social science study that's going to a peer-reviewed journal.

Doc. No. 357-3 (hereinafter "Bucklin Dep.") at 22.

Bucklin clarified,

> I don't leave behind what I know as an academic when I come and look at a

business situation. But I'm also mindful, having worked with businesses and managers extensively over the years that a business setting and managing a business and making decisions in a business setting are different from an academic study.

*Id.* at 22-23.

Additionally, Plaintiffs' counsel inquired:

Q. But from a social science standpoint or the other fields where you studied, it's not your opinion that ███████████████████ █████████

MR. YOUNGWOOD: Objection, form.

THE WITNESS: One is business analysis, and one is scientific analysis.

BY MR. HILL:

Q. *And you're not applying those principles of scientific research to your opinions here?*

MR. YOUNGWOOD: Objection, form.

THE WITNESS: They imbue the way that I look at the world because I've been a researcher for more than 30 years. So there are principles there that are helpful.

*But in analyzing business data, I believe it is a setting in which there's an applied element as opposed to a rigorous scientific element.*

*Id.* 115-16 (emphasis added).

Here, Bucklin's "business setting" approach is troubling because he did not apply the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Bucklin asserts that he "used principles that [he] employ[s] to evaluate peer research and graduate student work and in consulting" in reaching his opinions in this case. Bucklin Rpt. ¶ 8. As Defendants correctly note, Bucklin need not conduct his own experimental study or build a model.

*See* Fed. R. Evid. 703.  However, Bucklin "applied his amorphous 'business setting' approach that did not rely on any identified standards or principles from his discipline." Doc. No. 409 at 3.  Upon review of his report, the Court is unconvinced that Bucklin's "business setting" approach involved the same level of intellectual rigor that he employs in his field.

Although the business setting may be different from techniques involved in academic research, Defendants have not met their burden of demonstrating that Bucklin's testimony involves specialized knowledge that would require expert testimony.  *See Johns*, 2013 WL 1498965, at *28 ("[n]one of this evidence or testimony requires the providence of an expert," and the plaintiffs could elicit testimony from "[defendant's] representatives" and the "authors of the research reports" regarding "the results and conclusions reached by the third-party market research firms, and the impact [of] these results."); *In re Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *5 (excluding expert's opinion because it "invades the authority of the trier of fact to determine for itself the plain meaning of the facts and documents" and "contains no professional standards or principles and utilizes no specialized knowledge.").

Additionally, as Plaintiffs point out, Bucklin's "business setting" approach and the conclusions he reached cannot be replicated or tested by anyone.  Bucklin admitted at his deposition that his opinions were based in part on hypotheses he had never tested and never "specifically examined."  Bucklin Dep. at 177-78.  Defendants do not respond to this argument.  The Court's gatekeeping "function requires more than simply taking the expert's word for it."  *Castaic Lake Water Agency v. Whittaker Corp.*, No. CV 00-12613 AHM (Rzx), 2002 WL 34700741, at *4 (C.D. Cal. Oct. 25, 2002); *see also S.E.C. v. Lipson*, 46 F. Supp. 2d 758, 762 (N.D. Ill. 1999) ("In considering the reliability prong of the *Daubert* analysis, the Court must consider whether the principles and methodology underlining the testimony are valid.").

Accordingly, the Court finds Bucklin's methodology unreliable.  *See Easton v. Asplundh Tree Experts, Co.*, No. C16-1694RSM, 2017 WL 4005833, at *5 (W.D. Wash.

Sept. 12, 2017) (excluding expert testimony because "a jury can accomplish the same analysis without an expert.").[21]

   *b. Summary*

   In sum, the Court **GRANTS** Plaintiffs' motion to exclude the opinions and testimony of Dr. Randolph Bucklin.[22]  Dr. Randolph Bucklin will not be permitted to testify as an expert witness in this matter.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

   Defendants move for summary judgment as to Plaintiffs' Section 10(b) and 20(a) claims.  *See* Doc. No. 361.  Plaintiffs filed an opposition, to which Defendants replied. *See* Doc. Nos. 385, 419.

## 1.    Legal Standard

   "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is material if it could affect the outcome of the suit under applicable law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

   [21]  The Court declines to consider Plaintiffs' remaining arguments for exclusion.

   [22]  For the reasons set forth above, because the Court grants Defendants' motion to exclude the opinions and testimony of Dr. James Gibson, Dr. Bucklin's rebuttal opinions to Gibson's opening report must also be excluded.  *See Internet Servs. LLC*, 2008 WL 2051028, at *2 ("absent any initial expert report to rebut, th[is] [rebuttal] report[] must be excluded.").

1  242, 248 (1986).  A dispute about a material fact is genuine if there is sufficient evidence

2  for a reasonable jury to return a verdict for the non-moving party.  *See id.*

3  **2.     Objections to Evidence**

4         As a preliminary matter, both Plaintiffs and Defendants have filed objections to

5  evidence submitted in connection with their respective briefs.

6       *a.  Plaintiffs' Objections*

7         Plaintiffs object to two categories of evidence submitted by Defendants in support

8  of the instant motion.  *See* Doc. No. 369.  Defendants filed a response to Plaintiffs'

9  evidentiary objections.  *See* Doc. No. 419-12.

10        First, Plaintiffs assert that the Court should strike evidence of attorney involvement

11  or legal blessing.  *See* Doc. No. 369 at 1-2.  Specifically, in their motion for summary

12  judgment, Defendants identify SeaWorld's processes, including the Disclosure

13  Committee Process, as evidence that the Company ensured the integrity of its SEC filings

14  and disclosures.  In their statement of undisputed facts, Defendants describe those

15  processes in detail, referencing the involvement and approval of inside and outside

16  lawyers in the processes.  *See* Doc. No. 419-13 ("SSUF") ¶¶ 42-61.  Defendants then cite

17  to the declarations of Josh Powers, James Atchison, and James Heaney and claim that the

18  individuals relied on those processes in making the alleged false or misleading statements

19  at issue in this case.

20        Plaintiffs claim that the Court should strike several paragraphs of the Powers,

21  Atchison, and Heaney declarations because permitting Defendants to rely on evidence of

22  their attorneys' involvement or legal blessing to support their position of no scienter is

23  unfairly prejudicial.[23]  *See* Doc. No. 369 at 1.  Moreover, Plaintiffs claim that

24

25  _____

26        [23]  Plaintiffs filed a motion regarding this subject matter that was referred to the assigned
   magistrate judge.  Plaintiffs sought an order finding that Defendants waived any privilege or work-

27  product claim over communications regarding the alleged misrepresentations and conduct at issue by
   affirmatively injecting evidence of counsel's advice, role, and involvement into the record.  *See* Doc.

28  No. 313.  Alternatively, Plaintiffs sought an order barring Defendants from introducing such evidence at

Defendants' attempt to rely on this evidence is directly contrary to numerous representations made by defense counsel during the October 17, 2018 hearing before Magistrate Judge Goldman, where defense counsel indicated that Defendants would not rely on the involvement of inside and outside counsel to support the individual defendants' state of mind.  *See id.* at 2.

Upon review of the cited facts and relevant declarations, Plaintiffs' arguments are unpersuasive.  The portions of the declarations cited by Plaintiffs do not mention attorney involvement in the disclosure process.  ████████████████████████████████ ████████████████████████████████████  *See* SSUF ¶¶ 47, 56, 58.  Two of them (47 and 58) say no more than Ms. Gulacsy "met with" SeaWorld legal, among others. The other paragraph (56) references "input' from many, including SeaWorld legal, but Defendants do not disclose any advice "SeaWorld legal" may have provided or state that SeaWorld's disclosures are accurate or that there is no scienter because of the advice from counsel.  Defendants do not mention attorney involvement in their brief in support of their motion for summary judgment or in the individual defendants' declarations.  Nor are Defendants relying on evidence that they indicated they would not disclose. Accordingly, the Court **OVERRULES** Plaintiffs' objection.

Second, Plaintiffs contend the Court should strike excerpts from the declarations of Powers, Atchison, and Heaney pursuant to the sham affidavit rule.  *See* Doc. No. 369 at 3-5.  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  The Ninth Circuit has fashioned "two important limitations on a district court's discretion to invoke the sham affidavit rule."  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).  First, the rule does not apply automatically to every case where a contradictory affidavit is introduced; rather, "the

---

summary judgment or trial.  *See id.*  Judge Schopler issued a minute order on June 6, 2019, denying Plaintiffs' motion.  *See* Doc. No. 397.

district court must make a factual determination that the contradiction was actually a 'sham.'" *Id.* (quoting *Kennedy*, 952 F.2d at 267). Second, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* at 998-99.

With respect to the declaration of Josh Powers, dated April 12, 2019, ████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████ Doc. No. 361-30 ("Powers Decl.") ¶ 11.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████ Doc. No. 369-2 ("Powers Dep.") at 55. ████████████████

████████████████████████████████████████████████████████████████

████████████████ As such, the Court **OVERRULES** Plaintiffs' objection.[24] *See Van Asdale*, 577 F.3d at 998-99.

