**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LOU BAKER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SEAWORLD ENTERTAINMENT, INC., *et al.*,<br><br>Defendants. | Case No.:  14-cv-02129-MMA-AGS<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND**<br><br>[Doc. No. 521]<br><br>**GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**<br><br>[Doc. No. 522] |

Lead Plaintiffs Arkansas Public Employees Retirement System ("APERS") and Pensionskassen for Børne-Og Ungdomspædagoger ("PBU") (collectively, "Plaintiffs" or "Class Representatives"), on behalf of themselves and the Court-certified Class, move for final approval of the proposed class action settlement and plan of allocation, and for attorneys' fees and litigation expenses.  *See* Doc. No. 522.  Defendants SeaWorld Entertainment, Inc. ("SeaWorld"), The Blackstone Group L.P. ("Blackstone"), James Atchison, James M. Heaney, and Marc Swanson (collectively, "Defendants") do not oppose Plaintiff's motions.  The Court held a final approval hearing on these matters pursuant to Federal Rule of Civil Procedure 23(e)(2) and took Plaintiffs' motions under submission.  *See* Doc. No. 528.  For the reasons set forth below, the Court **GRANTS**

Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation (Doc. No. 521), and **GRANTS** Plaintiff's Motion for Attorneys' Fees and Litigation Expenses (Doc. No. 522).

### BACKGROUND

Plaintiffs bring this securities fraud class action against Defendants asserting claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated under § 10(b). *See* Doc. No. 123 ("SAC"). Plaintiffs bring this action on behalf of all individuals and entities who purchased or acquired common stock of SeaWorld throughout the Class Period (August 29, 2013 to August 12, 2014).

SeaWorld is a theme park and entertainment company. During the Class Period, SeaWorld owned and operated eleven theme parks in the United States: SeaWorld Orlando, SeaWorld San Diego, SeaWorld San Antonio, Aquatica Orlando, Aquatica San Diego, Discovery Cove, Busch Gardens Tampa, Busch Gardens Williamsburg, Adventure Island, Water Country USA, and Sesame Place. SeaWorld's brand and reputation are among the company's most important assets. SeaWorld has been subjected to criticism related to captivity issues, even prior to the release of the 2013 documentary *Blackfish*.

Mr. Atchison served as SeaWorld's Chief Executive Officer ("CEO"), President, and Director from before the start of the Class Period until January 2015. Mr. Heaney has served as SeaWorld's Chief Financial Officer from before the start of the Class Period to present. Mr. Swanson has served as SeaWorld's Chief Accounting Officer from before the start of the Class Period to present.

Blackstone is a multinational private equity, investment banking, alternative asset management, and financial services corporation based in New York, New York.

This case involves statements and omissions made by Defendants in the wake of the 2013 documentary *Blackfish*. *Blackfish* tells the story of Tilikum, a 12,000-pound bull orca implicated in the deaths of three people, and chronicles the cruelty of killer whale capture methods, the dangers trainers face performing alongside killer whales

during SeaWorld's popular shows, and the physical and psychological strains killer whales experience in captivity. Through interviews with former trainers, spectators, employees of regulatory agencies, and scientists, *Blackfish* makes the case that keeping killer whales in captivity for human entertainment is cruel, dangerous, and immoral.

In 2013 and throughout the Class Period, social media reaction to *Blackfish* remained elevated. Consumers contacted SeaWorld and vowed never to visit its parks because of *Blackfish*. Additionally, *Blackfish* publicity led partners and sponsors to end or table partnerships and promotions with SeaWorld.

Company-wide attendance declined in 2013 and 2014. Specifically, as compared to the prior year, attendance was down 9.5% in 2Q13, 3.6% in 3Q13, and 1.4% in 4Q13. This resulted in a 4.1% decline in overall attendance for 2013. SeaWorld further reported a 14% decline in attendance in 1Q14. SeaWorld's attendance was up 0.3% for 2Q14, but SeaWorld's internal attendance analysis reflected a demand shortfall of 484,000 visitors, largely attributable to SeaWorld Orlando (-265,000 visitors) and SeaWorld San Diego (-271,000 visitors).

Plaintiffs challenge several statements made by SeaWorld executives as false and/or misleading during the Class Period. On August 29, 2013, the *Los Angeles Times* published an article quoting SeaWorld's Vice President of Communications, Fred Jacobs, as stating, "*Blackfish* has had no attendance impact." *Bloomberg* also published an article quoting Jacobs as stating that "[w]e can attribute no attendance impact at all to the movie[.]" Jacobs testified at his deposition that he did not believe either statement was true when he made it.

Beginning in July 2013, SeaWorld received survey results from the TNS omnibus survey (the "Omnibus survey"). The survey inquired about awareness of the movie *Blackfish*, whether respondents had seen, or intended to see the movie, and whether respondents identified SeaWorld as the company the movie was about. SeaWorld's Director of Budgeting and Forecasting, Joshua Powers, testified that he did not believe or was not aware of any "specific assessment of whether publicity related to *Blackfish* had

affected attendance or revenue at the SeaWorld parks" from January 19, 2013 through August 28, 2013.  Further, Powers testified that from August 29, 2013 through November 13, 2013, aside from the Omnibus survey, he was not aware of any analysis SeaWorld performed to specifically address whether *Blackfish* had affected attendance or revenue at SeaWorld's parks.