Regarding the April 15, 2019 declaration of James Atchison, Atchison claims, "I believed that the Company's public statements were true and did not contain material misstatements or omissions." Doc. No. 361-81 ("Atchison Decl.") ¶ 4. Plaintiffs assert that this statement conflicts with his deposition testimony, wherein Atchison testified he could not recall if his challenged March 13, 2014 statement was completely true when made. *See* Doc. No. 369-3 ("Atchison Dep.") at 225 ("As of March 13, 2014, was that a completely true statement?" to which Atchison responded, "I can't recall. It's too long ago for me to get a context."). While it appears that Atchison's response to one question

---

[24] ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

arguably conflicts with a portion of his declaration, the Ninth Circuit has made clear that "the sham affidavit rule should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (internal quotation marks omitted). As required by the Ninth Circuit, the Court must make a factual determination that the declaration was a "sham." There is insufficient evidence to make this determination, as Atchison responded on several occasions throughout his deposition that he believed his public statements were true when made. *See* Atchison Dep. at 37, 47, 216. *Yeager*, a case cited by Plaintiffs, is distinguishable because this is not a case where the deponent remembered almost nothing about the events central to the case during his deposition, but suddenly recalled those same events "with prefect clarity in his declaration in opposition to summary judgment without any credible explanation as to how his recollection was refreshed." 693 F.3d at 1080. Thus, the Court **OVERRULES** Plaintiffs' objection.

With respect to the April 15, 2019 declaration of James Heaney, Heaney states, "I believed that the Company's public statements, reflected in filings with the Securities and Exchange Commission which I signed, as well as statements that I made on earnings calls that are cited in Plaintiffs' Complaint, were true and did not contain material misstatements or omissions." Doc. No. 361-83 ("Heaney Decl.") ¶ 5. Plaintiffs maintain that this statement contradicts Heaney's deposition testimony, wherein Heaney testified that "[m]y conclusion is it wasn't clear" in a follow-up response to the question, "[s]itting here today, do you believe Blackfish had an attendance impact on SeaWorld's parks as of January 23, 2014?" Doc. No. 369-4 ("Heaney Dep.") at 205-06. As Defendants point out, counsel's questioning at the deposition calls for Heaney's hindsight assessment as of the date of his deposition, not whether he believed the challenged statements at the time they were made. As such, the Court **OVERRULES** Plaintiffs' objection. *See Van Asdale*, 577 F.3d at 998-99.

/ / /

### b. Defendants' Objections

Defendants submitted objections in a five-page document entitled "Evidentiary Objections" (*see* Doc. No. 419-11) as well as in their Reply in Further Support of Defendants' Statement of Undisputed Facts and Response to Plaintiffs' Statement of Material Facts (*see* SSUF), which includes five pages of evidentiary objections and objections interposed in the 922-page chart containing the undisputed material facts.

The Court permitted Plaintiffs leave to file a response to Defendants' evidentiary objections. *See* Doc. No. 424. Plaintiffs argue that Defendants' evidentiary objections do not comply with Civil Chambers Rule IV and such an approach is fundamentally unfair. *See id.* at 1. Plaintiffs request that the Court overrule Defendants' objections in their entirety without prejudice to being re-raised at the appropriate time. *See id.*

Here, Plaintiffs are correct that Defendants' objections do not comply with Civil Chambers Rule IV. Many of Defendants' objections lodged in the parties' 922-page chart containing the statement of undisputed facts are "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." *Doe v. Starbucks, Inc.*, 2009 WL 5183773, at *1 (C.D. Cal. 2009). On this basis alone, the Court need not scrutinize each objection and give a full analysis of identical objections raised as to each fact. *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (quotation omitted) (noting that on motions with voluminous objections "it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised."). As such, the Court declines to individually rule on the objections lodged in the statement of undisputed facts.

Nevertheless, Defendants' objections in the 922-page chart are largely summarized in their five-page document entitled "Evidentiary Objections." *See* Doc. No. 419-11. Defendants generally assert objections to four categories of evidence. Plaintiffs argue that the Court need not address the objections. *See Holt v. Noble House Hotels & Resort, Ltd.*, 370 F. Supp. 3d 1158, 1164 (S.D. Cal. 2019). While the Court need not scrutinize

boilerplate recitations of evidentiary principles or blanket objections, Federal Rule of Civil Procedure 56 requires that the Court only consider admissible evidence at the summary judgment stage. *See* Fed. R. Civ. P. 56. As such, the Court proceeds to address the four categories of evidence that Defendants challenge.

First, Defendants contend that Plaintiffs' statement of additional material facts should be stricken in its entirety because "Plaintiffs cite to no authority permitting them to submit a single 'additional material fact' much less 1,060 'facts.'" Doc. No. 419-11 at 1. This Court routinely considers additional material facts proffered by a plaintiff in opposing a motion for summary judgment. Moreover, Defendants' cite to no binding authority in support of this argument. Thus, the Court **OVERRULES** Defendants' objection to Plaintiffs' statement of additional facts.

Second, Defendants take issue with Plaintiffs' reliance on the deposition testimony of Fred Jacobs, SeaWorld's former Vice President of Communications, to support their claim that certain statements made by SeaWorld's former CEO, James Atchison, were untrue. *See* Doc. No. 419-11 at 2-3. Defendants argue that Jacobs lacks foundation to opine on the truth or falsity of Atchison's statements because Jacobs had no personal knowledge as to whether *Blackfish* materially impacted SeaWorld's attendance or business. However, at his deposition, Jacobs testified that he was aware attendance was declining, was consistently in communication with Atchison and other SeaWorld executives, and was authorized to speak on SeaWorld's behalf about attendance declines. See PX 10 (hereinafter "Jacobs Dep.") at 176-95; PX 88. Thus, Jacobs has personal knowledge to testify about declining attendance at SeaWorld, regardless of whether he saw the results from certain attendance surveys. Accordingly, the Court **OVERRULES** Defendants' objection without prejudice.

Third, Defendants assert that Plaintiffs' citations to articles and analyst reports should be stricken because they violate the "best evidence" rule insofar as they are offered as substitutes for what SeaWorld's SEC disclosures said and they constitute hearsay. Doc. No. 419-11 at 4. Regarding the best evidence rule, Federal Rule of

Evidence 1002 provides: "An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. Here, the articles and analyst reports are not being offered to prove what SeaWorld's disclosures said. In fact, Defendants' SEC filings are part of the record in this case. Rather, Plaintiffs offer the articles and reports to show how the market interpreted SeaWorld's disclosures. Thus, Defendants' best evidence objection is without merit.

Moreover, with respect to Defendants' hearsay[25] objection, Plaintiffs do not attempt to offer the reports and articles as substitutes for what SeaWorld disclosures said or to prove Defendants made false statements. Rather, Plaintiffs rely on these documents to show how the market interpreted SeaWorld's disclosure. Defendants' reliance on *In re Oracle Corp. Sec. Litig.*, No. C 01-00988 SI, 2009 WL 1709050, at *8 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010), is misplaced as the district court there excluded articles and analyst reports that were cited to "prove that defendants made false statements." The district court repeatedly concluded that analyst reports "are not hearsay to the extent they are offered not for their truth but to prove the reports were made." *Id.* at *10 n.13. On appeal, the Ninth Circuit relied on "analyst reports" in determining how the market understood Oracle's earnings miss. *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 393. Thus, because Plaintiffs offer the articles and analyst reports not for the truth of the matter asserted in the reports and articles, but rather to demonstrate how the market understood and interpreted SeaWorld's disclosure, the analyst reports and news articles do not constitute hearsay. Accordingly, the Court **OVERRULES** Defendants' objection to analyst reports and news articles without prejudice at this stage of the proceedings.

Fourth, Defendants maintain that Plaintiffs improperly rely on two surveys prepared by third-parties and argue that both surveys constitute hearsay. *See* Doc. No.

---

[25] Hearsay is a statement, made out of court, offered for the truth of the matter asserted. Fed. R. Evid. 801.

419-11 at 5.  However, the Ninth Circuit has held that survey evidence does not constitute hearsay and "should be admitted as long as [it is] conducted according to accepted principles and [is] relevant."  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010).  "Technical inadequacies in the survey, including the format of the questions or the manner in which it was taken, bear on the weight of evidence, not its admissibility."  *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988).  Accordingly, the Court **OVERRULES** Defendants' objection to these surveys without prejudice at this stage of the proceedings.

### 3.   Section 10(b) and Rule 10b-5 Claim

Defendants argue that Plaintiffs' 10(b) claim for securities fraud fails because Plaintiffs fail to present evidence sufficient for a rational trier of fact to find in their favor on each element.  *See* Doc. No. 361 at 1-2.

Section 10(b) "makes it unlawful for 'any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.'"  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (quoting 15 U.S.C. § 78j(b)).  Rule 10b-5, promulgated under the Securities Exchange Act, makes it unlawful "for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  *Id.* at 989-90 (quoting 17 CFR 240.10b-5(c)).

"The required elements for a private securities fraud action are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (internal quotation marks omitted).

/ / /

*a. Loss Causation*

Defendants first argue that Plaintiffs cannot prove loss causation because the Second Quarter Earnings Release did not contain a corrective disclosure and because Plaintiffs' expert testimony does not create a genuine factual dispute as to loss causation. *See* Doc. No. 361 at 16, 19. In opposition, Plaintiffs maintain that a corrective disclosure need not be a direct admission that a previous statement is untrue. *See* Doc. No. 385 at 29. Moreover, Plaintiffs' expert, Chad Coffman, conducted a full event study regression analysis and concluded that the price of SeaWorld's stock fell in reaction to the August 13, 2014 disclosure. *See* Coffman Rpt. ¶ 79.

The Securities Exchange Act defines "loss causation" as the plaintiff's "burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "This inquiry requires no more than the familiar test for proximate cause." *First Solar*, 881 F.3d at 753.