Plaintiffs further challenge three statements made during 4Q13.  First, SeaWorld's earnings release for 3Q13, published on November 13, 2013, attributed a 3.6% attendance decline in 3Q13 to only "adverse weather" and "planned strategies that increased revenue but reduced low yielding and free attendance."  Second, on November 14, 2013, SeaWorld's Chief Executive Officer, James Atchison, was quoted by the *Wall Street Journal* as stating, "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it. . . .  Ironically, our attendance has improved since the movie came out."  Third, on December 20, 2013, Atchison was quoted by the *Orlando Sentinel* as stating, "As much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business."  From November 14, 2013 through December 20, 2013, Powers testified that beyond the ongoing Omnibus research, he was not aware of any consolidated type of effort to quantify whether publicity related to *Blackfish* had affected attendance or revenue at SeaWorld parks.

On March 13, 2014, SeaWorld issued its earnings release for 4Q13 and fiscal year 2013.  Defendants attributed SeaWorld's attendance decline for 4Q13 and FY13 to factors other than *Blackfish*, including weather and yield management strategies. Additionally, during the earnings call, Atchison made the following statements: (a) "As much as we're asked it, we can see no noticeable impact on our business;" (b) "But our surveys don't reflect any shift in sentiment about intent to visit our parks;" (c) "A matter of fact, the movie in some ways has actually made perhaps more interest in marine mammal parks, and actually even about us;" and (d) "But we have seen no impact on the business."  From December 21, 2013 through March 13, 2014, beyond the Goodwill

Memo that came out in January 2014, which assessed trends and attendance at SeaWorld, Powers testified that he does not believe there was any other specific work done to try and quantify whether publicity related to *Blackfish* had affected the revenue or attendance at SeaWorld parks.

Lastly, in SeaWorld's May 14, 2014 earnings release for 1Q14, SeaWorld attributed its 13% attendance decline for the quarter to weather and the shift in the Easter holiday from 1Q14 to 2Q14.  Powers testified that beyond an interim update to the Goodwill Memo in April 2014, he does not believe the company conducted any specific analysis to quantify whether publicity related to *Blackfish* had affected attendance or revenue at SeaWorld parks from March 14, 2014 through May 14, 2014.

SeaWorld's Director of Research during the Class Period, Kelly Repass, agreed at her deposition that to generate reliable data about why people did not visit SeaWorld parks, the company would have to survey people who actually chose not to visit the park. Repass testified that between the summer of 2013 and August 2014, SeaWorld did not commission or perform any survey, study or other research that asked consumers why they chose not to visit a SeaWorld park.  While SeaWorld did commission a consumer sentiment survey in March 2014, it did not attempt to measure why people had chosen not to visit SeaWorld parks; thus SeaWorld "could not draw a conclusion" on the issue between the summer of 2013 and August 2014.

SeaWorld reported its 2Q14 results in a Form 8-K filed with the SEC on August 13, 2014.  While attendance was up 0.3% versus the prior year, SeaWorld explained that this was "offset by lower attendance at its destination parks due to a combination of factors."  Specifically, attendance in the second quarter was impacted by factors including, "a late start to summer for some schools in the Company's key source markets, new attraction offerings at competitor destination parks, and a delay in the opening of one of the Company's new attractions[.]"  Moreover, "the Company believes attendance in the quarter was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California."  SeaWorld revised its

earnings estimates downward: "For the full year of 2014, the Company now expects full years 2014 revenue and Adjusted EBITDA to be down in the range of 6-7% and 14-16%, respectively, compared to the prior year."  SeaWorld's common stock price dropped by 33%, or $9.25 per share, following the announcement.  Plaintiffs commenced the instant action on September 9, 2014.

On May 19, 2017, Class Representatives filed their motion for class certification ("Class Certification Motion"), seeking the Court's certification of a class of all persons and entities who purchased or otherwise acquired the publicly traded common stock of SeaWorld between August 29, 2013 and August 12, 2014, inclusive, and who were damaged thereby.  Doc. Nos. 187, 188.  On November 29, 2017, granted the Class Certification Motion, certifying the Class, appointing Lead Plaintiffs APERS and PBU as Class Representatives, and appointing Kessler Topaz Meltzer & Check, LLP and Nix Patterson, LLP as Class Counsel.  Doc. No. 259.  Following the Ninth Circuit's denial of Defendants' 23(f) petition, Class Representatives, on October 9, 2018, filed an unopposed motion to approve the form and manner of notice to the Class and to appoint Epiq Class Action & Claims Solutions, Inc. as the Claims Administrator in connection with the dissemination of Class Notice ("Class Notice Motion").  Doc. No. 324.  The Court granted the Class Notice Motion on December 6, 2018.  Doc. No. 336.  The Court found the proposed Class Notice met the requirements of Rule 23 and due process and constituted the best notice practicable under the circumstances.  *Id*.

On April 15, 2019, Defendants filed their motion for summary judgment.  Doc. No. 359.  On November 18, 2019, the Court denied Defendants' motion for summary judgment.  Doc. No. 470.  On February 11, 2020, Class Representatives filed a stipulation and unopposed motion for preliminary approval of proposed settlement and authorization to disseminate notice of the settlement to the Class.  Doc. No. 516.  On February 19, 2020, the Court entered the Preliminary Approval Order, scheduling the final hearing on the proposed settlement and related matters for July 22, 2020 at 10:00 a.m.  Doc. No. 518.

On June 17, 2020, Plaintiffs filed the instant motions for Final Approval of Class Action Settlement and for Attorneys' Fees and Litigation Expenses.  Doc. Nos. 521, 522. Defendants have not opposed or otherwise responded to Plaintiffs' motions, nor have any objections been filed to the proposed settlement.

### OVERVIEW OF THE SETTLEMENT

**1.   Settlement Class**

The Settlement Class is defined as all persons who have purchased or otherwise acquired SeaWorld common stock during the Class Period and held those shares through the alleged August 13, 2014 corrective disclosure.  *See* Doc. No. 521-1 ("Mem.") at 22 (citing Doc. No. 523 ("Jt. Decl."), ¶ 105).