"[T]he plaintiff in a securities fraud action must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event." *Lloyd*, 811 F.3d at 1209. "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop and investors to lose money." *Id.* (internal quotation marks omitted). "[P]laintiffs need only show a 'causal connection' between the fraud and the loss" by "tracing the loss back to 'the very facts about which the defendant lied[.]" *First Solar*, 881 F.3d at 753 (quoting *Nuveen Mun. High Income Opportunity Fund*, 730 F.3d at 1119-20). Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Id.*

"The misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a 'substantial cause.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1055 (9th Cir.

2005)).

i.   Defendants' Burden

As a preliminary matter, Plaintiffs assert that Defendants must establish that the depreciation in the value of SeaWorld's stock could not have resulted from the alleged misstatements or omissions. Doc. No. 385 at 25. Plaintiffs contend that because "Defendants make no attempt to prove that the August 13 stock decline was unrelated to their misstatements," the Court "need go no further" and should deny summary judgment on loss causation. *Id.* at 27. Plaintiffs' argument is unavailing, as Plaintiffs cite to no binding authority in a Rule 10b-5 case in support of this argument. *Cf. Pompano Beach Police and Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543, 546 (9th Cir. 2018) (affirming the district court's grant of summary judgment as to "ample access" statement because *the plaintiffs* did not submit evidence to establish a causal connection between the fraud and the loss).

ii.   Whether the Earnings Release Contains a Corrective Disclosure

Defendants maintain that Plaintiffs' reliance on the earnings release is flawed because "a disclosure that only addresses the reasons for a decline in attendance in 2Q14—a quarter about which no alleged misrepresentations were made—cannot be 'corrective' of earlier statements concerning prior quarters." Doc. No. 361 at 16. Thus, because the disclosure does not relate back to the time period when the alleged misstatements were made, Plaintiffs cannot show loss causation. Plaintiffs contend that the disclosure need not explicitly reveal the falsity of Defendants' prior representations. *See* Doc. No. 385 at 29 (citing *NuVasive, Inc.*, 2018 WL 656036, at *5 ("[T]he Ninth Circuit does not require that fraud be affirmatively revealed to the market to prove loss causation.")). The parties agree that the Ninth Circuit's recent analyses of loss causation are instructive on the issue.

In *First Solar*, the plaintiffs alleged that during the class period, First Solar, one of the world's largest producers of photovoltaic solar panel modules, discovered a manufacturing defect causing field power loss (the "LPM defect") and a design defect

causing faster power loss in hot climates (the "heat degradation problem"). 881 F.3d at 752. The plaintiffs claimed that First Solar wrongfully concealed these defects, misrepresented the cost and scope of the defects, and reported false information on their financial statements. *See id.* Moreover, the plaintiffs argued that when First Solar later disclosed the product defects and financial liabilities to the market, First Solar's stock price fell. *See id.* The Ninth Circuit affirmed the trial court's denial of summary judgment as to five of the six alleged corrective disclosures. *See id.* at 754.

Defendants focus on the first and last corrective disclosures in *First Solar*. *See* Doc. No. 361 at 17. Similar to the corrective disclosure alleged in this case, the first corrective disclosure in *First Solar* was part of a quarterly earnings statement. *See Smilovits*, 119 F. Supp. 3d at 983. Defendants distinguish the first corrective disclosure in *First Solar* because it announced for the first time that there had been manufacturing problems during the class period, the company learned about those problems more than a year before the disclosure, and the company accrued unexpected expenses to remedy the problems in the current quarter and before.[26] *See id.* at 983-84. Unlike *First Solar*, Defendants argue that the corrective closure in this case "focused on current conditions rather than conditions at the time of the alleged misstatements." Doc. No. 361 at 18.

Plaintiffs point out, however, that First Solar issued other corrective disclosures which included earnings releases lowering guidance. *See Smilovits*, 119 F. Supp. 3d at 996-98. For example, in the May 3, 2011 Earnings Release, "First Solar issued its numbers for 1Q11, beating Bloomberg consensus estimates for earnings per share and revenue." *Id.* at 996. The company also announced additional expenses for the LPM defect and maintained its revenue and earnings per share guidance for the fiscal year. *See id.* However, the company's "guidance had accounted for some impact due to the heat degradation issue, but this fact was not disclosed in the financial statements." *Id.* Thus,

---

[26] Similarly, the last corrective disclosure mentioned the unexpected costs of "remediating" the LPM manufacturing problems that arose during the class period. *See id.* at 998-99.

unbeknownst to investors, the company's guidance "now incorporated some impact from the heat degradation problem." *Id.* The plaintiffs' expert noted that because the heat degradation issue "was not specifically discussed, or otherwise disclosed or broken out, none of the analysts had an opportunity to comment on the issue[.]" *Id.* The expert opined that the LPM expenses "and the impact of the heat degradation issue on the Company's 2011 guidance had a negative impact on First Solar's stock price" and contributed to the 6.2% decline in stock price. *Id.* The district court concluded that "[a] reasonable jury could determine that the very facts omitted and misrepresented by Defendants—the effect of the LPM defect and existence of the hot climate degradation issue—were substantial factors in causing the stock to decline and Plaintiffs' loss." *Id.*

Additionally, in First Solar's December 14, 2011 Guidance Updates, the company reduced its earnings guidance and reduced revenue guidance, missing Bloomberg consensus estimates. *See id.* at 997. The company also announced restructuring charges during the quarter, which included eliminating 100 positions. *See id.* at 998. First Solar updated its 2012 guidance for earnings per share and revenues, both of which fell below Bloomberg's consensus estimates. *See id.* Finally, the CEO stated in a press release that First Solar was "recalibrating our business to focus on building and serving sustainable markets rather than pursuing subsidized markets." *Id.* First Solar stock fell 21.4%. *See id.* Plaintiffs' expert attributed the low guidance to the heat degradation problem as First Solar was changing its focus to larger scale projects in warmer climates. *See id.* The district court concluded a reasonable jury could conclude that the facts omitted "relating to the hot climate defect revealed the true financial condition of First solar and were a substantial factor in the stock price decline." *Id.* Thus, contrary to Defendants' assertion that a disclosure must relate back to the time period when the alleged misrepresentations were made, the Ninth Circuit affirmed the district court's denial of summary judgment with respect to two disclosures that did not explicitly reference the time period when the alleged misstatements were made. *See First Solar*, 881 F.3d at 754.

The parties also cite to *Pompano Beach*, where the Ninth Circuit, in an

unpublished Memorandum Disposition, affirmed the district court's grant of summary judgment where the plaintiffs alleged that defendants misleadingly informed the market that they had "ample access" to credit and conflated quarterly revenues with annual earnings when addressing investors on an April 2008 earnings call. 731 F. App'x at 546. The plaintiffs alleged that an August 2008 report in the *South China Post* served as a corrective disclosure. *See id.* The court found that the disclosure was not corrective because the report blamed the company's problems on "'the global credit crunch' and 'banks' reluctance to lend in the current credit market climate,' not on [Senior Vice President] Henry's previous ['ample access'] statement." *Id.* Additionally, with respect to the alleged April 2008 misstatement concerning a $312 million reduction in EBITDAR for the year, the court similarly found that even if the Bank of America report impacted the stock price, the plaintiffs "do not demonstrate how Weidner's false statement months before was a 'substantial factor' in the decline when the disclosure does not mention EBITDAR or Weidner's April statement." *Id.* at 547.

Defendants argue that *Pompano Beach* stands for the proposition that a disclosure cannot be corrective if it focuses on "the current credit market climate, not on [defendants'] previous statement." *Id.* at 546. Thus, because the alleged disclosure in this case addressed declines in attendance in 2Q14, and the alleged misrepresentations were made between 2Q13 and 1Q14, the corrective disclosure does not "relate back" to that time period. Doc. No. 361 at 16. However, in reading the Ninth Circuit's explanation in context, the alleged misstatements were made amidst a "global financial recession." *Pompano Beach*, 731 F. App'x at 546. The court held that the plaintiffs had not demonstrated that the misstatements caused the resulting stock price as opposed to "the global credit crunch" or "banks' reluctance to lend in the current credit market climate." *Id.* Thus, the court's conclusion did not turn on the fact that the corrective disclosures did not explicitly mention the time period when the alleged misstatements or misrepresentations were made, but rather because the plaintiffs could not trace "the loss back to the very facts about which [defendants] lied." *First Solar*, 881 F.3d at 753

(internal quotation marks omitted).