**2.   Settlement Terms**

The proposed settlement (hereinafter "Settlement Agreement") would resolve all claims brought by Class Members against Defendants for alleged false and/or misleading statements made by SeaWorld relating to *Blackfish*.  Pursuant to the Settlement Agreement, SeaWorld must pay a settlement amount of $65,000,000 into an escrow account, which thereafter will be used to pay any taxes, notice and administration costs, litigation expenses, attorneys' fees, and any other costs and fees awarded by the Court. *See* Doc. No. 516-3, Settlement Agreement, ¶¶ 9-10.  Thereafter, the remaining balance, or net settlement fund, shall be distributed to authorized claimants pursuant to the Plan of Allocation.  *See id.*, ¶¶ 19-31.

Specifically, the claims administrator, Epiq Class Action & Claims Solutions, Inc., "shall administer the Settlement, including but not limited to the process of receiving, reviewing, and approving or denying Claims, under Class Counsel's supervision and subject to the jurisdiction of the Court."  *Id.*, ¶ 19.  In accordance with the Preliminary Approval Order and March 16 Notice Order, to date, the claims administrator has, through reasonable effort, "disseminated 16,597 Postcard Notices and 4,244 Notices to prospective Class Members and Nominees."  Mem. at 24 (citing Doc. No. 523-3 ("Barrero Decl."), ¶ 12.  The claims administrator "will determine each Authorized

Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (i.e., the sum of the Claimant's Recognized Loss Amounts as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Class Representatives' losses will be calculated in the same manner."  Jt. Decl., ¶ 106.

Once the claims administrator has processed all submitted claims and provided claimants with an opportunity to cure any deficiencies in their claims or challenge the claims administrator's claim rejection, Class Counsel will file a motion for approval of the claims administrator's "determinations with respect to all submitted Claims and authorization to distribute the Net Settlement Fund to Authorized Claimants."  *Id*., ¶ 107. "[I]f nine months after the initial distribution, there is a balance remaining in the Net Settlement Fund . . ., and if it is cost-effective to do so, Class Counsel will conduct a re-distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement . . . to Authorized Claimants who have cashed their initial distribution checks and would receive at least $10.00 from such re-distribution."  *Id*.  "Redistributions will be repeated until it is determined that re-distribution of the funds remaining in the Net Settlement Fund would no longer be cost effective. Thereafter, any remaining balance will be contributed to non-sectarian, not-for-profit organization(s), to be recommended by Class Counsel and approved by the Court."  *Id*.

## MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

### 1.   Legal Standard

"The court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."  *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 625 (9th Cir. 1982).

A court considers several factors in determining whether a Settlement Agreement is "fair, reasonable, and adequate" under Rule 23(e).  The Rule provides that a court should consider whether: (1) the class representatives and class counsel have adequately represented the class; (2) the proposal was negotiated at arms-length; (3) the relief provided for the case is adequate, taking into consideration the risks associated with continued litigation and the effectiveness of proposed relief to the class; and (4) the proposal treats class members equitably relative to each other.  Fed. R. Civ. P. 23(e)(2). The Ninth Circuit has identified additional factors, including: (1) the strength of the case; (2) the risk, expense, complexity, and likely duration of further litigation and the risk of maintaining class action status throughout the trial; (3) the stage of the proceedings (investigation, discovery and research completed); (4) the settlement amount; (5) whether the class has been fairly and adequately represented during settlement negotiations; and (6) the reaction of the class to the Settlement Agreement.  *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003).  The Court need only consider some of these factors—namely, those designed to protect absentees.  *See Molski v. Gleich*, 318 F.3d 937, 954 (9th Cir. 2003), *overruled in part on other grounds* by *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010).

Judicial policy favors settlement in class actions and other complex litigation where substantial resources can be conserved by avoiding the time, cost, and rigors of formal litigation.  *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1387 (D. Ariz. 1989) ("*WPPSS*").

**2.    Analysis**

**a.  Adequate Representation**

First, Plaintiffs assert that the first Rule 23(e)(2) factor—whether Class Representatives and Class Counsel "have adequately represented the class"—favors

1  approval of the Settlement.[1]  Mem. at 7.  Plaintiffs are correct.

2        As Plaintiffs point out, the Court previously found Class Representatives and Class

3  Counsel had "shown that they will fairly and adequately protect the interests of the class,

4  thereby satisfying the adequacy requirement of Rules 23(a)(4) and (g)."  Mem. at 7

5  (quoting Doc. No. 259 at 15-17, internal quotations omitted).  Plaintiffs also correctly

6  note that following the Court's initial finding, "Class Representatives and Class Counsel

7  further demonstrated their adequacy by prosecuting this Action to the brink of trial."  *Id*.

8  Moreover, the Class Representatives are sophisticated institutional investors that

9  Congress has deemed appropriate to lead securities class actions and have devoted much

10 time and effort to the progress of this litigation.  *See* Mem. at 7 (citing Jt. Decl., ¶ 132;

11 *id.*, Ex. 1, ¶¶ 5-7; *id.*, Ex. 2, ¶¶ 1-5).  And as the Court previously found, Class

12 Representatives have no interests that conflict with the rest of the Class.  *See* Doc. No.

13 259 at 11-17.  The Court also finds that Class Counsel have adequately represented the

14 Class, as Class Counsel have invested great efforts into the litigation for more than five

15 years, resulting in the Settlement Agreement capturing a $65,000,000 recovery for the

16 Class.  *See* Mem. at 8 (citing Jt. Decl., ¶¶ 19-80, 118-21).  Accordingly, this factor favors

17 approval of the Settlement Agreement.  *See Adoma v. Univ. of Phoenix, Inc.*, 913 F.

18 Supp. 2d 964, 977 (E.D. Cal. 2012) ("Great weight is accorded to the recommendation of

19 counsel, who are most closely acquainted with the facts of the underlying litigation.")