In *Metzler Investment GMBH*, the plaintiff alleged that Corinthian Colleges manipulated student enrollment to maximize the amount of federal Title IV funding the colleges received. 540 F.3d at 1063. The plaintiff alleged two corrective disclosures that purportedly revealed Corinthian's fraudulent student enrollment practices to the market: (1) the June 24, 2004 *Financial Times* story reporting the Department of Education's investigation at the Bryman campus; and (2) an August 2, 2004 press release disclosing reduced earnings and earning projections. *See id.* at 1059. The Ninth Circuit held that the plaintiff failed to allege loss causation because the complaint did not allege that either announcement "disclosed—or even suggested—to the market that Corinthian was manipulating student enrollment figures company-wide in order to procure excess federal funding, which is the fraudulent activity that Metzler contends forced down the stock that caused its losses." *Id.* at 1063. "Neither the June 24 *Financial Times* story nor the August 2 press release regarding earnings can reasonably be read to reveal widespread financial aid manipulation by Corinthian, and the TAC does not otherwise adequately plead that these releases did so." *Id.*

Importantly, the second corrective disclosure in *Metzler* postdated the class period, which spanned from August 27, 2003 to July 30, 2004. *See id.* at 1055. In concluding that Metzler failed to establish loss causation, the Ninth Circuit made no reference to the fact that the disclosure did not reference the time period when the alleged misstatements were made. Rather, the court focused on how the market understood the subject of the disclosure. *See id.* at 1065 (noting that the August 2nd disclosure reported that student population growth was up nearly 50% overall, "making it even further unwarranted to infer that the reference to 'attrition' was understood by the market to mean that Corinthian had revealed widespread misrepresentations of student enrollment to

fraudulently procure excess federal funding.").[27]

Defendants point to no Ninth Circuit authority to support their contention that summary judgment is appropriate as to loss causation if the corrective disclosure does not expressly reference the *time period* when the misrepresentations were made. While some corrective disclosures in recent cases do reference a time period that encompasses when the misrepresentations were made, recent Ninth Circuit analyses focuses on whether the *subject* of the disclosure relates back to the misrepresentation. Indeed, "[t]o be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Lloyd*, 811 F.3d at 1210 (quoting *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)); *see also First Solar*, 881 F.3d at 754 ("approval of one [loss causation] theory should not imply our rejection of others.").

As discussed in more detail below, Plaintiffs' expert opines that "information corrective of Defendants' alleged misstatements and omissions was disclosed on August 13, 2014." Coffman Rpt. ¶ 72. Coffman's conclusion is consistent with market commentary that attributed the August 13 stock decline not to disappointing earnings for the quarter, but rather to *Blackfish*. *See, e.g.*, PX 504 (August 14, 2014 *The Guardian* article entitled "SeaWorld Shares Tumble 33% Following Blackfish Documentary"). Thus, a reasonable jury could find that the August 13 disclosure related back to Defendants' alleged misstatements. Accordingly, summary judgment is inappropriate on this issue. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)

---

[27] Similarly, in *In re Oracle Corporation Securities Litigation*, the plaintiffs alleged that Oracle fraudulently concealed product defects and accounting manipulations. 627 F.3d at 383-84. The corrective disclosure was an earnings miss, but the "overwhelming evidence produced during discovery indicates that the market understood Oracle's earnings miss to be a result of several deals lost in the final weeks of the quarter due to customer concern over the declining economy. Numerous analyst reports support this conclusion." *Id.* at 393. As such, the Ninth Circuit found that the plaintiffs could not establish loss causation. *See id.* at 394.

("summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case.").

### iii. Coffman's Loss Causation Opinions

Next, Defendants argue that Plaintiffs' expert does not create a genuine factual dispute as to loss causation because he fails to show a corrective disclosure and fails to disaggregate confounding factors. *See* Doc. No. 361 at 19-22.

#### a. Corrective Disclosure

Defendants first assert that Coffman's report is unreliable and inadmissible for the reasons set forth in their motion to exclude his testimony; thus, without a loss causation expert, summary judgment must be entered in favor of Defendants. *See id.* at 19. However, for the reasons set forth above, the Court finds Coffman's testimony reliable and admissible.

Defendants next contend that Coffman "provides no basis on which a rational trier of fact could conclude that a statement identifying *Blackfish*-related negative publicity as a factor *in 2Q14* was understood as somehow 'corrective' of alleged misstatements concerning 2Q13 through 1Q14." *Id.* at 20 (emphasis in original). Specifically, the analyst reports and articles Coffman relies on demonstrate that the market understood SeaWorld's disclosure as concerning its performance in 2Q14 and do not create a triable issue of fact as to loss causation. *See id.* at 21. Additionally, "Coffman ignores the most obvious explanation: that the size of the reaction indicates that the market interpreted the discloses as indicating both an impact in the second quarter ***and an impact going forward***[.]" *Id.* (emphasis in original).

For example, Defendants note that one *Wall Street Journal* article connected SeaWorld's stock drop to "disappointing second-quarter results and slashed . . . revenue guidance." Youngwood Decl., Ex. 30. Additionally, another report stated: "SeaWorld had never before acknowledged any impact. Now the company says it happened in San Diego, blaming publicity from California legislative efforts. The legislative efforts faltered in the spring as attention to *Blackfish* waned. But the impact on attendance

rose." *Id.*, Ex. 31.

In response, Plaintiffs argue that they need not demonstrate that the disclosure was understood as corrective of Defendants' alleged misstatements concerning 2Q13 and 1Q14. *See* Doc. No. 385 at 29. "[T]o require defendants to concede that previous statements were false would be to require an admission of fraud—a standard the Ninth Circuit has repeatedly rejected." *Id.* (citing *NuVasive, Inc.*, 2018 WL 656036, at *5 ("[T]he Ninth Circuit does not require that fraud be affirmatively revealed to the market to prove loss causation.")); *see also Lloyd*, 811 F.3d at 1210 ("loss causation is simply a variant of proximate cause").

Even if Plaintiffs must demonstrate that the market understood the disclosure as a revelation of the falsity of prior statements, Plaintiffs identify numerous articles indicating market commentators perceived that the August 13, 2014 disclosure recalled and revised Defendants' public statements that *Blackfish* was having "no impact" on the business in 2013 and 2014. For example, in "SeaWorld Finally Confirms a Blackfish Backlash to Investors," Adweek.com stated:

> SeaWorld has been very insistent in its messaging since CNN's Blackfish expose surfaced with variations on 'The Documentary is skewed and it will not affect our business in any way' . . . . Today, however, the company officially changed its tune in a telling press release. . . . this release effectively serves as an admission that, *despites claims to the contrary*, the movie has indeed had an adverse effect on business.

PX 518 (emphasis added).

Additionally, in an article entitled, "SeaWorld: Remember When We Said That Blackfish Movie Didn't Hurt Us? Well Never Mind," New York Magazine reported, "SeaWorld changed course, and admitted, finally, that the backlash is taking a toll after all." PX 517. Moreover, in an article entitled, "SeaWorld Finally Admits That The Documentary Blackfish Is Hurting Attendance," Cinemablend.com reported, "While SeaWorld didn't specify Blackfish's impact by name, the quote you read above is

actually a huge step when compared to the amount of denial that was coming out of the company about the documentary." PX 511; *see also* PX 502, PX 515, PX 523.

As Coffman found, "the market saw the disclosure as the Company acknowledging a *Blackfish* impact when SeaWorld had explicitly denied any such impact in the past, in statements and omissions the Plaintiffs allege were materially false or misleading." Coffman Reb. Rpt. ¶ 88. Additionally, "the fact that several members of the media and analysts drew the link to Defendants' prior statements . . . is not offset by the fact that other analysts did not explicitly do so." *Id.* ¶ 89. Further, contrary to Defendants' assertion that Coffman "ignore[d] the most obvious explanation" for the stock price decline (Doc. No. 361 at 21), Coffman explains that "[t]he firm-specific stock price decline of $9.37 per share is many multiples of what could be explained by any short-term, single period impact" (Coffman Reb. Rpt. ¶ 91). "[T]he market interpreted the disclosure as one of structural, not short-term, consequence, and thus reaching *farther back and into the future*, not just to the prior quarter." Coffman Reb. Rpt. ¶ 91 (emphasis added).

Thus, a reasonable jury could find, consistent with Coffman's opinion, that the August 13, 2014 disclosure constituted a corrective disclosure. *Cf. In re Oracle Corp. Sec. Litig.*, 627 F.3d at 393 (affirming summary judgment on loss causation where the plaintiffs found only two analyst reports questioning whether Oracle's lost sales were attributable to the declining economy and the "agglomeration of evidence" presented demonstrates that the sales were lost "as a result of customer concerns over a faltering economy" and not product defects). As such, summary judgment on this issue is improper.

                    b.       Disaggregation

Defendants further assert that Coffman's loss causation opinions are inadmissible because even assuming that the 2Q14 earnings release constituted a corrective disclosure, Coffman "fails to apportion what part the alleged fraud contributed to the stock's loss in value 'among the tangle of factors' affecting SeaWorld's share price on August 13,

2014." Doc. No. 361 at 22 (quoting *Nuveen Mun. High Income Opportunity Fund*, 730 F.3d at 1123). Defendants contend that Coffman: (1) improperly relies on non-public data to conduct his apportionment analysis; (2) his methodology is impermissibly arbitrary; and (3) Coffman admitted that his apportionment analysis is only valid in 2014. *See id.* at 23.

Defendants raised all three of these arguments in their motion to exclude Coffman's testimony. *See* Doc. No. 349. For the reasons set forth above, Coffman's testimony is admissible. Defendants do not challenge Coffman's event study or the event study results, nor do Defendants suggest a superior approach to disaggregation. The jury can determine what weight to give Coffman's testimony at trial. *See Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1218 (concluding that the expert "explains the steps of his analysis and justifies the numbers he used; consequently, his expert opinion is admissible."); *Moshayedi*, 2013 WL 12129282, at *6 ("Whether [Coffman] chose the correct factors and gave them the correct weight is for the jury.").

Accordingly, genuine issues of material fact preclude summary judgment on the element of loss causation.

*b. Damages*

Next, Defendants assert that Plaintiffs have no admissible evidence of damages. Doc. No. 361 at 23. Defendants claim that Coffman's constant dollar inflation ("CDI") model of damages is unreliable and incompatible with the case. *See id.* at 23-24.