20 (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D.

21 Cal. 2004)).

22        **b.  Arm's Length Negotiation**

23        Next, Plaintiffs submit that the Settlement Agreement "was achieved through

24 protracted negotiations, including multiple mediation sessions facilitated by neutral and

25

26

27 [1] "This analysis is 'redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively.'"
   *Hudson v. Libre Tech. Inc.*, No. 3:18-CV-1371, 2020 WL 2467060, at *5 (S.D. Cal. May 13, 2020)
28 (quoting *Newberg on Class Actions* § 13:48 (5th ed.)).

experienced mediators."  Mem. at 8-9.  "A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair."  *DIRECTV*, 221 F.R.D. at 528.  The Court finds that the Settlement Agreement followed the completion of discovery and genuine arms-length negotiations, thus supporting the Court's approval of the Settlement Agreement.  *See* Rule 23(e)(2)(B); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution"); *see also Roberti v. OSI Sys., Inc.*, No. 1309174, 2015 WL 8329916, at *3 (C.D. Cal. Dec. 8, 2015) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is noncollusive.") (quoting *Satchell v. Fed. Express Corp.*, No. 32878, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007).  As Plaintiffs discuss in detail, the Settlement Agreement was reached through intensive, good-faith bargaining in several mediation sessions, first with Magistrate Judge Schopler, then with Jed. D. Melnick, Esq. of JAMS and The Weinstein Melnick Team.  *See* Mem. at 8-10 (citing Jt. Decl., ¶¶ 73-77).  These negotiations support approval of the Settlement Agreement.  *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1122 (9th Cir. 2020) (the fact that the settlement was "the result of four in-person, arms-length mediations before two different mediators" supported final approval) (citations omitted).  Accordingly, this factor also weighs in favor of the Court's final approval of the Settlement Agreement.

### c.  Adequate Relief

The remaining factors overlap and are generally focused on whether the Settlement Agreement provides the Class with adequate relief, considering factors such as the costs, risks, and delay of litigation, as well as the stage of the proceedings, Settlement Agreement amount, and class reaction to the Settlement Agreement.  To determine whether the Settlement Agreement is fair, reasonable, and adequate, the Court must balance the continuing risks of litigation (including the strengths and weaknesses of Plaintiffs' case), with the benefits afforded to members of the Class, and the immediacy and certainty of a substantial recovery.  *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000).  In other words:

> The Court shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, "It has been held proper to take the bird in hand instead of a prospective flock in the bush."

*DIRECTV*, 221 F.R.D. at 526 (citations omitted).

Plaintiffs claim that "the Settlement undoubtedly provides adequate relief for the Class, especially when taking into account the costs, risks, and delay of further litigation, and the other relevant factors." Mem. at 10.

i.   *The Amount Offered in Settlement*

Plaintiffs correctly identify the $65,000,000 settlement amount as "significant by any measure" and note that it "represents a meaningful percentage of the Class's maximum potentially recoverable aggregate damages." Mem. at 11. It "is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Rodriguez v. Bumble Bee Foods, LLC*, No. 17-CV-2447, 2018 WL 1920256, at *4 (S.D. Cal. Apr. 24, 2018). That is because a settlement "embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation." *Officers of Justice v. Civil Service Com'n of City and Cty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982). Here, the Settlement Agreement "provides an immediate and tangible cash benefit to the Class and eliminates the substantial risk that the Class could recover less, or nothing, if the Action continued." Mem. at 11 (citing Jt. Decl., ¶¶ 7-10, 81-96, 113-17).

Moreover, the settlement amount represents a significant recovery in comparison to the percentage of aggregate damages in similar cases and "to the typical recovery in similar court-approved settlements by a considerable margin." Mem. at 11 (citing Mem. at n. 2). First, Plaintiffs point to "Cornerstone Research report[ing] that in 2019, the

median securities class action settlement amount was 4.8% of estimated damages for cases with estimated damages between $250 - $499 million, and over the prior decade (2010 through 2018), the median settlement amount for such cases was 3.9% of estimated damages." *Id*.  Here, the Settlement Agreement "represents approximately 14% of the maximum amount [of $465 million] the Class potentially could have recovered upon total victory at trial and any appeal." *Id*. (citing Jt. Decl., ¶¶ 11, 112).  Second, Plaintiffs cite several cases approving settlements representing a lesser percentage of the maximum potential damages than the approximate 14% of the maximum recoverable amount in this case.  *Id*. at n 9 (collecting cases).  For example, in *In re Extreme Networks, Inc. Sec. Litig.*, the court approved a gross settlement amount representing a recovery of between 5% and 9.5% of estimated maximum damages.  No. 15-CV-04883, 2019 WL 3290770, at *9 (N.D. Cal. July 22, 2019).  In sum, this factor – the amount offered in settlement – favors approval of the Settlement Agreement.[2]

### ii.   *The Risks of Continued Litigation*

"To determine whether the proposed settlement is fair, reasonable, and adequate, the Court must balance the continuing risks of litigation (including the strengths and weaknesses of the Plaintiffs' case), with the benefits afforded to members of the Class, and the immediacy and certainty of a substantial recovery." *Velazquez v. Int'l Marine & Indus. Applicators, LLC,* No. 16-CV-494, 2018 WL 828199, at *4 (S.D. Cal. Feb. 9, 2018); Rule 23(e)(2)(C)(i); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004).