According to Coffman, the CDI method is commonly used to quantify artificial inflation throughout a class period. Coffman Rpt. ¶ 130; *see also In re Novatel Wireless Sec. Litig.*, 2013 WL 12247558, at *2-3 (S.D. Cal. Nov. 19, 2013) (noting that CDI is "a standard measurement of damages in securities fraud cases."). The CDI method "assumes that the per share artificial inflation that is dissipated in response to a corrective disclosure should be carried back in time to the actionable misstatements and/or

omissions." *Id.* Coffman determined that by utilizing this methodology, "the artificial inflation per share was $7.52 throughout the Class Period." *Id.* Coffman explains that, assuming Plaintiffs' allegations are true, "the most reliable method available to determine the impact this information would have on the stock price at any time during the Class Period is to observe the impact it actually had when it was ultimately disclosed—namely August 13, 2014." *Id.* ¶ 132. "At any point in time during the Class period, the corrective information would have signaled to investors, as it did on August 13, 2014, an impairment to SeaWorld's brand and reputation and therefore a structural issue . . . in value and demand for the Company's premier parks and products." *Id.* ¶ 135. If the market came to understand that SeaWorld's business . . . was negatively impacted by *Blackfish*, it is a reasonable expectation that the Company's stock price would suffer significantly." *Id.* ¶ 136. Coffman opines that the CDI method "may be overly conservative if the trier of fact accepts that SeaWorld's business was being impacted by *Blackfish* and related publicity at the start of the Class Period." *Id.* ¶ 137. "An earlier acknowledgement by Defendants at a time when public awareness of *Blackfish* was relatively less than the date of the Corrective Disclosure may have caused a more significant decline in the Company's stock price." *Id.*

Coffman explains in detail why he believes the CDI method is the most reasonable choice. *See id.* ¶¶ 12, 130-138. Defendants made these same arguments in their motion to exclude Coffman's expert testimony. Notably, Defendants do not provide an alternative calculation. For the reasons set forth above, Defendants' disagreement with Coffman's approach and conclusions are not bases for summary judgment. Thus, triable issues of fact exist as to Plaintiffs' damages. *See In re Novatel Wireless Sec. Litig.*, 2013 WL 12247558, at *2-3 (explaining that whether the constant dollar method is appropriate is a question for the jury).

*c. Falsity*

Defendants argue that summary judgment should be granted with respect to each of the alleged misstatements or omissions because there is no evidence that the

statements were false or misleading.[28]  *See* Doc. No. 361 at 32.  In opposition, Plaintiffs assert that ample evidence supports a finding that Defendants' statements were false or misleading at the time they were made.  *See id.* at 13.

"[T]o prevail, the plaintiffs must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression."  *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).  "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018).  "Even if a statement is not false, it may be misleading if it omits material information."  *Id.* at 1008-09.  "[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from one that actually exists.'"  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

"Disclosure is required . . . only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx Initiatives, Inc.*, 563 U.S. at 44 (quotation marks omitted).  "[C]ompanies can control what they have to disclose under these provisions by controlling what they say to the market."  *Id.* at 45.  "But once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information."  *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (quotation marks and citation omitted).

---

[28]  Without citing to any legal authority, Defendants state in passing that "each of the statements . . . were either plainly qualified or obvious statements of opinion about a hard-to-quantify, publicly known risk[.]"  Doc. No. 361 at 26.  Because Defendants fail to explain in any detail why any of the challenged statements were qualified or statements of opinion, the Court declines to address Defendants' argument.

"Generally, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact[.]" *S.E.C. v. Todd*, 642 F. 3d 1207, 1220 (9th Cir. 2011) (internal citations and quotation marks omitted).

### i.   August 2013 Statements

Plaintiffs challenge two August 2013 statements in which Jacobs, an individual authorized to speak to the press on matters related to SeaWorld's attendance, allegedly falsely stated that "[SeaWorld] can attribute no attendance impact at all to the movie" (PX 89) and that "*Blackfish* has had no attendance impact" (PX 92).[29]  Defendants argue that there is "no evidence that these statements were materially false at the time they were made."  Doc. No. 361 at 33.

Jacobs' statement that SeaWorld "can attribute no attendance impact at all to the movie" was published by *Bloomberg* on August 28, 2013, one day prior to the start of the Class Period.  *See* Ex. 36.  "A defendant may be held liable . . . only for the statements made during the class period."  *In re REMEC Inc., Sec. Litig.*, 702 F. Supp. 2d at 1222-23.  Thus, because this statement was made prior to the start of the Class Period, it is not actionable.[30]  It is undisputed, however, that the second statement, "*Blackfish* has had no attendance impact," was first published on August 29, 2013, by the *LA Times*.  PX 92.  At his deposition, when asked whether this statement was true when he made it, Jacobs responded, "[n]o, not as far as I'm concerned."  PX 10 at 194.  Jacobs, who was instructed by Atchison to make the statement, explained at his deposition that "the statement is unequivocal and I just can't conceive that it isn't—you know, that there wasn't at least one person out there who changed their mind about visiting SeaWorld

---

[29]  Plaintiffs contend that SeaWorld, through Jacobs, is the speaker of the August 2013 statements.  *See* Doc. No. 134-2.

[30]  Statements made before the class period can be relevant evidence on this issue of scienter because they may provide insight into what the defendant knew during the class period."  *Id.* at 1222 (quotation marks and citation omitted).

because of Blackfish." *Id.* at 184.[31]

During this time, consumers inundated SeaWorld with letters and emails vowing to never visit its parks because of *Blackfish*. For example, on August 23, 2013, SeaWorld received an email stating, "[j]ust a quick note to say that I have seen 'Blackfish', and I have urged all friends and family to see it and to never visit a SeaWorld owned park. Whales should be released." PX 394; *see also* PX 386, PX 387, PX 388, PX 389, PX 390, PX 391, PX 392. ████████████████████████████████████

████████████████████████████████ PX 428 at BakerSW0429362. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ PX 04 at 368.

Defendants affirmatively represented that *Blackfish* has had no attendance impact but failed to perform any analysis to determine whether the film had, in fact, impacted attendance. Meanwhile, attendance was declining, Heaney reported that he did not know the source of the attendance declines, and Defendants received numerous letters and emails from consumers claiming they would never visit a SeaWorld park again because of *Blackfish*. Accordingly, drawing all reasonable inferences in favor of Plaintiffs, triable issues of fact exist as to the falsity of the August 29, 2013 statement. *See Hsingching*, 2018 WL 4945703, at *8 (holding that where the defendant "chose to make statements directly inconsistent with the information he did have[,] . . . a triable issue of fact [exists] on whether [the defendant's] safety statements were false.").

/ / /

---

[31] Plaintiffs cite to two other exhibits to support their claim that Jacobs' statement was false when made. *See* PX 377, PX 137. These exhibits were not prepared until months after the August 2013 statement; thus, they do not support Plaintiffs' argument. *See Khoja*, 899 F.3d at 1008 (explaining falsity is properly alleged when the defendant's statements directly contradict what the defendant "*knew at that time*.") (emphasis added).

ii.   <u>November 13 and 14, 2013 and December 20, 2013 Statements</u>

Plaintiffs challenge three statements made during 4Q13.  First, Plaintiffs claim that in SeaWorld's earnings release for 3Q13, published on November 13, 2013, Defendants misleadingly attributed a 3.6% attendance decline in 3Q13 to "adverse weather" and "planned strategies that increased revenue but reduced low yielding and free attendance," omitting *Blackfish* as a contributing factor.  SAC ¶ 213.[32]  Second, Plaintiffs assert that on November 14, 2013, Atchison falsely stated to the *Wall Street Journal*, "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it. . . . Ironically, our attendance has improved since the movie came out."  PX 100.  Third, Plaintiffs contend that on December 20, 2013, Atchison falsely stated to the *Orlando Sentinel*, "As much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business."  PX 106.  Defendants assert that there is "no evidence that these statements were false or misleading[.]"  Doc. No. 361 at 35.  Defendants maintain that attendance trends improved in 3Q13 and 4Q13, ████████████████████████████████████████████ ███████████ and SeaWorld met its earnings guidance for fiscal year 2013.  *See id.* at 36.

However, attendance at SeaWorld's orca parks for 4Q13, taken together, was down ███ as compared to budgeted attendance.  PX 28.  Admissions revenue at SeaWorld's orca parks for 4Q13, taken together, was similarly down ███ as compared to budgeted admissions revenue.  *Id.* ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████  PX 4 at 370-71.  Powers further testified that from November 14, 2013 through December 20, 2013, ████████████████████████████

---

[32]  Plaintiffs assert that SeaWorld, Atchison, Heaney, and Swanson are the speakers of the November 13, 2013 statements.  *See* Doc. No. 134-2.

████████████████████████████████████████████████ *Id.* at 372-73.
████████████████████████████████

As noted above, during this time consumers flooded SeaWorld with letters and emails vowing to never visit its parks because of *Blackfish*. *See, e.g.*, PX 399 ("Due to your quote 'we can attribute no attendance impact at all to the movie,' I am writing to let you know I will never attend SeaWorld due to my seeing the Blackfish movie. I have a feeling there are many people who have not and will not visit SeaWorld due to this movie[.]"); PX 386, PX 387, PX 388, PX 389, PX 390, PX 391, PX 392, PX 397, PX 398, PX 400, PX 401.