Plaintiffs and Class Counsel acknowledge the "major challenges and considerable risks" associated with trying the case rather than settling.  *See* Mem. at 12.  That is, they

---

[2] Additionally, Plaintiffs represent that "the current pandemic virtually eliminated the chance of obtaining a larger settlement or satisfying a larger verdict down the road."  Mem. at 12.  This is because, due to the pandemic's effects on its business, SeaWorld "suffered a massive loss of revenue shortly after the Settlement funded."  *Id*.  This representation further supports that the proposed settlement represents adequate relief.

came to understand such risks after engaging jury consultants and conducting a two-day mock jury trial and focus group in December 2019. *Id*. at 12-13. First, Plaintiffs "faced challenges in establishing liability," including the risk of failing to convince a jury with "largely circumstantial evidence that Defendants knew or should have known of the *Blackfish* impact . . .." *Id*. at 13. Second, because Plaintiffs' ability to prove loss causation and damages would "come down to an unpredictable battle of the experts," the jury could have decided in Defendants' favor, resulting in Plaintiffs' claims being "severely reduced, or eliminated." *Id*. at 14. Lastly, Plaintiffs faced other jury and trial risks, including that "a single juror with entrenched sympathies toward SeaWorld or antipathies toward other pertinent issues, like class action lawsuits, could have singlehandedly defeated the Class." Mem. at 15 (citing Jt. Decl., ¶¶ 95-96). Considering these risks, this factor favors final approval of the Settlement Agreement.

> iii.   *The Complexity, Expense, and Duration of Continued Litigation*

In determining whether to approve a Settlement Agreement, the Court should also consider the "expense, complexity and likely duration of further litigation" or "delay of trial and appeal." Rule 23(e)(2)(C)(i). "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015).

The Court finds that these factors favor approval of the Settlement Agreement. First, as Plaintiffs note, "[c]ourts consistently acknowledge that securities fraud class actions are "notably complex, lengthy, and expensive cases to litigate[.]" Mem. at 16, n. 12 (citing *In re Par Pharm. Sec. Litig.*, No. 06-3226, 2013 WL 3930091, at *4 (D.N.J. July 29, 2013) (citing examples)). Further, "[t]he expense involved with litigating the Action for five-plus years was significant." *Id*. at 16 (citing Jt. Decl., ¶¶ 125-30, detailing litigation expenses in the amount of $2,104,370.19). Surely proceeding to trial would substantially increase the parties' expenses. Similarly, Plaintiffs estimate that trial would last approximately one month. *See* Doc. No. 512 at 7-8. If they would have succeeded,

1  Plaintiffs would have likely "faced vigorous post-trial motion practice, potential

2  individual trials for Class Members whom Defendants challenged in the claims process,

3  and likely appeals to the Ninth Circuit—delaying any recovery for years with the

4  possibility of eliminating it entirely."  Mem. at 16-17 (citing Jt. Decl., ¶¶ 53-54).

5  Accordingly, these factors weigh in favor of approval of the Settlement Agreement.

6              iv.    *Class Reaction to the Settlement Agreement*

7         The Ninth Circuit has held that the number of class members who object to a

8  Settlement Agreement is a factor to be considered.  *Mandujano v. Basic Vegetable Prods.*

9  *Inc.*, 541 F.2d 832, 837 (9th Cir. 1976).  The absence of many objectors supports the

10  fairness, reasonableness, and adequacy of the settlement.  *See In re Austrian & German*

11  *Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 175 (S.D.N.Y. 2000) ("If only a small number

12  of objections are received, that fact can be viewed as indicative of the adequacy of the

13  settlement.") (citations omitted); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal.

14  1979) (finding "persuasive" the fact that 84% of the class has filed no opposition).

15         Here, to date, no objection to the Settlement Agreement has been filed.  *See* Jt.

16  Decl., ¶¶ 12, 101.  Additionally, Class Representatives support the Settlement

17  Agreement.  Mem. at 19 (citing Doc. No. 523-1 ("APERS Decl."), ¶ 8; Doc. No. 523-2

18  ("PBU Decl."), ¶ 8).  Therefore, this factor favors approval of the Settlement Agreement.

19  **3.    Conclusion**

20         Because the factors outlined above favor approving the Settlement Agreement, the

21  Court **GRANTS** the motion and finds that the settlement is "fair, reasonable, and

22  adequate" pursuant to Rule 23(e).

23  **MOTION FOR AWARD OF ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE**

24  **AWARD OF COSTS**

25         Plaintiffs seek attorneys' fees, litigation costs, and a class representative incentive

26  award totaling $16,474,939.20.  *See* Doc. No. 522-1 at 22.  Specifically, Plaintiffs seek

27  attorneys' fees in the amount of $14,300,000, litigations costs in the amount of

28  $2,104,370.19, and a $70,569 award of costs for Class Representatives (*i.e.*, $10,569 to

APERS and $60,000 to PBU).  *Id.*  Defendants do not oppose Plaintiffs' motion for attorneys' fees, costs, and an award for Class Representatives' costs.

## 1.  **Attorneys' Fees**

With respect to attorneys' fees, Class Counsel seek approval of attorneys' fees under a percentage-of-recovery method of calculation.  *See* Doc. No. 522-1 ("Fees Mot.") at 6-8.  Class Counsel further argue that a cross-check to the lodestar method of calculation demonstrates that the fee request is reasonable.  *Id*. at 8-11.

### a.  **Legal Standard**

Rule 23(h) of the Federal Rules of Civil Procedure provides that, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  The reasonableness of any fee award must be considered against the backdrop of the "American Rule," which provides that courts generally are without discretion to award attorneys' fees to a prevailing plaintiff unless (1) fee-shifting is expressly authorized by the governing statute; (2) the opponents acted in bad faith or willfully violated a court order; or (3) "the successful litigants have created a common fund for recovery or extended a substantial benefit to a class."  *Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 275 (1975) (Brennan, J., dissenting); *accord Zambrano v. City of Tustin*, 885 F.2d 1473, 1481 & n. 25 (9th Cir. 1989).