Additionally, in October 2013, SeaWorld employees Atchison, Taylor, Rearden, Brad Andrews, Heaney, David Hammer, Scott Helmstedter, Mills, Brown, Swanson, Chris Dold, Jacobs, Bides, Barbara Hefferman and Judy St. Leger met to discuss SeaWorld's reputation, which was referred to as the "reputational charrette." PX 302. When asked what Jacobs recalled about the discussion of *Blackfish* at the reputational charrette, Jacobs testified:

> Well, the -- of all the things that were damaging – the company's reputation, the most significant was Blackfish and, you know, we were far from, you know, the -- the end of the road as far as Blackfish was concerned, but the -- it was one of the component pieces of the reputational problems that we were experiencing; the most significant, too.

PX 10 at 210-11. When asked what he thought the purpose of the reputational charrette meeting to be, Jacobs responded:

> That we could give form to what was becoming clear to all of us, that the – that the film was having a significant impact on the company's reputation, which is, you know, a great asset, and that we have to do whatever is required from that moment forward to try to repair and rebuild the company's reputation.

*Id.* at 212-13.

████████████████████████████████

████████████████████████████████████

███████████████████████ PX 134 at 256-59, 251-52. On

November 27, 2013, Barenaked Ladies cancelled its performance at SeaWorld's annual

Bands, Brews, and BBQ event ("BBBQ") because of *Blackfish*. PX 217 at

BakerSW0113078. On December 2, 2013, Scott Helmstedter forwarded an email to

Atchison which stated in part:

> There is a meeting with PR and Entertainment now to discuss a strategy to arm the artists [sic] management with proper information to combat the negative social media and correct the misconceptions purported by Blackfish. . . . I fear if we don't take action, we'll continue to lose artists and goodwill with our audience. *Further celebrity endorsements of Blackfish or resulting business partner boycotts will continue to damage our reputation.*

*Id.* at BakerSW0113076 (emphasis added).

████████████████████████████████

████████████████████████████████████

████████████████████████████████ PX

221 at BakerSW0079205. D'Alessandro responded noting that it is "troubling that

████████ has put our sponsorship deal on hold and ██████████ is threatening to

pull travel packages. I also understand ███████ is now stressing. We need to give a

better response than silence. These petition campaigns could very well continue and have

*more economic impact*." *Id.* at BakerSW0079204 (emphasis added).

████████████████████████████

██████████████████████████████████

████████████████████████████ PX 224 at

BakerBX0001340. █████████████████████████████

████████████████████████████████████

██████████████████████████████

██████████ *Id.* (emphasis added).

Regarding the December 20, 2013 statements, Jacobs testified that Atchison's statements were "simply untrue" because "[t]here was a cost impact, there was a staff resources impact, there is a reputation impact and very likely an attendance impact. There was a partnership impact. There were impacts across the business. So to say that there was no impact is not correct." PX 10 at 261-263.[33] A reasonable jury could also find that Atchison's statements conveyed that SeaWorld had tested for "any effect on our business" from *Blackfish*, when, in fact, it had not. PX 106; *see also* PX 4.

Accordingly, drawing all reasonable inferences in favor of Plaintiffs, triable issues of material fact preclude summary judgment as to whether the November 13 and 14, 2013 and December 20, 2013 statements were false or misleading. *See Schueneman*, 840 F.3d at 705-06 ("once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (quotation marks and citation omitted).

### iii. March 13, 2014 Statements

On March 13, 2014, SeaWorld issued its earnings release for 4Q13 and fiscal year 2013. Plaintiffs maintain that Defendants misrepresented that the entirety of SeaWorld's attendance decline for 4Q13 and FY13 was attributable to factors other than *Blackfish*, including weather and yield management strategies. Additionally, during the earnings call, Atchison made the following statements: (a) "As much as we're asked it, we can see no noticeable impact on our business;" (b) "But our surveys don't reflect any shift in sentiment about intent to visit our parks;" (c) "A matter of fact, the movie in some ways has actually made perhaps more interest in marine mammal parks, and actually even

---

[33] Except for certain band cancellations, these facts were not known by the market.

about us;" and (d) "But we have seen no impact on the business." PX 115.[34] Defendants argue that "[t]here is no evidence that suggests the Company's identification of attendance drivers was incorrect, that *Blackfish* was somehow a material factor in the slight 4Q13 1.4% attendance decline, or that the Company believed it was and concealed that information." Doc. No. 361 at 37. Additionally, "[n]o *Blackfish*-related attendance impact had been identified, other business impacts remained minimal, and there is no evidence that Mr. Atchison intentionally misinterpreted or misrepresented any survey data." *Id.* at 38.

Jacobs testified that Atchison's statement that SeaWorld has "seen no impact on the business" was not true. PX 10 at 279-281. Jacobs explained that "the impact on the business grew over time. So if there was a small impact, a marginal impact in -- in February 2013, there was much more of an impact in July and much more in November and much more in February of 2014." *Id.* at 280-81.

In addition to the impacts identified above regarding the 2013 statements (lost attendance, revenues, sponsors, events, and promotions), Atchison was informed in February 2014 that one of the "worst" performance factors was that "Blackfish continues to impact perception." PX 138 at BakerSW0094823, BakerSW0094825. ███████

█████████████████████████████████████████████████████████████

██████████ PX 186 at BakerSW0096639.

Attendance through February 23, 2014 at SeaWorld's orca parks, taken together, was down ████ on the month and ███ year to date. PX 591 at BakerSW0143869, BakerSW0143874, BakerSW0143875. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

[34] Plaintiffs assert that SeaWorld, Atchison, and Heaney are the speakers of the March 13, 2014 statements. *See* Doc. No. 134-2.

14cv2129-MMA (AGS)

PX 4 at 375-377.

PX 209.[35] Moreover, SeaWorld's 50th anniversary celebration was negatively affected by *Blackfish*, as many corporate partners cancelled partnerships and related events for the celebration. *See, e.g.*, PX 160, PX 419, PX 422.

PX 566 at BakerBX000923-24 (emphasis added).

Accordingly, Plaintiffs submit evidence that raises genuine issues of material fact as to whether the March 2014 statements were false or misleading. *See Hsingching*, 2018 WL 4945703, at *7 ("These material factual disputes are best left for a jury to decide.").

    iv.  <u>May 14, 2014 Statements</u>

Lastly, in SeaWorld's May 14, 2014 earnings release for 1Q14, Plaintiffs contend that SeaWorld misrepresented that the entire 13% attendance decline for the quarter was due to weather and the shift in the Easter holiday from 1Q14 to 2Q14.[36]  Defendants argue "no evidence exists to create a genuine factual dispute as to whether the Company had identified and failed to disclose a *Blackfish* impact[.]"  Doc. No. 361 at 38.

In addition to the evidence set forth above, internal reports indicated that the "combination of shifts in Easter/Spring break schedules, unfavorable weather *and negative publicity have impacted the SeaWorld parks performance*" through April 29,

---

[35]  Defendants argue that some of the opportunities identified in the chart aggregating the value of lost revenue and lost promotional value postdate the Class Period.  Defendants' argument is without merit, as those dates refer to the cancelled event date and not the date that SeaWorld learned that the performance or partnership had been cancelled.  *See id.*

[36]  Plaintiffs contend that SeaWorld, Atchison, Heaney, and Swanson are the speakers of the May 14, 2014 statements.  *See* Doc. No. 134-2.

2014. PX 144 at BakerSW0038175 (emphasis added). In reviewing this information, Jacobs emailed Jill Kermes in an email entitled "2014 SeaWorld Performance Update Summer Plan," "It worries me that we have stuff like this floating around: 'A combination of shifts in Easter/Spring break schedules, unfavorable weather and negative publicity have impacted the SeaWorld parks performance (through 4/29)' *Jim has explicitly and repeatedly said that we've seen no impact to our business*." *Id.* at BakerSW0038173 (emphasis added).

Defendants argue that this document is not evidence of falsity as to the May 2014 statements concerning a quarter that ended in March. Doc. No. 419 at 15. However, nothing in the document suggests that the negative publicity affecting SeaWorld parks performance began in April 2014. Rather, the statement makes clear that negative publicity affected performance "*through* 4/29[.]" PX 144 at BakerSW0038173 (emphasis added).

██████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████ PX 214 at BakerSW0218291, 002847, 002850, 002853.
██████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████ PX 215 at BakerSW00330013, BakerSW00330010.

Accordingly, drawing all reasonable inferences in favor of Plaintiffs, triable issues of fact exist as to the falsity of the May 14, 2014 statement. *See Schueneman*, 840 F.3d at 709 (noting that the defendant "could have remained silent about the dispute" but it "could not represent that there was no controversy here because all the data was favorable.").

### d. Materiality

Defendants argue that there is no evidence that creates a genuine factual dispute as to whether *Blackfish* had caused material attendance declines as of August 2013. Doc. No. 361 at 33. Defendants further characterize any *Blackfish* impacts as minimal or *de minimus*. *See id.* at 35. Plaintiffs contend that Defendants apply the wrong legal standard and ignore the evidence. *See* Doc. No. 385 at 17. "[T]he evidence demonstrates, however, [that] information about whether *Blackfish* was negatively impacting SeaWorld—the topic of the alleged misstatements—was plainly important to investors." *Id.* at 19.

"The materiality of the misrepresentation or an omission depends on whether there is 'a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available' for the purpose of decisionmaking by stockholders concerning their investments." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (quoting *Basic Inc.*, 485 U.S. at 231-32). "[M]ateriality is generally an issue of mixed fact and law, best left to the fact-finder[.]" *Id.* at 1276.