Where a settlement produces a common fund, courts in this Circuit have discretion to employ either the percentage-of-recovery method or the lodestar method in awarding attorneys' fees.  *See WPPSS*, 19 F.3d at 1296; *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).  Because the benefit to the class is easily quantified in common-fund settlements, the Ninth Circuit has allowed district courts within the Circuit to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar.  *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011).  Applying this calculation method, courts typically calculate 25% of the fund as the "benchmark" for a reasonable fee award,

1    providing adequate explanation in the record of any "special circumstances" justifying a

2    departure. *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th

3    Cir. 1990); *accord Powers v. Eichen*, 229 F.3d 1249, 1256-57 (9th Cir. 2000); *Paul,*

4    *Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  Courts have

5    found that a lodestar analysis is not necessary when the requested fee is within the

6    accepted benchmark.  *See, e.g., Craft v. County of San Bernadino*, No. 05-CV-359, 2008

7    U.S. Dist. LEXIS 27526, at *24 (C.D. Cal. April 1, 2008) ("A lodestar crosscheck is not

8    required in this circuit.").  Under the percentage-of-recovery method, "the court simply

9    awards the attorneys a percentage of the fund sufficient to provide class counsel with a

10   reasonable fee."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).

11          Alternatively, the lodestar figure is calculated by multiplying the number of hours

12   the prevailing party reasonably expended on the litigation (as supported by adequate

13   documentation) by a reasonable hourly rate for the region and for the experience of the

14   lawyer.  *See Staton*, 327 F.3d at 965.  Though the lodestar figure is "presumptively

15   reasonable," *Cunningham v. Cnty. of Los Angeles*, 879 F.2d 481, 488 (9th Cir.1988), the

16   court may adjust it upward or downward by an appropriate positive or negative multiplier

17   reflecting a host of "reasonableness" factors, "including the quality of representation, the

18   benefit obtained for the class, the complexity and novelty of the issues presented, and the

19   risk of nonpayment."  *Hanlon*, 150 F.3d at 1029 (citing *Kerr v. Screen Extras Guild, Inc.*,

20   526 F.2d 67, 70 (9th Cir. 1975)).  Foremost among these considerations, however, is the

21   benefit obtained for the class.  *See Hensley v. Eckerhart*, 461 U.S. 424, 434-36 (1983);

22   *McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009) (ultimate

23   reasonableness of the fee "is determined primarily by reference to the level of success

24   achieved by the plaintiff").

25          Though courts have discretion to choose which calculation method they use, their

26   discretion must be exercised to achieve a reasonable result.  *See In re Coordinated*

27   *Pretrial Proceedings*, 109 F.3d 602, 607 (9th Cir. 1997) (citing *WPPSS*, 19 F.3d at 1294-

28   95, n. 2).

### b. Analysis

Plaintiffs contend that a fee of 22% (or $14,300,000) of the settlement fund is reasonable under either the percentage-of-recovery method or lodestar method. *See* Fees Mot. at 7-8. The Court is inclined to agree, given that the fee of 22% of the settlement fund is below the benchmark of 25% for a fee award in common fund cases. Moreover, Plaintiffs come forward with persuasive authority resulting in fee rewards derived from comparable fee percentages in similar common fund cases. *See* Fees Mot. at 8 (collecting cases). Regardless of whether the Court uses the percentage approach or the lodestar method, the ultimate inquiry is whether the result is reasonable. *Powers*, 229 F.3d at 1258. As discussed below, the reasonableness of the fee percentage requested is supported by Ninth Circuit case law and a lodestar cross-check.

### i. *Factors Demonstrating Reasonableness*

The Ninth Circuit has identified a number of factors that may be relevant in determining if the award is reasonable: (1) the results achieved; (2) the risks of litigation; (3) the skill required and the quality of work; (4) the burdens carried by class counsel; and (5) the awards made in similar cases. *See Vizcaino*, 290 F.3d at 1048-50.

First, the Court considers the results achieved for the Class Members. *See In re Bluetooth*, 654 F.3d at 942 ("Foremost among these considerations, however, is the benefit obtained for the class."). Here, the Settlement Agreement amount is $65,000,000, 14% of the maximum amount the Class could have recovered. This percentage is higher than "the typical recovery in similar court-approved settlements by considerable margin." Mem. at 11 & n. 9 (citing n. 2 and collecting cases). This amount was obtained after five years of litigation, including vigorous disputes over the admissibility of expert testimony and the proprietary of summary disposition of the action. *See* Mem. at 1. Further, no objections to the settlement have been made. Jt. Decl., ¶¶ 12, 101. Additionally, Plaintiffs assert the Settlement Agreement "delivers a clear benefit and excellent result for the Class . . .." Mem. at 1. This factor favors the reasonableness of the requested fee award.

1    Second, the Court considers the risks of the litigation. *Vizcaino*, 290 F.3d at 1048-

2   49.  As discussed above, Plaintiffs and Class Counsel acknowledge the "major challenges

3   and considerable risks" associated with proceeding to trial. *See* Mem. at 12-15; *see also*

4   Fees Mot. at 13-15.  Moreover, Class Counsel faced these risks in the course of

5   representing the Class on a contingent-fee basis, meaning Class Counsel expended a great

6   amount of resources with no guarantee of recoupment. *See* Doc. No. 523 at 48-49.

7   Accordingly, the second factor favors the reasonableness of the requested fees.

8    The third and fourth factors ask the Court to consider the skill required, the quality

9   of work, and the burdens carried by class counsel. *See Vizcaino*, 290 F.3d at 1049-50.

10  Plaintiffs assert that "experience and skill [of Class Counsel] was critical to the

11  prosecution of this Action for more than five years to a successful resolution."  Fees Mot.