Here, triable issues of fact preclude summary judgment as to materiality. As an initial matter, Coffman opines that Defendants' misstatements and omissions were material from an economic perspective. PX 58 ¶¶ 29-30. Coffman bases this opinion on: (1) the analyst reports which indicated that investors were attempting to assess what impact, if any, *Blackfish* and related publicity was having on the Company's business throughout the Class Period; (2) the Company's own statements about how important its brand and reputation are to the Company's financial success; (3) the application of basic valuation principles to SeaWorld's business; and (4) his event study analysis that demonstrate a statistically significant decline in the price of SEAS Common Stock upon the correction of the alleged misstatements and/or omissions. *Id.* ¶ 30. As Defendants do not challenge Coffman's materiality opinion, summary judgment on materiality is inappropriate. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th

Cir. 1997) ("As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case.") (internal quotation marks and citation omitted).

Plaintiffs further point to a report that Atchison, Heaney, and Swanson received on July 24, 2013, entitled "Second Quarter 2013 Earnings, Pre-Earnings Call, Research Analyst Feedback," wherein analysts expressed concern over whether *Blackfish* would impact SeaWorld's business. PX 79.[37] Specifically, one analyst saw *Blackfish* as "the biggest uncertainty" and indicated "this will become a fundamental issue for all investors if it starts to impact results[.]" *Id.* at BakerSW0193118. Moreover, on several occasions media and analysts raised the issue of a *Blackfish* impact with SeaWorld management. *See, e.g.*, PX 580, PX 91, PX 96, PX 97, PX 106, PX 107, PX 111, PX 588. Specifically, asked on the March 2014 earnings call whether *Blackfish* was affecting SeaWorld's business, Atchison admitted, "I get asked that a lot." PX 115 at BakerSW0451160-61. Such coverage supports the materiality of the subject. *See In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d at 1021 ("[T]he fact that two analysts took the time to write reports on this issue demonstrates that the information disclosed that day was material.").

Defendants' argument that *Blackfish* impacts were minimal misses the mark. *See* Doc. No. 361 at 35. "[T]he concept of 'materiality' is not limited to a percentage of a company's total profits, but rather requires assessment of qualitative and quantitative factors so that even quantitatively small amounts can still present a materially misleading picture of a company's health." *S.E.C. v. Yuen*, No. CV 03-4376MRP(PLAX), 2006 WL 1390828, at *37 (C.D. Cal. Mar. 16, 2006); *see also Fecht v. Price Co.*, 70 F.3d 1078, 1080-81 (9th Cir. 1995) (rejecting argument that omission was not material "because it is

---

[37] Defendants claim that this report constitutes hearsay. However, the report likely satisfies the business records exception. *See* Fed. R. Evid. 803(6). As such, the Court may consider the report. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006) (noting that when evidence "*may be presented in an admissible form at trial*, a court may still consider that evidence.") (emphasis in original).

the profitability of the Company as a whole, not any particular aspect of the Company's operations, that is significant.").

Accordingly, genuine issues of fact preclude summary judgment on the element of materiality. *See Fecht*, 70 F.3d at 1081 ("Therefore, only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds [could] not differ are these issues appropriate resolved as a matter of law.") (internal quotation marks and citation omitted) (alteration in original).

*e. Scienter*

Defendants argue that Plaintiffs cannot raise a genuine issue of fact as to scienter because there is no evidence that any of the Individual Defendants were in possession of information that contradicted their statements, or that the Individual Defendants were reckless in failing to test whether *Blackfish* was affecting SeaWorld's business. *See* Doc. No. 361 at 26, 30. In opposition, Plaintiffs maintain that Jacobs has acknowledged some of his statements were false when made, Defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete, and Defendants' misrepresentations concealing a *Blackfish* impact purported to rely on data that they knew did not exist. *See* Doc. No. 385 at 20-22.

In order to prevail at trial on a § 10(b) claim, a plaintiff must establish that each defendant made the allegedly false or misleading statements with scienter. *See Kaplan v. Rose*, 49 F.3d 1363, 1378 (9th Cir. 1994), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). "Generally, scienter should *not* be resolved by summary judgment." *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996). The court must deny a defendant's motion for summary judgment on intent "unless all reasonable inferences that could be drawn from the evidence defeat the plaintiff's claims." *Id.* (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir.1980)). A plaintiff opposing summary judgment "must present significant probative evidence" of scienter. *Id.* "Thus, summary judgment on the scienter issue is appropriate *only* where there is no rational basis in the record for

concluding that any of the challenged statements was made with the requisite scienter." *Id.* (quotations and citations omitted).

"To establish scienter, plaintiffs must show that defendants had 'a mental state embracing an intent to deceive, manipulate, or defraud.'" *Id.* (quoting *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1424 (9th Cir. 1994)). Negligence, even if inexcusable, is not sufficient. *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990) (citations and quotations omitted). "Plaintiffs can 'establish scienter by proving either actual knowledge or recklessness.'" *Id.* (quotation omitted). The Ninth Circuit defines recklessness "as a form of intentional or knowing misconduct" and, at a minimum, requires a showing of conscious or "deliberate recklessness."[38] *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 976–77 (9th Cir.1999). "'[T]he proof of scienter in fraud cases is often a matter of inference from circumstantial evidence.'" *In re Software Toolworks, Inc.,* 50 F.3d 615, 627 (9th Cir.1994) (quoting *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 n.30 (1983)).

Plaintiffs must prove scienter as to the Individual Defendants before imputing it to SeaWorld. *See In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1032 (S.D. Cal. 2014); *In re Apple Computer, Inc.*, 127 F. App'x 296, 303 (9th Cir. 2005) (holding that "a corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time he or she makes the statement").

### i. Motive

Defendants claim that the Individual Defendants' stock transactions undermine any inference of intentional misconduct in this case. *See* Doc. No. 361 at 31. For example, Swanson did not trade at all during the Class Period, other than shares withheld by the Company for tax reasons, ████████████████████████

---

[38] The Supreme Court has not yet decided whether recklessness suffices to fulfill the scienter requirement. *See Matrixx Initiatives, Inc.*, 563 U.S. at 48.

███████████████████████████████████████████████████████

████████████████████████████████████████████████████ *See*

*id.* at 32.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Doc. No. 385 at 24.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██ *See id.* at 25.

████████████████████████████████████████████████████████

██████████████████████████ In any event, "[t]he absence of a motive allegation, though relevant, is not dispositive." *Matrixx Initiatives, Inc.*, 563 U.S. at 48; *see also No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("[T]he lack of stock sales by a defendant is not dispositive as to scienter."). Thus, the Court proceeds to Defendants' remaining arguments.

    ii.   <u>Knowledge or Deliberate Recklessness</u>

Defendants further contend that there is "no evidence" that the Individual Defendants had actual knowledge of any material *Blackfish*-related impact. Doc. No. 361 at 26. Moreover, Defendants maintain that there is no evidence they took steps to avoid discovering a *Blackfish*-related impact. *See id.* at 28.

For example, SeaWorld employed numerous internal processes, ██████████ ██████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ *See* Doc. No. 361 at 28. "SeaWorld also followed a comprehensive SEC reporting policy, █████████████████████ ████████████████████████████████████████████████████████



▇▇▇▇▇▇▇ *Id.* SeaWorld also had an internal audit team. *See id.* SeaWorld relied upon these processes for both business and disclosure purposes." *Id.* Thus, Defendants maintain that SeaWorld's executives discharged their duties in good faith and in reliance on the Company's disclosure process. *See id.* at 29.

Plaintiffs, in opposition, assert that Defendants fail to "address any evidence under the recklessness standard[.]" Doc. No. 385 at 20. Moreover, Plaintiffs contend that at the time each of the statements was made, Defendants had knowledge of the falsity of the statements or were deliberately reckless in not knowing. *See id.* at 20-24. The Court proceeds by analyzing what the speaker of each statement knew, or was deliberately reckless in not knowing, at the time each of the challenged statements was made.

Regarding Jacobs' August 2013 statement, Jacobs admitted that his August 2013 (and January 2014) statements were knowingly false when made. *See* PX 10 at 194. Defendants argue that Jacobs did not possess any knowledge of SeaWorld's attendance analyses. However, in light of Jacobs' admission, a jury should decide whether Jacobs had the requisite mental awareness when he made the August 2013 statement.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ PX 134 at
256-59, 251-52. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇ PX 28. ▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇ *Id.* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇ PX 224 at BakerBX0001340. ▇▇▇▇▇▇▇▇▇
▇▇▇▇▇ *Id.* (emphasis added), ▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

██████████████████████████████████ PX 4 at 370-73.

Prior to the March 2014 statements, Atchison was informed that one of the "worst" performance factors was "Blackfish continues to impact perception."  PX 138 at BakerSW0094823, BakerSW0094825. ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ PX 186 at BakerSW0096639.  Attendance through February 23, 2014 at SeaWorld's orca parks, taken together, was down ██████ in the month and ██████ year to date.  PX 591 at BakerSW0143869, BakerSW0143874, BakerSW0143875. ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ *See* PX 4 at 375-77. █████████████████████

████████████████████████████████████████████

████████████████████████████████████ PX 209.  SeaWorld's 50th anniversary celebration was also negatively affected by *Blackfish*, as many corporate partners cancelled partnerships and related events for the celebration.  *See, e.g.*, PX 160, PX 419, PX 422. █████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████ PX 566 at BakerBX000923-24.