12  at 15-16.  Plaintiffs emphasize that even though Defendants prevailed entirely on their

13  first motion to dismiss, "Class Counsel amended their claims and defeated Defendants'

14  second motion to dismiss . . ., obtain[ed] certification of the Class, defeat[ed] Defendants'

15  motion for summary judgment in its entirety, and secure[d] a favorable recovery for the

16  Class." *Id*. at 15-16.  It is also noteworthy that Class Counsel faced a rigorous defense

17  mounted by "Simpson Thacher & Bartlett LLP and Katten Muchin Rosenman LLP, both

18  nationally prominent defense firms that spared no effort or cost in vigorously defending

19  their clients." *Id*. at 16 (citing Jt. Decl., ¶ 123).  As such, these factors weigh in favor of

20  finding the requested fees are reasonable.

21   Finally, the Court considers awards made in similar cases. *See Vizcaino*, 290 F.3d

22  at 1048-50.  The 22% award requested in this case is commensurate with percentage-of-

23  the-fund awards made in securities class actions and other complex litigation in this

24  Circuit and this Court. *See, e.g., HCL Partners Ltd. P'ship v. Leap Wireless Int'l, Inc.*,

25  No. 07-CV-2245 MMA, 2010 WL 4156342, at *4 (S.D. Cal. Oct. 15, 2010) ("*HCL*

26  *Partners*") (awarding 25% of $13.75 million settlement fund); *In re Apollo Grp. Inc. Sec.*

27  *Litig.,* No. 04-2147, 2012 WL 1378677, at *7 (D. Ariz. Apr. 20, 2012) (awarding 33.3%

28  of $145 million settlement fund); *In re Mercury Interactive Corp. Sec. Litig.*, No. 05-CV-

03395, 2011 WL 826797, at *3 (N.D. Cal. Mar. 3, 2011) (awarding 22% of $117.5 million settlement fund); *Vizcaino*, 290 F.3d at 1051 (affirming award of 28% of $97 million settlement fund); *In re Amgen Inc. Sec. Litig.*, No. 07-CV-2536, 2016 WL 10571773, at *9 (C.D. Cal. Oct. 25, 2016) ("*Amgen*") (awarding 25% of $95 million settlement fund); *In re Verisign, Inc. Sec. Litig.*, No. 02-CV-2270, Doc. No. 528 (N.D. Cal. Apr. 24, 2007) (awarding 25% of $78 million settlement fund); *In re Hewlett-Packard Co. Sec. Litig.*, No. 11-CV-1404, Doc. No. 167 (C.D. Cal. Sept. 15, 2014) (awarding 25% of $57 million settlement fund); *In re: SanDisk LLC Secs. Litig.*, No. 15-CV-01455, Doc. No. 284 (N.D. Cal. Oct. 23, 2019) (awarding 25% of $50 million settlement fund); *In re Questcor Secs. Litig.*, No. 8:12-CV-01623, Doc. No. 255 (C.D. Cal. Sept. 21, 2015) (awarding 22% of $38 million settlement fund); *Schulein, et al. v. Petroleum Development Corp., et al.*, No. 11-CV-01891, Doc. No. 265 (C.D. Cal. Mar. 16, 2015) (awarding 30% of $37.5 million settlement fund); *Franke v. Bridgeport Education, Inc., et al.*, No. 12-CV-01737, Doc. No. 107 (S.D. Cal. April 27, 2016) (awarding 25% of $15.5 million settlement fund). Accordingly, the reasonableness factors support Plaintiffs' request for a 22% fee award from the settlement fund.

      ii.   *Lodestar Cross-Check*

District courts often conduct a lodestar cross-check to ensure that the percentage-based fee is reasonable. *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 546 (9th Cir. 2016); *Crawford v. Astrue*, 586 F.3d 1142, 1151 (9th Cir. 2009). The lodestar method multiplies the number of hours reasonably expended by a reasonable hourly rate. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013). Further, "[t]he lodestar 'cross-check' need not be as exhaustive as a pure lodestar calculation" because it only "serves as a point of comparison by which to assess the reasonableness of a percentage award." *Fernandez v. Victoria Secret Stores, LLC*, No. 06-CV-04149, 2008 WL 8150856, at *14 (C.D. Cal. July 21, 2008). Accordingly, "the lodestar can be approximate and still serve its purpose." *Id.*

A cross-check to the lodestar calculation of Plaintiffs' attorneys' fees corroborates

that the proposed fee of 22% of the settlement fund does not confer a windfall on Class Counsel.  "Plaintiffs' Counsel's lodestar, derived by multiplying the hours spent on the Action by each attorney and professional support staff employee by their hourly rates, is $23,765,584.25."  Fees Mot. at 9.  Thus, Class Counsel's request for a percentage-based fee award amounting to $14,300,000 is $9,465,584.25 less than the calculated lodestar amount – or about 60% of the lodestar amount.  Upon reviewing the underlying hourly rates of the Plaintiffs' attorneys, however, the Court observed that several exceed the hourly rates of those previously found reasonable in this legal community.  For example, the hourly rates for several partners, associates, and paralegals at Kessler Topaz Meltzer & Check, LLP exceed the hourly rates of partners in this legal community.  *Compare* Doc. No. 523-4 at 5 *with Dilts v. Penske Logistics, LLC*, No. 08-CV-318, 2017 WL 2620664, at *5 (S.D. Cal. June 16, 2017) (finding reasonable hourly rates of $550 to $750 for class counsel and $170 to $200 for paralegals); *Carr v. Tadin, Inc.*, 51 F. Supp. 3d 970, 978 (S.D. Cal. 2014) (finding reasonable hourly rates of $650 for principal, $335 to $375 for associates, and $150 for paralegals); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 644 (S.D. Cal. 2011) (finding hourly rates of $795 for experienced partner and $100 for paralegal reasonable and collecting cases).  Nevertheless, even after discounting the hourly rates of Plaintiffs' attorneys and legal support that exceed those charged in this legal community, the Court finds the adjusted lodestar amount to be higher than the requested fee based on the percentage-of-recovery method.  As such, this favors approval of the requested attorneys' fees.