Finally, prior to the May 2014 statements, Atchison and Heaney were informed that *Blackfish* was hurting SeaWorld through reports they received in April which stated in part that "negative publicity ha[s] impacted the SeaWorld parks performance (through 4/29)."  PX 144 at BakerSW0038175.  In reviewing this information, Jacobs emailed Jill Kermes in an email entitled "2014 SeaWorld Performance Update Summer Plan," "It worries me that we have stuff like this floating around: 'A combination of shifts in Easter/Spring break schedules, unfavorable weather and negative publicity have impacted

the SeaWorld parks performance (through 4/29)' *Jim has explicitly and repeatedly said that we've seen no impact to our business*." *Id.* at BakerSW0038173 (emphasis added).

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████         PX 215 at BakerSW00330013,

BakerSW00330010.

Defendants assert that "[e]vidence that SeaWorld personnel had concerns about *Blackfish* does not suffice to raise a genuine factual dispute as to whether Defendants acted with scienter in conveying attendance data . . . to the market." Doc. No. 361 at 28. Defendants cite to *In re NVIDIA Corp. Sec. Litig.*, where the defendant disclosed in 2008 that it would be taking a $150-$200 million charge to cover costs arising from product defects that the plaintiffs allege the defendant omitted from public statements in 2007 and 2008. 768 F.3d 1046, 1057 (9th Cir. 2014). The Ninth Circuit held that the plaintiffs did not allege facts sufficient to raise a strong inference of scienter. The court distinguished knowledge of the problem from knowledge of its financial impact. *See id.* at 1056-59. The court further explained that there is no "allegation that [the defendant] issued a false press release, attempting to discount any public discussion regarding its chips' defects." *Id.* at 1065. *In re NVIDIA* was a pure omissions case and there were not any public statements attempting to discount the product defects. Here, however, Defendants were continually asked about *Blackfish* and Defendants repeatedly stated that *Blackfish* was having no impact on the Company's business. Thus, the case at bar is more analogous to *Matrixx Initiatives, Inc.*, where the defendant issued a press release suggesting certain studies had confirmed information when, in fact, no such studies existed. 563 U.S. at 49.

While Defendants contend that the Individual Defendants had no knowledge of an actual material *Blackfish* impact, and that the Individual Defendants discharged their duties in good faith reliance on the Company's disclosure processes, Plaintiffs present

evidence that Defendants knew or should have known that their statements were false or misleading at the time they were made. "Conflicting inferences [of scienter] result in a case for the jury." *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 784 (C.D. Cal. 2004) (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1060 (9th Cir. 2000)).

Therefore, in viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs raise genuine issues of material fact as to whether Defendants made false or misleading statements about *Blackfish*'s impact intentionally or with deliberate recklessness. *See Gebhart v. S.E.C.*, 595 F.3d 1034, 1044 (9th Cir. 2010) (finding scienter where the defendants "conducted no meaningful independent investigation to confirm the truth of their representations."); *see also Howard*, 228 F.3d at 1064-65 (finding recklessness shown where the defendant had "grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts").

A rational jury could similarly conclude that the Individual Defendants' scienter, and that of senior management, confers scienter on SeaWorld. *See In re Apple Computer, Inc.*, 127 F. App'x at 303 (holding that "a corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time he or she makes the statement") (citing *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435-36 (9th Cir. 1995)).

Accordingly, the Court **DENIES** Defendants' motion for summary judgment as to Plaintiffs' 10(b) claim.

## 4. Section 20(a) Claims

Defendants maintain that "[s]ummary judgment should also be granted on the control person claims brought by Plaintiffs against Blackstone under Section 20(a) of the Exchange Act because "there is insufficient evidence for a rational trier of fact to conclude that Blackstone 'exercised actual power or control' over SeaWorld with respect to any statements made after December 17, 2013." Doc. No. 361 at 39. Plaintiffs assert that Defendants concede Blackstone's control through December 17, 2013 and argue that

genuine issues of material fact exist regarding Blackstone's control for the remainder of the Class Period.  *See* Doc. No. 385 at 39.

Defendants further argue that even if Plaintiffs' claims otherwise survive summary judgment, the Individual Defendants cannot be held liable under Rule 10b-5 for the alleged misstatements and omissions that they did not make.  *See* Doc. No. 361 at 39-40. Plaintiffs do not allege, nor do they argue in their brief, that each of the Individual Defendants should be considered the maker of every statement for purposes of Rule 10b-5.  *See* Doc. No. 134-2 (identifying the alleged false and misleading statements and the makers of those statements).  Rather, Plaintiffs allege that the Individual Defendants acted in concert and each was a controlling person of SeaWorld within the meaning of Section 20(a) of the Exchange Act[.]". SAC ¶ 292.  In their opposition brief, Plaintiffs assert that the "Individual Defendants concede their 'control' throughout the Class Period" for purposes of Section 20(a); thus, Defendants' argument that each cannot be held liable under the securities laws for statements made by another is "misguided and incorrect."  Doc. No. 385 at 39; *see id.* at n.48.

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

In order to prevail on a Section 20(a) claim, the plaintiff must prove a primary violation of federal securities law (satisfied here through Plaintiffs' Section 10(b) claim), and that the defendant exercised actual power or control over the primary violator. *Howard*, 228 F.3d at 1065.  "Whether [the defendant] is a controlling person is an

intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan*, 49 F.3d at 1382 (internal quotation marks and citations omitted). "Traditional indicia of control" include "having a prior lending relationship, owning stock in the target company, or having a seat on the board." *No. 84 Employer-Teamster Joint Council Pension Trust Fund*, 320 F.3d at 945.

Here, with respect to the Individual Defendants, Defendants mischaracterize Plaintiffs' claims. Upon a close reading of the SAC, Plaintiffs assert that the Individual Defendants are liable for statements others made because they each acted as a controlling person within the meaning of Section 20(a)—not because all the Individual Defendants were the makers of each alleged misstatement or omission for Rule 10b-5 purposes. Importantly, Defendants do not argue that the Individual Defendants did not exercise control for purposes of Section 20(a). By virtue of their high-level positions, participation in the Company's day-to-day operations, and knowledge of the statements filed with the SEC, a rational jury could find that the Individual Defendants had the power to influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements. *See Todd*, 642 F.3d at 1223 ("[a]ctual authority over the preparation and presentation to the public of financial statements" establishes control); *Howard*, 228 F.3d at 1066 (overturning JMOL on 20(a) claim where the defendant "was authorized to participate in the release of the financial statements and signed off on the statements as correct").

Regarding Blackstone, Defendants explain that while investment funds affiliated with Blackstone and certain co-investors (the "Blackstone-Affiliated Funds") held a majority of SeaWorld's common stock immediately after SeaWorld's initial public offering, the Blackstone-Affiliated Funds subsequently reduced their holdings to 42.8% as of December 17, 2013, and then to 22.6% on April 9, 2014. *See id.* Blackstone also did not hold a majority of seats on SeaWorld's board of directors at any time during the Class Period. *See id.* Plaintiffs assert that Blackstone's ownership of between 42.8% and

22.6% of all SeaWorld shares, and three board seats during the Class Period raise triable issues of fact. *See* Doc. No. 385 at 40.

Defendants are correct that Blackstone did not hold a majority of the shares after December 17, 2013. However, for the remainder of the Class Period, Blackstone held three seats on the board and fluctuated between owning 42.8% and 22.6% of all SeaWorld common stock shares—two factors that traditionally indicate control. *See Shepherd v. S3 Partners, LLC*, No. C-09-1405 FMW, 2011 WL 4831194, at *5 (N.D. Cal. Oct. 12, 2011) (denying summary judgment on Section 20(a) claim based on one third ownership); *In re Allstate Life Ins. Co. Litig.*, No. CV-09-8162-PHX-GMS, 2013 WL 789106, at *4 (D. Ariz. Mar. 1, 2013) (holding that the defendant failed to meet his summary judgment burden of showing there is no material issue of fact that he did not control the company where he owned 9% of the stock and held a seat on the board of directors). As such, a rational jury could find Blackstone exercised control throughout the Class Period.

In viewing the evidence in the light most favorable to Plaintiffs, and because the question of control is intensely fact-driven, genuine issues of material fact preclude summary judgment on Plaintiffs' Section 20(a) claims. Accordingly, the Court **DENIES** Defendants' motion for summary judgment as to Plaintiffs Section 20(a) claims.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**CONCLUSION**

Based on the foregoing, the Court **AFFIRMS** its tentative rulings.  Accordingly, the Court **DENIES** Defendants' motion to exclude the testimony and opinions of Dr. Steven Feinstein [Doc. No. 344]; **DENIES** Defendants' motion to exclude the testimony and opinions of Chad Coffman, CFA [Doc. No. 347]; **GRANTS** Defendants' motion to exclude the testimony and opinions of Dr. James Gibson [Doc. No. 351]; **GRANTS IN PART and DENIES IN PART** Plaintiffs' motion to exclude the testimony and opinions of Dr. Craig Lewis [Doc. No. 355]; **GRANTS** Plaintiffs' motion to exclude the testimony and opinions of Dr. Randolph Bucklin [Doc. No. 358]; and **DENIES** Defendants' motion for summary judgment [Doc. No. 359].

**IT IS SO ORDERED.**

Dated:  November 6, 2019

HON. MICHAEL M. ANELLO
United States District Judge