### c. Conclusion

Accordingly, the Court finds attorneys' fees in the amount of 22% of the settlement fund – or $14,300,000 – to be reasonable and **APPROVES** attorneys' fees in that amount.

## 2.   Litigation Expenses

Plaintiffs' Counsel also seek reimbursement for costs in the amount of $2,104,370.19 for expenses Plaintiffs' Counsel reasonably incurred in initiating,

prosecuting, and resolving this case. *See* Fees Mot. at 19. Federal Rule of Civil
Procedure 23(h) provides that, "[i]n a certified class action, the court may award
reasonable attorneys' fees and nontaxable costs that are authorized by law or by the
parties' agreement." Fed. R. Civ. P. 23(h). Class counsel are entitled to reimbursement
of the out-of-pocket costs they reasonably incurred investigating and prosecuting this
case. *See HCL Partners*, 2010 WL 4156342, at *2 ("Expenses are compensable in a
common fund case where the particular costs are of the type that 'would normally be
charged to a fee paying client.'") (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir.
1994)); *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996)
(citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391-92 (1970)).

Here, Class Counsel's expenses include the costs of experts and consultants,
jury/trial consultants, travel, an outside vendor to host a document database, and similar
expenses that facilitated the prosecution of this action. *See* Fees Mot. at 19-21. The
largest components of the litigation costs are those associated with experts and
consultants, which assisted Plaintiffs in defeating a motion for summary judgment and
achieving a favorable settlement, as well as travel-related costs, such as those incurred in
connection with hearings, status conferences, depositions, and mediations. *See id*. at 19-
21. Further, "to date, no objections to the maximum expense request set forth in the
notices [to Class Members] have been filed." *Id*. (citing Jt. Decl., ¶ 109).

Accordingly, the Court **APPROVES** Class Counsel's litigation costs in the amount
of $2,104,370.19.

### 3.   Class Representatives' Costs

The PSLRA provides that an "award of reasonable costs and expenses (including
lost wages) directly relating to the representation of the class" may be made to "any
representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Class
Representatives APERS and PBU seek awards under this statute in amounts of
$10,569.00 and $60,000.00, respectively. *See* APERS Decl., ¶ 14; PBU Decl., ¶ 14.

Plaintiffs assert that "[t]hese requested awards are purely for the time and effort

Class Representatives devoted to representing the Class in this Action." Fees Mot. at 21. Plaintiffs provide sufficient support demonstrating their commitment and cooperation in prosecuting this class action. "Class Representatives communicated regularly with counsel regarding strategy and developments in the Action, reviewed important pleadings and briefs filed in the Action, assisted Class Counsel in responding to voluminous discovery requests, and prepared for, traveled to, and testified at, depositions in connection with class certification." Fees Mot. at 21 (citing APERS Decl., ¶¶ 5-7; PBU Decl., ¶¶ 5-7). Class Representatives also "consulted with Class Counsel during the course of the Parties' settlement negotiations, including the Parties' formal mediations with Mr. Melnick." *Id.*

Moreover, Plaintiffs cite persuasive authority supporting approval of the requested awards "to compensate representative plaintiffs for the time and effort they spent on behalf of a class." Fees Mot. at 22 (citing *Amgen*, 2016 WL 10571773, at *10 (awarding institutional class representative $30,983.99 in expenses related to its participation in this litigation, including reimbursement of time for General Counsel, Office of Treasury; Solicitor General, and Assistant Attorney)); *In re Bank of Am. Corp. Sec. Litig.*, 772 F.3d 125, 133 (2d Cir. 2014) (affirming award of over $450,000 to representative plaintiffs for time spent by their employees on the action); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2019 WL 6043440, at *3 (S.D. Tex. Feb. 13, 2019) (awarding aggregate of over $56,000 to four institutional plaintiffs); *In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675, at *19 (E.D.N.Y. Sept. 18, 2007) (granting PSLRA awards where, as here, "the tasks undertaken by employees of Lead Plaintiffs reduced the amount of time those employees would have spent on other work and these tasks and rates appear reasonable to the furtherance of the litigation").

In sum, the Court finds that the Class Representatives have supported their requests for awards under the PSLRA and accordingly **APPROVES** $10,569.00 and $60,000.00 awards for APERS and PBU, respectively.

///

### CONCLUSION

Based on the foregoing, the Court **GRANTS** Plaintiff's Motion for Final Approval of Class Action Settlement (Doc. No. 521), and **GRANTS** Plaintiff's Motion for Attorneys' Fees and Litigation Expenses (Doc. No. 522).  The Court finds the Settlement Agreement of this class action appropriate for final approval pursuant to Federal Rule of Civil Procedure 23(e).  The Court finds that the Settlement Agreement appears to be the product of serious, informed, arms-length negotiations, that the settlement was entered into in good faith, and that Plaintiffs have satisfied the standards for final approval of a class action settlement under federal law.  Further, the Court finds attorneys' fees in the amount of $14,300,000, costs in the amount of $2,104,370.19, and an award of costs to Class Representatives in the amount of $70,569.00 (*i.e.*, $10,569.00 to APERS and $60,000.00 to PBU) to be reasonable.  The Court will enter a separate judgment and order of dismissal in accordance herewith.  *See* Fed. R. Civ. P. 58(a).

**IT IS SO ORDERED**.

DATE: July 24, 2020

_____
HON. MICHAEL M. ANELLO
United States District Judge